Todd Alexander-Cloud Abshire
June 13, 2017

1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF LOUISIANA
 2

    TODD ALEXANDER-CLOUD          CIVIL ACTION NO.
 3  ABSHIRE,                      16-669-BAJ-RLB

 4  VERSUS
                                  JUDGE JACKSON
 5  LOUISIANA DEPARTMENT OF
    WILDLIFE AND FISHERIES,       MAGISTRATE JUDGE
 6          DEFENDANT             BOURGEOIS

 7                      AND

 8  TODD ALEXANDER-CLOUD          CIVIL ACTION NO.
    ABSHIRE,                      16-852-BAJ-RLB
 9
    VERSUS
10
    LOUISIANA DEPARTMENT OF
11  WILDLIFE AND FISHERIES,
            DEFENDANT
12
13  * * * * * * * * * * * * * * * * * * * * * *

14         TRANSCRIPT OF THE DEPOSITION OF:

15          TODD ALEXANDER-CLOUD ABSHIRE

16  TAKEN ON BEHALF OF THE DEFENDANT, REPORTED IN THE

17  ABOVE ENTITLED AND NUMBERED CAUSE BY KARLA H.

18  MAYERS, CERTIFIED COURT REPORTER FOR THE STATE OF

19  LOUISIANA.

20  * * * * * * * * * * * * * * * * * * * * * *

21         REPORTED AT:

22             SMITH LAW FIRM

23             830 NORTH STREET

24             BATON ROUGE, LA  70802

25  COMMENCING AT 9:28 A.M. ON JUNE 13, 2017.
```



Todd Alexander-Cloud Abshire
June 13, 2017

2

```
 1                  APPEARANCES

 2   FOR THE PLAINTIFF:

 3       MR. J. ARTHUR SMITH, III
         Smith Law Firm
 4       830 North Street
         Baton Rouge, LA  70802
 5       (225) 383-7716
         jasmith@jarthursmith.com
 6
     FOR THE DEFENDANT:
 7
         MS. CHRISTINE S. KEENAN
 8       The Kullman Firm, APLC
         4605 Bluebonnet Boulevard, Suite A
 9       Baton Rouge, LA  70809
         (225) 906-4251
10       csk@kullmanlaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Todd Alexander-Cloud Abshire
June 13, 2017

3

```
 1                         INDEX

 2                                          Page

 3   LIST OF EXHIBITS . . . . . . . . . . . 4

 4
     STIPULATION. . . . . . . . . . . . . . 6
 5

 6   EXAMINATION BY:

 7
     MS. CHRISTINE S. KEENAN. . . . . . . . 7
 8
     MR. J. ARTHUR SMITH, III . . . . . . . 352
 9

10   REPORTER'S CERTIFICATE . . . . . . . . 363

11
     READ AND SIGN LETTER TO WITNESS. . . . 364
12

13   WITNESS AMENDMENT(S) . . . . . . . . . 365

14

15

16

17

18

19

20

21

22

23

24

25
```

Baton Rouge Court Reporters, LLC
225-292-8686

Todd Alexander-Cloud Abshire
June 13, 2017

4

```
 1              LIST OF EXHIBITS
 2   EXHIBIT NO. 1 . . . (Department of Veterans
                         Affairs Rating Decision)
 3
     EXHIBIT NO. 2 . . . (Detailed Job Posting)
 4
     EXHIBIT NO. 3 . . . (Employment Application)
 5
     EXHIBIT NO. 4 . . . (Health History)
 6
     EXHIBIT NO. 5 . . . (Personal Data Questionnaire)
 7
     EXHIBIT NO. 6 . . . (Report from Kenneth Ebersole)
 8
     EXHIBIT NO. 7 . . . (December 11, 2013, letter
 9                       from Kenneth Ebersole)
10   EXHIBIT NO. 8 . . . (November 27, 2013, letter
                         from Ruth Rigg)
11
     EXHIBIT NO. 9 . . . (Employment Contract)
12
     EXHIBIT NO. 10. . . (Planning & Evaluation Form
13                       for 12/9/2013 - 6/10/2014)
14   EXHIBIT NO. 11. . . (FTO Check List)
15   EXHIBIT NO. 12. . . (District Supervisor's
                         Recommendation Report)
16
     EXHIBIT NO. 13. . . (Counseling Conference
17                       Worksheet)
18   EXHIBIT NO. 14. . . (May 11, 2015, letter from
                         Sr. Agt. Justin Lowry)
19
     EXHIBIT NO. 15. . . (April 28, 2017, medical
20                       record)
21   EXHIBIT NO. 16. . . (Planning & Evaluation Form
                         for 6/11/2014 - 6/30/2014)
22
     EXHIBIT NO. 17. . . (Planning & Evaluation Form
23                       for 7/1/2014 - 6/30/2015)
24   EXHIBIT NO. 18. . . (Reallocation in a CPG
                         Tickler)
25
```

Baton Rouge Court Reporters, LLC
225-292-8686

Todd Alexander-Cloud Abshire
June 13, 2017

5

```
 1                            Todd Abshire to Lt. Beau
                              Robertson)
 2
      EXHIBIT NO. 20. . . (May 17, 2015, letter from
 3                            Todd Abshire to Lt. Beau
                              Robertson)
 4
      EXHIBIT NO. 21. . . (Planning & Evaluation Form)
 5
      EXHIBIT NO. 22. . . (August 10, 2015, termination
 6                            letter)
 7    EXHIBIT NO. 23. . . (August 5, 2015, letter from
                              Capt. Robert Buatt to Colonel
 8                            Joseph Broussard)
 9    EXHIBIT NO. 24. . . (Signed form regarding Cadet
                              Training Manual)
10
      EXHIBIT NO. 25. . . (Acknowledgement of Receipt
11                            and Review of LDWF Employee
                              Handbook and Policies)
12
      EXHIBIT NO. 26. . . (Employee Handbook Table of
13                            Contents)
14    EXHIBIT NO. 27. . . (Policy & Procedure Manual
                              Table of Contents)
15
      EXHIBIT NO. 28. . . (New Employee Safety
16                            Orientation Sign In Sheet)
17    EXHIBIT NO. 29. . . (March 4, 2015, Region Meeting
                              Agenda)
18
      EXHIBIT NO. 30. . . (EEOC Intake Questionnaire)
19
      EXHIBIT NO. 31. . . (Complainant Affidavit)
20
      EXHIBIT NO. 32. . . (Charge of Discrimination)
21
      EXHIBIT NO. 33. . . (Dismissal and Notice of
22                            Rights)
23    EXHIBIT NO. 34. . . (E-mail correspondence
                              between Todd Abshire and
24                            Ruth Rigg)
25    EXHIBIT NO. 35. . . (Handwritten document)
```

Todd Alexander-Cloud Abshire
June 13, 2017

6

STIPULATION

IT IS STIPULATED AND AGREED by and between
the parties in the proceeding above numbered and
entitled that the testimony of TODD
ALEXANDER-CLOUD ABSHIRE shall be taken at the
instance of the Defendant, herein, before and by
Karla H. Mayers, a Certified Court Reporter for
the State of Louisiana, on the 13th day of June,
2017, in the offices of Smith Law Firm, located at
830 North Street, Louisiana; that the witness
shall be sworn by said Court Reporter so
reporting; that the testimony shall be taken under
oral examination, reserving the right to make
objections, except as to the form of the question
and the responsiveness of the answer, until the
time of the trial of this matter; that the reading
and signing of the deposition are reserved by the
parties and by the witness; and that the said
deposition is being taken for all purposes allowed
under the Federal Rules of Civil Procedure.

Todd Alexander-Cloud Abshire
June 13, 2017

20

```
 1   Wildlife and Fisheries?
 2        A    Yes, ma'am.
 3        Q    What was your highest rank in the
 4   military?
 5        A    Sergeant.
 6        Q    And so when you requested to leave early,
 7   was -- did you still receive a honorable
 8   discharge?
 9        A    I did.
10        Q    Okay.  So is it fair to say that the
11   Wildlife and Fisheries job was the first
12   full-time job that you had after the military?
13        A    Yes, ma'am.  Actually, I used to joke that
14   it was my first big boy job, like, because, you
15   know, in the Marine Corps, I was -- I didn't
16   consider it a job.  And, you know, I did, like,
17   little -- after that -- you know, the grass
18   cutting job, that wasn't a profession.  That's
19   something I see, like, kids doing, you know, but I
20   did it just to make ends meet.  And, yeah, so I
21   would say Wildlife and Fisheries was, like, my
22   first actual foray into the real world, you know.
23        Q    Okay.  So in the lawsuit that you have
24   against Wildlife and Fisheries, you're alleging
25   that you're disabled.  So tell me what your
```

Todd Alexander-Cloud Abshire
June 13, 2017

21

```
 1   disability is.
 2        A    You want the technical answer or the -- I
 3   guess, the VA's breakdown of my disability?
 4        Q    Just tell me in your own words.
 5        A    Okay.  Well, I have back issues, and I
 6   have, like, severe knee issues.  Like, I have --
 7   it's all worn down, and I was told I would
 8   probably need surgery on my back.  That's just the
 9   physical part.  I was diagnosed with PTSD, and
10   that was actually before I even left the Marine
11   Corps, --
12        Q    Okay.
13        A    -- because, you know, they saw the signs
14   while I was in there.  And before I, you know, was
15   discharged, I went to the VA place on base and
16   spent hours talking to a psychologist, and, you
17   know, went to several appointments, and he
18   diagnosed me with having severe PTSD.
19        I think I actually provided that document to
20   the actual -- my discussion with him and
21   everything, because it was the copy I had from the
22   VA, but that's the diagnosis that I was given.
23        I don't really care about the back pain and
24   stuff.  Like, I could get used to it, but the PTSD
25   really does limit, I guess -- now it seems it's
```

Todd Alexander-Cloud Abshire
June 13, 2017

1   been -- it's been worse just because I kind of

2   went into a downward little spiral, but I can't go

3   places -- certain places.  I can't be around

4   crowds of people.  I get real anxious, and I can't

5   sleep at night.  Like, I -- it's not to the point

6   of paranoia, but it's almost to that point.

7       Like, for example, living with my sister, we

8   didn't have any -- me and my wife didn't have any

9   kids.  Well, my sister has three young kids, and

10  they're constantly making noise.  And for the

11  first couple of months of me living there I was on

12  edge, because I would hear random, like, you know,

13  noises and stuff, and it just -- I would kind of

14  have flashbacks and stuff sometimes.

15      It gets to the point where I can't even answer

16  the phone, because I'm just so, like, locked in.

17  Me and my wife used to -- I -- we joked about it a

18  little bit.  Probably shouldn't have, but I called

19  it my fainting goat syndrome.  It's, like,

20  whenever I -- I get worked up.  Before, like, I'm

21  about to have, like, an episode and, like, freak

22  out or something, I just kind of like go blank

23  and, like -- it's, like, kind of like I shut down,

24  and I kind of become numb.  And my wife said,

25  like, I kind of -- it's like I'm on autopilot.

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1    I'm just, "Yes," "No," and then I just --
 2         Q    Go ahead.
 3         A    But that's -- that's my PTSD at its worst,
 4    whenever I'm in my own home and I can't answer my
 5    phone because I just -- I can't even tell you why
 6    I can't answer it.  It's just like I can't even
 7    get the -- not the motivation, but perform the
 8    action to go and answer my phone.
 9         Like, he probably -- he has a hell of a
10    time getting -- excuse my language, but getting a
11    hold of me sometimes, because I just withdraw, and
12    I kind of just zombie out and -- but . . .
13         Q    And so the symptoms that you were just
14    describing to me, are those symptoms that you
15    currently experience?
16         A    Yes, ma'am.
17         Q    Okay.  And was it like that -- the same
18    for you back in 2014, 2015, when you were working
19    at Wildlife and Fisheries?
20         A    It wasn't initially, and I think --
21    because the first six months of your employment
22    when you're working at Wildlife and Fisheries,
23    they -- it's their boot camp.  It's their training
24    academy, and they run it like a boot camp.  But I
25    went to the Marine Corps boot camp, and it was
```

Todd Alexander-Cloud Abshire
June 13, 2017

1  pretty tough compared to this, too, but I'm used
2  to that military environment.
3      Like, when I was diagnosed with PTSD in the
4  Marine Corps -- there's a lot of people in the
5  Marine Corps with PTSD, so they were able to kind
6  of help me along, and they knew ways to, like,
7  lead me -- you know, these are my senior marines
8  I'm talking about -- and deal -- and compensate
9  for the fact that I had PTSD, because it was, you
10  know, not a normal thing, but it was -- it was an
11  issue that lots of marines have PTSD.
12      When I went to the Wildlife and Fisheries
13  academy, them running it like a boot camp, it kind
14  of reminded me of the Marine Corps, I guess.  I
15  don't know.  And I was able -- my PTSD was kind of
16  kept in check, because it was familiar to me.  It
17  was -- that's one of the biggest things is
18  whenever things get switched up on me, out of my
19  routine and everything, that's how I kind of get
20  to these little downward spirals that I was
21  talking about where I just kind of withdraw.
22      But it wasn't an issue that first six months
23  of the academy, because it was -- I was -- it was
24  similar -- like I was saying before, it was
25  similar to being in the Marine Corps, so I felt

Todd Alexander-Cloud Abshire
June 13, 2017

40

1   you immediately started treatment?

2        A    Yes, ma'am.

3        Q    Okay.  And so some of these symptoms that

4   you were experiencing in this report in 2010 you

5   were able to alleviate?

6        A    Uh-huh.

7        Q    Okay.  So some of these things that we're

8   seeing in here were things you were able to

9   overcome, you know, by 2013, 2014, --

10       A    Yes, ma'am.

11       Q    -- by the time you went to go work for

12  Wildlife and Fisheries?  Okay.  All right.  And so

13  then on the next page it talks about -- I guess

14  about a quarter of the way down, it says, "You

15  experience marked distress in response to the

16  sight of motor vehicle accident, the smell of

17  burning trash or diesel fumes, or the sound of

18  artillery or firearms practice."  So was that true

19  in 2010?

20       A    No.

21       Q    In 2010.

22       A    2010?  I'm trying to still find that.

23       Q    Oh, I'm sorry.  It's in the -- kind of at

24  the top third (indicating) . . .

25       A    Okay.  That was -- at that time, in 2010,

Baton Rouge Court Reporters, LLC
225-292-8686

Todd Alexander-Cloud Abshire
June 13, 2017

41

```
 1   it was true still.
 2        Q    Okay.  Yeah.  Did that change over time?
 3        A    It did.  I mean, I was around it -- we --
 4   it doesn't matter if you have PTSD or not.  Like,
 5   you're still training, so I had to get used to it.
 6   So it was just I was always -- I was -- after that
 7   point even getting used to it.  I'm still jumpy
 8   around it, you know.
 9        Q    Okay.  So that's still an ongoing thing
10   that you have to work with?
11        A    Yes.
12        Q    Okay.  And is that all of those things,
13   the sight of motor vehicle accidents, the smell of
14   burning trash?
15        A    Burning trash is a big one.  You wouldn't
16   believe how many memories, like, get triggered by
17   smell -- by smell.  But burning trash, I sometimes
18   get a very specific flashback, like, memory, you
19   know.  But the motor vehicle accidents, that's
20   something I got over, you know, kind of trial by
21   fire.  I had to do that whenever I worked for
22   Wildlife and Fisheries, so it's something that
23   didn't bother me.
24        Q    Okay.  And what about the sound of
25   artillery or firearms?
```

Todd Alexander-Cloud Abshire
June 13, 2017

44

```
 1        Q    So we've talked about -- now, again, I
 2   just want to make sure I get an understanding of
 3   the different symptoms.  You talked about you
 4   can't go -- be in large crowds.  You can't sleep.
 5   You almost have a paranoia.  You indicated about
 6   concentration -- when you're not on your
 7   medications, you have difficulty with
 8   concentration.  Is that --
 9        A    Yes, ma'am.
10        Q    -- fair to say?  All right.  Are there any
11   other symptoms that we haven't talked about with
12   respect to your PTSD?
13        A    Um . . .
14        Q    I mean, you may think about them as we go
15   along, and that's fine.
16        A    Yeah.  I mean, we pretty -- I probably
17   will think of something later, but, --
18        Q    Okay.
19        A    -- I mean, it just -- it does limit me a
20   lot in a lot of aspects in my life.  I mean, I
21   don't go to family events.  You know, I avoid
22   going to events at all.  I haven't actually spent
23   the night anywhere or had anybody spend the night
24   with me in like six months just because I -- I
25   don't -- it's not that I don't trust people.  I
```

Todd Alexander-Cloud Abshire
June 13, 2017

45

```
 1    just don't feel comfortable with people.
 2        Q    Is that a trust issue, or how do you --
 3    how would you explain that when you say you're not
 4    comfortable with people?
 5        A    I don't know.  That's when, I guess --
 6    when I -- earlier I said paranoia -- like, about
 7    paranoia.  Like, I -- it is a trust thing, and I
 8    kind of worry that they're -- not out to get me,
 9    but they're going to take advantage of me.  Like,
10    I don't believe that anyone is trying to hurt me,
11    but I don't think they have my best interest in
12    mind.
13        Q    Okay.  Do you find that there is any one
14    particular symptom that affects you more than
15    others?
16        A    The hypervigilance.  It's because I'm
17    always on -- I -- it makes me so tired.  Like, I
18    don't want to make it sound like I'm a superhero
19    or anything, but, like, I'm always -- like, I'm
20    talking to you, and then I hear stuff going on out
21    there, and then I see a bird flying, and then over
22    here I hear -- he sighs, and then I, like,
23    can't -- it's like I'm taking in everything.
24        And the way -- when I described that to the
25    psychiatrist, he said that was the -- he
```

Todd Alexander-Cloud Abshire
June 13, 2017

1    described -- hypervigilance is what he called it.

2    And he said it's just my body never clicked out of

3    that combat mode, and so I'm still, like, keyed up

4    and amped up all the time.

5        Q    It so it just makes you exhausted?

6        A    It makes me really exhausted.

7        Q    So you were talking about how the symptoms

8    limit your life, and you said that you avoid

9    family events, and you don't spend the night out,

10   and you don't have anybody spend the night with

11   you.  Are there any other ways that it limits your

12   life?

13       A    I mean, employment-wise, too.

14       Q    Right.  Okay.  So tell me about that.

15       A    I've kind of given up on getting a job for

16   the time being, until I get myself straight,

17   because I've -- I kind of had -- this last couple

18   of months has been really hard on me, and, you

19   know, I've had some breakdowns and everything, and

20   I'm a mess.  I know that, and I don't want to even

21   try to get a job.

22       And I'm not -- I don't even have a vehicle or

23   insurance.  I mean, I'm living in a shed at my

24   sister's house, so I really don't have a lot of

25   options as far as employment.  And she lives out

Todd Alexander-Cloud Abshire
June 13, 2017

50

```
 1        A     Yes, ma'am.
 2        Q     And feeling uncomfortable in the
 3   environment.  Is --
 4        A     Yes, ma'am.
 5        Q     -- that fair to say?  Okay.  Did you end
 6   up quitting that job?
 7        A     I did.
 8        Q     All right.  So any other ways in which you
 9   feel like your PTSD limits your life or even,
10   like, your daily activities?
11        A     I mean, just avoiding people like I do
12   really affects it.  Like I said earlier, I don't
13   even answer the phone sometimes, because I just
14   don't -- I can't.  It's like I don't want to talk
15   to anybody, and I can't even -- and it will be
16   something serious.  Like, I can see that it's the
17   VA number calling or whatever, and I still just
18   can't bring myself to answer the phone.  I can't
19   talk to people at times.
20        Q     And again, just so I'm clear, those
21   symptoms that we talked about, like avoiding
22   people and not being able to talk to people at
23   times, did those symptoms exist during the time
24   period that you worked at Wildlife and Fisheries
25   as well?
```

Todd Alexander-Cloud Abshire
June 13, 2017

57

1        Q    Okay.  And so this looks to me -- that

2   says, "Detailed Job Posting."  It looks like an

3   online posting.  Is this what you had seen from --

4        A    Yeah.

5        Q    -- the website?

6        A    Yes, ma'am.

7        Q    Okay.  And the job title says, "Wildlife

8   Enforcement Cadet."  Was that your understanding

9   of the particular position that you were applying

10  for?

11       A    Yes, ma'am, or as far as the title goes.

12       Q    Okay.  And so did you have an

13  understanding that there was a distinction between

14  a Wildlife Enforcement Cadet versus a Wildlife

15  Enforcement Agent?

16       A    Yes, ma'am.

17       Q    What is your understanding of that

18  distinction?

19       A    Well, comparing it to military rank

20  structure, it's -- a cadet is a private.  It's the

21  lowest rank, and then you get promoted, just like

22  in Wildlife and Fisheries.  You go in as a cadet,

23  and after a period of one year, you get promoted

24  to the next rank, which is an agent.

25       Q    Okay.  And that was your understanding

Todd Alexander-Cloud Abshire
June 13, 2017

58

```
 1    about this particular position?
 2          A    Yes, ma'am.
 3          Q    Okay.  And in the section that says,
 4    "Vacancy Information," -- do you see that at the
 5    bottom of the page?
 6          A    Oh, first page?
 7          Q    First page, yes.
 8          A    Yes, ma'am.
 9          Q    It says, "This position will be filled as
10    a Probational Appointment (open to all qualified
11    applicants)."  Did you have an understanding about
12    what that meant?
13          A    At the time I did not.
14          Q    Okay.
15          A    Like we discussed before, this was my
16    first, you know, big boy job, so I didn't really
17    understand that.  So I can't tell you, yes, I did,
18    because now I do.  Now I understand all this, so
19    my answers are going to kind of --
20          Q    Yeah.  That's fine.
21          A    -- be yes and no, because at the time I
22    didn't --
23          Q    Right.
24          A    -- know a lot of stuff.
25          Q    Okay.  That's perfect.  So at the time you
```

Todd Alexander-Cloud Abshire
June 13, 2017

59

```
 1   didn't understand what that meant?
 2        A    No, I had no idea.
 3        Q    Did you, at some point later, learn what
 4   that meant?
 5        A    I did.
 6        Q    Okay.  And so what did you learn -- what
 7   did you come to learn that that term meant?
 8        A    When did I?
 9        Q    Yeah.  Well, when and then what did you
10   learn -- understand it to be?
11        A    I learned it at the academy whenever
12   they -- they pretty much taunted us with it,
13   because it was a boot camp.  They had to be mean
14   to us, you know.  But they taunted us with it
15   saying that, "Oh, if you don't finish this run,
16   you're on probation.  We can fire you right now."
17   Like, that's how my first understanding of --
18        Q    Okay.  So you learned in boot camp, --
19        A    Yeah, pretty much.
20        Q    -- because they were teasing you?
21        A    Yeah.
22        Q    Okay.  Okay.  And if you look on the
23   second page, there's a section that's in bold that
24   says, "Responsibilities and/or Preferences."  Do
25   you see that?
```

Todd Alexander-Cloud Abshire
June 13, 2017

60

1      A    Yes, ma'am.

2      Q    And it says that the responsibilities

3  and/or preferences include, "Patrols public and

4  private land and water, including federal waters,

5  using a variety of specialized equipment while

6  enforcing laws, rules and regulations to protect

7  and preserve the fish and wildlife resources."  Is

8  that consistent with your understanding about the

9  position?

10      A    Yes, ma'am.

11      Q    And then also to provide public safety

12  services on the waterways of the state?

13      A    Yes, ma'am.

14      Q    Did you understand that to be an aspect of

15  the job?

16      A    I did.

17      Q    Okay.  And then it also said the position

18  is subject to call 24 hours a day, 7 days a week.

19  Did you understand that to be an aspect of the

20  job?

21      A    Yes, ma'am, I did.

22      Q    Okay.  And then if you look on that last

23  page, you see where it says, "Examples of Work"?

24      A    Yes, ma'am.

25      Q    Okay.  Then right above that it says, "Job

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   Distinctions."  Do you that?
 2        A    Yes.
 3        Q    It says, "Differs from the Wildlife
 4   Enforcement Agent by the absence of performing
 5   full range of field enforcement work and by the
 6   supervision received."  Do you see that?
 7        A    Yes.
 8        Q    And so is it your understanding that
 9   there's a different level of supervision for the
10   cadet versus the agent?
11        A    At the time I did, and I was told that the
12   difference in that aspect was, once you got off
13   probational -- not probational, but once you got
14   off of FTO, field training observation, you --
15   because that was six months following the Wildlife
16   and Fisheries Academy, you -- when -- that was the
17   supervision distinction, or difference.  After I
18   got off that FTO period, I could work on my own.
19   I didn't have to work with an FTO who was grading
20   my, you know, every move.
21        Q    Okay.  All right.  And at that point were
22   you still a cadet?
23        A    Yeah, you're still a cadet until --
24   officially, you have to wait -- you can be taken
25   off of FTO early, like I was, but officially, you
```

Todd Alexander-Cloud Abshire
June 13, 2017

62

```
 1    have to wait until that year period.  It's, you
 2    know, the six months following and everything to
 3    be promoted.  I guess it's something to do with
 4    the pay system.
 5            Q    To be promoted to agent?
 6            A    Yes.
 7            Q    Got you.  Okay.  All right.  And then it
 8    goes on to talk about examples of work on that
 9    last page, and it says, "Investigates/conducts law
10    enforcement activities designed to impact natural
11    resource conservation, protection and management
12    objectives, and to provide public safety
13    services."  Is that consistent with the kind of
14    work that you were performing as a cadet?
15            A    Yes, ma'am.
16            Q    Okay.  And then it says, "Checks hunters
17    and fishermen for equipment, limits and license
18    compliance."  Is that the kind of work that you
19    were doing as a cadet?
20            A    Yes, ma'am.
21            Q    Okay.  And it goes on to say, "Assists
22    other law enforcement agencies in the apprehension
23    of criminals."  Did you do any of that work as a
24    cadet?
25            A    No, ma'am.
```

Todd Alexander-Cloud Abshire
June 13, 2017

63

```
1         Q    No?  Okay.  You didn't have that
2    opportunity?
3         A    No, I didn't have the opportunity.
4         Q    Do you know if the agency itself would
5    actually --
6         A    They -- they do.
7         Q    Okay.  Just that opportunity didn't arise
8    while you were there?
9         A    No, ma'am.
10        Q    Okay.  And then it says other kinds of
11   work includes, "Investigates complaints of alleged
12   violations."  Is that something you were involved
13   in?
14        A    Yes.
15        Q    And then it says, "Provides search and
16   rescue response services."  Were you involved in
17   any search and rescue response?
18        A    I was.
19        Q    All right.  Then, "Provides information to
20   the public regarding wildlife/fisheries
21   conservation and boating safety."  Were you
22   involved in any of that kind of work?
23        A    Yes, ma'am.
24        Q    Okay.  And, "Investigates boating safety
25   incidents."  Were you involved in that kind of
```

```
 1   work?
 2        A    I just have one note on that.
 3        Q    Yeah.
 4        A    It's describing this as for a cadet, but
 5   like I was saying before, the first six months of
 6   the academy are -- or the first six months of
 7   employment are the academy, and they don't
 8   describe any of the work details or examples of
 9   work that you perform as a cadet in the academy.
10        Q    Okay.
11        A    This is all just -- it's like -- to me
12   this is -- if I was reading this, I wouldn't know
13   that I had to go to a six-month academy.  I would
14   be like, oh, I get hired on, and then these are my
15   examples of work.  I wouldn't know that examples
16   of work were me waking up at 2:00 in the morning
17   to go watch a dirty lint drawer.  They made us do
18   stupid stuff like that.  That is just an example.
19   I'm just saying that this isn't 100 percent
20   accurate.
21        Q    Okay.  So is it fair to say that this more
22   describes the work you would be doing once you got
23   out of the academy?
24        A    Yes, ma'am.
25        Q    Okay.  All right.  So we'll talk about
```

Todd Alexander-Cloud Abshire
June 13, 2017

65

1    that in just a second.  So this is more describing
2    what you did as an agent?
3           A    As a full-fledged agent.
4           Q    Okay.  And so during the time that you
5    worked at the academy, just so I'm clear, the
6    things that we talked about, those were things
7    that you actually participated in as part of your
8    job duties?
9           A    Yes.
10          Q    Okay.  All right.  And then I'll go back,
11   and I'll follow up with you on the academy part.
12          A    Okay.
13          Q    Okay.  And so the last thing talked about
14   was, "Trains for certification in defensive
15   driving, first responder, hunter/boating education
16   instructor."  So it's training aspects.  Did you
17   participate in any of that?
18          A    Yes, ma'am.
19          Q    Okay.  All right.  So to follow up on your
20   point about the academy, what kinds of, I want to
21   say, job duties -- did you have job duties while
22   you were at the academy?
23          A    Well, it -- it almost says it right here,
24   "Trains for certification," but it really doesn't,
25   because we had to perform, you know, custodial

Todd Alexander-Cloud Abshire
June 13, 2017

68

```
 1        Q    I've got it.  Okay.  So you talked about
 2   the fact that there was an extensive application
 3   process.  So did you actually fill out an
 4   application?
 5        A    Yes, ma'am, I did.
 6        Q    Okay.  All right.  Let me show you a
 7   document I'm going to mark as Exhibit No. 3, and
 8   tell me if you recognize this document.
 9        A    (Reviewing document)  Yeah, I recognize
10   it.
11        Q    All right.  So is this the employment
12   application that you completed to apply for the
13   Wildlife Enforcement Cadet position?
14        A    Yes, ma'am, it looks like it is.
15        Q    Okay.  And was that done electronically?
16        A    It was.
17        Q    All right.  Okay.  And it looks like in
18   the upper right-hand corner it says [as read]:
19   "Received October 15, 2013, 7:54 p.m."  Do you see
20   that?
21        A    Yes, ma'am.
22        Q    Okay.  So is that consistent with what you
23   recall --
24        A    That is.
25        Q    -- when you applied for the position,
```

Todd Alexander-Cloud Abshire
June 13, 2017

69

1   about October 2015?

2        A    Yes, ma'am.

3        Q    And so you would have typed in all of this

4   information online?

5        A    Yes, I did.

6        Q    Okay.  And then so the first two pages, it

7   looks like, is an actual application, and then

8   behind that there were agency-wide questions.  Did

9   you complete that?

10       A    I did.

11       Q    Okay.  And all of that was done

12  electronically?

13       A    Yes, it was.

14       Q    All right.  So the first page, it says,

15  "Agency-Wide Questions," but the second page says,

16  "Job Specific Supplemental Questions."  Do you see

17  that?

18       A    I do.

19       Q    Okay.  And looking -- if you turn to

20  Question No. 20 -- I think it's 26, it says, "The

21  Louisiana Department of Wildlife and Fisheries,

22  and in particular the Enforcement Division, serves

23  as the primary search and rescue agency for the

24  State.  In the course of any career in this

25  agency, employees may be called upon to work in

Todd Alexander-Cloud Abshire
June 13, 2017

70

```
1   all areas of the State during catastrophic events,
2   civil unrest and perhaps hostile working
3   conditions.  All of these types of conditions may
4   involve unsafe working conditions and/or the
5   possibility of bodily harm.  In view of these
6   types of situations and conditions, do you still
7   wish to be considered for the position advertised
8   in this job bulletin?"  And what was your
9   response?
10       A    "Yes, Definitely."
11       Q    At the time did you think -- or did you
12  have any concerns that your PTSD would impact your
13  ability to perform the job in light of the
14  conditions raised in Question No. 26?
15       A    No, ma'am.  At that time my medicine was
16  pretty well-managed.  I was coming out from being
17  pretty awesome in the Marine Corps, and everything
18  was going really well.  My PTSD wasn't an issue at
19  all really.
20       Q    Okay.  So in October of 2013, you felt
21  like your PTSD was well-managed?
22       A    Yeah.  Definitely.
23       Q    Okay.  Other than having to complete the
24  application, do you remember what the next step in
25  that preemployment hiring process involved?
```

Todd Alexander-Cloud Abshire
June 13, 2017

88

1        A    It -- yes, ma'am.

2        Q    Okay.  And it appears to be an offer

3   letter.  Is that correct?

4        A    It is.

5        Q    All right.  And it says, "The Human

6   Resources staff would like to welcome you to the

7   Department of Wildlife and Fisheries!  You have

8   been recommended for the following position:  Job

9   Title:  Wildlife Enforcement Cadet."  Is that

10  correct?

11       A    It is.

12       Q    Okay.  So it looks like you were hired on

13  at a salary of $1,369.60 biweekly.  Is that

14  consistent with what you remember?

15       A    Yes, ma'am.

16       Q    All right.  And it says, "Type of Appt:

17  Probational."  We talked about that already.  Is

18  that consistent with what you recall?

19       A    Yes, ma'am.

20       Q    All right.  And then is that your

21  signature right there in that block at the top?

22       A    It is.

23       Q    All right.  And what's the date next to

24  your signature?

25       A    2013/12/08.

Todd Alexander-Cloud Abshire
June 13, 2017

89

```
 1       Q    Okay.  And so by signing this document,
 2   did you understand that you were acknowledging
 3   acceptance of the position?
 4       A    Yes, ma'am.
 5       Q    All right.  So this was the offer letter
 6   that you received.  Is that right?
 7       A    Yes, ma'am.
 8       Q    Okay.  So the offer came November 27,
 9   2013?
10       A    It did.
11       Q    So if the offer came on November 27, 2013,
12   do you recall when you actually started that boot
13   camp?
14       A    December of 2012 -- December 9, 2012 --
15   I'm sorry, 2013.
16       Q    That was your official hire date?
17       A    Yes, ma'am.  It was a Monday.
18       Q    And the academy is in Baton Rouge?
19       A    It is.
20       Q    And I think you said that's for six
21   months.  Is that right?
22       A    Yes, ma'am, it is.
23       Q    Okay.  At what point in time was that
24   explained to you?
25       A    It was explained, I want to say --
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   discussion?  So it was a panel interview?
 2        A    Yes, ma'am.
 3        Q    All right.  So just one interview?
 4        A    Yeah.  You walk in and, you know, five
 5   minutes it was over.  They just briefly asked
 6   questions.  I answered.  They seemed to like me,
 7   and then they said, "Well, thank you," and then,
 8   "We'll let you know," and I left.
 9        Q    Okay.  And in that interview process, was
10   there any discussion about your disability?
11        A    No.  It wasn't mentioned.
12        Q    And at any part of the employment process,
13   the application process, did you need any kind of
14   accommodation during that process?
15        A    I just take time on paperwork, and it's --
16   I -- it's -- I have trouble focus -- like when I
17   was explaining earlier with hypervigilance, I get
18   distracted easily, too, so that packet that could
19   kill a man if it falls on them the wrong way, it
20   took me a while to finish that.  But it was --
21   mainly, I just needed time, which they gave you
22   plenty of time.  They just -- they mailed it out,
23   and they wanted it two weeks later, so . . .
24        Q    And I think you mentioned you had to take
25   a Civil Service test?
```

Todd Alexander-Cloud Abshire
June 13, 2017

93

```
 1         A     Yes, ma'am.

 2         Q     Was that a standardized test?

 3         A     Yes, it was.

 4         Q     Was that a timed test?

 5         A     It was a timed test.

 6         Q     Did you need any kind of accommodation --

 7         A     No.

 8         Q     -- for that?

 9         A     No, ma'am.

10         Q     Okay.  All right.  So we started to talk a

11   little bit about what the training was like at the

12   academy, and so you were there for six months.

13   Did you actually have training on your job

14   duties --

15         A     Yes.

16         Q     -- as an agent while you were at the

17   academy?

18         A     Yes, ma'am.

19         Q     How did that occur?

20         A     Well, the layout of the place is they have

21   the cabins, a kitchen, and a classroom, and we

22   would, you know, wake up in the mornings, go run

23   and exercise.  And then after eating breakfast, we

24   would go into the classroom and typically spend

25   all day in the classroom.  They would have
```

Todd Alexander-Cloud Abshire
June 13, 2017

94

1   instructors come from the -- within Wildlife and

2   Fisheries and outside instructors.  A lot of it

3   early on was just classroom learning.

4        And then later on you have to do, you know,

5   more hands-on, like the pistol range.  You have

6   to -- we had to go up north and do duck ID, just

7   random, odd trips that you can only, you know, do

8   the training on site at certain places.

9        Q    Okay.  So in that classroom learning, what

10  kind of subjects was the basis of the classroom?

11       A    It was, I mean, I would assume, any normal

12  law enforcement academy, just, you know, Miranda

13  rights, the basics, you know, the bare minimum

14  that cops need to know pretty much.  And then

15  there was also specialized classes because of our

16  position, like in wildlife laws and treaties and

17  acts and, you know, all kinds of regulations

18  regarding that.

19       So we had classroom instruction, and then we

20  would do, like, hands-on -- like, the self-defense

21  program and everything, just normal, routine stuff

22  for cops, I guess.

23       Q    So in the classroom portion, that's where

24  you learned about what the wildlife regulations

25  were?

Todd Alexander-Cloud Abshire
June 13, 2017

97

1   COIC that week, I would go to the COIC, and he
2   would go to the duty officer, who would then go to
3   Sergeant Turner.
4        Q    Got you.  Okay.  All right.  So your chain
5   of command would be the cadet officer in charge,
6   the duty officer, to the sergeant, to the
7   lieutenant?
8        A    Yes, ma'am.
9        Q    Okay.  And so was the lieutenant sort of
10  the top-ranking official at the academy?
11       A    Yes, ma'am.
12       Q    And did your chain of command ever change
13  while you were at the academy?
14       A    Like I was saying, with the exception of
15  duty officer, because they -- every week they had
16  a new one, but other than that, no.
17       Q    Okay.  Now, during the time period that
18  you were at the academy for those six months, did
19  you ever request an accommodation while you were
20  there for your disability?
21       A    I didn't need to, because it was a similar
22  environment to the military the way they ran it,
23  and I had already learned to kind of cope with it
24  in the military, and so it was kind of like being
25  in a very familiar environment.  And it didn't --

Todd Alexander-Cloud Abshire
June 13, 2017

98

```
 1   and plus I was still taking my medicine, so it
 2   wasn't an issue, and I hadn't had an issue with my
 3   PTSD in years at that point because of my
 4   medicine.
 5       Q    Okay.  During the time period that you
 6   were at the academy, did you mention to anyone in
 7   your chain of command that you suffered from PTSD?
 8       A    I did.
 9       Q    All right.  Do you recall who you
10   mentioned it to?
11       A    Everybody.  Sergeant Turner definitely,
12   because me and him were actually -- even back then
13   in -- when I was a cadet status, me and him were
14   pretty cool.  Like, I could, you know, talk to
15   him, and, you know, he loved the fact that I was a
16   former marine and everything.
17       But I mentioned it to him, you know, because
18   people, they ask questions of veterans a lot of
19   times.  Some -- some people are very good at
20   asking them, and other people are too blunt, and
21   they'll ask, "Oh, did you ever kill anybody," or
22   stuff like that.
23       Most veterans, when you're hanging out with a
24   group of guys that aren't veterans, they end up
25   asking you that question.  So I actually ended up
```

Todd Alexander-Cloud Abshire
June 13, 2017

99

```
 1    having some pretty detailed conversations with
 2    people regarding my PTSD and everything.
 3         Q    Okay.  So you said you told Sergeant
 4    Turner that you had PTSD.
 5         A    Yes, ma'am.
 6         Q    Do you remember anything about that
 7    conversation?
 8         A    No, I mean, I really don't.
 9         Q    Okay.  Do you remember, like, how long
10    into your training that that conversation
11    occurred?
12         A    Probably a month.
13         Q    Okay.
14         A    Because what kind of -- we had a bonding
15    moment.  I was leaving the academy.  My hood
16    wasn't latched, and it -- when I was going --
17    driving down the interstate, it flew open, and he
18    just happened to be behind me.  So that was kind
19    of a bonding moment for us, and I talked to him a
20    little bit more after that, and so it was probably
21    a month into the academy.
22         Q    Okay.  And why was that a bonding moment?
23         A    Because, like, during -- well, at the
24    academy he had to act like a drill instructor.
25    Like, he had to be, like, you know, mean to us or
```

Todd Alexander-Cloud Abshire
June 13, 2017

103

```
 1   PTSD?
 2        A    No, I don't really ever remember talking
 3   to him.  He was kind of like the head chief guy,
 4   so . . .
 5        Q    Okay.  All right.  So you would have
 6   been -- the academy was six months long, so you
 7   would have been at the academy until roughly May
 8   of 2014?
 9        A    June is when we graduated.
10        Q    June.  Okay.  And do you recall having to
11   sign an employment contract while you were at the
12   academy?
13        A    I do.
14        Q    Okay.  I'm going to show you a document
15   I'm going to mark as Exhibit No. 9.  Tell me if
16   you recognize that document.
17        A    (Reviewing document)  I'm trying to
18   remember.  This date is kind of throwing me,
19   3/6/2013.
20        Q    Right.  I was going to ask you about that.
21   So is that your signature on that second page?
22        A    That is.
23        Q    Okay.  And the date is 3/6/2013, so that
24   would be, what, three months after you started at
25   the academy?
```

Todd Alexander-Cloud Abshire
June 13, 2017

110

```
 1   stayed in class.  Like, we didn't have -- it was,
 2   like, 24/7.  We lived that lifestyle, so it's kind
 3   of hard for me to say, oh, yeah, we had a meeting,
 4   because it wasn't like we all met up and gathered
 5   around and drank coffee and joked.  It was like we
 6   sat there like we were in boot camp and got taught
 7   something.
 8        Q    Right.
 9        A    So it's kind of hard for me to determine.
10        Q    But you don't have a recollection --
11        A    No.
12        Q    -- of there being a one-on-one meeting --
13        A    No, ma'am.
14        Q    -- with Edward Skena and Lieutenant
15   Carpenter and you?
16        A    No, ma'am.
17        Q    Okay.  And then at some point when you're
18   at the academy, you graduate from the academy, and
19   you're assigned to a region.  Is that right?
20        A    Yes, ma'am.
21        Q    And you were assigned to Region 5.  Is
22   that correct?
23        A    That's correct.
24        Q    Okay.  And at what point do you learn what
25   region you're going to be assigned to?
```

1     A    Before you're even hired, they -- they --

2    you go take your physical, and you do your last

3    little in-person interview.  That's when they

4    actually talk to you one-on-one, but not even a

5    one-on-one.  It was -- you -- everybody else is

6    outside waiting to know if they get hired or not,

7    and they call out names.

8       And, you know, they call you in there and

9    like, "Hey, yeah, you get hired.  This is where we

10    have positions available," because when you do the

11    initial application, it shows you where the

12    positions are available, and you can put up to

13    three choices.  And I put, you know, Calcasieu

14    Parish, and Beauregard Parish, and then Cameron,

15    and I got assigned Cameron.

16       I went in there, and they said, "Hey, we have

17    somebody for Beauregard Parish.  We have Cameron

18    Parish available for you, if you want" -- "do you

19    want to take it?"  And I said, "Yes."

20     Q    All right.  And who did you have that

21    conversation with?

22     A    That one probably went with Captain Skena.

23    I can't -- it's hard to remember.

24     Q    Okay.

25     A    But it wasn't just him.  It was several,

Todd Alexander-Cloud Abshire
June 13, 2017

1    you know, game wardens in there kind of.  That was

2    all, like, game warden enforcement people.

3         Q    Okay.  And that would have been when you

4    were hired?

5         A    Yes, ma'am.

6         Q    Okay.  So you knew when you were at the

7    academy you were ultimately going to Region 5?

8         A    Yes, ma'am.

9         Q    And so when you got to Region 5, what was

10   your chain of command there?

11        A    Initially, it's -- because you're on FTO,

12   it was your FTO and then your lieutenant and then

13   the captain.  And the captain is in charge of the

14   whole region, and he reports to the majors that

15   are, like -- I think there's two of them in the

16   state.

17        Q    Okay.  And your FTOs change, as I

18   understand it.

19        A    Yes.

20        Q    Correct?

21        A    Yes.  You have, typically, three FTOs.

22        Q    Okay.  How long is the FTO period?

23        A    On paper it's six months, and after the

24   completion of the six months, you get released,

25   but you can get released off of it early.

Todd Alexander-Cloud Abshire
June 13, 2017

1    Q    Okay.  All right.  Do you remember who

2  your three FTOs were?

3    A    Sergeant Stanford was one of them.

4    Q    Sanford?

5    A    Sanford, yes.  Sorry.

6    Q    Okay.

7    A    It's been a while.  Sergeant -- I can

8  remember him, but I can't remember his name, a

9  little guy.  He ended up retiring not too long

10  after that.  I can't remember his name.  And then

11  there was also Sergeant Delahoussaye.

12    Q    Okay.  Was your other one Sergeant

13  Monceaux?

14    A    Yeah, Monceaux.

15        MS. KEENAN:

16            That's M-o-n-c-e-a-u.

17        THE WITNESS:

18            I thought he had an "x" at the end of

19    his name.

20        MS. KEENAN:

21            I don't think so; maybe.  I'll look

22    and check.

23  BY MS. KEENAN:

24    Q    And then who was your lieutenant?

25    A    Lieutenant -- I can't believe that I'm

Todd Alexander-Cloud Abshire
June 13, 2017

114

1   drawing a blank, because I've been trying to,

2   like, not think about him.  Wow.  I can't

3   remember.

4        Q    Was it Beau Robertson?

5        A    It was.  It was Beau Robertson.  Believe

6   me, I've put up a lot of mental blocks, so . . .

7        Q    And was he the only lieutenant you

8   reported to?

9        A    Yes, ma'am.  They only had the two

10  lieutenants, because there's Region 5, and then

11  there's District A and District B, and Lieutenant

12  Robertson was supervisor over District B.

13       Q    All right.  So you were in Region 5,

14  District B?

15       A    Yes, ma'am.

16       Q    And who was your captain?

17       A    Captain Robert Buatt.

18            MS. KEENAN:

19                 That's B-u-a-t-t.

20  BY MS. KEENAN:

21       Q    And do you remember the majors that

22  Robert -- I mean that Captain Buatt reported to?

23       A    No, I don't.

24       Q    When was the first time you met Lieutenant

25  Robertson?

Todd Alexander-Cloud Abshire
June 13, 2017

117

```
1   early?
2        A    Unofficially, yes, I think as early as the
3   beginning of November.  So almost a month before
4   the one-year mark at December 9, I was working on
5   my own.
6        Q    And is that something that you requested?
7        A    No, actually, quite the opposite.  I asked
8   to stay on, and I did it with a lot of
9   apprehension, because I was afraid that if I asked
10  to stay on that they would think that I wasn't
11  performing well.  But I really didn't feel like I
12  was ready to be on my own, not because I was
13  scared or anything but because it's a big job.
14  It's a huge responsibility, and I wanted to, you
15  know, do it right, so to speak.
16       And they said that they -- you know, they kind
17  of denied that.  They kind of gave me a funny look
18  when I asked, and they said, "No.  We think you're
19  ready to work on your own," so . . .
20       Q    Who denied that?
21       A    The captain.
22       Q    Let me show you a document.  It's called
23  an FTO Check List, and just tell me if you've ever
24  seen this before.  I've marked this as
25  Exhibit 11.
```

Todd Alexander-Cloud Abshire
June 13, 2017

118

```
 1        A     Thank you.  (Reviewing document)  Yes,
 2   ma'am.
 3        Q     Okay.  So is this a document that you
 4   would see, like, throughout your employment -- I
 5   mean, throughout the training?
 6        A     Yes, throughout the FTO period.
 7        Q     Okay.
 8        A     They -- you were given a binder, and
 9   pretty much you -- I was -- it was my
10   responsibility to hold that binder.  Like, if I
11   showed up to work while on FTO and I forgot the
12   binder, it looked bad and counted against me.
13        So, like, every day we would ride together
14   with, for example, Aaron Monceaux, and on the 3rd
15   of that month -- particular month, he -- we -- he
16   introduced me to a bunch of guys, so he marked
17   that -- checked that down on that week.
18        And each FTO did it differently, like, as far
19   as waiting -- or some would grade during the day.
20   Others would wait till the end of the day,
21   so . . .
22        Q     Okay.  And so this document, the FTO Check
23   List, was in your binder?
24        A     Yes.
25        Q     Okay.  And they would mark it off in your
```

Todd Alexander-Cloud Abshire
June 13, 2017

122

```
 1    drive a boat, but I still struggled with it.
 2         So it's kind of -- that's what I was getting
 3    at earlier is it's flawed, because, yeah, he
 4    instructed me, but I still had a lot of issues.
 5    Like, Aaron Monceaux -- and this is embarrassing
 6    to admit.  I couldn't back up a trailer to save my
 7    life.  Like, I would jackknife a trailer in front
 8    of a bunch of people, and that made me feel really
 9    bad, because I'm wearing a game warden uniform,
10    and they're laughing at me because I can't back a
11    boat up.
12         He left me at his house one day for like four
13    hours with a boat trailer, and I just practiced
14    backing it up back and forth.  Like, that's --
15    that's how I got trained, you know.  I asked them
16    to do crazy stuff like that.
17         Q    Okay.  Okay.  Are there any other specific
18    items that you recall that you felt like you
19    weren't sufficiently trained on --
20         A    Paperwork.
21         Q    -- during the FTO period?
22         A    Oh, yeah, paperwork definitely, --
23         Q    Okay.
24         A    -- because that's my biggest thing.  I
25    can't concentrate on paperwork because of the
```

```
 1    hypervigilance deal.  Even with my medicine it's
 2    hard, and it takes me a long -- it's muscle memory
 3    is what I call it, and I have to do something
 4    repetitively the right way over and over again to
 5    get it done.
 6          Well, I wasn't doing my paperwork the right
 7    way initially, because I didn't have a full
 8    understanding of it, even though they explained it
 9    to me.  And that's an issue that came up several
10    times throughout the course of my employment with
11    Lieutenant Robertson was me asking for those
12    reasonable accommodations where job -- where --
13    like, I didn't -- I didn't know how to, like, do
14    stuff like that.  I wanted a cheat sheet almost
15    kind of, you know, just like a quick how-to -- how
16    to fill out this piece of paper.
17          I know I'm kind of rambling, but this -- I
18    just -- a lot of that should be discounted,
19    but . . .
20          Q    Okay.  So I asked you -- I think you
21    answered, you know, was there a particular topic
22    where you felt like you weren't sufficiently
23    trained during your FTO period, and you said the
24    report writing.
25          A    Yeah, paperwork, report writing, boat
```

Todd Alexander-Cloud Abshire
June 13, 2017

124

```
 1   handling.
 2        Q    Okay.  So I think you said you were given
 3   some training on the report writing -- is that
 4   right -- during the FTO period?
 5        A    I was, yes.
 6        Q    Okay.  But you just felt like it wasn't
 7   sufficient?
 8        A    Yes, ma'am.
 9        Q    Okay.  Do you remember, like, how much
10   training you got?
11        A    Well, the -- going back to how FTO works,
12   like, the FTO does the -- you're, like, riding
13   along with him, and you're just -- you don't do
14   anything the first couple of days.  You just watch
15   him do everything.  And then it steadily
16   progresses to where he does some of the work, and
17   then you do some of the work, and then -- so it's
18   a completely flipped roll reversal.
19        So my training with writing reports was
20   sitting there initially watching him do
21   everything, and then the next time he's like, "All
22   right.  Well, you're going to fill out this
23   section of the report."  And it just -- it didn't
24   work for me.  That training method didn't really
25   stick with me.
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        Q    Okay.  And are we talking about the Daily
 2   Activity Report or -- and then report writing?
 3   Those are two different things?
 4        A    Yeah, like, when the -- for offense
 5   reports, for specific citations that we issued.
 6        Q    Okay.  And so I notice in the FTO Check
 7   List, it looks like Aaron Monceaux was the one
 8   that trained you on both of those things.
 9        A    Yes, ma'am.
10        Q    Okay.  And it looks like the report
11   writing, September 15, and then the Daily Activity
12   Report, that's something different.  Right?
13        A    Yes, ma'am.
14        Q    Okay.
15        A    Daily Activity Report is just our
16   little -- we call them diaries or journals that --
17   you know, stop and get gas, write down how much,
18   you know.
19        Q    Okay.  And the report writing is what
20   we're talking about?
21        A    Yes, ma'am.
22        Q    Okay.  All right.  And so that was done by
23   Aaron Monceaux.  In your conversations with Aaron
24   Monceaux when he was training you in report
25   writing, did you ever mention to him that you
```

Todd Alexander-Cloud Abshire
June 13, 2017

126

```
 1    needed an accommodation?
 2         A    Not at the time.  The closest -- because I
 3    didn't know what an accommodation was --
 4         Q    Okay.
 5         A    -- at that time.  I -- I was asking him
 6    for, like, examples of his old reports so I could
 7    base reports off of, and that's how I kind of
 8    learned a little bit.  But we actually didn't
 9    write too -- that's the unfortunate part of my FTO
10    period was it was right -- relatively slow, so I
11    didn't get a lot of activities that other agents
12    did.
13         Like, you know, I had a very small amount of
14    stuff going on in my area, like, hunting-wise and
15    everything.  So I didn't -- even after I got let
16    off of FTO, there was still stuff that I should
17    have known how to do, but I didn't know, because I
18    never actually did it or saw anybody else do it.
19         Q    Because it didn't happen?
20         A    Yes, ma'am.
21         Q    I've got you.  Okay.  So I know I asked
22    you if you had asked Mr. Monceaux for an
23    accommodation.  You said you really didn't know
24    what that was.
25         A    Yes.
```

Todd Alexander-Cloud Abshire
June 13, 2017

127

```
1       Q    So let me rephrase the question.  So did
2   you ever talk to Mr. Monceaux or tell him you had
3   PTSD?
4       A    Oh, yeah.  Yeah.  He was fascinated by --
5   by me being in the military and everything.  A lot
6   of the older game wardens were.  So, I mean, we
7   talked on a regular basis.
8       Q    Okay.  So I know you talked to him about
9   your marine experience, but did you specifically
10  tell him that you suffered from PTSD?
11      A    Yeah.
12      Q    And in those conversations where you told
13  him that you suffered from PTSD, did you talk to
14  him about any ways in which that PTSD affected
15  your ability to do your job?
16      A    I -- I do.  One day he -- he had this
17  really annoying habit of, like, whenever he would
18  push the boat in full blast, he would, like, yip,
19  because he was a Cajun, and I guess that's what
20  they do.  I don't know.
21      He -- he was a weird, like, little southern
22  guy, but it was really -- that's one of my, like,
23  kind of triggers is loud, sharp noises.  Like, it
24  just kind of -- I don't know why.  I think it's
25  because it sounds like a rifle shot.
```

Todd Alexander-Cloud Abshire
June 13, 2017

128

```
 1        And he did that in my ear, and I actually,
 2   like, got upset.  And I had to, like, pull the
 3   boat down and tell him what he just did, because
 4   it, like, actually -- excuse my language, it
 5   pissed me off, because it was a loud noise, and I
 6   just went and automatically, like, started
 7   hyperventilating and -- combat mode, I guess you
 8   would say.  But because that's -- because that
 9   happened, I went on to tell him why I freaked out,
10   and that led us to discussing my PTSD.
11        Q    Okay.  All right.  So other than that
12   conversation, were there any conversations with
13   Mr. Monceaux where you explained to him any ways
14   in which PTSD affected your ability to do any of
15   your other job duties, like the report writing,
16   for example?
17        A    No.  We didn't write a lot of reports, so
18   it actually never came up.
19        Q    Okay.  And what about any of -- your other
20   two FTO officers?  Did you ever discuss your PTSD
21   with either of them, Mr. Delahoussaye or
22   Mr. Sanford?
23        A    Mr. Delahoussaye I did not, and Sergeant
24   Sanford I did.
25        Q    All right.  Tell me about the conversation
```

Todd Alexander-Cloud Abshire
June 13, 2017

1   you had with FTO Sanford.

2        A    It's kind of a long one, but to sum it up,

3   he did something -- he -- somebody left some gear

4   in his truck, and he automatically assumed it was

5   my gear, and he sent a picture to me, and he also

6   sent a picture at the same time to my lieutenant

7   saying, "Are you missing something?"

8        Like, and so I went through my truck and tore

9   it apart until I found the piece of equipment that

10  he found in his truck, because they assumed it was

11  mine, and it wasn't.  I went and found the

12  piece of -- my issued piece of equipment and sent

13  a picture right back.

14       And the next time I worked with him, I kind of

15  went off on him and told him that, you know, like,

16  I can't trust people already, because of my --

17  because -- I really went off on him, and I can't

18  tell -- say exactly what I said to him.  But I

19  remember describing my PTSD and, in a very firm,

20  you know, manner, telling him not to do that crap

21  again.

22       Q    And what did he say in response?

23       A    He apologized.

24       Q    Okay.

25       A    He said he didn't have a lot of experience

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        Q    Do you recall having any kind of a meeting
 2   with Captain Buatt where you went through your FTO
 3   Check List?
 4        A    I do.  This was the day that I -- remember
 5   I had said earlier that I had got off of FTO
 6   earlier?  And he called me into office.  I wasn't
 7   supposed to get off of FTO until December 9th,
 8   technically.  And he called me into his office,
 9   because that would have been the year mark that I
10   had been employed.
11        He called me into his office on this day and,
12   you know, discussed that from what he had read of
13   my FTO reports that I was ready to, you know, go
14   out on my own.  I was doing good enough to leave
15   the program early.  And that's whenever I brought
16   up to him that I didn't think I was ready, but,
17   you know, he said I was.
18        Q    Was there anybody else in that meeting?
19        A    Lieutenant Robertson was there, because he
20   was my actual supervisor, --
21        Q    Uh-huh.
22        A    -- you know, and I believe Senior Agent
23   Lowry was as well.
24        Q    Why was Lowry there?
25        A    Him and me were actually going to work
```

Todd Alexander-Cloud Abshire
June 13, 2017

133

1   that night together.

2       Q    Okay.  He was going to be your FTO?

3       A    No.

4       Q    No?

5       A    He wasn't qualified.  It was just agent

6   paired up with agent working.

7       Q    Okay.

8       A    And, actually, that night Lieutenant

9   Robertson, I believe, came out with us, too.  We

10  had a complaint investigation that we were working

11  on.

12      Q    Okay.  All right.  So in that meeting with

13  Captain Buatt where he said he thought you were

14  ready to leave the FTO program, was it your

15  understanding that you were to work on your own

16  going forward?

17      A    Yes.

18      Q    Were there also going to be times, like,

19  for example, that evening, where you were also

20  going to be assigned to work with other agents?

21      A    "Assigned" is -- it's not as structured as

22  that.  If they have -- you could -- I could have

23  just called Lieutenant Robertson and been like,

24  "Hey, Lowry is working on something important.

25  Can I come help him out?"  He would have been

Todd Alexander-Cloud Abshire
June 13, 2017

134

```
 1    like, "Yeah."  That's how that usually works.
 2        We weren't really assigned to work with each
 3    other, because we made our own schedule, so dudes
 4    that work together a lot would be like, "Hey, I'm
 5    going to work "water -- or, "I'm going to work
 6    fishing in this lake with so-and-so as my backup."
 7    So that's how that system kind of worked.
 8        Q    Okay.  So you could work with other
 9    agents?
10        A    Yeah.
11        Q    Okay.
12        A    But it wasn't like they were cutting me
13    loose and I was, like, you know, banished from
14    working with other people.
15        Q    Okay.
16        A    He just said he would like to see me work
17    more on my own.
18        Q    Okay.  Okay.  And let me show you a
19    document I'm going to mark as Exhibit 12, and tell
20    me if you've ever seen this document before.  It's
21    entitled, "District Supervisor's Recommendation
22    Report."
23        A    (Reviewing document)  Yes, ma'am.
24        Q    Okay.  You've seen this document before?
25        A    Uh-huh, I have.
```

Todd Alexander-Cloud Abshire
June 13, 2017

135

```
 1        Q    And I don't see your signature on this --
 2   on this page anywhere.  Do you see it?
 3        A    I didn't have any role in -- this was, you
 4   know, above my pay grade.
 5        Q    Okay.  But they showed it to you?
 6        A    Yes, ma'am.
 7        Q    Okay.
 8        A    This was actually in -- this was in the --
 9   the same binder as all of these (indicating).
10        Q    Okay.  So it goes with your FTO Check
11   List?
12        A    Yes, ma'am.
13        Q    All right.  And so this is the document, I
14   think, where both Robertson and Buatt are signing
15   off for you to leave the FTO program.
16        A    Yeah.  Yes, ma'am.
17        Q    Is that correct?
18        A    That's correct.
19        Q    And so this would have been the same
20   meeting where they told you it's time for you to
21   leave the FTO program?
22        A    Yes, ma'am.
23        Q    Okay.  At that point in time, did you tell
24   Lieutenant Robertson that you suffered from PTSD?
25        A    I did.
```

1    Q    All right.  Tell me about the first time
2  you told him that.
3    A    It was the first day I was meeting him in
4  the region.  I had met him earlier, as I said
5  before, at the -- during the academy.  But I
6  graduated on a Wednesday, I believe it was, and I
7  saw him the next day, so it was the Thursday after
8  I graduated, whatever date that was.
9        And it was kind of his "welcome aboard" little
10  message he had for everybody, like, you know, "If
11  you need something, come talk to me", blah, blah,
12  blah, just -- it wasn't even anything, like,
13  official.  It was kind of -- he just pulled me
14  aside into the lounge at the office in Lake
15  Charles, you know, and just said what he expected
16  of me, which was, you know, write good reports,
17  listen to your FTO, learn from them, and that was
18  pretty much it.
19    Q    Okay.
20    A    And he asked me, you know, "Do you have
21  any questions of me?"  And that's whenever I
22  brought up how -- I said, "I've never been in law
23  enforcement, and I've never hunted or fished a day
24  in my life, but" -- "so I'm going to need a lot of
25  help.  Is there any way I can get some, like,

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   resources or some of the old reports and
 2   everything," because that was what Sergeant Turner
 3   had actually -- you know, he gave me advice before
 4   I graduated.  You know, "Get with your other
 5   agents that have been there for a while and base
 6   your stuff off of them, because they're doing it
 7   right, because they're still there."
 8        So that's what -- I kind of went in with that
 9   attitude, and, you know, he did the whole, "Thanks
10   for your service," blah, blah, blah, kind of deal.
11   And, you know, he said, "Well, just get with other
12   agents," and, you know, "They have" -- "they have
13   a lot of experience."  And that kind of ended that
14   conversation.  And that was, like I said, after I
15   graduated, so it was -- I was still in FTO.
16        Q    Okay.  So at what point during that
17   conversation did you tell him you had PTSD?
18        A    That day, because I said, you know, I
19   served in the military, and I have PTSD, because
20   he actually -- it actually surprised me.  He was
21   pretty -- I'm missing the word, but he kind of
22   asked me in a blunt manner, like, "Oh, did you
23   ever get shot at or ever get in a firefight?"
24   Like, it's -- he didn't have a lot of manners in
25   the way he asked it.  And I said, "Well, yeah, you
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   know.  I've gotten into firefights and stuff," and
 2   we kind of talked about that.
 3        But when I told him about my PTSD and
 4   everything, he asked me, "Well," you know, "has it
 5   ever been an issue before?"
 6        And I said, "No."  You know, "In the military
 7   they're so used to guys, you know, acting all
 8   crazy that," you know, they kind of have based the
 9   system around it."
10        And he said -- that's whenever he said,
11   "Always seek" -- you know, "Get advice from other
12   agents."  Like, you know, "If you want to see some
13   reports or anything, get with them."  And that's
14   what I did.
15        Q    So he asked you -- I just want to make
16   sure I understand your testimony correctly.  He
17   asked you whether or not the PTSD had ever been an
18   issue before?
19        A    Uh-huh.
20        Q    Okay.  And I know you said to him that you
21   had not hunted or fished -- or fished before, and
22   so you were going to need some help, or need some
23   resources.
24        A    Yes, ma'am.
25        Q    Did you tell him that you were going to
```

Todd Alexander-Cloud Abshire
June 13, 2017

139

1    need any kind of additional help because of your
2    PTSD?
3         A    No.  At that point I didn't know that I
4    was entitled to those rights, but I had -- I was
5    asking him essentially for the same things that I
6    had gotten in the Marine Corps.  I thought that it
7    wasn't asking too much, so -- I didn't know that
8    there was a thing called "reasonable
9    accommodations."
10        I'm not even -- like, I didn't know it.  Like,
11   that's why I wasn't aware of my rights at the
12   time.  I would have been a little more firm, but I
13   was just expecting what, I guess, any decent
14   supervisor would do.  I asked him for help, you
15   know, because I wasn't -- I wasn't quite getting
16   it, and that was my version of asking for
17   reasonable -- I told him that I was having issues
18   with it.
19        Q    Well, yeah, but I guess that's what I was
20   going to ask you.  So when you transferred into
21   the region, --
22        A    Uh-huh.
23        Q    -- at that point in time, right after you
24   graduated, --
25        A    Yeah.  See, I --

Todd Alexander-Cloud Abshire
June 13, 2017

1    Q    -- were you even struggling at that point
2  in time?
3    A    I wasn't.  I wasn't struggling at all.
4  The only thing was I hyper -- the tension and
5  everything.  I got prescribed Adderall at that
6  time, which is a controlled substance, so I had to
7  tell them that I got prescribed it, which I don't
8  know if that's included in any documents.
9    But, yeah, because -- for my PTSD I got
10  prescribed Adderall to help me calm -- calm me
11  down and not be so jumpy all the time, and I told
12  them about that, and that -- because I got
13  prescribed that a week after I got sent to the
14  region.
15    Q    Who did you tell?
16    A    I asked Ms. Cindy.  I can't remember her
17  last name, but she's the secretary there.  And she
18  said, you know, "Tell Lieutenant Robertson."  And
19  she was like, "You might need to get proof from
20  your doctor that you're getting prescribed it,"
21  like, you know, have them print off something
22  showing that it's official.
23    And I e-mailed Lieutenant Robertson and
24  Ms. Cindy, I think, and after that I never got a
25  response.  So it kind of was one of those things

Todd Alexander-Cloud Abshire
June 13, 2017

142

1    in time when you had that first conversation with
2    Lieutenant Robertson and telling him you had PTSD,
3    you were not really having any particular issues?
4          A    No, ma'am.
5          Q    Okay.  All right.  So when is the next
6    time you talked to Lieutenant Robertson about your
7    PTSD?
8          A    I want to say it's the same night as --
9    that I said that me and -- that they finally let
10   me go be on my own.
11         Q    Okay.  So that's that October date we
12   looked at?
13         A    Yes, ma'am, because if I'm -- if I'm
14   right, that night, me, Lieutenant Robertson, and
15   Senior Agent Lowry worked together, and it was
16   kind of like a sneaky little job that we had to
17   do.  We had to go in on the river without somebody
18   seeing us.  So we waited at the boat launch before
19   we launched our boat.  We were waiting for the sun
20   to set, and -- three guys just sitting in a truck.
21         So we started talking, and they -- they were
22   asking hypothetical questions.  And one of them
23   was, "Well, if you" -- "if there was one thing you
24   could change, what would it be?"
25         And I said, "I'd make it to where there's not

Todd Alexander-Cloud Abshire
June 13, 2017

143

```
 1   so much paperwork."
 2        And they started laughing.  They were like,
 3   "Aw, man, it's not so bad."
 4        And I said, "No.  It's like I have a problem
 5   with paperwork because of my PTSD.  My attention
 6   gets diverted.  I have to actually sit down and
 7   chain myself to a desk; otherwise, I'm going to
 8   get up and wander around and do something else."
 9        And their response was, "Well, it gets easier
10   with the paperwork."  Like, "You'll get used to
11   it.  You'll get the hang of it."
12        So, I mean, that's a very specific
13   conversation I remember having.  That's why I just
14   wanted to mention it.
15        Q    Okay.  And so Agent Lowry would have been
16   a part of that conversation as well?
17        A    Yes, ma'am.
18        Q    And do you remember any other
19   conversations with Lieutenant Robertson regarding
20   your PTSD?
21        A    Not for several months.  And it was 2015,
22   actually, whenever I started having really bad
23   issues with my PTSD, --
24        Q    Okay.
25        A    -- to the point where it was affecting my
```

Todd Alexander-Cloud Abshire
June 13, 2017

144

```
 1    job performance, and I got called into the office
 2    to discuss it with Lieutenant Robertson and
 3    Captain Buatt.
 4         Q    Okay.  Do you remember about when in 2015
 5    that was?
 6         A    I don't.  It's -- I included it in the
 7    paperwork I provided, but it's the formal -- or
 8    counseling worksheet or something.
 9         Q    Okay.  Okay.
10         A    It's three pages, I believe, and it was
11    just them stating the issue that was going on, and
12    I think they said it's not -- it wasn't negative
13    paperwork or anything.  It's just formal
14    counseling.  It's the first -- it's the first
15    thing before they write anything negative
16    paperwork-wise on me.
17         Q    Okay.  Let me show you a document I'm
18    going to mark as Exhibit No. 13.
19         A    Okay.
20         Q    And you tell me if this is it, what you're
21    referring to.
22         A    (Reviewing document)  Yes, ma'am.
23         Q    Okay.
24         A    This is what we had.
25         Q    So Exhibit No. 13 is entitled, "Counseling
```

Todd Alexander-Cloud Abshire
June 13, 2017

1   Conference Worksheet," and it's got a date of

2   May 13, 2015.  So is this the meeting that you're

3   recalling?

4        A    Yes, ma'am.

5        Q    Okay.  All right.  So tell me what you

6   remember.

7        A    I started having real issues with my --

8   with my PTSD.  I'm not sure what caused it

9   directly.  It actually started a couple of months

10  before this date up here, this May 13.  It was

11  probably maybe February where I started having,

12  like, recurring nightmares, and it was affecting

13  my marriage, and it started affecting, you know,

14  my -- my job, too.  And, admittedly, in here I

15  admit -- I took blame for my actions.  I said,

16  "Hey, I messed up.  I don't have any other

17  excuses.  I'll work on it."

18       But Lieutenant Robertson -- they -- they're --

19  in here they're discussing on this date they tried

20  to contact me.  I'm not sure -- he ended up coming

21  to my house, and I sat down with him and had,

22  like -- I told him I was -- I had tears in my

23  eyes, because -- I mean, it's hard describing to

24  y'all, because y'all don't have PTSD.

25       But whenever -- there's certain times when it

Todd Alexander-Cloud Abshire
June 13, 2017

146

```
1   gets -- it hooks into you, and I was, like, crying
2   because I just felt so hopeless, and he was there
3   for that.  And me and him sat down and talked
4   about it, and he saw me at my weakest when I --
5   with my PTSD.  He was very much aware of it.
6         And he later on denied that we had that
7   meeting at my house, because he -- he says here
8   that he -- they came to check on my well-being,
9   but then he said that we -- he never -- I just
10  wanted to throw that out there, too.
11        Q    Yeah.  That's fine.  So you had this
12  meeting on May 13, 2015, with Captain Buatt and
13  Lieutenant Robertson.  Right?
14        A    Yes, ma'am.
15        Q    Okay.  And so my question to you was, you
16  know, to describe the next meeting you had where
17  you talked about your PTSD.  So, if I understand
18  your testimony correctly, it sounds like you had a
19  conversation with Lieutenant Robertson --
20        A    At my house.
21        Q    -- at your house.
22        A    Yeah.
23        Q    Okay.
24        A    Because I wasn't respond -- I hadn't
25  responded to -- it was my off week, but I had -- I
```

Todd Alexander-Cloud Abshire
June 13, 2017

147

```
 1    hadn't turned in some paperwork, apparently, and
 2    they were trying to get a hold of me.  And
 3    whenever I'm at my lowest, like, I can't even
 4    answer the phone sometimes, and I knew my phone
 5    was ringing, but it's -- I couldn't even will
 6    myself to go check -- check it.  Like, it was --
 7    and it was one of my days off.  And I know I was
 8    subject to call 24 hours a day, but it's one of
 9    those -- I really couldn't control it.
10         Q    Okay.  So let's tackle one thing at a
11    time.  So even looking at this memo, in that first
12    paragraph, which is what I think you're talking
13    about, --
14         A    Yes, ma'am.
15         Q    -- it says, "On April 8th and 9th on your
16    days off, I made numerous attempts to contact you
17    by phone over some paperwork issues, and you never
18    answered, nor did you call me back."  And I think
19    this is -- captain Buatt is the "I."  So do you
20    recall Captain Buatt attempting to contact you
21    during April 8 and 9 on your days off?
22         A    I remember them discussing it.  I don't
23    really -- I'm not trying to be evasive here, but I
24    can't really recall 100 percent what I did
25    whenever I was acting like that.  It's -- I really
```

Todd Alexander-Cloud Abshire
June 13, 2017

148

```
 1    wasn't in control.
 2         Q    Okay.  But you remember that they
 3    discussed with you --
 4         A    I do remember.
 5         Q    -- the fact that they had tried to reach
 6    you several times?
 7         A    Yes, ma'am.  I do remember them saying,
 8    like, "We" -- "Hey, we've been trying to get a
 9    hold of you, man," and . . .
10         Q    Okay.  And you just don't have a
11    recollection one way or the other?
12         A    I remember them trying to get a hold of
13    me.
14         Q    Okay.
15         A    But I just -- specific -- just my state of
16    mind, I can't be -- I can't recall something that
17    accurately.
18         Q    Okay.  Then it says, "I sent Lt. Robertson
19    to your residence on the afternoon of April 9 to
20    check on your wellbeing.  Lt. Robertson made
21    contact with you and you advised you had been sick
22    with some sort of mouth infection that resulted
23    from being hit in the face with a board . . ."  Is
24    that accurate?
25         A    No.  That's the -- well, the board part
```

Todd Alexander-Cloud Abshire
June 13, 2017

1    is, but he -- he didn't mention how he talked to

2    me with -- whenever I was, like, upset, like,

3    because stuff was just going wrong at that point,

4    and it was kind of was compiling.  Like, I got hit

5    in the face with a board, and my mouth was all

6    swollen up.  Me and my wife were having problems,

7    and me and my -- my PTSD is in full force.

8         And he came over, and, like, that's why I -- I

9    kind of, like, sobbed -- not sobbed to him, but I

10   cried on his shoulder a little bit just telling

11   him what I was going through, and then he didn't

12   even mention that.  He just mentioned that I had

13   been sick with a mouth infection, but he didn't

14   mention that -- how I had told him that I had been

15   having trouble sleeping.  Me and my wife were

16   having problems.  You know, I was just getting,

17   like -- I needed to change my medicine or

18   something.  He didn't mention any of that.

19        Q    Right.

20        A    So . . .

21        Q    So in that conversation with Lieutenant

22   Robertson, you specifically told him that you were

23   having issues with your PTSD?

24        A    I did.

25        Q    Okay.

Todd Alexander-Cloud Abshire
June 13, 2017

150

```
 1        A    I immediately -- I told him after -- my
 2   face was all swollen, too, and I told him about
 3   getting hit in the face with a board and then my
 4   PTSD right after that.
 5        Q    Okay.
 6            MR. SMITH:
 7                 Excuse me just a minute.  Go off the
 8        record.
 9                 (OFF RECORD DISCUSSION)
10                    (RECESS TAKEN)
11   BY MS. KEENAN:
12        Q    All right.  So we were talking about the
13   different conversations that you had had with --
14   excuse me -- Lieutenant Robertson regarding your
15   PTSD.  And before we broke, we were talking about
16   the conversation that you had had with Lieutenant
17   Robertson in April when he came to your house.
18        A    Yes.
19        Q    Okay.  And I think you described a
20   conversation with him where you -- I think, to use
21   your words, you said you sort of cried on his
22   shoulder?
23        A    Yeah.  I was pretty upset just because of
24   everything that was going on, and I kind of -- I
25   started talking to him, and it just kind of all
```

1    came out, you know.  I wasn't trying to make

2    excuses or anything to him.  I was just trying to

3    let him in on what was going on.

4         And he, like, you know -- you know, said

5    normal -- like, "Oh, it will get better," blah,

6    blah, blah, and, you know, "but we've got to

7    work" -- he was mainly focused on the work

8    aspects.  That was his response.

9         He said, "Well, Captain sent me here because

10   we were worried about you."  You know, "We haven't

11   heard from you."

12        And I was like, "Well, thank you.  I

13   appreciate that."

14        And then they -- this was before we had signed

15   this, and then when I went back to work, they had

16   it waiting for me, because they were like, you

17   know, "We talked about it, but it's not" --

18   "doesn't count against you.  It's just showing

19   that we" -- "we saw some issues with your

20   performance, and we were going to discuss them,"

21   so . . .

22        Q    How long do you think that conversation

23   with Lieutenant Robertson at your home -- how long

24   do you think that lasted?

25        A    Oh, not -- not nearly that long, 15

```
 1    minutes.  He kind of came by just to make sure I
 2    was alive still, and then, you know, I kind of
 3    cried.  And then, you know, he said, "Well, good
 4    to hear from you," blah, blah, blah.  And, you
 5    know, "Whenever your shift starts next time, just
 6    give me a call, and we'll" -- "we'll meet up at
 7    the office," because, you know, they were planning
 8    on doing that.
 9         Q    Okay.
10            MR. SMITH:
11                Excuse me, Christine.  And you're
12         referring to the employment agreement, sir?
13            THE WITNESS:
14                I'm referring to the Counseling
15         Conference Worksheet.
16            MR. SMITH:
17                Counseling conference.
18    BY MS. KEENAN:
19         Q    Did you ever tell Lieutenant Robertson
20    that it was your wife that had hit you in the
21    face?
22         A    My wife?  I did.
23         Q    Okay.  Is she the one that hit you in the
24    face?
25         A    Yes, she did.
```

1        Q      With a board?

2        A      Yeah.

3        Q      And y'all were having marital difficulties

4   at the time?

5        A      Yeah.  She was also suffering from

6   withdrawals.  She was addicted to drugs at the

7   time, so . . .

8        Q      Okay.  Did you tell him that as well?

9        A      I did.  I discussed that with him.

10       Q      Okay.  All right.  So we were talking

11  about the different conversations you had had with

12  Lieutenant Robertson about your PTSD.  So you

13  mentioned the conversation in April at your home.

14  When was the next time you had a conversation with

15  Lieutenant Robertson about your PTSD?

16       A      Not -- in person or -- I sent him a -- an

17  e-mail following this meeting, because he kind

18  of -- I felt like he kind of railroaded me.  We --

19  he came over to my house, and we talked, and I

20  thought we had an understanding.

21            And whenever I went in the next time and I had

22  the actual sit-down meeting with the captain and

23  they provided this form for me to sign, they

24  didn't mention nearly anything that I talked to

25  Lieutenant Robertson about.  And at the time, I

Todd Alexander-Cloud Abshire
June 13, 2017

154

```
 1   didn't want to call him out on it, because I'm a
 2   big respecter of chain of command, so I wanted it
 3   to be like -- I wasn't sure if he didn't include
 4   that in what he told the captain because he was
 5   trying to look out for me, because, you know, he
 6   came over to my house, and I was, like, hysterical
 7   almost, like, and I'm supposed to be a law
 8   enforcement officer.  That probably would raise
 9   some concerns.
10       So I wasn't sure if he neglected to tell the
11   captain that on purpose or what, but he kind of
12   made it -- by him neglecting to even mention our
13   conversation that we had about the PTSD and how --
14   what it was doing, he kind of just put it all on
15   me as poor performance.  Like, he didn't even
16   mention the PTSD, and that kind of upset me.
17       So I sent him an e-mail, I think, the same
18   day, because I didn't get a chance to talk to him
19   one-on-one, and I included that, I believe.  I
20   pretty much kind of called him out on not having
21   my back, I guess, in the meeting with the captain,
22   like, kind of just blowing off everything I had
23   said.
24       Q    Okay.  So you think there's an e-mail
25   after -- dated sometime after May 13?
```

Todd Alexander-Cloud Abshire
June 13, 2017

155

1       A    Yes, ma'am.  It actually might be the same

2    day.  I was pretty upset about it.

3       Q    Okay.  So there should be an e-mail from

4    you to Lieutenant Robertson dated May 13 or

5    sometime thereafter to address the meeting with

6    the captain?

7       A    Yes.

8       Q    Okay.  And the fact that he didn't raise

9    the issue of your PTSD?

10      A    Yes.

11      Q    Okay.  So it would be by e-mail, you

12   believe?

13      A    Yes, ma'am.

14      Q    Okay.  All right.  Any other conversations

15   that you remember or communications that you

16   remember with Lieutenant Robertson?

17      A    I mean, we exchanged e-mails sporadically.

18   It was mainly -- he communicated -- we worked on

19   opposite shifts a good bit.  He communicated

20   through, like, our weekly paperwork.  We would,

21   you know, turn in, at the end of our shift, a

22   manila folder with all of our citations that we

23   had written.  And the next week when we, you know,

24   went to get our schedule to see what we were

25   working, he would include, like, any notes he had

Todd Alexander-Cloud Abshire
June 13, 2017

156

```
1   for us.  And, you know, that's primarily how we
2   communicated.
3        Q    Okay.  And so in that envelope with the
4   paperwork, would he have notations as to
5   corrections on your reports?
6        A    Yes, ma'am.
7        Q    Okay.  And that's how he would communicate
8   to you the corrections that should be made?
9        A    Yes, ma'am.
10       Q    And it's my understanding that he would
11  have office hours on Monday.  Is that consistent
12  with what you remember?
13       A    I'm not going to say no.  I mean, he was
14  kind of -- I always remember him being on opposite
15  shifts, but he's also a really busy person,
16  because, like I said earlier, he was the weapons
17  instructor for Wildlife and Fisheries.  So he
18  usually had to leave like at least once a month to
19  come to Baton Rouge.  So I honestly can't say if
20  that was his normal office hours or what.
21       Q    Okay.  Do you know if he had normal office
22  hours?
23       A    No, I don't --
24       Q    Okay.
25       A    -- just because his schedule is so
```

Todd Alexander-Cloud Abshire
June 13, 2017

157

```
 1   sporadic.
 2        Q    Okay.  So then do you remember any other
 3   specific communications with Lieutenant Robertson
 4   about your PTSD?
 5        A    No, ma'am, just, like I said, that e-mail,
 6   because after we had this meeting, I thought
 7   everything was fine.  Like, we kind of had the,
 8   "Hey, this is what you're messing up," and I was
 9   like, "Thank you for letting me know.  I don't
10   have any excuses.  I'll do better," even though I
11   was upset with the lieutenant.  And then this is
12   the last time I actually remember them really
13   talking to me about my performance at all.
14        Q    Okay.  Now, I asked you about
15   conversations you had with Lieutenant Robertson
16   about your PTSD.  Do you recall any specific
17   conversations or communications where you asked
18   Lieutenant Robertson for any kind of accommodation
19   for your PTSD --
20        A    I did.
21        Q    -- to help you do your job?
22        A    Yeah.  Sorry.
23        Q    Okay.  That's okay.
24        A    I did.  I sent an e-mail.  Most -- like I
25   said, most of the communication -- we never worked
```

Todd Alexander-Cloud Abshire
June 13, 2017

158

1   the same shift.  There were times when I tried
2   going in there to bring it to him in person on my
3   days off, and I never really -- I got the vibe I
4   was bugging him.  He was always swamped with work,
5   so I would, like, you know, leave and come back at
6   a different time to ask questions.
7        And, you know, after that -- I was kind of,
8   like, ashamed that he saw me, like, crying and
9   stuff, so I tried, like, putting, like, a brave
10  face on after that.  And especially when he
11  didn't -- he kind of railroaded me at that
12  meeting, I didn't really trust him, like, after
13  that.  So I didn't really go to him for anything
14  after that.
15       Q    Okay.  But before the May 13, 2015,
16  meeting, do you recall any communications with
17  Lieutenant Robertson where you specifically asked
18  him either for an accommodation or some kind of
19  assistance to your job?
20       A    Oh, yes.  Yeah.
21       Q    Okay.  Tell me about that.
22       A    Through e-mails.  I mean, like I said, he
23  would return paperwork and have notes and
24  everything.  I would send him an e-mail saying,
25  "Hey, when you" -- "on this report, why did we

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1    have to write it this way," because he was -- he
 2    was sending back reports that had corrections, but
 3    he didn't -- he wasn't telling me why what I had
 4    done was wrong and -- or even why his way was the
 5    right way.
 6         Q    Okay.
 7         A    And I tried several times to ask him if --
 8    you know, "Could you give me some" -- the main
 9    thing I wanted from him was copies of his old
10    reports, because what I realized was I had been
11    relying on other agents and using their reports as
12    a template, and I wasn't, like, doing that well,
13    so why not just use his.  He's the boss, so I'll
14    use what he has written down.  He can't be wrong
15    if he's the one that's grading all this stuff, in
16    a manner of speaking.  But he never -- he never
17    did that.
18         Q    Did you ask him for his old reports?
19         A    I did, and it got -- I think it got to the
20    point where -- I almost felt like, as I said
21    earlier, I was annoying him, like, because I
22    started getting even a little more persistent in
23    asking for, you know, the reports and -- or even
24    just for a moment of his time even and him kind of
25    blowing me off or whatever or him being like, "Oh,
```

Todd Alexander-Cloud Abshire
June 13, 2017

160

```
 1  well, we have a region meeting in two weeks."  You
 2  know, "We could" -- "me and you can go sit down
 3  afterwards and talk about stuff."  And it never --
 4  it never happened, or it was always a rushed deal,
 5  so . . .
 6      Q    So with respect to the request for the
 7  reports, it's my understanding the reports are,
 8  like, in filing cabinets.  Is that consistent with
 9  what you remember?
10      A    Yes, ma'am, but we -- we had access to
11  those reports, but that's -- those were the -- the
12  copies.  Most agents carried around thumb drives,
13  and they do everything -- everything that, like,
14  they have work-related, they have templates of the
15  thousands of forms we have to use on the thumb
16  drive.  And a lot of them save their old reports
17  on a thumb drive, and that's what I was asking
18  for.
19      I wasn't about to go rooting around in the
20  cabinets for, you know, the original reports and
21  somehow something -- I lose one, and then they get
22  audited, and they're missing reports.  I just -- I
23  saw that as being an issue, so I didn't do it.
24      Q    Okay.  So you remember making those
25  requests to him through e-mails?
```

Todd Alexander-Cloud Abshire
June 13, 2017

161

```
 1         A     Yes, ma'am.
 2         Q     Do you remember any conversations with him
 3    about requesting his reports?
 4         A     After this meeting right here, --
 5         Q     The May 13 meeting?
 6         A     -- the May 13 meeting, I rarely saw him,
 7    and we never worked on the same shift.
 8         Q     Okay.  But before the May 13 meeting --
 9    I'm just trying to make sure I got all the times
10    that you asked him for assistance because you were
11    having issues with your PTSD.  So you mentioned
12    that there were e-mail communications --
13         A     Yes, ma'am.
14         Q     -- where you would talk to him.
15         A     And even after that meeting, I didn't -- I
16    never had, like, another follow-up meeting with
17    the lieutenant, like me and him one-on-one.  It
18    was all primarily through e-mails at my -- my
19    request, because when that happened, I got -- I
20    got pissed, and I started printing off e-mails and
21    saving evidence, and I started getting a little
22    paranoid, because around this time he called me
23    and said that I hadn't turned in some paperwork.
24         And I said, "Yes, sir, I did."
25         And he said, "Well, it's not in your envelope.
```

Todd Alexander-Cloud Abshire
June 13, 2017

162

1    You keep messing this up.  I thought we talked
2    about this."
3         So I drove up there later that night to the
4    office from my house and heard the phone ringing
5    in his office, went and answered it, and just
6    happened to look down in the trash can, and there
7    was my paperwork that I allegedly didn't turn in,
8    in his trash can.
9         So when I saw that, -- and I sent a picture of
10   it to my wife, who was waiting in the car
11   outside -- I didn't trust them at all after that.
12   I kind of ceased communication of anything other
13   than, "Hey, I have a boat repair that needs to be
14   done," or, "My vehicle needs something."  Like,
15   after that I kind of counted him like I wasn't
16   going to get any assistance from him.
17        And I can't remember the exact date.  It was a
18   little bit after that, but -- I'm starting to get
19   a little worked up thinking about it, actually,
20   but that was the last time I really tried talking
21   to him.
22        Q    Do you need to take a break?
23        A    Yeah.
24                    (RECESS TAKEN)
25   BY MS. KEENAN:

Todd Alexander-Cloud Abshire
June 13, 2017

163

```
 1        Q    I think you mentioned that when you were
 2   in Lieutenant Robertson's office, you had texted a
 3   picture of your report to your wife?
 4        A    Yes, ma'am.
 5        Q    Do you still have that?
 6        A    I don't.  I just felt that it was worth
 7   mentioning, but I tried my hardest.  It's gone up
 8   in the Cloud, wherever that is.
 9        Q    Okay.  And so I take it that when you went
10   into the office -- was this a weekend?
11        A    I believe it was -- it probably was a
12   weekend.  I just -- the way the scheduled shifts
13   are, I -- no.  wait.  It had to have been a
14   work -- a weekday.  It was a weekday.
15        Q    Okay.  Was this the evening time?
16        A    Yes.
17        Q    So nobody else was there?
18        A    No.
19        Q    And Lieutenant Robertson's office was
20   open?
21        A    Yes, it was and which was weird, because
22   it's like everything lined up perfectly, because
23   normally they, like, lock all the doors, and you
24   have to know the PIN code to get in to even the
25   main office, and it wasn't locked.  It was
```

Todd Alexander-Cloud Abshire
June 13, 2017

164

```
 1    actually wide open that day, and the phone was
 2    ringing.  So I went to check, because it's the
 3    office phone.
 4         Q    Okay.  Okay.  So my question to you had to
 5    do with communications that you had with
 6    Lieutenant Robertson prior to the May 13 meeting,
 7    and so do you remember any other specific
 8    communications you had with the lieutenant
 9    requesting accommodations or assistance with
10    respect to your PTSD?
11         A    No, ma'am, because it wasn't really that
12    big of an issue.  There was, like -- you know, I
13    was a new employee, so there was little hiccups
14    here and there.  I was messing up stuff.  But, you
15    know, actually, in the e-mails that they would
16    send out, it kind of -- it sounded like it was a
17    pretty relevant -- prevalent issue.  Like, a lot
18    of agents were messing up stuff, so I wasn't alone
19    in, like, getting -- not chewed out, but, like,
20    you know, my little graded reports back.
21         But I didn't really feel like I had an issue
22    to ask him for the reasonable accommodations,
23    because he hadn't told me anything was going
24    wrong.  I still, of my own accord, kind of --
25    because I'm a nerd when it comes to work.  I don't
```

Todd Alexander-Cloud Abshire
June 13, 2017

165

```
 1   have a social life, and whenever I'm working
 2   something I love, I, like, got really obsessed
 3   with it, so I was making my own kind of stuff, if
 4   that makes any sense.
 5        Q    Making your own --
 6        A    Like, flashcards and stuff, like, to
 7   memorize the, you know, Miranda rights and to have
 8   it down perfectly and so I don't look stupid in
 9   front of people.
10        Q    So was that working for you?
11        A    Yeah.
12        Q    Okay.  So were there any particular issues
13   that you recall having prior to May 2015?
14        A    There was the issue of how to -- like, on
15   our policy and procedure, the proper way to change
16   your schedule, if you need to.  And I -- I'll take
17   the blame for that, even though there were
18   circumstances, like, I changed my schedule, and I
19   followed the -- not the guidance, but the example
20   of another agent, but I didn't see the full
21   picture.
22        He said, "Oh, well," -- I was working with him
23   one day, and he said, "We need" -- "we're going to
24   have to work a couple of hours over.  I'll e-mail
25   Lieutenant Robertson and let him know."
```

1      Well, I thought that was the extent of what
2   you needed to do to change your schedule.  Well,
3   there's a huge policy and procedure book, and in
4   that book there's a little, small section that
5   says, hey, this is the right way to do that.  So,
6   admittedly, I messed that up, you know.  You know,
7   I take full blame for that, but that was -- that
8   was, like, one of the issues that I had that they
9   would bring up to me.
10      Q    Okay.
11      A    It was just kind of -- a lot of the stuff
12  was, you know, learning for the first time how to
13  do stuff.
14      Q    Okay.  All right.  Any other conversations
15  or communications that you recall with Lieutenant
16  Robertson where you asked him for an accommodation
17  or some kind of assistance related to your PTSD?
18      A    No, ma'am, I can't recall one.
19      Q    Okay.  At any point in time did you tell
20  Captain Buatt that you suffered from PTSD?
21      A    I did.  I didn't get into too much detail
22  with him.  I -- I was basing that off of my
23  interpretation of the chain of command.  Like, you
24  don't go to your boss' boss and talk to him about
25  your problems.  And so Lieutenant Robertson kind

Todd Alexander-Cloud Abshire
June 13, 2017

1    of was the one that I detailed and stuff.

2         But there was one day I can remember

3    specifically that I was -- it was after a region

4    meeting, and it was when I was still working -- I

5    was in the FTO program.  And Sergeant Monceaux, he

6    couldn't take me out that day.  He had an

7    appointment, so I rode with the captain around.

8         And he started asking me questions about my

9    military background.  And I mentioned that, you

10   know, I had been getting compensation from the VA,

11   because I was disabled technically, because I get,

12   you know, 1600 a month for it.  And he said, "Oh,

13   wow."  He's like, "Well, how do you" -- "why do

14   you get so much?"

15        And then I kind of broke down that form we

16   looked at earlier that kind of -- the ratings

17   decision from the VA, and I kind of briefly told

18   him about it, but I didn't really detail too much

19   how it affected me, because at that time it hadn't

20   started affecting me.  This was probably around

21   September of 2013 -- or 2014.

22        Q    Okay.  So you just simply told him that

23   you had PTSD?

24        A    Yeah.  He -- I don't even think -- like

25   most people, he probably didn't even know what

Todd Alexander-Cloud Abshire
June 13, 2017

168

 1   that was.  Like, he just heard me say a series of
 2   letters, and was like, oh, okay, but he probably
 3   didn't know.
 4        Q    And he didn't ask you any questions about
 5   it?
 6        A    No.
 7        Q    Okay.  Do you remember having any other
 8   conversations with Captain Buatt about your PTSD?
 9        A    One other one.  It was after -- after this
10   had happened, and --
11        Q    "After this," being the May 13 --
12        A    May 13.
13        Q    -- counseling?
14        A    It was probably in June, I want to say,
15   because it was before a region meeting that we
16   had, and it -- that would have been June 2015.
17        He called me at my house, and it was one of my
18   off days.  It was the captain.  He called me at
19   the house and asked me if I had told a reporter --
20   he -- pretty much he called me, and it came across
21   to me that he was accusing me of talking to a
22   reporter about something and giving the reporter
23   the wrong information.
24        So this had been stacked up on Lieutenant
25   Robertson pretty much railroading me at that

Todd Alexander-Cloud Abshire
June 13, 2017

174

```
 1    I don't know why he called me or why he thought I
 2    was the one going around doing that.  Maybe I was
 3    just the first person alphabetically in his phone,
 4    trying to figure out who it was, but --
 5         Q    And they didn't know who that --
 6         A    They didn't know.
 7         Q    -- employee was?
 8         A    No.
 9         Q    Okay.  And so after that conversation with
10    Buatt in June where he asked you about the
11    reporter, the first meeting you had with him was
12    the one following the region meeting in Crowley?
13         A    Yes, ma'am.
14         Q    Okay.  And you apologized to him for --
15         A    For being disrespectful.  I mean, I
16    just -- chain and command and all.  He was the
17    captain, and I spoke out of line.
18         Q    So you were telling me about that
19    conversation because I had asked you when was the
20    next time you had a conversation with the captain
21    about your PTSD.  So where did your -- where did
22    the conversation about PTSD come up?
23         A    Well, that's where it ties into the
24    ambulance.
25         Q    Okay.
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        A     They called -- because this -- this
 2   happened after that.  I think that it was in April
 3   or -- I don't have the exact date, whenever the
 4   ambulance was called on me, because I showed up to
 5   work.  I hadn't taken my medicine immediately,
 6   like, in the morning when I wake up like I was
 7   supposed to.
 8        Q     Okay.
 9        A     And I took it as I was walking out the
10   door.  And so by the time I got to the office -- I
11   lived literally five minutes from the office.  I
12   was waiting on Stewart to show up.  My medicine
13   still hadn't kicked me in -- still hadn't kicked
14   in, and I was sitting there trying to do
15   paperwork, and I couldn't focus.
16        And he noticed whenever he did show up that
17   something was kind of off about me.  Like, he said
18   I was acting, like, all -- kind of spaced out.
19        Q     This is Stewart Guillory?
20        A     Yes.  And he did a field sobriety test on
21   me, but not intentionally.  He was trying -- there
22   was a new guy, newer than me, that was there, and
23   they -- they wanted to use me as an example, like
24   how you're supposed to do a field sobriety test,
25   like, go through the entire thing.  And when they
```

Todd Alexander-Cloud Abshire
June 13, 2017

1    did the sobriety test, they noticed that I had

2    nystagmus, which is signs of impairment.

3        And Stewart called Lieutenant Robertson and

4    told him, saying, "Hey, I just did a field

5    sobriety test on Abshire, and I can't tell that

6    he's messed up, but he has nystagmus."

7        So then Lieutenant Robertson, who -- it was

8    his day off.  He showed up, and he did a field

9    sobriety test on me.  And then he said, "Well, I

10   have a friend that works for Acadian Ambulance.

11   They're going to come check you out."

12       And I was like, "Okay."  You know, I wanted --

13   because I didn't want them to think that I was

14   drunk.  Like, I was perfect -- I was cooperating

15   100 percent.

16       The ambulance showed up, and they took my

17   vitals, and they said aside from my blood pressure

18   being elevated, like, I was fine.  Like, they did

19   the whole series of tests as well, and, you know,

20   Lieutenant Robertson still made me go home.

21       Because of that, the way they handled that,

22   there were rumors going around.  That's where the

23   rumor started that I was an alcoholic and I showed

24   up to work drunk, even though I didn't.  I wasn't

25   drunk.  It was a lack of medicine, and I tried

Todd Alexander-Cloud Abshire
June 13, 2017

177

```
 1    explaining that.
 2         And they still persisted.  I mean, it still
 3    followed me around, because this was a month
 4    later.  I was talking to Hoover at the Lake Arthur
 5    Regatta, and we were working overtime.  And he --
 6    he told me -- his exact wording was, "So what's
 7    this I hear about you showing up drunk to work?"
 8         And I was like, "What are you talking about?"
 9         And then that's whenever he told me the rumors
10    that he was hearing.  And, like I said, he didn't
11    even work in the same district.
12         Q    Okay.  So in your conversation with
13    Captain Buatt in June of 2015 in Crowley, you were
14    telling him about the information Jake Hoover
15    shared with you?
16         A    Yes, ma'am.
17         Q    Okay.  So in what part of your
18    conversation with Captain Buatt did you talk about
19    your PTSD?
20         A    I said that I was sent home because the
21    medicine I take for my -- for my disability -- I
22    didn't call it PTSD.  I -- I remember my wording.
23    I said, "I got sent home because I didn't take my
24    medicine for my disability on time, and now people
25    think I'm an alcoholic."
```

Todd Alexander-Cloud Abshire
June 13, 2017

178

```
 1        And he said, "You don't think people started
 2   rumors about us whenever we were coming up through
 3   the ranks?"  He's like, "You've just got to let it
 4   roll off your shoulders."  And that's all they
 5   said about that.
 6        Q    Let me show you a document I'll mark as
 7   Exhibit No. 14.  Tell me if you've ever seen this
 8   before.  It's a statement by Sergeant -- Senior
 9   Agent Lowry.
10        A    (Reviewing document)
11             MS. KEENAN:
12                  Oops.  Got it?
13             MR. SMITH:
14                  Yeah, I've got it.
15        A    I remember this.  Oh, I don't remember --
16   I didn't receive this till after the fact.  It
17   wasn't until recently that I saw this.
18   BY MS. KEENAN:
19        Q    Okay.
20        A    But, I mean, yeah, reading through it,
21   it's -- I mention -- I didn't mention Stewart --
22   or Lowry being there, but he was there.  And he
23   also mentions that other Agent Vanya.  That's the
24   new agent I was talking about that they were
25   doing -- they were working on the tests.
```

Todd Alexander-Cloud Abshire
June 13, 2017

179

```
 1         Q     Okay.  And so he talked about the incident
 2    occurring on May 9, 2015.
 3         A     Uh-huh.
 4         Q     Is that consistent with what you remember?
 5         A     Yes, ma'am.
 6         Q     Okay.  And do recall him being present?
 7         A     Yes.
 8         Q     All right.  And in his statement he says
 9    that he was refreshing himself on SFST.  That's
10    the standard field sobriety test?
11         A     Yes, ma'am.
12         Q     And he was practicing that with Sergeant
13    Guillory.  Is that consistent with your
14    recollection?
15         A     I remember Vanya being a little more
16    active in the whole process, but . . .
17         Q     Okay.  And then he says, "I noticed Agt.
18    Abshire standing with his back towards Sgt.
19    Guillory and myself.  I asked Agt. Abshire if he
20    thought he should get in on some SFST practice
21    before we go on patrol.  Agt. Abshire stated that
22    he was staring at the interstate and that I could
23    do the first DWI and he would watch then."  Is
24    that consistent with your recollection?
25         A     Honestly, I couldn't say exactly.  I mean,
```

Todd Alexander-Cloud Abshire
June 13, 2017

180

```
1    I was not on my medicine at that point.  I was
2    waiting for it to kick in, so I was kind of in
3    zombie mode.
4         Q    So you had just taken your medicine, you
5    said, what, 30 minutes before you went into the
6    office?
7         A    Probably 30 minutes.  And, typically,
8    like, I wake up -- like, I like taking my time
9    doing stuff, so I would wake up sometimes two
10   hours early before I would go to work to slowly
11   get ready, and I would take my medicine first
12   thing when I woke up.  So, normally, I have that
13   hour, hour-and-a-half window where it's in -- it's
14   ready -- or I'm ready to face the world, and I
15   didn't have that this time.
16        Q    Okay.
17        A    I just don't understand why -- after this
18   happened, there wasn't any mention of this event
19   officially.  I didn't get punished.  I should --
20   according to them, and they're both -- they both
21   went to an advanced school in Florida, I was
22   intoxicated.  So why wasn't I fired on the spot or
23   punished?  I just never understood that.
24        Q    Okay.  So at some point they practiced the
25   field sobriety test on you.  Is that right?
```

Todd Alexander-Cloud Abshire
June 13, 2017

181

```
 1        A     It is.

 2        Q     Okay.  And it says, "While doing the HGN,"

 3   and that's the horizontal gaze --

 4        A     Nystagmus.

 5        Q     -- nystagmus, "I noticed lack of smooth

 6   pursuit and distinct and sustained nystagmus at

 7   maximum deviation."  Do you understand what that

 8   means?

 9        A     Yes, I do.

10        Q     Okay.  So it means that they noticed some

11   nystagmus on you, I guess.

12        A     Yes.

13        Q     Is that fair to say?

14        A     Yeah.

15        Q     All right.  And then it says, "Sgt.

16   Guillory did the HGN on Agt. Abshire as well."  Do

17   you recall that Sergeant Guillory performed that?

18        A     I remember being passed around.

19        Q     Okay.  All right.  And then it says, "When

20   Sgt. Guillory questioned Agt. Abshire as to why he

21   was not following the stimulus Agt. Abshire stated

22   that he was daydreaming."  Do you recall that?

23        A     I do remember saying something along those

24   lines.

25        Q     Okay.  "Sgt. Guillory began questioning
```

Todd Alexander-Cloud Abshire
June 13, 2017

182

```
 1    Agt. Abshire on the medications he may be taking."
 2    Do you recall that Sergeant Guillory was
 3    questioning you about your medications?
 4         A    I remember telling him, "I'm taking
 5    medicine, and it hasn't kicked in."  I remember
 6    explaining why I was -- I was like, "Dude, I just
 7    need to kind of chill for a moment."  And they
 8    kept, like -- tested me.
 9         Q    Okay.  All right.  Then it goes on to say
10    that, "Sgt. Guillory told Agt. Vanya to practice
11    the walk and turn and the one leg stand on Agt.
12    Abshire.  I did not observe the entire test but at
13    one point Agt. Abshire stepped off line and
14    laughed and stated once again that he was
15    daydreaming."  Do you recall that Agent Vanya
16    practiced the walk and turn and one leg stand
17    test?
18         A    I don't recall that, no.
19         Q    Okay.
20         A    Not exactly.
21         Q    Do you have any reason to disagree that
22    Agent Vanya would have conducted that test?
23         A    No.  I mean, actually, it makes sense,
24    because he was trying to learn.
25         Q    Okay.
```

Todd Alexander-Cloud Abshire
June 13, 2017

183

```
 1        A     Although in hindsight, they probably
 2    shouldn't have -- they were suspecting me of being
 3    intoxicated.  They shouldn't have had an untrained
 4    person follow up on their evaluation.
 5        Q     And it's your understanding that, I guess,
 6    Sergeant Guillory called Lieutenant Robertson to
 7    come out?
 8        A     Yes, ma'am.  And then Lieutenant Robertson
 9    showed up and did his little test, and the
10    ambulance showed up after that.
11        Q     Okay.  And I think you testified already
12    you weren't issued any kind of disciplinary action
13    in connection with that particular incident?
14        A     No.  It just kind of -- I don't even
15    know -- I don't remember filling out the leave
16    paper.  They put me on administrative leave, I
17    believe and -- just for the rest of the weekend.
18    And to cover myself, I -- I went to my doctor,
19    Kenneth Ebersole and requested that he do a drug
20    analysis on me, which I did, and I think I
21    submitted that, too.
22        Q     Okay.  And then when you were -- you said
23    "administrative leave."  You mean leave with pay?
24        A     Yes, ma'am.  Yeah.  They -- they took my
25    firearm and the keys to the truck and had -- I
```

Todd Alexander-Cloud Abshire
June 13, 2017

196

```
 1        A     No.

 2        Q     Okay.

 3        A     It was mainly Lieutenant Robertson.

 4        Q     All right.  Do you remember any

 5  conversations with Captain Buatt where you would

 6  have asked him for either an accommodation or some

 7  kind of assistance with respect to your PTSD to do

 8  your job?

 9        A     I do.

10        Q     Okay.

11        A     I don't have any of the examples with me,

12  but I had asked his advice on how to complete

13  something, and it was -- I made a checklist, kind

14  of, like, step by step what to do, how to fill out

15  a citation, and I kept it, like, a little

16  book-sized version with me, and he saw that.

17        And he was like, "Well, why do you need that?"

18        And told him -- I was like, "Well, I just kind

19  of had something like this similar in the Marine

20  Corps."  You know, "It had" -- "it was just, like,

21  a guide on how to do" -- "fill out a citation."

22        And he's like, "Well, do you really" -- "is it

23  really that bad?  Do you need it?"

24        And I was like, "Yes, sir."  I was like, "You

25  know, sometimes I just get so overwhelmed.  Like,
```

Todd Alexander-Cloud Abshire
June 13, 2017

197

```
 1    I can't concentrate, and it will help me" -- "keep
 2    me on track."
 3          And he was like, "Oh, okay."  He was like,
 4    "That's pretty smart, I guess," you know.  And
 5    then he walked into his office.
 6          Q    Okay.  So you didn't make any specific
 7    request to him at that time?
 8          A    No.  No.
 9          Q    Okay.  You were just telling him --
10          A    Yeah.
11          Q    -- about that accommodation you had done?
12          A    Yeah.  It was -- like I said earlier,
13    Lieutenant Robertson was mainly the guy that I
14    talked to, because that whole chain of command
15    thing, in the Marine Corps it's like -- I know
16    it's -- I keep comparing it, but it's -- that's
17    like law.  You don't break the chain of command
18    ever.  You get in trouble if you skip somebody in
19    the chain of command.
20          And so that's how I was kind of applying it to
21    the civilian world, because they still use rank
22    and stuff, so it kind of threw me.  Like, the
23    captain is like, "Oh, my door is always open," but
24    I always went to the lieutenant before telling him
25    anything, because that's just something people in
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   charge say.  Their door is not really open.  You
 2   don't -- they're trying to make light of it, but
 3   they're never serious about that kind of stuff.
 4   You know, it's like, "Why are you in my office,"
 5   kind of.
 6        Q    But did anybody at the agency tell you
 7   that you had to follow that chain of command?
 8        A    At -- during the academy.
 9        Q    Okay.
10        A    But afterwards it's kind of like -- they
11   said, "Oh, throw it out the window."  But in the
12   policy and procedure, it does mention chain of
13   command and the proper way to do stuff.  So,
14   technically, I guess I was -- I was obeying policy
15   and procedure by not telling the captain.  I mean,
16   I was waiting to tell the lieutenant anything,
17   so . . .
18        Q    And so I think you answered this already.
19   Even though you felt like the lieutenant wasn't
20   responsive to you, you didn't raise that issue to
21   the captain?
22        A    Oh, yeah, because at that point I didn't
23   trust anybody at the office at all, after hearing
24   the rumors and, you know, Sergeant Guillory
25   saying, like, "Hey, you need to watch yourself.
```

Todd Alexander-Cloud Abshire
June 13, 2017

1    They're gunning for you."  Those were his exact

2    words.  Like, that's not something you want to

3    hear about work.  So I kind of shut off being

4    friendly with them even.

5         Q    Okay.  So the question I had asked you was

6    any conversations or communications you had had

7    with Captain Buatt where you asked him for an

8    accommodation or assistance with your PTSD to do

9    your job.  Do you remember any other

10   communications with Captain Buatt?

11        A    No, ma'am.

12        Q    Okay.  So just that one situation where

13   you showed him that step-by-step guide you had?

14        A    Yes, ma'am.  Just for an example of the

15   chain of command, like, he would send out e-mails,

16   but he would send them to the lieutenants before

17   he sent them to us.  I know it doesn't make a lot

18   of sense to some people, because they're like, why

19   don't you just cut out the middle man?  It will

20   save time.  But that's how they stuck to the chain

21   of command.  I just wanted to emphasize that they

22   did have a chain of command there.

23        Q    Okay.  So any message that Captain Buatt

24   wanted to communicate to agents he would send

25   first to the lieutenant?

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1          A     Pretty much.
 2          Q     And then the lieutenant would send it to
 3    you?
 4          A     Yes.
 5          Q     At any point in time did you go to Human
 6    Resources to request any assistance in doing your
 7    job?
 8          A     I -- we didn't -- I had no idea who Human
 9    Resources was.  We had Ms. Cindy, who was the
10    enforcement secretary, and I went to her with all
11    my questions about a lot of stuff.  And her answer
12    was usually like, "Oh, well, send a letter to
13    Beau," or, "Send an e-mail to Beau," or, "Leave a
14    note for Beau."
15          Ruth Rigg, the Human Resources lady, I talked
16    to her through e-mail about -- I can't remember
17    what issue.  It wasn't connected to this, but I
18    never really even had the number to contact them.
19    It's -- I never thought about it really.  It was
20    my first -- we didn't have Human Resources in the
21    Marine Corps.
22          Q     Okay.  So you didn't have an understanding
23    about that?
24          A     Yeah.  It's -- you go to the people
25    that -- your bosses, your supervisors.  You go to
```

Todd Alexander-Cloud Abshire
June 13, 2017

201

```
 1  your supervisors, and that's how you fix problems.
 2  You don't go and complain to people.
 3       Q    Okay.  All right.  Let me show you a
 4  document I'm going to mark as Exhibit No. 16, and
 5  tell me if you remember this document.
 6       A    (Reviewing document)  I remember this.
 7       Q    Okay.  Exhibit 16, it looks like it's a
 8  performance evaluation, the Planning & Evaluation
 9  Form.  And I see on the left-hand side -- is that
10  your signature in the left-hand box under,
11  "Planning Session"?
12       A    Yes, down at the bottom where it says,
13  "Employee Signature"?
14       Q    Yes.
15       A    Yes, that's my --
16       Q    Dated June 16, 2014?
17       A    Yes, ma'am.
18       Q    Do you remember having a planning session
19  with Captain Buatt in June of 2014?
20       A    No.  I remember -- I'm fairly 100 percent
21  certain that if you go back on the 6/16/2014 when
22  I signed this, that was following -- it was a
23  region meeting day, and Lieutenant Robertson
24  called me after the meeting to come sign this,
25  because he said -- then that's when he kind of
```

Todd Alexander-Cloud Abshire
June 13, 2017

1  no meeting to discuss either of these?

2      A    No.  It wasn't -- we were at a meeting,

3  but it was a region meeting, and that was just,

4  like, a quarterly -- all agents get together under

5  one roof at the same time to discuss changes and

6  stuff.

7      Q    Okay.

8      A    So they actually didn't sit down with me

9  and say, "Hey, this is how we're going to grade

10 you."  This was a mystery to me until I finally

11 looked it up myself after my termination.

12     Q    Okay.  So they didn't go through with you

13 their expectations and the various goals that are

14 set forth in this --

15     A    No.

16     Q    -- planning document?  And is it your

17 understanding that the purpose of the planning

18 document is to set out goals against which you're

19 going to be evaluated in the upcoming year?

20     A    Yeah.  He -- instead -- rather than flip

21 through and go to each one, his version of

22 explaining it was the same work requirements

23 whenever we applied and everything, like, to be

24 able to perform the duties of a wildlife officer.

25 He said that was pretty much it.

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        Q    And when you say "he," are you talking
 2   about Buatt?
 3        A    I'm sorry.  Lieutenant Robertson.
 4        Q    Okay.
 5        A    Yeah.
 6        Q    And so you're saying "the same duties."
 7   I'm a little bit -- your testimony is a little bit
 8   unclear.  So tell me what he said to you when he
 9   started to describe what the expectations were.
10        A    Like, how it went was, I went up to -- I
11   went up to the desk that he was sitting at, or the
12   table.  And he said, "Yeah, I'm not going to bore
13   you with all the details, but this pretty much" --
14   you know, "we're going to go through and based off
15   your performance through the year, I'll check a 0
16   or a 2."
17        And he didn't get specific with what -- what
18   exactly it was.  He said, "It's pretty" -- he
19   said, "This is just based off of the work
20   requirements and responsibilities that you were,"
21   you know, not given, but, "you were made aware of
22   when you applied."
23        Q    Okay.  All right.  So there was no
24   in-depth discussion?
25        A    No.  He didn't, like -- it -- that didn't
```

Todd Alexander-Cloud Abshire
June 13, 2017

208

```
1    occur until I got my evaluation for this year,
2    whenever they sat me down.
3         Q    Okay.  After the year had --
4         A    Yes, ma'am.
5         Q    -- transpired?  Okay.  All right.  So that
6    was August of 2014.  Okay.  All right.  Let me
7    show you a document I'm going to mark as Exhibit
8    No. 18, and tell me if you've ever seen this
9    document before.  It's entitled, "Reallocation."
10        A    (Reviewing document)  I believe I saw this
11   after I was terminated.  I requested a copy of my
12   personnel record.
13        Q    Okay.
14        A    But I don't remember seeing it before
15   that.
16        Q    Okay.  So as I look at Exhibit No. 18, it
17   appears to show your promotion from the title of
18   Wildlife Enforcement Cadet to Wildlife Enforcement
19   Agent effective December 9, 2014.
20        A    Yes, ma'am.
21        Q    Is that consistent with your recollection?
22        A    On paper, yes.  Like I said before, in
23   October they had already made -- you know, we
24   discussed me being released early from it.  So at
25   that point I had been working on my own
```

Todd Alexander-Cloud Abshire
June 13, 2017

209

```
 1    unofficially, but it wasn't until -- because it
 2    was -- it was a requirement, one year from the
 3    date -- eligible date, so I was -- I started
 4    working the 9th of 2013, or December 9.  And so I
 5    wasn't eligible on paperwork-wise to be promoted.
 6    Sorry.  I just kind of rambled, but --
 7         Q    I understand what you're saying.
 8         A    Yeah.
 9         Q    But we discussed earlier when we looked at
10    your FTO Check List -- they had actually promoted
11    you off the FTO --
12         A    Yes, ma'am.
13         Q    -- program in October.
14         A    Yes.
15         Q    Right?
16         A    That's what I was describing.
17         Q    Yeah.  So from October until December 9,
18    you were already --
19         A    Yeah.  I was in this weird gray area
20    between an agent and a cadet.  Like, I was -- I
21    was allowed to go out and do my thing.  On paper I
22    was a cadet, but I was performing the duties of an
23    agent just --
24         Q    I understand.  And then in connection with
25    the actual formal promotion come December, there
```

Todd Alexander-Cloud Abshire
June 13, 2017

211

```
 1        Q    All right.  So I want to go back and look
 2   at Exhibit 13, if you don't mind.  That's the
 3   May 13 counseling session.
 4        A    Okay.
 5        Q    All right.  We had already talked about
 6   the first paragraph on Exhibit No. 13.  I want to
 7   take a look at the second paragraph, and I think
 8   we may have talked about this briefly, but I want
 9   to make sure we've discussed it.  You see the
10   second paragraph that starts [as read]:  "On
11   April 21, 2015, you were scheduled to work
12   10:00 a.m. to 8:30 p.m."?
13        A    Yes, ma'am.
14        Q    It says [as read]:  "I attempted to call
15   you by phone at 9:00 a.m., 10:00 a.m., and
16   10:40 a.m.  I made numerous attempts to contact
17   you on the radio with no response."  And again I
18   think that's Captain Buatt referring to himself
19   when he says "I."  Do you recall on April 21
20   Captain Buatt attempting to reach you several
21   times?
22        A    Well, I remember looking at my phone and
23   seeing it, and I remember the rest of -- that was
24   the incident I told -- I talked about earlier, how
25   I was having issues with not changing the -- my
```

Todd Alexander-Cloud Abshire
June 13, 2017

212

```
1   schedule according to the policy and procedure.
2        Q    Okay.  All right.  So we did talk about
3   that already.
4        A    Yes, ma'am.
5        Q    Okay.  All right.  Then the third
6   paragraph, it says, "On April 27, 2015 I received
7   an e-mail from Cindy Pippin advising you had not
8   turned in your P-card log and receipts from
9   March."  For the record, what's the P-card log?
10       A    It's a purchase log.  It's just their way
11  of shortening it even more.  It's -- if, for some
12  reason, I needed to make a repair on my boat or I
13  needed to buy something for work, I go through the
14  very, very long process of asking permission to
15  buy it.  And when I finally get to buy it, I have
16  to put it on this one certain, special form, among
17  a bunch of other ones, just to -- it's just a
18  series of checks and balances to make sure I'm not
19  using State money to go buy stuff for myself.
20       Q    Okay.  Because you're actually purchasing
21  that stuff with State money?
22       A    Yes.  We were all given our own credit
23  cards and everything through the State.
24       Q    Okay.  So on April 27, 2015, Buatt says he
25  received an e-mail from Cindy Pippin advising you
```

Todd Alexander-Cloud Abshire
June 13, 2017

213

1   had not turned in your P-card log and receipts for

2   March.  You had to be reminded to turn in your

3   P-card log almost a month after it was due.  Do

4   you recall that exchange?

5       A     I do.

6       Q     Okay.  And is that accurate?

7       A     It is.

8       Q     Okay.  It said you advised your lieutenant

9   that you lost a receipt and was in the process of

10  looking for it.  Is that also accurate?

11      A     Yes, I did.

12      Q     Okay.  And is there anything about your

13  PTSD that, you know, attributed to how you were

14  handling that situation with the P-card log on or

15  about April 27?

16      A     It's not going to sound too medical, but I

17  get scatter-brained, I guess, and part of my

18  attention -- it's just -- I can't emphasize how

19  tired I get being so alert all the time, like,

20  hearing noises and, like, twitching.  Like, I look

21  like I'm probably on drugs sometimes because I'm

22  over here twitching, but it's because I'm, like,

23  hearing noises.

24      And that's -- whenever I'm trying to sit down

25  and do something, I can't focus on it, because

Todd Alexander-Cloud Abshire
June 13, 2017

214

```
 1    I'll -- something will pass by, and, like, I keep
 2    hearing cars pass by, and when everyone passes by
 3    different, it sounds weird.  I get, like, alert.
 4    That's -- I don't know how else to explain it, but
 5    I completely attribute my poor performance to
 6    that.  I mean, I just couldn't sit down and focus
 7    on it.
 8         Q    Okay.  Have you ever talked to a physician
 9    about the kinds of work environments that would be
10    appropriate for your disability in light of the
11    symptoms that you just described, the
12    hypervigilance?
13         A    Uh-uh.  Uh-uh.
14         Q    Is that a no?
15         A    No.  I'm sorry.  No, I didn't.  They all
16    recommended plants and stuff.  I didn't want to
17    work in a plant.
18         Q    "They all recommended plants."  Who
19    recommended plants?
20         A    Oh, the doctor and, you know -- because I
21    was unemployed for a while, and they were like,
22    "Well, have you tried getting hired on here or
23    there?"  And it wasn't official advice.  It was
24    more of, "I know where they're hiring."  It was
25    hard to get a job, so . . .
```

Todd Alexander-Cloud Abshire
June 13, 2017

215

1      Q    Okay.  All right.  And then looking back

2    at Exhibit No. 13, that last paragraph [as read]:

3    "On May 3, 2015 you did not turn in your MV-3 for

4    the month of April with your weekly report."  Is

5    that correct?

6      A    Yes.

7      Q    "Lieutenant Robertson made several

8    attempts to contact you by phone with no answer."

9    Is this the MV-3 report that we were talking about

10   that you found in the trash?

11     A    This may have been it, because I could

12   have swore it was also -- it was an MV-3, and it

13   was my proposed schedule for the upcoming week.

14   Like, we kind of got to make our own schedules,

15   and we would submit an itinerary, and most times

16   they would let us work those days unless there was

17   something they had in mind for us.  I believe it

18   was this form and that form, the MV-3 that they

19   mentioned and another one.

20     Q    Okay.  Now, it talks about, "Lt. Robertson

21   made several attempts to contact you by phone with

22   no answer."  Is that accurate?

23     A    According to him, yes.

24     Q    But I'm asking you.  Do you recall?

25     A    I -- not particularly, just the -- this

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   was whenever I was kind of at the height of when I
 2   was off.  Like, I was -- when I wasn't working, I
 3   was kind of just secluding myself, scared to
 4   answer the phone, because I was having issues.
 5        Q    Okay.  [As read]:  "You finally called him
 6   back that afternoon.  While on the phone with
 7   Lt. Robertson he got another call and told you to
 8   hold on.  While Lt. Robertson was on the other
 9   call you hung up.  Lt. Robertson was on the other
10   call only briefly and made several attempts to
11   call you back when he got off the other line,"
12   and, "You did not answer."  Do you recall that?
13        A    I don't recall that.
14        Q    Okay.  Do you know if that's accurate?
15        A    I think I agreed to it whenever they --
16   this was going on, because it sounded familiar,
17   because they had mentioned how they had been
18   trying to contact me several times, but that's --
19   I guess it's accurate.
20        Q    Okay.  Do you have any reason to believe
21   it's not accurate?
22        A    They just -- they kind of emphasize how
23   they -- in this counseling sheet how they tried so
24   hard to get a hold of me, like they were fricking
25   Frodo trying to get to Mount Doom, and that's how
```

Todd Alexander-Cloud Abshire
June 13, 2017

217

1    hard it was to reach me, but that's not the case.

2        That's why I actually, in the past, printed

3    out my -- my phone logs, and you can see how many

4    times calls were made.  And I never submitted that

5    as evidence, but I didn't really think it was

6    relevant to my PTSD.  But it wasn't as crazy as

7    they're making it sound, me, like, being

8    unreachable.

9        There was times whenever I tried reaching

10   them, like several times, whenever I was in a

11   broken boat in the middle of the lake and no one

12   was coming to get me because they weren't

13   answering their phone.

14       Q    Okay.

15       A    So I just wanted to throw that out there.

16            THE WITNESS:

17                 I need a second.

18                 (RECESS TAKEN)

19   BY MS. KEENAN:

20       Q    And looking back at Exhibit No. 13, it

21   said -- it says in the last few sentences on that

22   first page, "Lt. Robertson needed your MV-3 on May

23   3rd.  You did not turn in your MV-3 until

24   May 4th."  Is that consistent with your

25   recollection?

Todd Alexander-Cloud Abshire
June 13, 2017

218

```
 1        A    Yes, ma'am.
 2        Q    All right.  "I reviewed your MV-3 and you
 3   had several" -- "several mathematical mistakes.  I
 4   returned it to you for corrections.  You made some
 5   corrections and turned it back into me.  I checked
 6   it again and the corrections had not been made."
 7   Is that consistent with your recollection?
 8        A    Yes, ma'am.
 9        Q    Okay.  And the MV-3 -- for the record,
10   what is an MV-3?
11        A    It's a motor vehicle report.  It's just a
12   log of -- every day that we drive our vehicle, you
13   just write the starting mileage, ending mileage.
14   If you get gas or anything, you put that down, --
15        Q    Okay.
16        A    -- information about that.
17        Q    And was there anything about your
18   disability that was causing you to be unable to
19   meet Captain Buatt's expectations with respect to
20   the MV-3 report?
21        A    Just numbers.  I can't -- I don't even
22   know if there's a number thing -- if there's a
23   number dyslexia or if it's attributed to my PTSD,
24   but I can't -- I'm no good with numbers.  Like, if
25   you told me your phone number, I wouldn't remember
```

Todd Alexander-Cloud Abshire
June 13, 2017

219

1  it.  More -- beyond -- I can remember a PIN number

2  of four digits and that's about it.  Other than

3  that, I have to write it down.

4        And being stressed and then staring at a piece

5  of paper with -- that's covered in nothing but

6  numbers, I just -- I was like -- I felt like a

7  little kid trying to fix stuff.  I'd hand it back

8  to them, and it was still messed up.  I -- I do

9  remember that specifically, because I remember how

10  frustrated I was getting.

11        Q    Okay.  Did you ask Captain Buatt for any

12  particular assistance with that report?

13        A    No, because there's nothing they could

14  have done, I think.  This is something I'll take

15  fully myself.  That's just the numbers thing.  I

16  mean, I just have an issue with numbers.  I mean,

17  I think all -- a lot of my MV-3s up to this point

18  were good.  It's just I started cracking under the

19  pressure.  I started having flare-ups of PTSD, and

20  me being suspicious of my supervisors wasn't

21  helping.  So I started making a lot of stupid

22  mistakes unintentionally.

23        Q    I've got you.  Okay.  All right.  So then

24  that last paragraph, -- I think I may have talked

25  about this already -- it says, "On

1    May 4, 2015 Lt. Robertson and I met with you in my

2    office to speak with you about paperwork issues

3    and not being able to make contact with you when

4    you were off duty."  So that was that initial

5    meeting you had with them after the situation when

6    Lieutenant Robertson went to your house?

7         A    Yes, ma'am.

8         Q    Okay.  And --

9         A    See, this form wasn't given to me.  It's

10   based off of this meeting.  This -- but I didn't

11   actually receive this form until the 13th of May,

12   but it was pretty much the typed, I guess, record

13   of that meeting that we had on the -- what day is

14   that?

15        Q    May 4?

16        A    Yeah, May 4.

17        Q    Okay.  All right.  So after the occasion

18   when Lieutenant Robertson went to your house and

19   you had the conversation --

20        A    Uh-huh.

21        Q    -- at home, you came back to work.  You

22   had a meeting on May 4 --

23        A    With the captain --

24        Q    -- with the captain?

25        A    -- and Lieutenant Robertson.

Todd Alexander-Cloud Abshire
June 13, 2017

221

```
 1        Q     Okay.
 2        A     And we went over all this, and I got it on
 3   May 13.  They -- I guess it was part of the
 4   process they -- to give me my copy.
 5        Q     Okay.  So when you got this paperwork on
 6   May 13, was that another meeting?
 7        A     No.  It was just a walk-in and kind of --
 8   they had it ready already and --
 9        Q     Okay.  Go ahead.
10        A     Oh, yeah.  I think the captain had it
11   ready, because, you know, me and the lieutenant
12   never worked the same schedule.  I went into the
13   office and got it, and he said, "Yeah, it's just a
14   typed summary of that" -- you know, "that
15   counseling session we had."
16        And I was like, "Okay."
17        So -- and I was there.  Stupidly, I went ahead
18   and signed it because I just wanted to get away
19   from him, and it wasn't until later that I read
20   the -- like, how the meeting went, and it just
21   seemed really slanted against me.
22        And earlier I was discussing how I was upset
23   with Lieutenant Robertson.  That's kind of -- I
24   was really upset when I read this, because I saw
25   that he actually didn't try sticking up for me or
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   even, you know, saying anything to the captain
 2   about what we had discussed.
 3        Q    Right.  So I wanted to clarify something.
 4   So now that we understand that you had had that
 5   meeting on May 4 --
 6        A    Yes, ma'am.
 7        Q    -- where you all talked about all the
 8   content of this, and you said you had gotten upset
 9   with Lieutenant Robertson because he didn't stick
10   up for you --
11        A    Uh-huh.
12        Q    -- based on your conversations that you
13   had had at your house?
14        A    Yes, ma'am.
15        Q    And you had sent him an e-mail either that
16   same day or the next day?
17        A    Yes.  I think I sent it that same day.  I
18   was --
19        Q    Okay.
20        A    -- pretty upset about it.
21        Q    So was it the day you had the meeting or
22   the day you got the counseling that you sent him
23   the e-mail?
24        A    Well, "the counseling."  You mean the
25   physical counseling sheet itself?
```

Todd Alexander-Cloud Abshire
June 13, 2017

223

1     Q     Yeah.

2     A     I think I sent it to him after that

3  meeting, because the counseling sheet doesn't -- I

4  mean, it sounds bad about me, but it doesn't --

5  you can't read the attitude and ego that took

6  place whenever they were -- the meeting actually

7  happened.

8     Q     Okay.

9     A     That's not recorded.  So I think it was

10  the day that the meeting actually occurred that I

11  sent out that e-mail to the lieutenant, --

12    Q     Okay.  That's what I was trying to

13  clarify.

14    A     -- because this is, like, a really bland

15  version of the meeting.

16    Q     And the handwriting -- when it says, "What

17  was the employee's explanation of the incident,"

18  that handwriting, is that your handwriting or

19  Buatt's?

20    A     The captain's, I believe.

21    Q     Okay.

22    A     Yeah, I believe that's the captain's.

23    Q     Because it says, "What was the employee's

24  explanation of the incident?"  And it says,

25  "Employee advised he is dealing with some issues

Todd Alexander-Cloud Abshire
June 13, 2017

224

1   in his personal life."  Is that consistent with

2   your recollection?

3       A    Yes.  See, he didn't -- but those personal

4   issues weren't mentioned whenever, like, I got my

5   chewing-out session.  Like, the lieutenant kind of

6   just didn't mention anything at all.  So that was

7   something that was added on here on May 13 when I

8   got it.

9       Q    Okay.  Were you telling the captain on

10  May 13, "Hey, Captain, I'm having personal

11  issues," or that was --

12      A    No.

13      Q    -- just from other conversations?

14      A    That was from other conversations.

15      Q    Okay.

16      A    Like, he, I guess, typed this up, because

17  that -- that meeting happened on -- I keep --

18  May 4?

19      Q    May 4.

20      A    May 4.  So about a week went by, and the

21  captain used his memory, and he recollected

22  what -- the conversation that took place a week

23  prior, typed it up, and then gave it to me.

24      Q    Okay.  And when he handed it to you, were

25  his handwritten notes on there already where it

Todd Alexander-Cloud Abshire
June 13, 2017

225

 1   says, "What was the employee's" --
 2        A    Yes, they were.
 3        Q    -- "explanation of the incident?"
 4        A    They were.
 5        Q    Okay.  And so it says, "Employee advised
 6   he is dealing with some issues in his personal
 7   life."  Would you agree with that statement?
 8        A    I would.
 9        Q    Okay.  And, "Other than the personal
10   issues, the employee advised he has no excuses for
11   the performance problems mentioned on this
12   counseling conference worksheet."  Is that
13   consistent with what you remember?
14        A    Yes.
15        Q    Okay.
16        A    Because I -- the personal issues I was
17   speaking about were with my PTSD.
18        Q    Okay.  And then right above that section,
19   it has, "What Rules/Policies/SOP's were
20   discussed?"  And it identifies a number of
21   policies.  In either of your meetings on May 4 or
22   on May 13 when the captain gives you this
23   document, did they show you or discuss specific
24   policies to reference, "Hey, this policy governs
25   this situation"?

Todd Alexander-Cloud Abshire
June 13, 2017

226

```
 1       A    Yes, they did.  The captain --
 2  specifically for the changing of your schedule.
 3       Q    Okay.
 4       A    They -- they just wanted to stress that to
 5  me.  On a side note, they thought that I was
 6  trying to -- I was -- I mentioned that I was
 7  following examples of other agents, and to them
 8  that came across that I was trying to use other
 9  agents as an excuse and throw them under the bus,
10  so to speak, like, oh, well, so-and-so is the one
11  that told me how to do this.  And that's one thing
12  that me and him talked about several times was me
13  not taking responsibility.  I don't know if
14  there's any other forms or whatever, but . . .
15       Q    So you and the captain?
16       A    Yes.
17       Q    Okay.  All right.  And when you -- when
18  you were hired at the agency, you were provided
19  with an enforcement manual, right, --
20       A    Yes.
21       Q    -- which is a couple of hundred pages
22  long.  Right?
23       A    Yeah, it's a lot.
24       Q    Yeah.  Okay.
25       A    But -- oh, I'm sorry.  You're provided
```

Todd Alexander-Cloud Abshire
June 13, 2017

227

1    access -- you're not actually given a manual.  I
2    was thinking, when we had our training manual,
3    that as we attended six months, it got full of
4    papers.  The manual was -- we were made -- we were
5    made aware that the manual was available on the
6    intranet.
7         Q    Okay.
8         A    So I didn't actually have a physical copy
9    of it.
10        Q    Okay.  But you knew where it was?
11        A    I did.
12        Q    Okay.
13        A    I eventually learned.
14        Q    Okay.  All right.  So you had talked about
15   this e-mail.  I'm going to show you a document --
16   an e-mail that you sent to Lieutenant Robertson.
17   I'm going to show you a document.  You tell me if
18   this is the e-mail that you're referring to.  I'm
19   going to mark this as Exhibit No. 19.  This is an
20   e-mail that was produced to us in discovery.
21        A    (Reviewing document)  This is one of the
22   e-mails I cc'd myself.  I would have sent it from
23   my State e-mail.
24        Q    Right.  So it looks like it comes from
25   your Wildlife and Fisheries e-mail address,

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1    correct, because it says tabshire@wlf.la.gov.
 2         A    Yes, ma'am.
 3         Q    That's your Wildlife and Fisheries --
 4         A    Uh-huh.
 5         Q    -- e-mail address?  To Beau Robertson at
 6    his Wildlife and Fisheries address.  And then
 7    there's a cc to your Gmail address.  Is that
 8    correct?
 9         A    That's correct.
10         Q    Okay.  Is there a reason why you were
11    cc'ing your Gmail address?
12         A    They started it.  I know that sounds like
13    a little kid thing, but, no, they actually
14    encouraged us to include our -- because, unless
15    you set up the intranet on your phone, which if
16    you did that, then you have access -- if you lose
17    your phone, you would get in trouble, because it
18    has access to the intranet.
19         We didn't have a way to check our e-mails, our
20    State e-mails, unless we went to the office and
21    used the office computer, so they encouraged us to
22    use our -- our, I guess, off duty e-mail so we --
23    to make sure that we got important e-mails.
24         Q    Okay.  So you were allowed to cc
25    yourself --
```

Todd Alexander-Cloud Abshire
June 13, 2017

229

```
 1        A     Uh-huh.
 2        Q     -- and send things to your home e-mail
 3   address?
 4        A     It just -- most of the e-mails, -- not
 5   mine, because I didn't -- they have the
 6   e-signature that, at the bottom of it, will say,
 7   like, "This e-mail is not" -- "is intended for
 8   original" -- blah, blah, blah.
 9        Q     Okay.  All right.  So Exhibit No. 19, is
10   this the e-mail that you recall sending to
11   Lieutenant Robertson after your meeting with --
12        A     It is.
13        Q     -- the captain --
14        A     Yes, ma'am.
15        Q     -- on May 4?
16        A     Yes, ma'am.
17        Q     Okay.  Remember you've got to let me
18   finish my questions.
19        A     Oh, I'm sorry.
20        Q     That's okay.  It's just hard for the
21   record.  All right.  So in this e-mail, on May 5
22   at 8:23 p.m., it says, "Lt., I know the last month
23   the quality of my work has been slipping and the
24   issues you and the Captain discussed with me have
25   already been addressed . . ."  So are you
```

Baton Rouge Court Reporters, LLC
225-292-8686

Todd Alexander-Cloud Abshire
June 13, 2017

230

```
1    referring there to the meeting that y'all had had
2    earlier --
3         A    Yes.
4         Q    -- on May 4?  Okay.  ". . . but I was
5    hoping that in the future, prior to it becoming
6    such an issue, that you can notify me and we can
7    professionally address the issue."  What do you
8    mean by that?
9         A    At that point I had already started
10   hearing little rumors and stuff, and there were
11   jokes going around that I, like, you know, sucked
12   at doing my MV-3 and everything.  I didn't like
13   that.  I didn't like it being spread around.  How
14   else would other people know that my paperwork was
15   messed up if my lieutenant was the one that was
16   supposed to be -- it's going to him.  Like, the
17   other agents had no right to even go through my
18   paperwork.
19        So, like, I was kind of upset about that, and
20   I guess in my mind, I thought, like, he must have
21   been telling other agents about my poor
22   performance or whatever.  That's really
23   unprofessional, especially him being a supervisor.
24   He shouldn't ever talk down about one employee to
25   another.
```

Todd Alexander-Cloud Abshire
June 13, 2017

231

1    Q    Okay.  "When you came by my house last
2 month to check on me I told you that due to my
3 PTSD I had hit a pretty rough patch in my life,
4 and that lately it had been interfering with
5 work."  So that relates to the conversation you
6 had when he came by your house?
7    A    Yes, ma'am.
8    Q    "I know in the past I have asked about
9 working together more so that I can pick your
10 brain and get feedback on my performance."  So
11 were there occasions where you had asked -- asked
12 if you could work with him?
13    A    All the time.
14    Q    Okay.  So that was in those previous
15 communications --
16    A    Yes, ma'am.
17    Q    -- when you were asking if you could get
18 feedback from him?
19    A    Yes, ma'am.
20    Q    Okay.
21    A    Just to throw in, that's why actually on
22 my own days off I would go up there, because I --
23 after requesting a couple times to work with him
24 and it not going anywhere, I took the own
25 initiative and went off on my own days when I knew

Todd Alexander-Cloud Abshire
June 13, 2017

232

```
1    he was working in the office and just to, like,
2    trap him so I could ask him questions.
3          Q    And did that work?
4          A    Kind of.  I mean, sometimes I would go in
5    there and he would be -- you could tell he's
6    swamped, and I didn't want to really, you know,
7    bug him, so . . .
8          Q    And the questions that you had for him,
9    what kind of questions were they?
10         A    Stupid, simple questions, I mean, that
11   I -- "Hey, sir, if they're above the latitude of
12   this, can they use the gillnet and catch this
13   species of fish?  Because this regulation says
14   this."  It's really confusing -- there's a lot of
15   confusing regulations when it comes to fish.
16         Q    Okay.
17         A    So -- and all fish look the same to me.
18   So I was just getting feedback from him, and . . .
19         Q    Okay.  And do you think, like, the
20   confusion you had on that occasion, with that
21   example, is that -- is your confusion somehow
22   related to your PTSD?
23         A    It -- well, that fish example is a bad
24   example.
25         Q    Okay.
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1       A    But, yes, because it's hard -- it all
 2  comes to my concentration and the paranoia that
 3  started setting in later.  Like, whenever I
 4  started hearing -- like, I -- I don't -- I don't
 5  know.  I'll quit talking.
 6       Q    Okay.  Well, what you're saying is -- what
 7  I heard you say was, it comes down your
 8  concentration.
 9       A    Yeah.  I mean, I just -- I keep mentioning
10  it, but that hypertension -- hyperattentiveness,
11  like, it really sucks for your concentration --
12       Q    Yeah.
13       A    -- trying to focus on this, and then you
14  keep seeing trucks go by the window.
15       Q    That's fine.  And if that's the answer for
16  every -- that's fine.
17       A    Yeah.
18       Q    I just need to know, and I'm sorry --
19       A    Okay.
20       Q    -- if I'm asking you the same question --
21       A    Oh, no.  That's fine.
22       Q    -- and that's the answer.  It's fine.  I
23  just need to get it in the record, so . . .
24       Okay.  So then if we look for Exhibit No. 19,
25  this e-mail, this -- you would find this e-mail in
```

Todd Alexander-Cloud Abshire
June 13, 2017

241

1      A     Yes, ma'am.

2      Q     How often do you think you did that?

3      A     A pretty regular basis.  Starting probably

4  around March, maybe twice a month on my days off

5  just to get caught up on paperwork, because

6  that -- you know, that's when it started slipping.

7      Q     Uh-huh.

8      A     And I would just go on -- in on, like, a

9  random week or whatever and, you know, just get on

10 the computer and type up reports and stuff.

11     Q     Okay.  So did he ever respond to this memo

12 of May 17, 2015?

13     A     No.  And that was -- that kind of struck

14 me as weird, too, but like I was saying, I was

15 kind of glad at the time, because I thought I

16 sounded a little disrespectful.

17     Q     So after that May 13 counseling session,

18 how much interaction did you have with the

19 lieutenant?

20     A     Not a lot at all.  I mean, we still

21 remained the same -- on different shifts.  I mean,

22 that one phone call conversation happened whenever

23 he, you know, called me on my day off and accused

24 me of the report -- talking to the reporter and

25 meeting them after that meeting.  But as far as

Todd Alexander-Cloud Abshire
June 13, 2017

242

```
 1   one-on-one, we didn't really meet up at all.
 2        Q    Okay.  Did you do any boating safety
 3   patrols with him?
 4        A    I did.  It was actually -- I worked one
 5   shift with him, Captain Buatt, and Sergeant
 6   Guillory, and then another -- and Lieutenant
 7   Robertson as well.  We went out into the Gulf of
 8   Mexico and did a -- a patrol way out there, and I
 9   had a conversation with him about the upcoming
10   evaluation, because I was, you know, nervous --
11   not nervous but anxious about it.  And we -- I
12   remember where we were at in the water, too.
13        So I asked him, you know, when the evaluations
14   were going to take place, and he, you know, said,
15   "Well, probably in July, end of July."
16        And I was like, "Okay.  Cool."
17        And he's like, "Why?  You're nervous?"
18        And I said, "Well, not nervous, sir, but it's
19   something I'm really interested in seeing to see
20   how," you know, "my performance is."
21        And he's like, "Oh, okay."  And that's all I
22   mentioned.  He didn't mention that he had been
23   keeping, like, a log of all the stuff that I had
24   been messing up and not telling me, which,
25   apparently, that's what he was doing.
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        Q    Okay.  Did you mention anything else?
 2        A    No.
 3        Q    Any conversations about your PTSD or --
 4        A    No, but -- not on that day but on a
 5   different day we had a conversation about my PTSD,
 6   because we were discussing local events that had
 7   occurred.  There's a woman -- or a guy tried
 8   bringing his PTSD service dog -- he was a
 9   veteran -- into a local restaurant, and so we
10   were, like, talking about that, just kind of, you
11   know, shooting the breeze on the boat.
12        And they were like, "Well, why are you so,"
13   you know, "up in arms about it," because I was
14   pretty, like -- getting pretty worked up.
15        I was like, "It's stupid.  He's a veteran, and
16   it's a service dog.  Like, how can they kick him
17   out a restaurant?"  And I was like, "Well, you
18   know, if I had a service dog for my PTSD, I would
19   want" -- you know, "I would want it to be treated
20   normal."
21        And I said that in front of all of them.
22   Like, that's just -- I'm just using that as
23   another example of a time that more than one
24   person was present and I mentioned something.  And
25   it was Lieutenant Robertson, Captain Buatt, and
```

Todd Alexander-Cloud Abshire
June 13, 2017

244

```
 1   Sergeant Guillory, and on some day in June is when
 2   that happened.
 3        Q    Okay.  All right.  So how many times do
 4   you think you worked with Captain -- I'm sorry,
 5   with Lieutenant Robertson between that May 13
 6   counseling and the end of your employment?
 7        A    Twice maybe.
 8        Q    Okay.  And so one was the Gulf of Mexico
 9   boat safety --
10        A    One was the Gulf of Mexico.
11        Q    When was the other one?
12        A    I think another boating -- or boating
13   safety in the Gulf of Mexico.
14        Q    Okay.  All right.  All right.  So when was
15   the next interaction you had with him after that?
16        A    The meeting in which -- well, my whole
17   "showing up drunk to work" thing or whatever.
18        Q    That's right.
19        A    And then, you know, I -- we had that
20   region meeting where I got upset and -- because I
21   had heard about the rumors, but after that I had
22   very, very, very limited interaction with him.
23        Q    Okay.  All right.  Let me show you a
24   document I'm going to mark as Exhibit No. 21.
25   Tell me if you recognize that document.
```

Todd Alexander-Cloud Abshire
June 13, 2017

245

```
 1        A     (Reviewing document)  I do.
 2        Q     Okay.  And so Exhibit No. 21, the title
 3   says, "Evaluation Session."  And then under Step
 4   No. 3, where it says, "Employee Signature," is
 5   that your signature?
 6        A     That is.
 7        Q     All right.  And the date next to it is
 8   August 5, 2015.  Is that right?
 9        A     That is correct.
10        Q     Okay.  And so do you recall meeting with
11   Captain Buatt and Lieutenant Robertson on
12   August 5, 2015, --
13        A     I do.
14        Q     -- to have the performance evaluation?
15        A     Yes, ma'am.
16        Q     All right.  And so according to Exhibit
17   No. 21, it appears you were rated a "Needs
18   Improvement."  Is that correct?
19        A     Unsuccessful/Needs Improvement.
20        Q     Okay.  And so this meeting was with both
21   Captain Buatt and Lieutenant Robertson?
22        A     Yes, ma'am.
23        Q     All right.  Tell me about what they told
24   you in terms of setting up the meeting to meet
25   with them on August 5, 2015.
```

Todd Alexander-Cloud Abshire
June 13, 2017

1        A      The setup of it?

2        Q      Yeah.   In other words, did you know you

3    were going to meet with them to do a performance

4    evaluation?

5        A      I did, because like I mentioned earlier,

6    the month prior, or the beginning of -- or, yeah,

7    the beginning of July, I had mentioned how anxious

8    I was to the lieutenant about the performance

9    evaluations coming up, and he had asked me why,

10   and, you know, we discussed a little bit.

11       I think, though, they -- he sent out an e-mail

12   that said, "Hey, we're doing evaluations on this

13   day, so come" -- "first come first serve."  Like,

14   all the agents just kind of -- whenever they went

15   on -- you know, on their shift for the day, we

16   went to the office to get our evaluation.

17       Q      Okay.  I've got you.  All right.  So you

18   understood you were going to go in and they were

19   going to give you your evaluation?

20       A      Yes, ma'am.

21       Q      All right.  So tell me how they went

22   through this with you.  Did they go through it

23   item by item?

24       A      They did.  They -- I guess, because given

25   the circumstances, they had to.  You know, they

Todd Alexander-Cloud Abshire
June 13, 2017

247

```
 1   did the whole explanation of what it was.  Like,
 2   it's a State Civil Service evaluation form, and
 3   they -- they said as a probational employee, my
 4   evaluation needed to be successful for me to
 5   continue employment.  And they said, "You have" --
 6   "you've been rated as a Needs
 7   Improvement/Unsuccessful," and they were like,
 8   "We're going to show you why."  And then they went
 9   through each one, and, you know, told me why they
10   gave me that score.
11        Q    Okay.  And so if we look at the first area
12   where you're rated a 0, which is on page 4 of
13   5, --
14        A    Okay.
15        Q    -- and the subject is, "Maintains a
16   working knowledge of laws, policies, SOPs, job
17   requirements, conditions and other directives and
18   adheres to same," do you see that?
19        A    I do.
20        Q    Now, on the document that was produced to
21   us, it's -- I think it's got some highlights on
22   it.  Are those highlights that you made?
23        A    Yes.
24        Q    Okay.
25        A    I did.
```

Todd Alexander-Cloud Abshire
June 13, 2017

1    Q    Okay.  So then the handwriting that's
2  underneath there, whose handwriting is that?
3         A    Oh, that's Lieutenant Robertson.
4         Q    Okay.  So I think, as best I can read it,
5  it says [as read]:  "Worked with him on a boating
6  safety patrol on May 23, 2015, and agent could not
7  perform," slash, "administer SFST test.  Incident
8  was documented on performance log, date 5/23/15.
9  Incident document on" -- I can't tell what that
10 word is -- "immediate supervisor of schedule
11 change" -- oh, "Incident documented notifying
12 immediate supervisor of schedule change," and then
13 I think it's got an April date in there.  Did you
14 understand what he was talking about in his notes
15 there?
16        A    I did, and I disagreed verbally and pretty
17 loudly at the meeting with that.  The test -- the
18 boating safety test that he said that I
19 performed -- or the field sobriety test that he
20 said I did poorly on, --
21        Q    Right.
22        A    -- I was -- we were sitting out in the
23 middle of the water.  There was nobody around, so
24 we were -- they had me practicing the field
25 sobriety test.  And they thought it was good

Todd Alexander-Cloud Abshire
June 13, 2017

249

```
 1    training if my -- the person I'm performing it on,
 2    which was Senior Agent Lowry, decided to play the
 3    role of a drunken, abusive, like, local.
 4          And he was saying, -- excuse my language --
 5    "Shut the fuck up, mother fucker.  Shut the fuck
 6    up, mother fucker," while I was sitting there
 7    trying to do a field sobriety test.  I'd like
 8    anybody to -- to do a test like that, and I
 9    mentioned it.  And he, at the meeting, said that
10    he was just trying to give me a taste of the real
11    word.  But at this point I had done field
12    sobrieties of my own already and had arrested
13    several people.
14          Q    Okay.  And so you explained to him that
15    you disagreed with that?
16          A    I did, and they -- they said, "Okay.
17    Moving on to the next one."  They didn't even take
18    my -- anything I said into consideration.  They
19    used -- the, "Incident documented notifying
20    immediate supervisor of schedule change," they
21    used that several locations -- in several
22    different spots.
23          They used same, like, deficiency to -- as a
24    way to score me lower on several aspects instead
25    of it being just kind of segregated and, hey, you
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1    failed to tell us about the schedule change, so
 2    that falls under the, "Maintains a working
 3    knowledge of SOPs.  You should have known that."
 4    But instead they used it on that one, and then
 5    they used it on this one, and then they used it on
 6    this one.  So my score automatically was dropping
 7    from one incident, but I'll kind of stop right
 8    there.
 9         Q    Okay.  So back on the notations with
10    respect to the boating safety patrol on May 23,
11    did Lieutenant Robertson make mention of any other
12    boating safety patrols that he did with you out on
13    Prien Lake with Sergeant Lowry?
14         A    Senior Agent Lowry?
15         Q    Yeah, Senior Agent Lowry.
16         A    This was that one patrol.
17         Q    That's the one -- that's the only one that
18    you remember?
19         A    That's the one I remember.  I remember he
20    gave me the allegory of the -- he told me some --
21    I was trying to discuss my problems with him,
22    while out in the water, with my wife, and he gave
23    me some weird allegory.  I don't even know, like,
24    but, that's how I remembered it.
25         Q    Okay.
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        A    He told me some weird story.  That's why
 2   it stuck with me so well and also, you know, me
 3   trying to do that field sobriety test on a fellow
 4   agent, who was acting stupid on purpose.  That's
 5   all we talked about.  They -- and they just kind
 6   of dismissed what I said.
 7        Q    All right.  And then the next topic that
 8   you were rated a 0 is, "Assignments completed on
 9   time without reminders."  And again, I think those
10   are Lieutenant Robertson's notes below.
11        A    Uh-huh.
12        Q    "Numerous instances that are documented of
13   failing to meet deadlines for P-card purchases,
14   MV-3s, and offense reports not being turned in on
15   time.  Formally counseled on this issue."  Does
16   that happen to relate to some of the instances
17   that were identified in the May 13 counseling
18   about the MV-3 report?
19        A    Yes, ma'am.
20        Q    Okay.  And did you disagree with that?
21        A    I didn't because -- I didn't disagree with
22   the May 13 meeting -- or the May 4 meeting and
23   later on that May 13 paper.
24        Q    Right.
25        A    But I did disagree with it on here,
```

Todd Alexander-Cloud Abshire
June 13, 2017

252

1  because they -- they told me what my issue was

2  back in May, that, "Hey, you're messing up MV-3s.

3  You need to turn them in on time."

4       I said, "Okay."

5       And they even -- I said, "This is something

6  that you pointed out to me, and I thought we fixed

7  it."

8       And they said, "Yeah, you did, but you're

9  judged on the entire year, so . . ."

10      Q   Okay.  I've got you.  All right.  So the

11 next topic that you got the 0 next to is,

12 "Produces work detailed, accurate and neat."  And

13 the handwritten notes underneath that says, "Had

14 above average number of time sheets, reports, and

15 citations, as well as MV-3s, that contained

16 mistakes that had to be corrected."  Is that

17 accurate?

18      A   No, it's not accurate, because I never saw

19 any of this paperwork that he's saying that he

20 needed corrections.  I never made the corrections,

21 so I don't know what papers he's talking about.

22 And him saying "above average," so him -- there --

23 he says there's an average number of tickets that

24 are getting messed up, so I was the only person is

25 what I'm getting at.

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        Q    Right.  Now, do you know if other people
 2   were getting their reports returned?
 3        A    Yes, --
 4        Q    Okay.
 5        A    -- because he sent out several hate mails
 6   to -- he didn't name any names, but in one e-mail
 7   he said, "We only have two rookies in the
 8   area," -- he was referring to me and Hoover --
 9   "and they're not the ones I'm having to return
10   reports."  So it was senior agents and sergeants
11   that were messing up.
12        Q    Now, we did talk about earlier that he
13   would review some of your reports, make notations
14   on them, and return them back to you.  Correct?
15        A    Yes.
16        Q    Okay.  So you were aware of those reports?
17        A    I was aware of those, yes.
18        Q    Okay.  Then the next topic that you have a
19   0 on is, "Reports for duty on time and as
20   scheduled."  And his notations below that are,
21   "Several documented instances of agent not
22   reporting for duty on time and/or late for
23   scheduled event."
24        A    And the only documented time that we had
25   discussed up to this point was what had happened
```

Todd Alexander-Cloud Abshire
June 13, 2017

254

```
 1    whenever I didn't change my schedule according to
 2    SOP.  I don't know why it says, "Several
 3    document" -- like, he -- I was messing up, and he
 4    was documenting it, but I wasn't being made -- how
 5    can I fix something if I don't know it's broken?
 6         Q    So you were not made aware of --
 7         A    No.
 8         Q    -- other instances other than what was
 9    discussed with you --
10         A    No, ma'am.
11         Q    -- in that May 4 meeting?
12         A    No.
13         Q    And did you tell him that?
14         A    I did.
15         Q    And what was his response?
16         A    "Moving on to the next section."
17         Q    Okay.  "Available for callouts and handles
18    commitments reliably," is the next topic that you
19    have that has a 0 next to it.  And his notes under
20    that says, "Numerous times agent was called by
21    supervisors and was unavailable and did not return
22    calls.  Formal counseling session was conducted
23    addressing this issue."  So that has to do with
24    the instances we've already discussed.  Correct?
25         A    Yes, ma'am.
```

Todd Alexander-Cloud Abshire
June 13, 2017

255

1      Q     Okay.  Then the next topic that has a 0

2   next to it is, "Performs well without close

3   supervision."  And his notes under that -- I don't

4   even know if I can read that.

5      A     It says, "Agent" -- "appears through

6   documentation that agent performs a little better

7   during academy and while on FTO, but during

8   individual capacity had to be supervised closely

9   in order to complete assigned tasks and patrols."

10     Q     Do you agree with that?

11     A     No, not at all.

12     Q     Okay.  So what part of that do you

13  disagree with?

14     A     I performed a little better during the

15  academy and while on FTO.  Well, the way they're

16  making me sound on this was I was an awful

17  employee.  Why did they let me off of FTO early if

18  it was only -- my performance -- I didn't agree

19  with it at all.  I just . . .

20     Q     Okay.  But you do agree that during the

21  academy and FTO, you were performing better during

22  that time period.  Correct?

23     A     Yes and no.  I was performing different

24  job aspects as well -- different job functions.

25     Q     Okay.

Todd Alexander-Cloud Abshire
June 13, 2017

1    A    Like, at the academy I wasn't going up to
2   random people in the woods and checking them.  I
3   was a student in the classroom.  So I don't know
4   why they're even mentioning that, because that
5   happened in a -- in a prior year.  So the
6   evaluation is supposed to encompass, what, June to
7   June or whatever?  Well, they're mentioning stuff
8   that occurred in a private -- what role does that
9   have in my evaluation?  Oh, he messed up two years
10  ago.  It's not a two-year-ago evaluation.  It's
11  for last year.
12    Q    Well, the topic is, "Performs well without
13  close supervision," so I think the observation has
14  to do with the amount of supervision, so --
15    A    But why -- why even make the connection to
16  a previous evaluation?  This is supposed to be --
17  every year -- it was explained to me that this
18  evaluation, it disregards what happened in the
19  past.  It takes into account what you've done the
20  prior year.  That's how they -- that's why they
21  said they were able to use what they -- on my --
22  it wasn't a punishment -- counseling form.  They
23  were -- they were able to use that to later --
24  even though it was mentioned, documented, and
25  agreed upon, they were able to put that in my

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1    evaluation negatively even though they already --
 2    it just -- next question, please.
 3         Q    So do you --
 4         A    I just -- I don't agree with that
 5    statement.  I guess we can keep it simple like
 6    that.
 7         Q    All right.  All right.  So this meeting
 8    with the captain and lieutenant was on August 6,
 9    2014.  During this meeting with the captain and
10    lieutenant where you were given this needs
11    improvement evaluation, was there any discussion
12    about your PTSD?
13         A    No.  It was really a one-sided meeting
14    overall.  Like, whenever I -- I really didn't even
15    fight.  I felt like someone punched me in the
16    stomach whenever I found out that I had a Needs
17    Improvement/Unsuccessful rating, so I kind of was
18    in a daze through a lot of this.
19         Q    And other than what you've already
20    discussed in terms of your disagreement with the
21    ratings, was there anything else that you said in
22    the meeting?
23         A    I remember when Lieutenant Robertson left
24    to make me a copy of this form, Captain Buatt said
25    that this didn't necessarily have to be the end
```

Todd Alexander-Cloud Abshire
June 13, 2017

258

1    and that there were lots of local PDs that would

2    have hired me, and -- that would hire me with all

3    the qualifications I had.

4         And then I made sure to remind him that I had

5    a signed employment contract stating that if I

6    leave anywhere -- voluntarily leave Wildlife and

7    Fisheries before my two-year period is up, then

8    Wildlife and Fisheries can come back and sue me

9    for -- he was -- he was trying to take -- he was

10   advising me to take a position with a different

11   law enforcement agency voluntarily so I wouldn't

12   get fired, because he said it looked bad to get

13   fired.  And he -- by doing that, he was advising

14   me to break the contract I signed with Wildlife

15   and Fisheries, so -- he's just an awful person.

16        Q    Were there any specific accommodations

17   that you had requested either from Buatt or

18   Robertson that would have addressed any of these 0

19   ratings?

20        A    Yeah.  Yes, ma'am.  Sorry.

21        Q    Okay.

22        A    Are you -- were you finished?

23        Q    Yeah.

24        A    I'm sorry.  I found the -- what I was

25   asking Lieutenant Robertson for was available.  It

Todd Alexander-Cloud Abshire
June 13, 2017

1     Q    So again, your case, what you specifically

2  wanted was more one-on-one time with Robertson?

3     A    Yes.  I just wanted them to tell me what

4  the issue was and talk to me and not let me have

5  the feeling that, like, they were setting me up,

6  because that's what it -- it slowly got to the

7  point where my paranoia -- like, that was arising

8  out of, you know, just the weird circumstances,

9  paperwork in the trash and everything.  It got

10 worse and worse, and, like, it just -- the stress

11 got too much, and I -- I started really cracking

12 up.

13    I mean, you could see -- I mean, I admit that

14 they tried getting a hold of me and stuff, and

15 there were times where I just couldn't physically

16 answer the phone.  I know that's -- to y'all, you

17 just -- you don't understand that maybe, but I

18 couldn't bring myself to answer the phone.

19    Q    How much time do you think you would have

20 needed with Robertson in order for it to have been

21 beneficial to you?

22    A    I can't say, but it would have been

23 beneficial, I think, immediately, because just the

24 psychological effect of, hey, my supervisor is not

25 out to get me -- he's willing to work with me and

Todd Alexander-Cloud Abshire
June 13, 2017

263

```
 1   you know, willing to help me be better -- I wanted
 2   to be the best game warden.  That -- that's all --
 3   that's all I wanted to do.  I just wanted to not
 4   make mistakes, and I'm a perfectionist, and I
 5   wanted to learn from the guy that supposedly was,
 6   you know, one of the best agents in the -- in the
 7   state.
 8       Q    And so do you have an idea in your mind
 9   about how much time you would have needed from him
10   in order for that to have made a difference in
11   your performance?
12       A    No, but like I said, I would have felt an
13   immediate advantage to it, just for morale.
14       Q    All right.  Anything else that Robertson
15   or Buatt could have done to help improve your
16   performance?
17       A    No, ma'am.
18       Q    All right.  Let's talk about the day that
19   you were terminated.  Tell me what you recall
20   about the day that you reported to work, the day
21   that you were terminated.
22       A    Yes, ma'am.  I had -- I was investigating
23   a crab trap theft in -- close to the Texas border,
24   and I went out there -- or weeks earlier I had set
25   up some trail cams on this one spot, and I was
```

Todd Alexander-Cloud Abshire
June 13, 2017

264

1    working with the crabber that was getting his

2    stuff stolen.

3         And I went out there probably 4:00 in the

4    morning to check the camera to make sure --

5    because I wanted to get out there before anybody

6    was awake.  I went and grabbed the memory card out

7    the camera, put a new one in, went and started

8    conducting a patrol on the -- on Calcasieu Lake.

9         And I think my schedule was until 4:00 that

10   day.  Probably around maybe 1:00 -- maybe 12:00,

11   1:00 I got a call over the radio saying, "Hey, you

12   need to come in" -- it was from somebody at the

13   office.  They said, "You need to come in and fix

14   some of your paperwork."

15        And I was like, "All right."

16        So I loaded up the boat.  I dropped it off.  I

17   stopped -- I dropped it off at my house because it

18   was on the way, and I stopped at the -- I went to

19   the office.  And it wasn't even my lieutenant.  It

20   was the other district's lieutenant, Jesse Savoie.

21   He -- I walked in and knew something was up,

22   because he had this look on his face.

23        And he told me, "Hey, I don't know why, and I

24   just found out, but it's coming from the top that

25   you're no longer going to be employed with us."

Todd Alexander-Cloud Abshire
June 13, 2017

265

1    And he asked to take my firearm and my badge, and
2    I went out -- I had to go outside and take all my
3    personal stuff out my truck and call my wife and
4    have her come pick me up.
5         Q    Was the captain in that day?
6         A    No.  I didn't speak to my lieutenant or my
7    captain following that event.  They never -- they
8    never called me or anything.
9         Q    Did you ever speak to either of them?
10        A    I didn't.  I didn't -- I did that because
11   I didn't want to say something I would regret, but
12   I did try contacting people in the department for
13   an explanation.
14        Q    Did Lieutenant Savoie give you any
15   documentation?
16        A    He just gave me my dismissal form that was
17   from the colonel saying -- citing the Civil
18   Service rule.
19        Q    Okay.  Let me show you a document I'm
20   going to mark as Exhibit No. 22.  Tell me if you
21   recognize that document.
22        A    (Reviewing document)  Yes, ma'am.
23        Q    Is this the document that Lieutenant
24   Savoie gave to you?
25        A    Yes, ma'am.

Todd Alexander-Cloud Abshire
June 13, 2017

1      Q     All right.  And it's dated August 10,

2    2015.  Is that consistent with your recollection

3    as to the date that you were terminated?

4      A     Yes, ma'am.

5      Q     All right.  And it says, "Dear

6    Mr. Abshire, you have been on probation since your

7    employment with the Department of Wildlife and

8    Fisheries on December 9, 2013.  Pursuant to Civil

9    Rule" -- Civil Service Rule 9.1(e), your

10   probationary appointment with this department will

11   terminate close of business August 10, 2015."  Did

12   you have an understanding of what that Civil

13   Service rule was?

14     A     Yes and no.  I had just the -- pretty much

15   the lump sum of it is, unless you're a permanent

16   employee, you can get fired at any time for any

17   reason.

18     Q     Okay.  And who explained that to you?

19     A     Huh?

20     Q     Who explained that to you?

21     A     Oh, whenever they -- that's what they used

22   to kind of dangle over our heads when we were at

23   the academy.

24     Q     Okay.  All right.  And so did Lieutenant

25   Savoie say anything else other than handing you

Todd Alexander-Cloud Abshire
June 13, 2017

278

```
 1    doctor or got anything like that.  It was just
 2    more of a -- me asking.
 3         Q    Okay.  Do you know any other Wildlife and
 4    Fisheries employees who requested an accommodation
 5    of any kind for a disability?
 6         A    No.
 7         Q    Now, in your lawsuit you also allege that
 8    you were terminated because of your disability.
 9    Do you believe that?
10         A    I believe that because I wasn't given the
11    tools that I asked for, my performance did suffer
12    as a result.  I can't say that, you know, if they
13    had given them to me I would have done any better
14    or not, but I sure as hell would have tried.
15         Q    Do you think you were fired because you
16    had PTSD?
17         A    I think that my actions because of my PTSD
18    sometimes and my -- my attempts to get help kind
19    of made me an inconvenience, and it probably had a
20    little to do with the decision, because like I
21    said, there were other agents that were messing up
22    and everything, and, I mean, I didn't see
23    anything as far as -- the other agent that I went
24    to the academy with wrecked his truck three times,
25    and he didn't get fired, I mean, but I just think
```

Todd Alexander-Cloud Abshire
June 13, 2017

279

```
 1   it had something to do with it.
 2        Q    Did anybody ever say anything to you about
 3   your PTSD in connection with these performance
 4   counselings?
 5        A    No.  The closest I ever came to really,
 6   like, discussing it with anyone on a regular basis
 7   was Sergeant Guillory.  And, I mean, we worked
 8   pretty well together.  He kept me in line as far
 9   as -- you know, he was able to pick up on, like,
10   the signs that I was starting to get aggravated
11   and stuff, and . . .
12        Q    Do you know if there were any other agents
13   in the region that had PTSD?
14        A    Sergeant Lowry -- or Senior Agent Lowry.
15        Q    How do you know that?
16        A    We talked about it.  He was Army Special
17   Forces, and, you know, I was in the Marines, so we
18   had a lot in common.
19        Q    And did you ever talk with him about how
20   he managed to do or perform his job duties?
21        A    No.  He -- he would actually discuss -- we
22   didn't actually discuss PTSD in relation to his
23   job.  We discussed it in relation to his issues
24   that he had with his ex-wife, because I started
25   going through the same things.  But we never
```

Todd Alexander-Cloud Abshire
June 13, 2017

1      Q    When did the captain say, "I can't do

2  anything about this.  It's coming" -- "it's over

3  my head"?

4      A    Whenever I got the evaluation.

5      Q    Okay.  In your lawsuit it also alleges

6  that you were terminated in retaliation for

7  requesting an accommodation.  Is that what you

8  believe?

9      A    Yes.  Whenever I met up with the captain

10  and lieutenant after that region meeting and I --

11  I didn't -- it should be -- because I requested

12  the right -- the grievance procedures.  I didn't

13  request -- because they weren't -- I wanted to

14  file a grievance because of what was being said

15  about me, that I was an alcoholic and I showed up

16  drunk to work, and I didn't like that -- that

17  rumor following me.  That's a bad rumor to have

18  following you.

19      And so I requested the right to file a

20  grievance, and I wasn't even sure who I was going

21  to file it against.  I just wanted to go on record

22  saying that this is not true, and they -- they

23  said no.

24      Q    Okay.  So I'm sorry.  Just to make sure I

25  understand, are you saying that you think you were

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   terminated because you requested the right to file
 2   a complaint about the rumors?
 3        A    I think it --
 4            MR. SMITH:
 5                 Well, excuse me.  That's not what he
 6        testified to.
 7            MS. KEENAN:
 8                 Well, that's what I'm trying to
 9        understand, because it was confusing.
10        A    No answer.  I'm not going to answer.
11            MR. SMITH:
12                 No.  No, no, no.
13   BY MS. KEENAN:
14        Q    You've got to answer.
15            MR. SMITH:
16                 Just start over.  You need to answer
17        her question.
18   BY MS. KEENAN:
19        Q    Yeah.  So my question was to you, in your
20   lawsuit it alleges you believe that you were
21   terminated in retaliation, and I thought your
22   lawsuit said you believe you were terminated
23   for -- in retaliation for requesting an
24   accommodation.
25        A    For requesting -- well, for requesting
```

Todd Alexander-Cloud Abshire
June 13, 2017

1    accommodations in the sense that, like -- I think

2    I got on their nerves mainly.  I don't think that

3    they even knew what an accommodation was.  I'm

4    pretty sure they didn't know what PTSD was.  They

5    just thought it was some kind of weird acronym

6    like, you know SFST or whatever, and they probably

7    thought I was just a stupid former grunt who

8    couldn't get the job right.  I mean, that's

9    what -- that's what my opinion is.

10       Q    Okay.  So let me ask a broader question.

11   Do you think that you were terminated in

12   retaliation -- as a retaliatory measure?

13       A    Yes.

14       Q    Okay.  In retaliation for what?

15       A    Asking for help all the time.

16       Q    I'm sorry.  Asking what?

17       A    Asking for help all the time.

18       Q    Okay.  And then you were talking a minute

19   ago about requesting the grievance procedure.

20   What was that in connection to?  What were you

21   asking for -- or requesting to use the grievance

22   procedure for?

23       A    That's what I was -- I wasn't ever sure

24   who I was going to grieve against, because I --

25   Hoover came to me saying that he had heard rumors

Todd Alexander-Cloud Abshire
June 13, 2017

284

1    that I was an alcoholic and I showed up to

2    drunk -- drunk to work, and I wasn't even sure who

3    I was going to file this against.  I just wanted

4    it on record that I was not -- I was -- I wasn't

5    drunk.  Like, if I was drunk, then they should

6    have fired me or arrested me or something.

7    Nothing ever came of that.

8         So I wanted -- I wanted their support,

9    actually.  It would have been great for them to

10   say, "You know what?"  You know, "We handled that

11   wrong, so while all the other agents are here at

12   this region meeting, let's go ahead and make an

13   announcement that you weren't drunk when you

14   showed up to work," because everybody was

15   whispering it.  And that -- would you like to walk

16   into a law office and, you know, that -- I mean, I

17   don't want people talking about me, especially

18   when it's not true.

19        Q    Okay.  So you were trying to invoke the

20   grievance procedure to address that issue?

21        A    Yeah, just to establish that I was not

22   drunk.

23        Q    Okay.  And do you think in some way that

24   factored into your termination?

25        A    Yeah, --

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1        Q     Okay.
 2        A     -- because I have read the e-mail that --
 3   or I read the -- the letter that the captain sent
 4   to the colonel, and it's very -- it's so two-faced
 5   and very harsh towards me, and it's almost -- it
 6   almost hurts because how, like -- how he describes
 7   me and my performance, and it -- he never said
 8   that to my face.  Like, that's probably something
 9   he should have said.
10        Q     All right.  Let me show you a document I'm
11   going to mark as Exhibit 23, and tell me if this
12   is the document you're referring to from Captain
13   Buatt to the colonel that you said you saw.
14        A     (Reviewing document)  Yes, ma'am.
15        Q     Okay.  And so --
16        A     I didn't see this till after my
17   termination.
18        Q     Okay.  So is this the memo you were just
19   talking about that you were saying that you felt
20   like you wish he would have addressed to your
21   face?
22        A     Yes, ma'am.
23        Q     Okay.  What parts of this letter do you
24   wish he would have addressed with you directly?
25        A     "Deceptive tendencies."
```

Todd Alexander-Cloud Abshire
June 13, 2017

294

```
 1   that.  You're not thinking the right way whenever
 2   someone is yelling and screaming at you.
 3        Q    But did you get the Cadet Training Manual?
 4        A    I did.
 5        Q    Okay.  And you had access to it?
 6        A    I did.
 7        Q    All right.  Let me show you another
 8   document I'm going to mark as Exhibit No. 25.
 9   Tell me if you recognize this document.
10        A    (Reviewing document)  Yeah, I recognize
11   it.
12        Q    Okay.  And this Exhibit No. 5 -- 25 is
13   entitled, "Acknowledgment of Receipt and Review of
14   Louisiana Department of Wildlife and Fisheries
15   Employee Handbook and Policies."  So is that your
16   signature on the bottom of the page?
17        A    Yes, ma'am.
18        Q    All right.  And it's also dated
19   December 9, 2013.
20        A    Yes, ma'am.
21        Q    And then that says, "Signature of HR
22   Representative."  Do you recall meeting with an HR
23   representative?
24        A    For the -- for the initial, like, first
25   hour, they had Human Resources ladies there that
```

Todd Alexander-Cloud Abshire
June 13, 2017

295

1   were going through the -- the paperwork that they

2   had to have done, and then this was one of them.

3          Q    Okay.  And so were you made aware of how

4   to find the Wildlife and Fisheries Employee

5   Handbook and Policies?

6          A    I was made aware of how to find it but

7   wasn't given the access to it.

8          Q    What do you mean by that?

9          A    I didn't have a State e-mail or anything

10  until after I graduated the academy.

11         Q    Okay.

12         A    So I wouldn't have had access to this

13  stuff.

14         Q    Okay.  All right.  And so, ultimately, you

15  would have gotten your State e-mail address, which

16  would have given you access to the intranet?

17         A    Yes, ma'am.

18         Q    And is that where you would find the --

19         A    Yes.

20         Q    -- Employee Handbook and Policies?  Okay.

21  And did you understand that by signing this

22  document, you were acknowledging your obligation

23  to remain aware of and comply with the agency's

24  existing policies and procedures?

25         A    Yes, ma'am.

Todd Alexander-Cloud Abshire
June 13, 2017

300

 1   if you recognize this document.

 2          A     (Reviewing document)  Yes, ma'am.

 3          Q     Okay.

 4              MR. SMITH:

 5                  Can we go off the record?

 6              MS. KEENAN:

 7                  Sure.

 8                  (OFF RECORD DISCUSSION)

 9   BY MS. KEENAN:

10          Q     Okay.  So I was asking you about Exhibit

11   No. 28.  Is that your signature on the bottom of

12   the page?

13          A     Yes, ma'am.

14          Q     And Exhibit No. 28, it's the Department of

15   Wildlife and Fisheries New Employee Safety

16   Orientation Sign In Sheet, and your -- the date

17   next to your signature is February 24, 2014.  Do

18   you recall having some kind of new employee safety

19   orientation in February of 2014?

20          A     I think it was one of those classes that

21   got pushed back that was supposed to be a lot

22   earlier on in the process, and it just took place

23   a little too -- a little later in the academy than

24   they wanted.

25          Q     Okay.  And so were there presentations on

Todd Alexander-Cloud Abshire
June 13, 2017

1   the different topics that are listed on this sheet
2   to your recollection?
3        A    It's death by slide show, you know,
4   PowerPoint.  I'm sure we did.  Some of this does
5   look familiar.  Like, Sexual Harassment Policy, I
6   remember taking that.  Yeah, this would have been
7   one of those, like, filler classes that we would
8   have done, like, just sign a thing afterwards
9   and -- like a 30-minute class, but . . .
10       Q    Okay.  And then there's an intranet link
11  to the policies on the following topics as well.
12  Is that right?
13       A    Uh-huh.  Yes, ma'am.
14       Q    Okay.  All right.  All right.  And the
15  last thing, I'm going to show you another document
16  I'm going to mark as Exhibit No. 29.  This was a
17  document that was produced to us in discovery.  Do
18  you recognize this document?
19       A    I do.
20       Q    Okay.  And the title of it says, "Region
21  Meeting - March 24, 2015 Agenda."  This was a
22  document that was produced to us in discovery.  Do
23  you recall there being any particular -- anything
24  particularly significant about the region meeting
25  on March 24, 2015, as it relates to your case, or

Todd Alexander-Cloud Abshire
June 13, 2017

312

1   document I'm going to mark as Exhibit No. 33.  Do
2   you recognize that document?
3        A    (Reviewing document)  I -- I do recognize
4   this, yes.
5        Q    Okay.  And this is entitled, "Dismissal
6   and Notice of Rights," from the EEOC.  Do you
7   recall being issued a notice of right to sue from
8   the EEOC?
9        A    Yes, ma'am.
10       Q    All right.  Let me show you another
11  document I'm going to mark as Exhibit No. 34.
12  It's an e-mail string.  Tell me if you can
13  identify this for me.
14       A    Yes, ma'am.
15       Q    Okay.  Exhibit No. 34 appears to be an
16  e-mail string between you and Ruth Rigg in the
17  September 2015 time frame.  Is that right?
18       A    Yes, ma'am.
19       Q    Okay.  Tell me about the conversation you
20  had with Ruth Rigg via e-mail in September of
21  2015.
22       A    I was made aware that they were hosting
23  another academy, that they were going to have
24  another academy for wildlife agents, and I was so
25  desperate to get my job back that I was willing to

Todd Alexander-Cloud Abshire
June 13, 2017

1    apply and go through the academy again and which I

2    said earlier wasn't fun.

3         But I contacted her to ask her the specifics

4    on that, because my -- I -- nothing changed except

5    for my -- my application process, except for the

6    fact that I had already been hired.  And so I was

7    asking her can I even get hired on again, you

8    know, because there are rules in the Civil Service

9    that prohibit you being rehired, but it's only if

10   certain things takes place, and I didn't fit any

11   of that criteria, so I should have been able to at

12   least hire, but I didn't even make it through the

13   first stage of the process this time.

14        Like, when I applied, they just -- it's like

15   they -- I was blackballed almost, like my name

16   came up and, like, it got flagged and didn't even

17   make it to the next step.  And the first time I

18   applied, there was like 700 people in the state,

19   and I was ranked No. 6 out of the 700 people, so I

20   just didn't get that.

21        Q    And so what did Ms. Rigg respond back to

22   you?

23        A    Oh, you've got me.  "I'm still actively

24   working on the cadet list, but at the first

25   opportunity I will check Civil Service Rule,

Todd Alexander-Cloud Abshire
June 13, 2017

322

```
 1    and it was minimum wage.  I probably would have
 2    spent -- or broke even on gas money just getting
 3    to work.
 4         Q    Okay.
 5         A    And then people offering me trucking
 6    positions.  Well, I don't have a commercial
 7    trucking license, so it's always something.
 8         Q    All right.  So is there anything that you
 9    do, like, regularly to look for jobs?  Like, are
10    you looking on monster.com or careers.com?
11         A    Not right now.  I pretty much existed on
12    just my benefits from the VA and, like, little,
13    random odd jobs.  I've sold a lot of my stuff,
14    like personal belongs.
15         Q    When was the last time you've actually
16    applied for a job?
17         A    Actually, two months ago.
18         Q    Uh-huh.
19         A    I applied for a border patrol position on
20    usajobs.gov, and I haven't heard anything back.
21    It says that it's in processing or whatever.
22         Q    All right.  And do you still get benefits
23    from the VA?
24         A    I do.
25         Q    And how much is that?
```

Todd Alexander-Cloud Abshire
June 13, 2017

323

```
 1        A     Sixteen hundred dollars and some change.
 2        Q     All right.  And what is your current
 3   disability rating with the VA?
 4        A     Eighty percent.
 5        Q     And was that the same disability rating
 6   you had --
 7        A     Yes, ma'am.
 8        Q     -- in 2011?  Are you seeking to get that
 9   disability rating changed?
10        A     Yes, but not under -- they -- they did it
11   on their own accord.
12        Q     Okay.
13        A     I spent time in a mental institution last
14   month or the month before, and they agreed that I
15   needed to get bumped up in my benefits.
16        Q     To what level?
17        A     A hundred percent.
18        Q     So 100 percent disability?
19        A     Yes, ma'am.
20        Q     Okay.  And what does that mean?
21        A     Well, it's going to mean more compensation
22   from the VA, but it's supposed to open me up to be
23   eligible for more programs through the VA, like,
24   for vocational rehabilitation.  And they have a
25   lot of stuff that it's only open to vets who are,
```

Todd Alexander-Cloud Abshire
June 13, 2017

324

```
1   like, catastrophically injured, like missing, you

2   know, limbs or have PTSD so bad that they're in my

3   kind of situation.

4        Q    Okay.  And so you said you went into the

5   hospital last month or the month before?

6        A    In April.

7        Q    In April.

8        A    So yes.

9        Q    What hospital was that?

10       A    It was the Alexandria VA facility.

11       Q    What was that for?

12       A    I just hit a really, really bad spot, and

13  killing myself really looked, you know, like an

14  attractive option.

15       Q    Is it fair to say you were suicidal?

16       A    Definitely.  I mean, I attempted suicide

17  several times after losing my job.

18       Q    How long did you stay in the hospital?

19       A    Fifteen days, I believe.

20       Q    And did you check yourself into a

21  hospital?

22       A    I did.

23       Q    Okay.  And what was the reason that you

24  checked yourself in?

25                THE WITNESS:
```

Todd Alexander-Cloud Abshire
June 13, 2017

343

```
1   raised, and so I, like, was a nature person.
2   Like, I was all about animals, and I got to help
3   animals, too.  So there's a job that I sometimes
4   get to help save people's lives.  I would get to
5   go protect animals, and I'm a conservationist.
6   Like, how -- and I get to spend a good bit of my
7   day on a boat.  Like, what's not to love about
8   that?
9        Q    Did that ever happen to you where you got
10  to find somebody who had been missing --
11       A    Uh-huh.
12       Q    -- a few days in the woods?
13       A    Uh-huh.
14       Q    What impacted your marriage?  What
15  happened initially?
16       A    I think I got a little too obsessed with
17  this whole fighting for my job and letting it get
18  to me, and I neglected stuff at home.  I mean, and
19  quite simply put, we shouldn't have been married
20  in the first place, because, you know, the first
21  three years were great, but then, you know, you
22  start to see stuff rise up, but that didn't -- my
23  divorce hasn't really been too hard on me.
24       Q    Now, when you were trying to work on your
25  citations and your reports and such, did you
```

Todd Alexander-Cloud Abshire
June 13, 2017

344

1    review the reports and citations of other officers
2    as well?
3         A    Yes, ma'am.
4         Q    And did you keep copies of other work from
5    other officers, other citation reports and such?
6         A    I -- I don't have any of that stuff
7    currently.  I did at the time.  I had thumb drives
8    with, you know, other officers', you know, work on
9    it.
10        Q    All right.  I'm going to show you just a
11   stack of documents that was produced to us in
12   discovery.  Can you just tell me what this is that
13   was produced to us in discovery?
14        A    Yes, ma'am.  This first form was a
15   citation form.  It is -- yeah, a citation.  It's
16   not a warning.
17        Q    But are those citations that you did?
18        A    No.  This is Justin Lowry.  This isn't
19   mine.
20        Q    Okay.
21        A    I worked with him a lot.  Yeah, this is
22   Lowry's stuff.  Yeah, this is for a DUI that he
23   did.
24        Q    Okay.  So why would you have that?
25        A    As a -- as an example.

Todd Alexander-Cloud Abshire
June 13, 2017

345

1      Q     Okay.

2      A     Because DUIs are really tricky --

3      Q     Okay.

4      A     -- a tricky thing to do.

5      Q     So that stack right there, if you flip

6   through that, I think it looks like it's citations

7   that other agents would have done, so those would

8   have been documents you would have had that you

9   would have been using as examples?

10     A     Yes, ma'am.

11     Q     Okay.

12     A     Yeah, and this -- yeah, this is all Lowry.

13  This all right here pertains to one DUI.

14     Q     Okay.

15     A     So, yeah, all of this is -- from here on,

16  actually, it's all DUIs.

17     Q     You can flip through it.

18     A     Okay.

19     Q     I just wanted to know what it was -- what

20  it was.

21     A     (Reviewing documents)  Yeah, this is

22  another agent's report on a seafood inspection he

23  did at a restaurant.  Another agent, a vessel

24  on -- see, this is just a good example of the

25  types of reports that I had, because there are so

Todd Alexander-Cloud Abshire
June 13, 2017

346

```
 1    many different variations that stuff can be.
 2         Like, you have this guy that could be fishing
 3    without a license, and that's one ticket in
 4    itself, but if he's fishing without a license on
 5    Rockefeller Refuge and during this time of the
 6    year at this time of the day, that changes the
 7    game completely.  So it was -- that's why I like
 8    to have copies of stuff like this.
 9         Q    Okay.  Okay.
10         A    Yeah.  This is all just typical stuff that
11    would be turned in on a report.
12         Q    Okay.  That was just something you used as
13    examples?
14         A    Yes, ma'am.
15         Q    All right.  And that would have just been
16    on a thumb -- on your thumb drive that you would
17    have had?
18         A    Yes, ma'am.
19         Q    And did the agents have to give you that?
20    I mean, did they --
21         A    No.
22         Q    -- have to say you can use that?
23         A    They -- they didn't have to.  They didn't
24    even redact it or whatever, block out the names,
25    because, I mean, it's pretty, I mean, open there,
```

Todd Alexander-Cloud Abshire
June 13, 2017

```
 1   Racial slur used" --
 2        A     "Told supervisors.  They did nothing.
 3   Racial slur used.  Expressed discomfort at
 4   wrongdoing."  I was talking to Justin Sonnier, and
 5   we were working in Lake Charles -- or Lake Arthur
 6   Regatta and just doing overtime, make sure -- for
 7   boat safety.  And I had told him -- I was just
 8   shooting the breeze with him, and I had told him
 9   that I had gone to the Regatta the year before,
10   and it was me and my wife and her friend Rashonda.
11        And she was like -- he was like, "Rashonda?
12   That sounds like a black chick's name."
13        And I was like, "Yeah."
14        He's like, "I wouldn't let no mother f'ing,"
15   "n" word, "in my boat with me."
16        I was just think -- I was just, like, wow.
17   That kind of shocked me that he would say that
18   even in uniform, but . . .
19        Q    Okay.
20             MR. SMITH:
21                  Christine, can we go ahead and finish
22        up?
23             MS. KEENAN:
24                  Oh, yeah, yeah, yeah.
25             MR. SMITH:
```

Todd Alexander-Cloud Abshire
June 13, 2017

363

```
 1                    REPORTER'S CERTIFICATE
 2            I, Karla H. Mayers, Certified Court
      Reporter in and for the State of Louisiana, and as
 3    the officer before whom this testimony was taken,
      do hereby certify that TODD ALEXANDER-CLOUD
 4    ABSHIRE, after having been duly sworn by me upon
      authority of R.S. 37:2554, did testify as set
 5    forth in the foregoing 362 pages.
              I further certify that said testimony was
 6    reported by me in the Stenotype reporting method,
      was prepared and transcribed by me or under my
 7    direction to the best of my ability and
      understanding.
 8            I further certify that the transcript has
      been prepared in compliance with transcript format
 9    guidelines required by statute or by rules of the
      board and that I have been informed about the
10    complete arrangement, financial or otherwise, with
      the person or entity making arrangements for
11    deposition services.
              I further certify that I have acted in
12    compliance with the prohibition on contractual
      relationships, as defined by Louisiana Code of
13    Civil Procedure Article 1434 and in rules and
      advisory opinions of the board.
14            I further certify that I am not an
      attorney or counsel for any of the parties, that I
15    am neither related to nor employed by any attorney
      or counsel connected with this action, and that I
16    have no financial interest in the outcome of this
      matter.
17            This certification is valid only for this
      transcript accompanied by my original signature
18    and original raised seal on this page.
19
20
                        Karla H. Mayers, CCR
21                      Certificate No. 94023
22
23
24
25
```

Baton Rouge Court Reporters, LLC
225-292-8686

NEOGOV Insight - Detailed Job Posting                          Page 1 of 3

NEOGOV🅸🅽                | Search                    ○           🎇 Donia Gillespie

Class   Post   Benefits   Reports   CandidateTrack   Tests   Requisitions   List

🏠 My HR      Your password expires in 5 days                    Detailed Job Posting

                                                                Edit | Inactivate

View Class Spec | View Exam Plan | Supplemental Questions | Item Bank | Scoring Plan

| Job #      | Hits | Submitted | Advertised |
|------------|------|-----------|------------|
| DG14025    | 0    | 0         | 10/01/13 - 10/23/13 11:59 PM |

**Job Title:** WILDLIFE ENFORCEMENT CADET

**Closing Date/Time:** Wed. 10/23/13 11:59 PM Central Time

**Salary:** $12.38 - $27.84 Hourly
$990.46 - $2,227.38 Biweekly
$2,146.00 - $4,826.00 Monthly
$25,752.00 - $57,912.00 Annually

**Job Type:** Classified

**Location:** Other, Louisiana

**Department:** Wildlife & Fisheries-Office of the Secretary

Print Job Bulletin

| Qualifications | Details | Supplemental Questions |

MINIMUM QUALIFICATIONS:
Two years of experience as a Peace Officer Standards and Training (POST) level 1 certified peace officer in a full-time position, whose job duties include armed duty with the power of arrest; or

A minimum of sixty semester hours from an accredited college or university; or

Any two year combination of Options 1 and 2 above, whereby thirty semester hours will be equivalent to one year of experience; or

Completion of an associate degree in business administration, business management, corrections, criminal justice, law enforcement, forestry or a conservation related science from a technical college. Accumulation of technical college hours without an associate degree does not qualify; or

A completed diploma or certificate in a two-year program in business administration, business management, corrections, criminal justice, law enforcement, forestry or a conservation related science from a vocational or technical school; or

Four years of continuous active military duty (all Military Occupational Specialties apply).

NECESSARY SPECIAL REQUIREMENTS:

Must have attained 18th birthday at time of application.
Must possess a valid driver's license at time of appointment.
An applicant who has been convicted of a misdemeanor crime of domestic violence or a felony, or who is under indictment on a felony charge will be disqualified until relief from the disabilities imposed by state and federal laws is granted.

NOTE: This job has special physical requirements in that the incumbent must lift heavy objects (50 lbs. or more), walk long distances, work in harsh weather conditions, fire handguns, rifles, and shotguns accurately and have the ability to operate vehicles, boats, and all terrain vehicles while in the performance of duties.

Supplemental Information:

**Vacancy Information:**
This position will be filled as a Probational Appointment (open to all qualified applicants). Current permanent status, classified employees will be required to accept a Probational appointed if selected.

This position has a minimum Special Entrance Rate (SER) of $17.12 per hour / $1,369.60 bi-weekly.

Wildlife Enforcement Cadets are required to live within the parish in which their position is domiciled and within the district in which their position is domiciled. Following is a list of parishes for which we currently have vacancies. Applicants should only select the parishes on their application in which they are willing to work and reside.

Wildlife Enforcement Cadet
vacancies currently exist in the following parishes:

EXHIBIT
2
tabbies'

| Allen | Lafourche | Sabine |
|---|---|---|
| Beauregard | LaSalle | St. Bernard |
| Cameron | Natchitoches | St. Charles |
| Catahoula | Orleans | St. James |
| Desoto | Ouachita | St. Mary |
| East Feliciana | Plaquemines | Vermilion |
| Jefferson | Pointe Coupee | West Feliciana |
| | Statewide (All Parishes) | |

A criminal background check will be required of all selected applicants. If you are selected for an interview, you must submit to a criminal background check as a condition of employment.

Applications will be rejected if the applicant fails to meet the minimum qualifications, submits an incomplete application or fails to apply by the closing date of the announcement. Resumes will not be accepted in lieu of an application listing complete work experience and education.

Applicants who are using college, vocational or technical education to qualify for this position must submit a copy of their transcripts, certificate of completion and/or diploma. Any college hours or degree must be from a school accredited by one of the following regional accrediting bodies: the Middle States Association of Colleges and Secondary Schools; the New England Association of Schools and Colleges, Incorporated; the North Central Association of Colleges and Secondary Schools; the Northwest Association of Secondary and Higher Schools; the Southern Association of Colleges and Secondary Schools; the Western Association of Schools and Colleges.

Applicants who are using military experience to qualify for this position must submit a copy of their DD-214. Applicants who are using law enforcement experience to qualify for this position must submit a copy of their Post Certificate. Examples of experience accepted as law enforcement are Post Certified police officers commissioned with the power of arrest, military police, and deputy sheriffs. Examples of experience not accepted as law enforcement are correctional officers and private security guards.

These documents may be submitted along with your on-line application as an attachment or they may be submitted via email, fax, mail or hand delivery (contact information listed below). The selected candidate will be required to submit original documentation upon hire.

Applicants are encouraged to click on the "Apply" link above and complete an electronic application. All applicants who choose to submit a paper application must complete the supplemental questions on the attached vacancy announcement and complete the attached LA CAREERS Employment Application. Applications may be submitted via fax, mail or hand delivery using the contact information below. If mailed, the envelope must be postmarked on or before the closing date of the vacancy announcement.

**Responsibilities and/or Preferences:**
Patrols public and private land and water, including federal waters, using a variety of specialized equipment while enforcing laws, rules and regulations to protect and preserve the fish and wildlife resources, provides public safety services on the water ways of the state. Position is subject to call 24 hours a day, 7 days a week.

**Exam Required:**
LEAPS (9500) - Applicants are required to have an active score of 70 or above for the Law Enforcement and Protective Services (LEAPS) series 9500. Preference may be given to applicants with a score of 77 or higher. Applicants without a current test score may apply to take the test here. Once your application has been submitted you may report to a test center for testing. Although no appointment is necessary, tests are given on specific dates at specific times. For testing locations and schedules, applicants may click here. The applicants test score must be posted in the LA CAREERS system on or before the closing date of this vacancy announcement.

**Exam Exemptions:**
No testing exemptions will be allowed; applicants without a passing score will not be considered.

**Contact Information:**
Department of Wildlife & Fisheries
Human Resources
P.O. Box 98000
Baton Rouge, LA 70898
(225) 219-1322 – Phone
(225) 342-3709 – Fax
Donia Gillespie
Tara Dupre
Ruth Rigg
Sandra Schober
dgillespie@wlf.la.gov
tdupre@wlf.la.gov
rrigg@wlf.la.gov
sschober@wlf.la.gov

Wildlife & Fisheries is an Equal Opportunity Employer.

| Job Concepts: |
|---|

Function of Work:
To provide the enforcement patrol component in support of major programs for fish, game, wildlife, ecosystem, and boating safety regulations for the protection and sustainability of wildlife/fisheries resources and public safety within an assigned area or for a statewide specialized enforcement unit in a training capacity.

Level of Work:

NEOGOV Insight - Detailed Job Posting

Entry.

**Supervision Received:**
Close from a Wildlife Enforcement Lieutenant, Wildlife and Fisheries Law Enforcement Training Academy staff, or higher-level Wildlife Enforcement personnel who are Field Training Officers during FTO program.

**Supervision Exercised:**
None.

**Location of Work:**
Department of Wildlife and Fisheries, Law Enforcement Division, Law Enforcement Training Academy.

**Job Distinctions:**
Differs from the Wildlife Enforcement Agent by the absence of performing full range of field enforcement work and by the supervision received.

**Examples of Work:**

Investigates/conducts law enforcement activities designed to impact natural resource conservation, protection and management objectives, and to provide public safety services.

Checks hunters and fishermen for equipment, limits and license compliance.

Assists other law enforcement agencies in the apprehension of criminals.

Investigates complaints of alleged violations.

Provides search and rescue response services.

Provides information to the public regarding wildlife/fisheries conservation and boating safety. Investigates boating incidents.

Trains for certification in defensive driving, first responder, hunter/boating education instructor, police boat operation, firearms, defense tactics, boating crash investigation, field survival, enforcement of wildlife/fisheries/boating laws, as well as other state criminal code.

Company Information   |   Privacy Policy   |   Legal Terms

Copyright © 2000-2013 NEOGOV, Inc. All rights reserved. Patent Pending.

LDWF 000025

## EMPLOYMENT APPLICATION

**STATE OF LOUISIANA**
For agency contact information, please refer to the supplemental information above.
Louisiana State Civil Service, Louisiana 70802
(866) 783-5462
http://www.civilservice.la.gov/index.asp

**Abshire, Todd A**
**DG14025 WILDLIFE ENFORCEMENT CADET**

Received: 10/15/13
7:54 PM
**For Official Use Only:**
QUAL:_____
DNQ:_____
□ Experience
□ Training
□ Other:_____

## PERSONAL INFORMATION

| | |
|---|---|
| **POSITION TITLE:** WILDLIFE ENFORCEMENT CADET | **EXAM ID#:** DG14025 |
| **NAME:** (Last, First, Middle) Abshire, Todd A | **SOCIAL SECURITY NUMBER:** ▓▓▓▓▓▓ |

**ADDRESS:** (Street, City, State, Zip Code)
▓▓▓▓▓▓▓▓ Westlake, Louisiana 70669

| | | |
|---|---|---|
| **HOME PHONE:** (337) 802-6990 | **ALTERNATE PHONE:** (337) 309-5742 | **EMAIL ADDRESS:** toddabshire88@gmail.com |
| **DRIVER'S LICENSE:** ■ Yes □ No | **DRIVER'S LICENSE:** State: ▓ Number: ▓▓▓ | **LEGAL RIGHT TO WORK IN THE UNITED STATES?** ■ Yes □ No |

## PREFERENCES

| | |
|---|---|
| **PREFERRED SALARY:** $13.00 per hour; $25,000.00 per year | **ARE YOU WILLING TO RELOCATE?** □Yes □No ■Maybe |

**WHAT TYPE OF JOB ARE YOU LOOKING FOR?**
Regular

**TYPES OF WORK YOU WILL ACCEPT:**
Full Time,Part Time,Per Diem

**SHIFTS YOU WILL ACCEPT:**
Day,Evening,Night,Rotating,Weekends,On Call (as needed)

**OBJECTIVE:**
To find a job that is fulfilling and rewarding, where I can see an impact with the work I do.

## EDUCATION

| | | |
|---|---|---|
| **DATES:** From: 8/2010 To: 5/2013 | **SCHOOL NAME:** McNeese State University | |
| **LOCATION:(City, State)** Lake Charles, Louisiana | **DID YOU GRADUATE?** □Yes ■No | **DEGREE RECEIVED:** No Degree |
| **MAJOR:** General Studies | | **UNITS COMPLETED:** 39 - Semester |

## WORK EXPERIENCE

| | | |
|---|---|---|
| **DATES:** From: 12/2010 To: Present | **EMPLOYER:** United States Marine Corps Reserve | **POSITION TITLE:** Platoon Sergeant/Platoon Commander |
| **ADDRESS:** (Street, City, State, Zip Code) 1710 Surrey St, Lafayette, Louisiana 70508 | | **COMPANY URL:** marines.mil |
| **PHONE NUMBER:** (337) 593-0351 | **SUPERVISOR:** SSgt Scott Van Keuren - Platoon Commander | **MAY WE CONTACT THIS EMPLOYER?** ■Yes □No |
| **HOURS PER WEEK:** 48 | **SALARY:** $240.00/month | **# OF EMPLOYEES SUPERVISED:** 21 |

**DUTIES:**
As Platoon Sergeant and later Platoon Commander I was placed in a position above my pay grade. I was responsible for the morale, welfare, and training of the Marines under me. I ensured that all tasks given by my superiors were completed and my Marines were able to perform the requirements of any mission given.

**REASON FOR LEAVING:**
Currently Employed/Nearing end of contract

| | | |
|---|---|---|
| **DATES:** From: 8/2006 To: 8/2010 | **EMPLOYER:** United States Marine Corps | **POSITION TITLE:** Squad Leader |
| **ADDRESS:** (Street, City, State, Zip Code) Camp Lejeune, North Carolina 28542 | | **COMPANY URL:** marines.mil |



**EXHIBIT**
**3**

.../OHC/reports/reportriew.cfm?encStr=436E3167F475913147  11/27/2013

| PHONE NUMBER: | SUPERVISOR: | MAY WE CONTACT THIS EMPLOYER?<br>■Yes ☐No |
|---|---|---|
| HOURS PER WEEK:<br>80 | SALARY:<br>$2,000.00/month | # OF EMPLOYEES SUPERVISED:<br>12 |

**DUTIES:**
As a Marine Infantryman I held numerous billets and had various responsibilities. I was at times responsible for hundreds of thousands of dollars worth of equipment as well as being responsible for the training and welfare of the Marines under me.

**REASON FOR LEAVING:**
Decided to go to college using the GI Bill to pursue a degree

| CERTIFICATES AND LICENSES |
|---|
| Nothing Entered For This Section |

| SKILLS |
|---|

**OFFICE SKILLS:**
Typing:25
Data Entry:0

**OTHER SKILLS:**
Marksmenship - Skilled - 7 years and 0 months

**LANGUAGE(S):**

| ADDITIONAL INFORMATION |
|---|

**Military Service**
I have served 5 years of active military service in the USMC, and 2 years in the USMCR. I was awarded for my performance on several occasions and have been assigned billets and positions normally held for those of higher rank.

| REFERENCES | | |
|---|---|---|
| REFERENCE TYPE:<br>Professional | NAME: | POSITION: |

**ADDRESS: (Street, City, State, Zip Code)**

| EMAIL ADDRESS: | PHONE NUMBER: |
|---|---|

LDWF 000015

### Agency-Wide Questions

**1.   Are you currently at least 18 years old?**

Yes

**2.   How did you find out about this job?**

Civil Service website

**3.   Please check all that apply to you.**

I am an active duty member of the armed forces, or a veteran of the armed forces who has served at least 90 days of active service for purposes other than training and who has been honorably discharged from active duty within the previous twelve months. (Rule 22.8(d))

**4.   Are you an Army Pays participant?**

No

**5.   Are you claiming Veteran's Preference points on this application?**

Yes

**6.   If you are claiming Veteran's Preference points, were you honorably discharged or discharged under honorable conditions from the Armed Forces of the United States?**

Yes

**7.   Are you an honorably discharged veteran who served either in peace or in war and who has one or more disabilities recognized as service-connected by the Veteran's Administration?**

Yes

**8.   During which period did you serve? (Check all that apply)**

Post 09/11/01 for 90 days or more and for purposes other than training

**9.   Please select all that apply:**

None of the above

**10.   Are you currently holding or running for an elective public office?**

No

**11.   Have you ever been on probation or sentenced to jail/prison as a result of a felony conviction or guilty plea to a felony charge?**

No

**12.   If "YES", give the law enforcement authority (city, police, sheriff, FBI, etc.) the offense, place, and disposition of case.**

**13.   Have you ever been fired from a job or resigned to avoid dismissal? A "YES" answer will not necessarily bar you from state employment.**

No

**14.   If you answered "YES" to the previous question, please explain.**

**15.   If you are a male from the ages 18 through 25, please answer the following question "YES" or "NO". If you are not a male in this group, select "does not apply". Are you registered with the Selective Service System or exempted from such registration?**

Yes

**16.   JOB LOCATION AVAILABILITY - IMPORTANT: Mark at least one (1) parish. Mark ONLY the parish(es) where you are willing to work.**

Beauregard, Calcasieu, Cameron, Lafayette

**17.   I consent to the release of information concerning my capacity and/or all aspects of prior job performance by employers, educational institutions, law enforcement agencies, and other individuals and agencies to duly accredited investigators, human resources staff, and other authorized employees of the state government for the purpose of determining my eligibility and suitability for employment. Please type your initials into the box below if you agree to the statement above.**

T.A.

LDWF 000016

Case 3:16-cv-00669-BAJ-RLB   Document 28-1   10/16/17   Page 184 of 290

### Job Specific Supplemental Questions

1. This position requires an active or converted score of 77 or above on the Civil Service Law Enforcement and Protective Services (LEAPS) test. Have you taken and successfully passed the required exam by the closing date of this job bulletin? If no, you may apply to take the test by accessing the Civil Service website: www.civilservice.la.gov/info/LEAPS/Applying%20for%20the%20LEAPS%20Test.pdf Sample test questions can be viewed on the Civil Service website: www.civilservice.la.gov/Examining/SampleQuestions/7500.doc.

   Yes

2. Are you at least 18 years of age?

   Yes

3. Do you currently possess a valid driver's license?

   Yes

4. Have you ever been charged with a misdemeanor crime?

   No

5. If you answered "Yes" to question # 4 above, please provide the type of offense(s), date(s), location(s) and current disposition of the case(s).

6. Have you ever been charged with a felony crime?

   No

7. If you answered "Yes" to question # 6 above, please provide the type of offense(s), date(s), location(s) and current disposition of the case(s).

8. Have you ever been charged with a Federal or State hunting, fishing or boating violation?

   No

9. If you answered "Yes" to question # 8 above, please provide the type of offense(s), date(s), location(s) and current disposition of the case(s).

10. During the course of the application process, an extensive criminal history and background investigation will be conducted. Is there any other situation or circumstance not mentioned in the above three questions that might be discovered?

    No

11. If you answered "Yes" to question # 10 above, please describe the situation or circumstance in detail.

12. If you are a male from the ages 18 through 25 and you answered "No" to Agency-Wide Question # 15, are you able and willing to register with the Selective Service System? If you are not a male in this group, select "Does not apply".

    Does Not Apply

13. As stated on this job bulletin, Wildlife Enforcement Cadets are required to attend the Enforcement Cadet Training Academy. The academy is located in Baton Rouge, Louisiana and is 21-22 weeks in duration. Cadets are required to live at the training facility (may be allowed to leave Friday p.m. and return on Sunday p.m.). The academy for the candidates selected from this job bulletin is scheduled to begin on December 9, 2013. Are you willing and able to begin the academy on December 9, 2013?

    Yes

14. During the Enforcement Cadet Training Academy, Cadets endure long days of training where physical, mental and other skills are tested. Do you think you can meet or exceed these requirements?

    Yes

15. * 15. Are you willing and able to lift heavy objects (50 lbs. or more), walk long distances and work in harsh weather conditions?

    Yes

16. Are you willing and able to fire handguns, rifles and shotguns accurately?

    Yes

17. Are you willing and able to operate vehicles, boats and all terrain vehicles?

    Yes

18. Wildlife Enforcement Cadets are required to live within the parish in which their position is domiciled. Vacancies are available in the following parishes. Please indicate below which parishes you are willing to reside and work in. (Click All That Apply)

    Beauregard,Cameron,Statewide

LDWF 000017

Case 3:16-cv-00669-BAJ-RLB   Document 28-1   10/16/17   Page 185 of 290

**19.** If you are advised that a position for which you have applied would require you to relocate to meet the domicile requirements, would you be willing and able to relocate at your own expense?

Yes, Definitely

**20.** Enforcement agents work variable shifts, including nights, holidays and weekends. Agents often work during the peak recreational seasons for boating, hunting, fishing and during inclement weather. Are you willing to accept varying work schedules, and the addition of on-call duty, if required?

Yes, Definitely

**21.** Are you using two (2) years of experience as a Peace Officer Standards and Training (POST) level 1 certified Peace officer in a full-time position, whose duties include armed duty with the power of arrest, to qualify for this position? If yes, a copy of your POST certificate must be submitted via attachment to your application as a resume or via email, fax, mail or hand delivery by the closing date indicated on the job bulletin. Selected candidates will be required to furnish their original POST certificate upon hire.

No

**22.** Are you using college credit from an accredited college or university to qualify for this position? If yes, a copy of your transcripts must be submitted via attachment to your application as a resume or via email, fax, mail or hand delivery by the closing date indicated on the job bulletin. Selected candidates will be required to furnish original transcripts upon hire.

No

**23.** Are you using a diploma or certificate from a two-year program in business administration, business management, corrections, criminal justice, law enforcement, forestry or a conservation related science from a vocational or technical school to qualify for this position? If yes, a copy of your certificate or diploma and transcripts must be submitted via attachment to your application as a resume or via email, fax, mail or hand delivery by the closing date indicated on the job bulletin. Selected candidates will be required to furnish original transcripts upon hire.

No

**24.** Are you using four (4) years of continuous active Military service to qualify for this position? If yes, a copy of your DD-214 must be submitted via attachment to your application as a resume or via email, fax, mail or hand delivery by the closing date indicated on the job bulletin. Selected candidates will be required to furnish their original DD-214 upon hire. If you are currently enlisted in the Military and do not have a DD-214, you must submit a letter from your commanding officer that lists your dates of active military service.

Yes

**25.** Did you claim Veteran's Preference Points on the Agency Wide Supplemental Questions Section? If yes, you must submit the required documentation (DD-214, etc) via attachment to your application as a resume or via email, fax, mail or hand delivery by the closing date indicated on the job bulletin, using the contact information within the job bulletin. Selected candidates will be required to furnish their original DD-214 upon hire.

Yes

**26.** The Louisiana Department of Wildlife and Fisheries, and in particular the Enforcement Division, serves as the primary search and rescue agency for the State. In the course of any career in this agency, employees may be called upon to work in all areas of the State during catastrophic events, civil unrest and perhaps hostile working conditions. All of these types of conditions may involve unsafe working conditions and/or the possibility of bodily harm. In view of these types of situations and conditions, do you still wish to be considered for the position advertised in this job bulletin?

Yes, Definitely

**27.** Why are you interested in obtaining employment as a WLF Enforcement Cadet with the WLF Enforcement Division?

I have always enjoyed being outdoors, and I believe my time spent as a Infantry Marine would be an asset. I have always wanted to work in a job that is both satisfying professionally and personally and being a Wildlife and Fisheries Agent would allow me to work to have a career that would be just that. I also have a sincere interest in protecting our states natural wildlife and allow it to continue to be the Sportsman's Paradise.

**28.** What experiences or skills do you have that you think would make you a good candidate for a WLF Enforcement Cadet?

I spent five years as an active duty infantry Marine, and have undergone various training. I also uphold myself to a high physical standard, and during my free time often drag my wife and family outside on Camping and outdoor trips.

**29.** Describe in detail your experience in the outdoors related to hunting, fishing, and/or boating.

I do not have much experience in hunting but I practice tracking and stalking techniques often, and enjoy fishing as a past time. One of my favorite things is to be out on the water and often Kayak and spend time scuba diving.

LDWF 000018

Case 3:16-cv-00669-BAJ-RLB   Document 28-1   10/16/17   Page 186 of 290

**30.** **List hobbies or recreational activities in which you regularly participate, which are related to wildlife, fishing or boating. (Examples: Hunting, Fishing, Shooting, Taxidermy, etc.)**

Some of my hobbies are hiking, running, geocaching, shooting, fishing, diving, and kayaking.

The following terms were accepted by the applicant upon submitting the online application:

By clicking on the "Accept" button, I certify that I have read the statements below carefully and that all statements made on this application and any attached papers are true and complete to the best of my knowledge.

I understand that information on this application may be subject to investigation and verification and that any misrepresentation or material omission may cause my application to be rejected, my name to be removed from the eligible register and/or subject me to dismissal from state service.

AUTHORITY TO RELEASE INFORMATION: I consent to the release of information concerning my capacity and/or all aspects of prior job performance by employers, educational institutions, law enforcement agencies, and other individuals and agencies to duly accredited investigators, human resources staff, and other authorized employees of the state government for the purpose of determining my eligibility and suitability for employment.

This application was submitted by Todd A Abshire on 10/15/13 7:54 PM

LDWF 000019



**BOBBY JINDAL
GOVERNOR**

### State of Louisiana

**ROBERT J. BARHAM
SECRETARY**

DEPARTMENT OF WILDLIFE AND FISHERIES
OFFICE OF SECRETARY

November 27, 2013

> *Please sign below & submit a copy of this letter with your New Hire Packet.*
>
> I acknowledge acceptance of the position as described below.
>
> _____        2013\208
> Signature                                      Date

Dear Todd Abshire,

The Human Resources staff would like to welcome you to Louisiana Department of Wildlife and Fisheries! You have been recommended for the following position:

| | |
|---|---|
| Office/Division:  OSEC/Enforcement | Job Title:  Wildlife Enforcement Cadet |
| Location/Parish:  Baton Rouge/East Baton Rouge | Type of Appt:  Probational |
| Salary:  $1,369.60/Bi-weekly | FLSA Status:  Non-Exempt |

This letter accompanies your New Hire Packet & Instructions. As you review and complete your packet, please make note of any questions you have, so that they can be addressed during Orientation, which is normally held on the first Thursday of every other month at Headquarters in Baton Rouge. Please coordinate your attendance with your supervisor.

Along with your completed New Hire Packet, you must return the following to Human Resources on or before your first day of employment:
- Social Security Card (Must be an Original)
- Valid Driver's License
- Official College Transcript (if applicable)
- Voided Check – Direct Deposit of your paycheck is required as a condition of employment.
- Original marriage license and/or original birth certificate for each dependent to be covered by insurance (if applicable)
- Copy of Social Security Card(s) and birth certificate(s) for retirement beneficiaries (if applicable)

If you have any questions, please contact Human Resources at (225) 219-1323.

Sincerely,

*Ruth A. Rigg*

Ruth A. Rigg, Human Resources Specialist

> If you fail to present your New Hire Packet and the required documents listed above, you may not be allowed to begin work.



**EXHIBIT
8**

P.O. BOX 98000 • BATON ROUGE, LOUISIANA 70898-9000 • PHONE (225) 765-2800
AN EQUAL OPPORTUNITY EMPLOYER

LDWF 000012



**Louisiana Department of Wildlife & Fisheries**
**Enforcement Division**

# COUNSELING CONFERENCE WORKSHEET

**Supervisor's Name:** _Captain Robert Buatt_          **Date:** May 13, 2015

**Employee's Name:** _Agent Todd Abshire_          **Location:** Region 5

**Witnesses Name(s):** Lt. Beau Robertson

**Reason for Conference:** There have been a few incidents lately where paperwork has not been turned in on time and you not answering your phone or returning a phone call when Lt. Robertson or I call you.

**Explanation:** On April 8th and 9th on your days off I made numerous attempts to contact you by phone over some paperwork issues and you never answered nor did you call me back. I sent Lt. Robertson to your residence on the afternoon of April 9th to check on your wellbeing. Lt. Robertson made contact with you and you advised you had been sick with some sort of mouth infection that resulted from being hit in the face with a board and that is why you didn't answer the phone or call me back.

On April 21, 2015 you were scheduled to work 10A-8:30P. I attempted to call you by phone at 9A, 10A, and 10:40A. I made numerous attempts to contact you on the radio with no response. I contacted dispatch and asked if you had gone 10-8 and they advised you had not gone 10-8. Lt. Robertson had not approved a schedule change from you on that morning. You called me back at 11A and advised you had changed your work schedule to go to work later to work closed season froggers. I asked if you had gotten approval from your lieutenant for the schedule change. You advised you did not know you need to do that and while working with other agents they just change their schedule without notifying the supervisor. I told you that was not the case and that all other agents know they must first notify their respective supervisor before making a change to their work schedule.

On April 27, 2015 I received an email from Cindy Pippin advising you had not turned in your P-card log and receipts from March. You had to be reminded to turn in your P-card log almost a month after it was due. You advised your lieutenant that you lost a receipt and was in the process of looking for it.

On May 3, 2015 you did not turn in your MV-3 for the month of April with your weekly paperwork. Lt. Robertson made several attempts to contact you by phone with no answer. You finally called him back that afternoon. While on the phone with Lt. Robertson he got another call and told you to hold on. While Lt. Robertson was on the other call you hung up. Lt. Robertson was on the other call only briefly and made several attempts to call you back when he got off the other line. You did not answer. Lt. Robertson needed your MV-3 on May 3rd. You did not turn in your MV-3 until May 4th. I reviewed your MV-3 and you had several mathematical mistakes. I returned it to you for corrections. You made some

T.A.



corrections and turned it back into me. I checked it again and the corrections had not been made. I took the time and made the corrections for you. (See April 2015 MV-3 for corrections.)

On May 4, 2015 Lt. Robertson and I met with you in my office to speak with you about the paperwork issues and not being able to make contact with you when you are off duty. You advised that you didn't answer my call because you did not have my number in your phone and that you did not recognize the number calling you. I told you that you put my number in your phone the day you graduated from the LDWF Academy. You then advised you just did not feel like talking.

**What Rules/Policies/SOP's were discussed?**

Policy 2-6.1 B 1 States that agents are subject to call for duty 24 hours per day.

Policy 2-6.1 C 1 States that all schedule changes must be approved by the Lieutenant and in his absence, by the Region Captain.

Policy 3-1.1 B 40 b States that agents shall be subject to being called to duty as needed and shall be subject to orders from competent authority and / or emergency calls from the public.

Policy 3-1.1 B 40 c States that agents shall make notification through the chain of command when unable to respond to a call while off duty.

**What was the employee's explanation of the incident?**

Employee advised he is dealing with some issues in his personal life. Other than personal issues, the employee advised he has no excuses for the performance problems mentioned on this counseling conference worksheet.

**Was the issue a training deficit?** _____YES    X  NO

**Explanation:**    N/A

**How will the training deficit be addressed or corrected?**    N/A

**What follow up is required?** You are here-by directed to answer phone calls from your supervisors and the region office whether you are on duty or off duty. If you are unable to answer the call at that time you are to return the phone call within a reasonable amount of time. If you will be in a position where you will not be available for a callout for an extended period then you are to notify your supervisor to make him aware and let him know when you expect to be available (i.e., annual leave, out of town trip,

T.A.



**Louisiana Department of Wildlife & Fisheries**
**Enforcement Division**

sick leave, etc.).  You are also directed to check your state email on a regular basis for directives and information.

You are here-by directed to get approval for all changes in your work schedule as dictated by policy.

You are here-by directed to turn in all required paperwork and documents in a timely manner.  Your timesheet is due in accordance with direction from your supervisor with your weekly paperwork.  Your completed Pcard log and receipts are due in to the Region office no later than the 6th of each month. Your completed MV-3 is due to be turned in with your weekly paperwork immediately following the last day of the previous month.  If you have any problems with or questions about any paperwork or need extensions you are to contact your supervisor.

**Employee's response/comments:** *The employee advised now he knows the proper procedures and this will not happen again. He advised he will not make these mistakes any more.*

Signatures: _____ 1804J___        _____ 2791:29 Todd Abshire

　　　　　　Supervisor　　　　　　　　　　　　　　　　　Employee

_____ 189522
　　Beau Robertson

　　　　　　Witness　　　　　　　　　　　　　　　　　　Witness

 **Louisiana Department of Wildlife & Fisheries**
**Enforcement Division**

May 11, 2015

On May 9th, 2015 I, Sr. Agt. Justin Lowry, was scheduled to work 11:30 am to 12:00 midnight. Shortly after going 10-8 I arrived at the Region 5 office to meet with Agt. Abshire, Sgt. Guillory, and Agt. Vanya to discuss the day's events as we were working Contraband Days. I was refreshing myself on SFST with Sgt. Guillory. I noticed Agt. Abshire standing with his back towards Sgt. Guillory and myself. I asked Agt. Abshire if he thought he should get in on some SFST practice before we go on patrol. Agt. Abshire stated that he was staring at the interstate and that I could do the first DWI and he would watch then. Sgt. Guillory and I continued to discuss SFSTs. We then asked Agt. Abshire if he would sit in the chair for me so I could perform the full SFST on him while Sgt. Guillory graded me. Agt. Abshire stated that he would. While doing the HGN test I noticed lack of smooth pursuit and distinct and sustained nystagmus at maximum deviation. Sgt. Guillory did HGN on Agt. Abshire as well. At one point Agt. Abshire was not following the stimulus with his eyes. When Sgt. Guillory questioned Agt. Abshire as to why he was not following the stimulus Agt. Abshire stated that he was daydreaming. Sgt. Guillory began questioning Agt. Abshire on the medications he may be taking. I told Agt. Abshire that if he felt he was not feeling 100% that he should call in sick for that day. Agt. Abshire stated that he felt fine. Sgt. Guillory told Agt. Vanya to practice the walk and turn and the one leg stand on Agt. Abshire. I did not observe the entire test but at one point Agt. Abshire stepped off line and laughed and stated once again that he was daydreaming. Sgt. Guillory and I stepped out of the office to discuss what we had observed. It was obvious to the both of us that Agt. Abshire's actions were not normal. We both felt as if it was not safe for him to be on patrol that day due to his dazed and confused attitude. At that point Sgt. Guillory called Lt. Robertson to advise him of the observations we had made. Before Lt. Robertson arrived at the Region 5 office I was talking to Agt. Abshire outside. On two separate occasions Agt. Abshire stepped off the side walk losing his balance. On both occasions he laughed about it. A few minutes later Lt. Robertson arrived at the Region 5 office.

_251606_

Sr. Agt. Justin Lowry



**EXHIBIT**
**14**



**SCS Performance Evaluation System - Planning & Evaluation Form**
Form Revision Date 4/2014

## Employee Information

| | | | |
|---|---|---|---|
| Dept/Office/Section/Unit: | LDWF/Office of the Secretary/Enforcement/Region 5 | Employee Personnel #: | 279129 |
| Employee Name: | Todd Abshire | Performance Year: | 7/1/2014 - 6/30/2015 |
| Employee Title: | Wildlife Enforcement Sr. Agent Training Series | Evaluation Period: | 7/1/2014 - 6/30/2015 |

## Initial Planning Session

### Step #1 - Evaluating Supervisor (SCS Rule 10.2):

| Signature: | *[signature]* Brian Robertson | | |
|---|---|---|---|
| Personnel #: | 189322 | Date Given to Second Level Evaluator: | 7/26/14 |

### Step #2 - Second Level Evaluator (SCS Rule 10.3):

| Signature | *[signature]* Capt P M Brunet 17245 | | |
|---|---|---|---|
| Personnel #: | 17245 | Date Approved *(Must be on or before planning session):* | 7/28/14 |

### Step #3 - Employee:

| Employee Signature: | *[signature]* 279129 | Date: 8-6-14 | |
|---|---|---|---|

*By signing and dating this form, I am certifying that my evaluating supervisor conducted a planning session with me on the date shown.*

### Updated Planning Sessions (Optional)

| Date Conducted: | | Supervisor Initial: | | Employee Initial: | |
|---|---|---|---|---|---|
| Date Conducted: | | Supervisor Initial: | | Employee Initial: | |
| Date Conducted: | | Supervisor Initial: | | Employee Initial: | |

**EXHIBIT 17**

### Agency Human Resources Office Use Only (Optional)

| Date Planning Received in Human Resources: | 8/22/14 | Human Resources Staff Initial: | KPC/WP | Evaluating Supervisor Compliance (Y/N) | | Second Level Evaluator Compliance (Y/N) | |
|---|---|---|---|---|---|---|---|

LDWF 000085

| Evaluation Session | | |
|---|---|---|
| **Step #1 - Evaluating Supervisor (SCS Rule 10.2):** | | |
| Signature: | | |
| Personnel #: | Date Given to Second Level Evaluator: | |
| **Step #2 - Second Level Evaluator (SCS Rule 10.3):** | | |
| Signature: | | |
| Personnel #: | Date Approved *(Must be on or before evaluation session):* | |
| **Step #3 - Employee:** | | |
| Employee Signature: | Date: | |

*By signing and dating this form, I am certifying that my evaluating supervisor conducted an evaluation session with me on the date shown.*

**_Employee Statement (Only if Employee is NOT Signing Form for purposes of Evaluation):_** ☐ *I have decided not to sign this form, but I acknowledge that I received a copy of the evaluation and understand that my failure to sign will not prohibit the evaluation from becoming official for the performance year.*

**If employee did not sign above, or chose not to sign the form, please indicate whether the employee was given or mailed a copy of the evaluation below:**

| Mailed | ☐ | Given | ☐ |
|---|---|---|---|

| Overall Evaluation: (Select only one evaluation) | | |
|---|---|---|
| ☐ Exceptional | ☐ Successful | ☐ Needs Improvement/Unsuccessful |
| ☐ Not Evaluated | ☐ Unrated - If Unrated, select sub-category: | ☐ Never Rendered   ☐ Untimely   ☐ Violation of Chapter 10 |

| Agency Human Resources Office Use Only (Optional) | | | | | |
|---|---|---|---|---|---|
| Date Evaluation Received in Human Resources: | | Human Resources Staff Initial: | Evaluating Supervisor Compliance (Y/N) | Second Level Evaluator Compliance (Y/N) | |

LDWF 000086

SCS-PES EVAL (Rev 7/12)         **SCS Performance Evaluation System – Planning & Evaluation Form**


Louisiana
SCS
State Civil Service

Employee Name:  Todd Abshire                    Employee Personnel #:   279129

**Agency Mission / Goals / Standards:**

To manage, conserve, and promote wise utilization of Louisiana's renewable fish and wildlife resources and their supporting habitats through replenishment, protection, enhancement, research, development, and education for the social and economic benefit of current and future generations; to provide opportunities for and to encourage the use and enjoyment of these resources in a safe and healthy environment both on land and on water.

**Department Mission / Goals:**

**Mission**

The Mission of the Enforcement Division is to establish and maintain compliance through the execution and enforcement of laws, rules and regulations of the state relative to the management, conservation and protection of renewable natural wildlife and fisheries resources and relative to providing public safety on the state's waterways and lands for the continued use and enjoyment of current and future generations.

**Goal 1**
To support natural resource preservation by providing frontline enforcement component of laws, regulations, and programs related to wildlife and fisheries use, conservation and management. Hours worked and public contacts associated with wildlife, fisheries and ecosystem enforcement, education and community policing programs are the most relevant measures of the activities related to work toward improving and sustaining the state's natural resources.

**Wildlife, Fisheries and Ecosystem Enforcement**
LDWF/LED is responsible for assuring public compliance with state and federal laws, regulations, and programs which promote, manage and enhance the conservation of Louisiana's wildlife and fisheries resources and protect and sustain their supporting ecosystems. This activity is conducted through patrols of Louisiana's forest, woods and marshes, in-vessel patrols of Louisiana's inshore and offshore waters and investigations of relevant commercial facilities. The LDWF/LED also conducts community policing activities which publicize legal practices, encourage voluntary compliance and promote safe participation in recreational and commercial activities which use Louisiana's natural resources.

**Goal 2**
To advance crime and safety reform by protecting Louisiana citizens of all ages from life-threatening criminal activities when they are involved in recreational activities on the state's waterways. Hours worked and public contacts associated with boating safety and waterways enforcement, education, and community policing programs are the most relevant measures of the activities related to work toward reducing illegal and dangerous activities on the state's waterways.

**Boating Safety and Waterways Enforcement**
LDWF/LED is responsible for providing public safety on Louisiana's vast waterways through education and enforcement of criminal statutes. These responsibilities include maintaining and improving public compliance with boating safety laws, investigating all reportable recreational boating fatalities and crash incidents, enforcing laws restricting the operation of vessels under the influence of alcohol or drugs and administering the state's mandatory boating education program for operation of motorboats. The LDWF/LED also maintains authority for permitting regattas and other marine events and ensuring compliance with boating safety regulations. LDWF/LED boating safety and waterway enforcement activities are conducted through boating incident investigations, community policing activities and in-vessel patrols of Louisiana's inshore and offshore waterways. These activities recruit new recreational boaters, encourage safe and legal activities, protect property and save lives. LDWF/LED regularly coordinates its boating safety and waterway enforcement activities with local law enforcement waterway efforts to direct the state's safety efforts on Louisiana's waterways.

LDWF 000087

SCS-PES EVAL (Rev 7/12)　　　　**SCS Performance Evaluation System – Planning & Evaluation Form**　　　　Louisiana **SCS** State Civil Service

**Goal 3**
Lead, coordinate and provide emergency response services for search and rescue and maritime security operations. Enhance Louisiana's collaborative efforts in the maritime domain and build a safe and secure environment that supports public safety, public confidence and ensures economic stability.

**Search and Rescue and Maritime Security**
LDWF/LED is responsible for providing and coordinating search and rescue response activities for the state. This activity includes state response and coordination of local, parish and federal responses to natural or man-made disasters or other homeland security events involving urban, rural and maritime search and rescue and maritime security activities. The activity includes exercises, training, first response to search and rescue events, maritime security patrols and initiatives focused on saving lives and protection of critical infrastructure. LDWF/LED is the state's lead agency for the state's emergency support search and rescue and lead for maritime security functions and supports emergency support functions for transportation, communications, firefighting, emergency management and public safety and security.

---

**Work and Behavior Expectations (at least one each):**　　　　　　　　　　　　　　　　　　**Bank of Expectations**

**Documentation is required to support a zero (0) score or a two (2) score for any Work and Behavior Expectation.**

| Expectation | 0 | 1 | 2 |
|---|---|---|---|
| Uses time productively, effectively and efficiently. | 0 ☐ | 1 ☐ | 2 ☐ |
| Maintains a work product that produces strong, productive and measurable results in wildlife enforcement. | 0 ☐ | 1 ☐ | 2 ☐ |
| Maintains a work product that produces strong, productive and measurable results in fishery enforcement. | 0 ☐ | 1 ☐ | 2 ☐ |
| Maintains a work product that produces strong, productive and measurable results in boating safety and waterway enforcement. | 0 ☐ | 1 ☐ | 2 ☐ |
| Conducts search and rescue missions in a safe and successful manner. | 0 ☐ | 1 ☐ | 2 ☐ |
| Provides an adequate presence on waterways for maritime security activities. | 0 ☐ | 1 ☐ | 2 ☐ |

LDWF 000088

SCS-PES EVAL (Rev 7/12)          **SCS Performance Evaluation System – Planning & Evaluation Form**          Louisiana **SCS** State Civil Service

Maintains a working knowledge of laws, policies, SOPs, job requirements, conditions and other directives and adheres to same.          0 ☐   1 ☐   2 ☐

Independently investigates violations through surveillance, developing sources of information, informants and interviews.          0 ☐   1 ☐   2 ☐

Assignments completed on time without reminders.          0 ☐   1 ☐   2 ☐

Produces work that is detailed, accurate and neat.          0 ☐   1 ☐   2 ☐

Reports for duty on time and as scheduled.          0 ☐   1 ☐   2 ☐

Available for callouts and handles commitments reliably.          0 ☐   1 ☐   2 ☐

Reports pertinent information to chain of command.          0 ☐   1 ☐   2 ☐

Performs well without close supervision.          0 ☐   1 ☐   2 ☐

Works well as a team and supports team activities when required.          0 ☐   1 ☐   2 ☐

Maintains a positive, professional and courteous attitude.          0 ☐   1 ☐   2 ☐

Accepts and applies constructive criticism.          0 ☐   1 ☐   2 ☐

Utilizes electronic devices properly.          0 ☐   1 ☐   2 ☐

LDWF 000089

SCS-PES EVAL (Rev 7/12)　　　　　**SCS Performance Evaluation System – Planning & Evaluation Form**

Louisiana
**SCS**
State Civil Service

| | | | |
|---|---|---|---|
| Use radio as primary means of communication for all official enforcement activities. | 0 ☐ | 1 ☐ | 2 ☐ |
| Answers public inquiries clearly and accurately and seeks information to answer questions when necessary. | 0 ☐ | 1 ☐ | 2 ☐ |
| Maintains personal appearance and uniforms that present a professional image. | 0 ☐ | 1 ☐ | 2 ☐ |
| Uses and maintains equipment in an appropriate manner. | 0 ☐ | 1 ☐ | 2 ☐ |
| Handles assigned public relations duties willingly and professionally. | 0 ☐ | 1 ☐ | 2 ☐ |

**Evaluation Scale**　　　　　　　　　　　　　　　　　　Total Score_____
**Exceptional**　　　　　32 – 46
**Successful**　　　　　　19 – 31
**Needs Improvement/Unsuccessful**　0 – 18

Documentation / Comments ( attach supporting documentation):

LDWF 000090

Rev 03/14/12

# REALLOCATION IN A CPG TICKLER

Office/Org Unit   0512/ Off of Sec/ Enf/ Region 5          Pos #   39925

Name   Todd Abshire          EE #   279129          Eligible Date   12/09/14

Curr Job Title   WLF Enf Cadet          Curr Pay Level   PS-109   Curr Job Code   133630

New Job Title   WLF Enf Agent          New Pay Level   PS-110   New Job Code   133820

The above referenced employee is eligible for a reallocation in a Career Progression Group (CPG). Please return this form to Human Resources as the action cannot be processed until this signed tickler is received.

Comments _____
_____
_____
_____

| Office/Division/Section Concurrence Signatures: | I recommend this action effective | This action will be reviewed again on |
|---|---|---|
| *B. Mayo...B. Robertson*   11/10/14    Date | 12/09/14  ☑ | ☐ |
| *Cap'l...* ROBERT BUATT #17245   11/12/14   Date | ☑ | ☐ |
| Cliff Comeaux #15731   11/22/14   Date | ☑ | ☐ |
| *Peter Oliver 34596*   12-4-14   Date | ☑ | ☐ |
| *Cary Broussard*   12-4-14   Date | ☑ | ☐ |

**Approval & Certification:** By signing this form, I approve this action and certify that it is in accordance with Civil Service Rules, policies and procedures; Article X of LA Constitution; and the Uniform Classification and Pay Plans.

*[signature]*          12-8-2014
Appointing Authority          Date

I authorize this CPG Reallocation:
☑ Yes          ☐ No

**Human Resources Certification:**   Min Quals met: ☑ Yes   ☐ No   Next CPG Eligible Date: 12/09/15

ISIS Updated: ☑ Object   ☑ Relationship   ☑ Planned Comp   ☑ FLSA   ☑ Info Type 41-Date Spec

☑ Info Type 19-Monitoring of Task          HR Initials & Date: Ctb 12/12/14

Action Processed in ISIS on  12/12/14  by  Ctb



EXHIBIT
18

LDWF 000075

5/15/2015                                    Gmail - Request for assistance



Todd Abshire <toddabshire88@gmail.com>

## Request for assistance
1 message

Todd Abshire <TAbshire@wlf.la.gov>                          Fri, May 5, 2015 at 8:23 PM
To: Beau Robertson <brobertson@wlf.la.gov>
Cc: "toddabshire88@gmail.com" <toddabshire88@gmail.com>

Lt.,
I know the last month the quality of my work has been slipping and the issues you and the Captain discussed with me
have already been addressed but I was hoping that in the future, prior to it becoming such an issue, that you can notify
me and we can professionally address the issue. When you came by my house last month to check on me I told you
that due to my PTSD I had hit a pretty rough patch in my life, and that lately it had been interfering with work. I know
in the past I have asked about working together more so that I can pick your brain and get feedback on my
performance, and also getting some copies of your old paperwork to use as a template. Any chance this could happen?
R/S
Agent Abshire

EXHIBIT
19

PLF000775



**Louisiana Department of Wildlife & Fisheries**
**Enforcement Division**

May 17, 2015

Lieutenant Robertson,

My purpose in writing this is to address issues that have occurred at work within the last few months, formally re-submit my previous requests, and express my concern regarding a lack of dialogue between us.

I have asked several times since coming to Region 5 and falling under your supervision for assistance concerning paperwork, work related issues, and professional development. Most of these requests have been verbal, but I have also sent emails to your state email on at least three occasions. The most recent email was sent on May 13, 2015. I have yet to receive a response, and the nature of that email was related to recent events. I was under the impression that after explaining my reoccurring struggles with PTSD to you when you came to my home in April that Capt. Buatt would be informed. I was not and still am in no way trying to use my disability as a way to gain sympathy or "special" treatment; that being said I recognize the limitations and effects it places on me and tried seeking assistance over the course of the last year. I have even gone into the office on my days off due to our conflicting work schedules to ask work related questions. I understand the heavy workload prevents you from dedicating time for one agent, and all respect to you and your position, but my understanding of your position is that you provide close supervision, support, and guidance to all agents under you, especially a new agent such as myself. This is something I feel has been lacking.

I am in no way trying to undermine your authority and have the utmost respect for the chain of command, but my understanding of department policy is that if your immediate supervisor is unable to address issues then an agent may then speak with the next level supervisor.

That being said, I believe it would be more appropriate to handle these issues at your level.

I am prepared to speak with you in person in a professional setting but if our schedules conflict I am willing to come into the office on my off days as this is something I really hope to resolve.

Respectfully Submitted

*T. Abshire  5/17/2015*
*279129*

EXHIBIT
20

## Evaluation Session:

### Step #1 - Evaluating Supervisor (SCS Rule 10.2):

Signature: _(signature)_

Personnel #: _189802_

Date Given to Second Level Evaluator: 7/29/15

### Step #2 - Second Level Evaluator (SCS Rule 10.3):

Signature: _(signature)_

Personnel #: _17245_

ROBERT DUAT #17245

Date Approved (Must be on or before evaluation session): 7/29/15

### Step #3 - Employee:

Employee Signature: _(signature)_  T. Ilshire  2/29/29

Date: 8/5/2015

By signing and dating this form, I am certifying that my evaluating supervisor conducted an evaluation session with me on the date shown.

**Employee Statement (Only if Employee is NOT Signing Form for purposes of Evaluation):** ☐ I have decided not to sign this form, but I acknowledge that I received a copy of the evaluation and understand that my failure to sign will not prohibit the evaluation from becoming official for the performance year.

*If employee did not sign above, or chose not to sign the form, please indicate whether the employee was given or mailed a copy of the evaluation below:*

|  | Given | Mailed |
|---|---|---|
|  | ☐ | ☐ |

**Overall Evaluation:**
(Select only one evaluation)

☐ Exceptional    ☐ Successful    ☒ Needs improvement/Unsuccessful

☐ Not Evaluated    ☐ Unrated - If Unrated, select sub-category:    ☐ Never Rendered    ☐ Untimely    ☐ Violation of Chapter 10

| Agency Human Resources Office Use Only (Optional) | | |
|---|---|---|
| Date Evaluation Received in Human Resources: | Human Resources Staff Initial: | Evaluating Supervisor Compliance (Y/N) | Second Level Evaluator Compliance (Y/N) |



EXHIBIT
21

PLF000083

SCS-PES EVAL (Rev 7/12)

**SCS Performance Evaluation System – Planning & Evaluation Form**

Louisiana
**SCS**
State Civil Service

Employee Name:  Todd Abshire

Employee Personnel #:  279129

---

**Agency Mission / Goals / Standards:**

To manage, conserve, and promote wise utilization of Louisiana's renewable fish and wildlife resources and their supporting habitats through replenishment, protection, enhancement, research, development, and education for the social and economic benefit of current and future generations; to provide opportunities for and to encourage the use and enjoyment of these resources in a safe and healthy environment both on land and on water.

---

**Department Mission / Goals:**

**Mission**

The Mission of the Enforcement Division is to establish and maintain compliance through the execution and enforcement of laws, rules and regulations of the state relative to the management, conservation and protection of renewable natural wildlife and fisheries resources and relative to providing public safety on the state's waterways and lands for the continued use and enjoyment of current and future generations.

**Goal 1**

To support natural resource preservation by providing frontline enforcement component of laws, regulations, and programs related to wildlife and fisheries use, conservation and management. Hours worked and public contacts associated with wildlife, fisheries and ecosystem enforcement, education and community policing programs are the most relevant measures of the activities related to work toward improving and sustaining the state's natural resources.

**Wildlife, Fisheries and Ecosystem Enforcement**

LDWF/LED is responsible for assuring public compliance with state and federal laws, regulations, and programs which promote, manage and enhance the conservation of Louisiana's wildlife and fisheries resources and protect and sustain their supporting ecosystems. This activity is conducted through patrols of Louisiana's forest, woods and marshes, in-vessel patrols of Louisiana's inshore and offshore waters and investigations of relevant commercial facilities. The LDWF/LED also conducts community policing activities which publicize legal practices, encourage voluntary compliance and promote safe participation in recreational and commercial activities which use Louisiana's natural resources.

**Goal 2**

To advance crime and safety reform by protecting Louisiana citizens of all ages from life-threatening criminal activities when they are involved in recreational activities on the state's waterways. Hours worked and public contacts associated with boating safety and waterways enforcement, education, and community policing programs are the most relevant measures of the activities related to work toward reducing illegal and dangerous activities on the state's waterways.

**Boating Safety and Waterways Enforcement**

LDWF/LED is responsible for providing public safety on Louisiana's vast waterways through education and enforcement of criminal statutes. These responsibilities include maintaining and improving public compliance with boating safety laws, investigating all reportable recreational boating fatalities and crash incidents, enforcing laws restricting the operation of vessels under the influence of alcohol or drugs and administering the state's mandatory boating education program for operation of motorboats. The LDWF/LED also maintains authority for permitting regattas and other marine events and ensuring compliance with boating safety regulations. LDWF/LED boating safety and waterway enforcement activities are conducted through boating incident investigations, community policing activities and in-vessel patrols of Louisiana's inshore and offshore waterways. These activities recruit new recreational boaters, encourage safe and legal activities, protect property and save lives. LDWF/LED regularly coordinates its boating safety and waterway enforcement activities with local law enforcement agencies to direct the state's safety efforts on Louisiana's waterways.

Page 2 of 5

PLF000084

SCS-PES EVAL (Rev 7/12)

SCS Performance Evaluation System – Planning & Evaluation Form

Louisiana
**SCS**
State Civil Service

**Goal 3**
Lead, coordinate and provide emergency response services for search and rescue and maritime security operations. Enhance Louisiana's collaborative efforts in the maritime domain and build a safe and secure environment that supports public safety, public confidence and ensures economic stability.

**Search and Rescue and Maritime Security**
LDWF/LED is responsible for providing and coordinating search and rescue response activities for the state. This activity includes state response and coordination of local, parish and federal responses to natural or man-made disasters or other homeland security events involving urban, rural and maritime search and rescue and maritime security activities. The activity includes exercises, training, first response to search and rescue events, maritime security patrols and initiatives focused on saving lives and protection of critical infrastructure. LDWF/LED is the state's lead agency for the state's emergency support search and rescue and lead for maritime security functions and supports emergency support functions for transportation, communications, firefighting, emergency management and public safety and security.

| | |
|---|---|
| Work and Behavior Expectations (at least one each): | Bank of Expectations |
| **Documentation is required to support a zero (0) score or a two (2) score for any Work and Behavior Expectation.** | |
| | |
| Uses time productively, effectively and efficiently. | 0 ☐  1 X  2 ☐ |
| | |
| Maintains a work product that produces strong, productive and measurable results in wildlife enforcement. | 0 ☐  1 X  2 ☐ |
| | |
| Maintains a work product that produces strong, productive and measurable results in fishery enforcement. | 0 ☐  1 X  2 ☐ |
| | |
| Maintains a work product that produces strong, productive and measurable results in boating safety and waterway enforcement. | 0 ☐  1 X  2 ☐ |
| | |
| Conducts search and rescue missions in a safe and successful manner. | 0 ☐  1 X  2 ☐ |
| | |
| Provides an adequate presence on waterways for maritime security activities. | 0 ☐  1 X  2 ☐ |

PLF000085

SCS-PES EVAL (Rev 7/12)                    SCS Performance Evaluation System – Planning & Evaluation Form

| | 0 | 1 | 2 |
|---|---|---|---|
| Maintains a working knowledge of laws, policies, SOPs, job requirements, conditions and other directives and adheres to same. | 0 X | 1 ☐ | 2 ☐ |
| *Worked with him in FY. Did an excellent job for me and I feel he could not perform labor/collaboration SFST test. Treated DUI detection performance by disregard. Failed to comment a comment. Implemented supervisory S.F.S.T. due to chg* | | | |
| Independently investigates violations through surveillance, developing sources of information, ② informants and interviews. (14/15) | 0 ☐ | 1 X | 2 ☐ |
| Assignments completed on time without reminders. ①④ *Numerous instances that are discussed at of failing to meet deadlines for field-placement MUS's and attend* | 0 X | 1 ☐ | 2 ☐ |
| *Reports not being turned in on time. Formally counseled on this issue.* | | | |
| Produces work that is detailed, accurate and neat. *Had an above number of templates reports and citations as well as MUS's that contained mistakes that had to be corrected.* | 0 X | 1 ☐ | 2 ☐ |
| Reports for duty on time and as scheduled. *Several documented instances of failing to report for duty in time taken for late for schedule.* | 0 X | 1 ☐ | 2 ☐ |
| *Excused.* *failing to report for duty in time taken for late for schedule.* | | | |
| Available for callouts and handles commitments reliably. ② *Numerous times* *supervisor less important... could not be reached field notice* | 0 X | 1 ☐ | 2 ☐ |
| *Failed to forward statewide... position tests evaluating FY 2015.* | | | |
| Reports pertinent information to chain of command. | 0 ☐ | 1 X | 2 ☐ |
| Performs well without close supervision. *Appears that his electronic data that his job performance is little better during during out during individual capacity back to be supervised closely in order to complete assigned tasks and perform.* | 0 X | 1 ☐ | 2 ☐ |
| Works well as a team and supports team activities when required. | 0 ☐ | 1 X | 2 ☐ |
| Maintains a positive, professional and courteous attitude. | 0 ☐ | 1 X | 2 ☐ |
| Accepts and applies constructive criticism. | 0 ☐ | 1 X | 2 ☐ |
| Utilizes electronic devices properly. | 0 ☐ | 1 X | 2 ☐ |

Page 4 of 5

Louisiana
SCS
State Civil Service

PLF000086

SCS-FES EVAL (Rev 7/12)

**SCS Performance Evaluation System – Planning & Evaluation Form**

Use radio as primary means of communication for all official enforcement activities.

0 ☐   1 X   2 ☐

Answers public inquiries clearly and accurately and seeks information to answer questions when necessary.

0 ☐   1 X   2 ☐

Maintains personal appearance and uniforms that present a professional image.

0 ☐   1 X   2 ☐

Uses and maintains equipment in an appropriate manner.

0 ☐   1 X   2 ☐

Handles assigned public relations duties willingly and professionally.

0 ☐   1 X   2 ☐

**Total Score** ___17___

**Evaluation Scale**
Exceptional          32 – 46
Successful           19 – 31
Needs Improvement/Unsuccessful   0 – 18

Documentation / Comments ( attach supporting documentation):

SCS
Louisiana
State Civil Service

PLF000087





BOBBY JINDAL
GOVERNOR

### State of Louisiana
DEPARTMENT OF WILDLIFE AND FISHERIES
LAW ENFORCEMENT DIVISION

ROBERT J. BARHAM
SECRETARY

COLONEL JOEY BROUSSARD
CHIEF OF LAW ENFORCMENT

August 10, 2015

Mr. Todd Abshire
4281 Houston River Road
Westlake, La 70669

Re: Termination of Employment:

Dear Mr. Abshire:

You have been on probation since your employment with the Department of Wildlife and Fisheries on December 09, 2013. Pursuant to Civil Service Rule 9.1(e), your probationary appointment with this department will terminate close of business on August 10, 2015.

Yours Truly,



Colonel Joseph Broussard
Chief of Law Enforcement

APPROVED AND AUTHORIZED:

ROBERT J. BARHAM
SECRETARY

**EXHIBIT**
tabbies®
**22**

JB2015-20
JB:pb

P.O. BOX 98000 • BATON ROUGE, LOUISIANA  70898-9000 • PHONE (225) 765-2800
AN EQUAL OPPORTUNITY EMPLOYER

LDWF 000530



**Louisiana Department of Wildlife & Fisheries**
**Enforcement Division**

August 5, 2015

Colonel Joseph Broussard
P.O. Box 98000
Baton Rouge, LA 70898

RE: Todd Abshire Unsatisfactory PES

Dear Sir,

For the 2014 – 2015 evaluation period Agent Todd Abshire received a Needs Improvement / Unsatisfactory rating with a score of 17. Lieutenant Beau Robertson documented Agent Abshire's performance throughout the rating period. I concurred with this evaluation as the second level evaluator.

Lieutenant Robertson and I have met and spoken with Agent Abshire during this rating period several times to address performance deficiencies and to give him advice on how to improve. Lieutenant Robertson has met with Agent Abshire on numerous occasions and has conducted informal counseling sessions. On one such meeting we conducted a formal counseling session. During these meetings I found Agent Abshire to be deceptive when asked about some things. Lieutenant Robertson and I met with Agent Abshire on August 5, 2015 and presented him with his PES evaluation.

Agent Abshire's hire date was December 9, 2013 and he is eligible to be placed on permanent status on December 9, 2015. Due to Agent Abshire's poor performance and deceptive tendencies I recommend that his employment with La. Dept. Wildlife and Fisheries be terminated. If you do not see fit to terminate Agent Abshire's employment I request that he not be placed on permanent status and that he remain on probation for at least another year.

Attached are the documentation of Agent Abshire's poor performance and a copy of his latest PES.

Sincerely,

Captain Robert Buatt





**SCS Performance Evaluation System · Planning & Evaluation Form**
Form Revision Date: 4/2014

## Employee Information

| | |
|---|---|
| Dept/Office/Section/Unit: LDWF/Office of the Secretary/Enforcement/Region 5 | Employee Personnel #: 279129 |
| Employee Name: Todd Abshire | Performance Year: 7/1/2014 - 6/30/2015 |
| Employee Title: Wildlife Enforcement Sr. Agent Training Series | Evaluation Period: 7/1/2014 - 6/30/2015 |

## Initial Planning Session

### Step #1 – Evaluating Supervisor (SCS Rule 10.2):

| Signature: | *[signature]* Brew Robertson |
|---|---|
| Personnel #: 189302 | Date Given to Second Level Evaluator: 7/28/14 |

### Step #2 – Second Level Evaluator (SCS Rule 10.3):

| Signature: | *[signature]* 17245 |
|---|---|
| Personnel #: 17245 | Date Approved *(Must be on or before planning session)*: 7/28/14 |

### Step #3 – Employee:

| Employee Signature: *[signature]* 279129 | Date: 8-6-14 |
|---|---|

*By signing and dating this form, I am certifying that my evaluating supervisor conducted a planning session with me on the date shown.*

## Updated Planning Sessions (Optional):

| Date Conducted: | | Supervisor Initial: | | Employee Initial: | |
|---|---|---|---|---|---|
| Date Conducted: | | Supervisor Initial: | | Employee Initial: | |
| Date Conducted: | | Supervisor Initial: | | Employee Initial: | |

## Agency Human Resources Office Use Only (Optional):

| Date Planning Received in Human Resources: | | Human Resources Staff Initial: | | Evaluating Supervisor Compliance (Y/N) | | Second Level Evaluator Compliance (Y/N) | |
|---|---|---|---|---|---|---|---|

LDWF 000395

| Evaluation Session | | |
|---|---|---|
| **Step #1 – Evaluating Supervisor (SCS Rule 10.2):** | | |
| Signature: | *R. Glenn Robertson* Glenn Robertson | |
| Personnel #: | 187592 | Date Given to Second Level Evaluator: 7/29/15 |
| **Step #2 – Second Level Evaluator (SCS Rule 10.3):** | | |
| Signature: | *Capt R A Buatt* ROBERT BUATT #17245 | |
| Personnel #: | 17245 | Date Approved (Must be on or before evaluation session): 7/29/15 |
| **Step #3 – Employee:** | | |
| Employee Signature: | *J M Ahz* T. Abshire 279129 | Date: 8/5/2015 |

*By signing and dating this form, I am certifying that my evaluating supervisor conducted an evaluation session with me on the date shown.*

**Employee Statement (Only if Employee is NOT Signing Form for purposes of Evaluation):** ☐ *I have decided not to sign this form, but I acknowledge that I received a copy of the evaluation and understand that my failure to sign will not prohibit the evaluation from becoming official for the performance year.*

*If employee did not sign above, or chose not to sign the form, please indicate whether the employee was given or mailed a copy of the evaluation below:*

| Mailed | ☐ | Given | ☐ |
|---|---|---|---|

| **Overall Evaluation:** (Select only one evaluation) | ☐ Exceptional | ☐ Successful | ☒ Needs Improvement/Unsuccessful |
|---|---|---|---|
| | ☐ Not Evaluated | ☐ Unrated - if Unrated, select sub category | *Never Rendered*   *Untimely*   *Violation of Chapter 10* |

| Agency Human Resources Office Use Only (Optional) | | | | | |
|---|---|---|---|---|---|
| Date Evaluation Received in Human Resources: | | Human Resources Staff Initial: | | Evaluating Supervisor Compliance (Y/N) | | Second Level Evaluator Compliance (Y/N) |

LDWF 000396

SCS-PÉS EVAL (Rev 7/12)          **SCS Performance Evaluation System – Planning & Evaluation Form**



Employee Name:   Todd Abshire                        Employee Personnel #:   279129

**Agency Mission / Goals / Standards:**

To manage, conserve, and promote wise utilization of Louisiana's renewable fish and wildlife resources and their supporting habitats through replenishment, protection, enhancement, research, development, and education for the social and economic benefit of current and future generations; to provide opportunities for and to encourage the use and enjoyment of these resources in a safe and healthy environment both on land and on water.

**Department Mission / Goals:**

**Mission**

The Mission of the Enforcement Division is to establish and maintain compliance through the execution and enforcement of laws, rules and regulations of the state relative to the management, conservation and protection of renewable natural wildlife and fisheries resources and relative to providing public safety on the state's waterways and lands for the continued use and enjoyment of current and future generations.

**Goal 1**
To support natural resource preservation by providing frontline enforcement component of laws, regulations, and programs related to wildlife and fisheries use, conservation and management. Hours worked and public contacts associated with wildlife, fisheries and ecosystem enforcement, education and community policing programs are the most relevant measures of the activities related to work toward improving and sustaining the state's natural resources.

**Wildlife, Fisheries and Ecosystem Enforcement**
LDWF/LED is responsible for assuring public compliance with state and federal laws, regulations, and programs which promote, manage and enhance the conservation of Louisiana's wildlife and fisheries resources and protect and sustain their supporting ecosystems. This activity is conducted through patrols of Louisiana's forest, woods and marshes, in-vessel patrols of Louisiana's inshore and offshore waters and investigations of relevant commercial facilities. The LDWF/LED also conducts community policing activities which publicize legal practices, encourage voluntary compliance and promote safe participation in recreational and commercial activities which use Louisiana's natural resources.

**Goal 2**
To advance crime and safety reform by protecting Louisiana citizens of all ages from life-threatening criminal activities when they are involved in recreational activities on the state's waterways. Hours worked and public contacts associated with boating safety and waterways enforcement, education, and community policing programs are the most relevant measures of the activities related to work toward reducing illegal and dangerous activities on the state's waterways.

**Boating Safety and Waterways Enforcement**
LDWF/LED is responsible for providing public safety on Louisiana's vast waterways through education and enforcement of criminal statutes. These responsibilities include maintaining and improving public compliance with boating safety laws, investigating all reportable recreational boating fatalities and crash incidents, enforcing laws restricting the operation of vessels under the influence of alcohol or drugs and administering the state's mandatory boating education program for operation of motorboats. The LDWF/LED also maintains authority for permitting regattas and other marine events and ensuring compliance with boating safety regulations. LDWF/LED boating safety and waterway enforcement activities are conducted through boating incident investigations, community policing activities and in-vessel patrols of Louisiana's inshore and offshore waterways. These activities recruit new recreational boaters, encourage safe and legal activities, protect property and save lives. LDWF/LED regularly coordinates its boating safety and waterway enforcement activities with local law enforcement waterway efforts to direct the state's safety efforts on Louisiana's waterways.

LDWF 000397

SCS-PES EVAL (Rev 7/12)         SCS Performance Evaluation System – Planning & Evaluation Form



Louisiana
SCS
State Civil Service

**Goal 3**
Lead, coordinate and provide emergency response services for search and rescue and maritime security operations. Enhance Louisiana's collaborative efforts in the maritime domain and build a safe and secure environment that supports public safety, public confidence and ensures economic stability.

**Search and Rescue and Maritime Security**
LDWF/LED is responsible for providing and coordinating search and rescue response activities for the state. This activity includes state response and coordination of local, parish and federal responses to natural or man-made disasters or other homeland security events involving urban, rural and maritime search and rescue and maritime security activities. The activity includes exercises, training, first response to search and rescue events, maritime security patrols and initiatives focused on saving lives and protection of critical infrastructure. LDWF/LED is the state's lead agency for the state's emergency support search and rescue and lead for maritime security functions and supports emergency support functions for transportation, communications, firefighting, emergency management and public safety and security.

---

Work and Behavior Expectations (at least one each):                                    <u>Bank of Expectations</u>

**Documentation is required to support a zero (0) score or a two (2) score for any Work and Behavior Expectation.**

| | | |
|---|---|---|
| Uses time productively, effectively and efficiently. | 0 ☐  1 X  2 ☐ |
| Maintains a work product that produces strong, productive and measurable results in wildlife enforcement. | 0 ☐  1 X  2 ☐ |
| Maintains a work product that produces strong, productive and measurable results in fishery enforcement. | 0 ☐  1 X  2 ☐ |
| Maintains a work product that produces strong, productive and measurable results in boating safety and waterway enforcement. | 0 ☐  1 X  2 ☐ |
| Conducts search and rescue missions in a safe and successful manner. | 0 ☐  1 X  2 ☐ |
| Provides an adequate presence on waterways for maritime security activities. | 0 ☐  1 X  2 ☐ |

**LDWF 000398**

SCS-RES EVAL (Rev 7/12)

Case 3:16-cv-00669-BAJ-RLB   Document 28-1   10/16/17   Page 212 of 290

SCS Performance Evaluation System – Planning & Evaluation Form

Louisiana
SCS
State Civil Service

Maintains a working knowledge of laws, policies, SOPs, job requirements, conditions and other directives and adheres to same.     0 X   1 ☐   2 ☐

*Worked with him on BLs patrol on 5/23/15 and agent could not perform/administer SFST test. Incident was documented on performance log sheets. Incident documented on notifying immediate supervisor of schedule change. (4/4/15)*

Independently investigates violations through surveillance, developing sources of information, informants and interviews.     0 ☐   1 X   2 ☐

Assignments completed on time without reminders.     0 X   1 ☐   2 ☐

*Numerous instances that are documented of failing to meet deadlines for Flash purchases, MV-3's and other reports not being turned in on time. Formally counseled on this issue.*

Produces work that is detailed, accurate and neat.     0 X   1 ☐   2 ☐

*Had an above average number of timesheets reports and citations as well as MV3's that contained mistakes that had to be corrected.*

Reports for duty on time and as scheduled.     0 X   1 ☐   2 ☐

*Several documented instances of agent not reporting for duty on time and/or late for scheduled event.*

Available for callouts and handles commitments reliably.     0 X   1 ☐   2 ☐

*Numerous times agent was called by supervisors and was unavailable and did not return calls. Formal counseling session was conducted addressing this issue.*

Reports pertinent information to chain of command.     0 ☐   1 X   2 ☐

Performs well without close supervision.     0 X   1 ☐   2 ☐

*Appears through documentation that agent performed a little better during Academy and while on FTO but during individual capacity had to be supervised closely in order to complete assigned tasks and patrols.*

Works well as a team and supports team activities when required.     0 ☐   1 X   2 ☐

Maintains a positive, professional and courteous attitude.     0 ☐   1 X   2 ☐

Accepts and applies constructive criticism.     0 ☐   1 X   2 ☐

Utilizes electronic devices properly.     0 ☐   1 X   2 ☐

LDWF 000399

SCS-PES EVAL (Rev 7/12)

**SCS Performance Evaluation System – Planning & Evaluation Form**

Louisiana
**SCS**
State Civil Service

Use radio as primary means of communication for all official enforcement activities.

0 ☐   1 X   2 ☐

Answers public inquiries clearly and accurately and seeks information to answer questions when necessary.

0 ☐   1 X   2 ☐

Maintains personal appearance and uniforms that present a professional image.

0 ☐   1 X   2 ☐

Uses and maintains equipment in an appropriate manner.

0 ☐   1 X   2 ☐

Handles assigned public relations duties willingly and professionally.

0 ☐   1 X   2 ☐

<u>Evaluation Scale</u>                                             Total Score ___17___
Exceptional                         32 – 46
Successful                          19 – 31
Needs Improvement/Unsuccessful  0 – 18

Documentation / Comments ( attach supporting documentation):

**LDWF 000400**



**Louisiana Department of Wildlife & Fisheries
Enforcement Division**

## COUNSELING CONFERENCE WORKSHEET

**Supervisor's Name:** Captain Robert Buatt          **Date:** May 13, 2015

**Employee's Name:** Agent Todd Abshire          **Location:** Region 5

**Witnesses Name(s):** Lt. Beau Robertson

**Reason for Conference:** There have been a few incidents lately where paperwork has not been turned in on time and you not answering your phone or returning a phone call when Lt. Robertson or I call you.

**Explanation:** On April 8th and 9th on your days off I made numerous attempts to contact you by phone over some paperwork issues and you never answered nor did you call me back. I sent Lt. Robertson to your residence on the afternoon of April 9th to check on your wellbeing. Lt. Robertson made contact with you and you advised you had been sick with some sort of mouth infection that resulted from being hit in the face with a board and that is why you didn't answer the phone or call me back.

On April 21, 2015 you were scheduled to work 10A-8:30P. I attempted to call you by phone at 9A, 10A, and 10:40A. I made numerous attempts to contact you on the radio with no response. I contacted dispatch and asked if you had gone 10-8 and they advised you had not gone 10-8. Lt. Robertson had not approved a schedule change from you on that morning. You called me back at 11A and advised you had changed your work schedule to go to work later to work closed season froggers. I asked if you had gotten approval from your lieutenant for the schedule change. You advised you did not know you need to do that and while working with other agents they just change their schedule without notifying the supervisor. I told you that was not the case and that all other agents know they must first notify their respective supervisor before making a change to their work schedule.

On April 27, 2015 I received an email from Cindy Pippin advising you had not turned in your P-card log and receipts from March. You had to be reminded to turn in your P-card log almost a month after it was due. You advised your lieutenant that you lost a receipt and was in the process of looking for it.

On May 3, 2015 you did not turn in your MV-3 for the month of April with your weekly paperwork. Lt. Robertson made several attempts to contact you by phone with no answer. You finally called him back that afternoon. While on the phone with Lt. Robertson he got another call and told you to hold on. While Lt. Robertson was on the other call you hung up. Lt. Robertson was on the other call only briefly and made several attempts to call you back when he got off the other line. You did not answer. Lt. Robertson needed your MV-3 on May 3rd. You did not turn in your MV-3 until May 4th. I reviewed your MV-3 and you had several mathematical mistakes. I returned it to you for corrections. You made some

T. A.

corrections and turned it back into me. I checked it again and the corrections had not been made. I took the time and made the corrections for you. (See April 2015 MY-3 for corrections.)

On May 4, 2015 Lt. Robertson and I met with you in my office to speak with you about the paperwork issues and not being able to make contact with you when you are off duty. You advised that you didn't answer my call because you did not have my number in your phone and that you did not recognize the number calling you. I told you that you put my number in your phone the day you graduated from the LDWF Academy. You then advised you just did not feel like talking.

**What Rules/Policies/SOP's were discussed?**

Policy 2-6.1 B 1 States that agents are subject to call for duty 24 hours per day.

Policy 2-6.1 C 1 States that all schedule changes must be approved by the Lieutenant and in his absence, by the Region Captain.

Policy 3-1.1 B 40 b States that agents shall be subject to being called to duty as needed and shall be subject to orders from competent authority and / or emergency calls from the public.

Policy 3-1.1 B 40 c States that agents shall make notification through the chain of command when unable to respond to a call while off duty.

**What was the employee's explanation of the incident?**

Employee advised he is dealing with some issues in his personal life. Other then personal issues, the employee advised he has no excuses for the performance problems mentioned on this counseling conference worksheet.

**Was the issue a training deficit?** _____ YES      X   NO

**Explanation:** _____N/A_____

**How will the training deficit be addressed or corrected?** _____N/A_____

**What follow up is required?** You are here-by directed to answer phone calls from your supervisors and the region office whether you are on duty or off duty. If you are unable to answer the call at that time you are to return the phone call within a reasonable amount of time. If you will be in a position where you will not be available for a callout for an extended period then you are to notify your supervisor to make him aware and let him know when you expect to be available (i.e., annual leave, out of town trip,



**Louisiana Department of Wildlife & Fisheries**
**Enforcement Division**

sick leave, etc.).  You are also directed to check your state email on a regular basis for directives and information.

You are here-by directed to get approval for all changes in your work schedule as dictated by policy.

You are here-by directed to turn in all required paperwork and documents in a timely manner.  Your timesheet is due in accordance with direction from your supervisor with your weekly paperwork.  Your completed Pcard log and receipts are due in to the Region office no later than the 6th of each month.  Your completed MV-3 is due to be turned in with your weekly paperwork immediately following the last day of the previous month.  If you have any problems with or questions about any paperwork or need extensions you are to contact your supervisor.

Employee's response/comments: *The employee advised now he knows the proper procedures and this will not happen again. He advised he will not make these mistakes any more.*

Signatures: _____     _____ 2791127 Todd Abshire

       Supervisor                                          Employee

       _____                    _____

       Witness                                              Witness

Page ___ of ___

Employee Name: _Todd Abshire_

Rating Period: _July 2014 – June 2015_

# EMPLOYEE PERFORMANCE LOG

| DATE | WHAT HAPPENED (What did you see/hear/touch/smell/taste? Who else was involved? What was your response? How was the employee notified? How can you demonstrate the Communication?) NOTE: This is for Acceptable/Good performance, as well as Poor, during the whole rating period. |
|------|------|
| 4/21/15 | On this date Agent Abshire was scheduled to be at work from 10A-8:30P. Captain Buatt attempted to call Agent Abshire at 9A, 10A and 11A w/o receiving any response. Capt. Buatt called dispatch and they notified that he had not gone 10-8 at the time he was supposed to be at work. Agent Abshire made no contact with me prior to this time to notify me of any schedule change. Finally he called Capt. Buatt back at 11:00 Am and told him that he was about to send me an email notifying me of his intent to change his schedule. Capt. Buatt notified him at that time that he must get prior approval to change his schedule. I also had a counseling session w/ Agent Abshire on 4/27/15 at the Region 5 office and explained to him policy 2-6.1C and told him that it is unacceptable for him not to report to work on time and that this was not the first time this has happened. I advised him that the next time he did not report for a shift at the time on his schedule w/o receiving prior approval that he would be formally counseled with a letter and meeting with the captain. /s/ 4/27/15 |

LDWF 000404

**Beau Robertson**

| | |
|---|---|
| **From:** | Robert Buatt |
| **Sent:** | Tuesday, April 21, 2015 11:24 AM |
| **To:** | Beau Robertson |
| **Subject:** | FW: Todd Abshire |
| **Attachments:** | image001.jpg |

I just spoke with Abshire at 11:00 AM. He advised he was in the process of sending you an email with a schedule change. He said he wanted to work later for C/S frogs. I advised him that all schedule changes required prior approval as per policy 2-6.1C. He said he did not realize this because other agents he worked with did not get prior approval. Please explain to him that he must first get approval to deviate from his work schedule except for emergency situations and call-outs between 11P and 5A, as it is written at the top of the first page of every schedule. Also mention to him that he is on call 24 hours every day. This is not the first time I have attempted to contact him and he not answer his phone. Today I attempted to contact him at around 9A then again at around 10A then again around 11A just prior to him calling me back. Not being able to contact an agent is unacceptable, especially on a day he is scheduled to work.

I know you are at training this week. Please take care of this next week when you return.

Thanks,



Captain Robert Buatt
LDWF Enforcement Region 5
1213 N. Lakeshore Dr.
Lake Charles, LA 70601
337-491-2580
rbuatt@wlf.la.gov

CONFIDENTIALITY MESSAGE - NOTE: This e-mail constitutes communications which may involve investigative information and records of a law enforcement agency, personal information, and/or deliberative process information, and is therefore PRIVILEGED and CONFIDENTIAL. No dissemination of this message by you is authorized absent express written or e-mail consent of the sender. This information is intended only for the use of the specific individual or entity named above. If you or your employer is not the intended recipient of this e-mail, or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this e-mail is strictly prohibited. If you have received this transmission in error, please immediately delete the message. Thank You.

1

**From:** Robert Buatt
**Sent:** Tuesday, April 21, 2015 10:49 AM
**To:** Beau Robertson
**Subject:** Todd Abshire

Abshire is scheduled to work 10A – 8:30P today. I have not received anything stating he is on sick leave. According to dispatch he has not gone 10-8. I have attempted to contact him several times by phone and by radio. I have been unable to make contact with him. Do you know if he has taken sick leave and I was just not in the loop?



Captain Robert Buatt
LDWF Enforcement Region 5
1213 N. Lakeshore Dr.
Lake Charles, LA 70601
337-491-2580
rbuatt@wlf.la.gov

CONFIDENTIALITY MESSAGE - NOTE: This e-mail constitutes communications which may involve investigative information and records of a law enforcement agency, personal information, and/or deliberative process information, and is therefore PRIVILEGED and CONFIDENTIAL. No dissemination of this message by you is authorized absent express written or e-mail consent of the sender. This information is intended only for the use of the specific individual or entity named above. If you or your employer is not the intended recipient of this e-mail, or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this e-mail is strictly prohibited. If you have received this transmission in error, please immediately delete the message. Thank You.

2

Page _1_ of _1_

Employee Name: _Todd Abshire_

Rating Period: _July 2014 - June 2015_

# EMPLOYEE PERFORMANCE LOG

| DATE | WHAT HAPPENED (What did you see/hear/touch/smell/taste? Who else was involved? What was your response? How was the employee notified? How can you demonstrate the Communication?) NOTE: This is for Acceptable/Good performance, as well as Poor, during the whole rating period. |
|------|------|
| 5-3-15 | Agent Abshire did not turn his MV3 in with his weekly paperwork and was the only agent in the district not to do so. I called him Sunday morning at approximately 11am and 11:30am and received no answers. He got back with me later that afternoon and I asked him why I didn't have his MV3 and he stated that he lost a receipt and needed to verify it. Before I could tell him I needed him to come to the office I took another call with him holding on the line. He hung up while I was talking to the other individual. I called back as soon as I got off the phone and he did not answer. At 8:15 PM I texted him if he was going to bring his MV3 or not and again he stated that he had a missing receipt. At that point I decided that I would deal with it on Monday morning. |

Page ___ of ___

Employee Name: *Todd Abshire*

Rating Period: *July 2014 - 2015*

# EMPLOYEE PERFORMANCE LOG

| DATE | WHAT HAPPENED (What did you see/hear/touch/smell/taste? Who else was involved? What was your response? How was the employee notified? How can you demonstrate the Communication?) NOTE: This is for Acceptable/Good performance, as well as Poor, during the <u>whole rating period.</u> |
|------|------|
| 3-1-15 | Didn't turn in his mv3 on time. |
| 5-5-15 | On this date I received an email from Capt Bracht in reference to a DEA case written by Todd Abshire and Justin Sonnier. The report had not been filed at the Region office yet and the case was made on 3/24/15. I made contact with Agent Abshire and he advised me that he turned the report in. I told Abshire that I did not remember receiving this report and he needed to look for its whereabouts. I then called SGT Sonnier, and he advised that he reviewed the reports and sent it back to Abshire on 4-6-15 for corrections. Abshire confirmed getting the report back from Justin and stated that he made corrections and turned the report in with his paperwork which would have been in the 12th if in fact he did this. I reviewed reports on Monday the 13th while in the office and had Abshire case in to fix a DOI report. If I had the report I could assume that it would have been with those other that I was reviewing. To this date I have yet to locate this report. *JH 5/5/15* |

 **Louisiana Department of Wildlife & Fisheries**
**Enforcement Division**

May 11, 2015

On the afternoon of May 9, 2015 at approximately 12:27PM I was at my personal residence when I received a phone call from SGT Stuart Guillory. SGT Guillory told me that he needed to advise me of a situation at the office with Agent Todd Abshire. He told me that he believed that Agent Abshire was under the influence of something and he believed that he was too impaired to be at work that day. He advised that they were practicing SFST's at the office and that Agent Abshire showed nystagmus along with an overall confused and dazed look. I advised SGT Guillory not to let Abshire leave the office and that I would be heading up there to speak with him myself. When I got to the office I called Agent Abshire in to the copy room and shut the door. I then asked him what was going on and he stated that SGT Guillory and Sr Agent Lowry believed that he was too impaired to be at work. While Agent Abshire was speaking with me I noticed that his eyes were glassy and bloodshot, but other than that he spoke normally. I asked Agent Abshire had he been drinking and he said no. I asked him if he had been drinking the previous night and he said no. He then stated that he woke up that morning at approximately 830AM and had forgotten to take his medication. He then stated that he took his meds at about 1120AM which was about 10 minutes prior to him going 10-8 for work. I then asked him if he had taken a normal dose and he said yes. He then explained that he took Vyvanse and Lexipro. After speaking with Captain Buatt, Acadian ambulance was called to check Agent Abshire. Agent Abshires heat rate was around 182-186 beats per minute which is extremely high, but other than that the medical personnel did not believe that he needed to be admitted to the hospital and he refused transport. At that point, I advised Abshire that he was being placed on administrative leave with pay until further notice. I secured Abshire's rig belt with sidearm and taser, his rifle and shotgun. I asked Abshire to get all of his personal belongings out of his unit and at that point Sr Agent Lowry drove him to his house and dropped him off. Agent Abshire's unit was then parked at the Region 5 Office.

Lt. Beau Robertson 189592

LDWF 000409

Page 1 of 1

Employee Name: Todd Abshire

Rating Period: July 2014 - June 2015

See back

# EMPLOYEE PERFORMANCE LOG

| DATE | WHAT HAPPENED (What did you see/hear/touch/smell/taste? Who else was involved? What was your response? How was the employee notified? How can you demonstrate the Communication?) NOTE: This is for Acceptable/Good performance, as well as Poor, during the whole rating period. |
|------|------------------------------------------------------------------------------|
| 5-13-14 | Had formal counseling session w/ Todd and went over expectations. After meeting agent was told to look for missing citations and report again. He found the missing citations in his truck. Agent then left to go back to his house and get his jump drive that he forgot to complete the report. Approximately 5 minutes after he left he texted me and advised that he had a flat tire. I asked if he had it under control and he said yes. 30 minutes later he texted back and said his jack was broken. At that point I went to meet him. He apparently tried to jack the truck up with the jack on the frame instead of the axle (The jack is an axle jack) and extended it out too far where it could not be fixed. I then showed him where he needed to place the jack and changed the tire for him. Once he finally got back to this his jump drive that he stores all his reports on for work had been chewed up by his dog. After turning the report back in I reviewed it and gave it back to him for corrections. At this time it was after 6pm and he had been working on this report since 3pm. I had highlighted all of the corrections that needed to be made in his report and this task shouldn't have taken more than 15-20 minutes to complete and turn back in the corrected again. Approximately 30 minutes after it handed the corrections back to him I went in to check on him. He handed me the chain of custody form that still had the wrong information in it. He had papers strown all |

over the copy room and it was all jumbled up and disorganized. I briefly thumbed through some of the papers and found the corrected version of the chain of custody mixed in with the incorrect ones. The process of getting him to correct the report took approximately another 30 minutes to complete and it was nearing 7:00 when I left the office. Todd was very disorganized and had trouble completing simple tasks when asked on his paperwork. He stated that he became "flustered" and all "F'd" up when I came back in there with all of the corrections at once.

LDWF 000411

Page ___ of ___

Employee Name: _Tedd Abshire_

Rating Period: _July 2014 - June 2015_

# EMPLOYEE PERFORMANCE LOG

| DATE | WHAT HAPPENED (What did you see/hear/touch/smell/taste? Who else was involved? What was your response? How was the employee notified? How can you demonstrate the Communication?) NOTE: This is for Acceptable/Good performance, as well as Poor, during the whole rating period. |
|------|------|
| 5-21-15 | While on BWFi patrol with SGT Snow, Tedd lost a contact boarding slip. He is establishing a pattern of losing/or misplacing important paperwork. |
| 5-29-15 | Worked a boating safety patrol with Sr. Agent Justin Lowry and Agent Tedd Abshire on Prien Lake and Calcasieu Ship Channel. Agent Abshire is incapable on conducting the seated battery SFST tests. One boat that was stopped the operator admitted to drinking. Showed signs of impairment and Agent Abshire did not do any SFST's to look for any clues that the operator was intoxicated. I stepped in and showed Abshire how to handle Bts stops with operators that had been drinking. Abshire was then asked to practice on Sr. Agent Lowry and he could not even read the paper correctly when trying to administer the test and tried multiple times. When he finally fumbled though getting the test read off of the paper, I asked him what exactly he was looking for during the HGN test and he did not know the answer. On a boating safety check he let a 16 year old w/o a lifejacket go w/o instructing the operator that the 16 year old needed to wear a PFD while underway. |

**Robert Buatt**

| | |
|---|---|
| **From:** | Cindy Pippin |
| **Sent:** | Monday, April 27, 2015 8:53 AM |
| **To:** | Beau Robertson |
| **Cc:** | Robert Buatt |
| **Subject:** | Todd Abshire |

Had purchases for the Month of March and did not turn in his pcard log for said purchases.
Baton Rouge is on me today, to get this done.
Please get this to me today, if at all possible.
I realize Bob has to sign off on this, still, I need this asap.

Todd Abshire, March 11 – Wholesale Battery $89.95
Todd Abshire, March 25 – Louisiana Radio $ 73.94

This is happening every month, we need to do something to curtail it.

Thanks!

cindy

LDWF 000413

**Beau Robertson**

From:      Beau Robertson
Sent:      Wednesday, May 06, 2015 8:15 AM
To:        David Sanford; Derek Logan; Myron Verret; Carl Pickett; Jason Stagg; Stuart Guillory; Justin Sonnier; Justin Lowry; Todd Abshire;
           Nathan Vanya
Cc:        Robert Buatt
Subject:   Fwd: Purchases - Month of April - May 5th

If someone has a pcard log to do between this time period, you need to let me know immediately.  See below.  Thanks.

Sent from my iPhone

Begin forwarded message:

> From: Cindy Pippin <cpippin@wlf.la.gov>
> Date: May 6, 2015, 7:27:26 AM CDT
> To: Jesse Savoie <jsavoie@wlf.la.gov>, Beau Robertson <brobertson@wlf.la.gov>
> Cc: Robert Buatt <rbuatt@wlf.la.gov>
> Subject: Purchases - Month of April - May 5th

> PLEASE ADVISE ASAP (TODAY) THAT ALL PCARD LOGS HAVE BEEN TURNED IN FOR THE ABOVE CAPTIONED TIME PERIOD.
> THERE HAVE BEEN LATE ONES EVERY MONTH THAT SOMEONE FORGOT TO TURN IN.

> THANKS!

> CINDY

Did not get back with me on this and had two purchases in the timeframe to be

1

LDWF 000414

**Beau Robertson**

| | |
|---|---|
| From: | Beau Robertson |
| Sent: | Monday, February 02, 2015 1:03 PM |
| To: | Carl Pickett; 'Carl Pickett'; Todd Abshire; 'toddabshire88@gmail.com' |
| Cc: | Robert Buatt |
| Subject: | Certificates of Training |
| Attachments: | image001.jpg |

As per protocol, all certificates that you receive for training completed by you, 2 copies of the certificate of completion should be turned in with your paperwork.  I did not receive the Intoxilyzer 9000 training certificates from wither of you.  Please turn these in as soon as possible so they can be sent to HQ. Thanks.

Lieutenant Beau Robertson
Louisiana Wildlife and Fisheries
Law Enforcement Division
1213 N. Lakeshore Drive
Lake Charles, LA 70601
Office: 337-491-2588
Fax: 337-491-2971
Mobile: 512-925-2830

*[handwritten note: showed up late to the training for went to work late.]*

CONFIDENTIALITY MESSAGE – NOTE: This e-mail constitutes communications which may involve investigative information and records of a law enforcement agency, personal information, and/or deliberative process information, and is therefore  PRIVILEGED and CONFIDENTIAL.  No dissemination of this message by you is authorized absent express written or e-mail consent of the sender.  This  information is intended only for the use of the specific individual or entity named above.  If you or your employer is not the intended recipient of this e-mail, or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this e-mail is strictly prohibited. If you have received this transmission in error, please immediately delete the message. Thank You.

1

**Beau Robertson**

| | |
|---|---|
| From: | Robert Buatt |
| Sent: | Tuesday, June 02, 2015 11:51 AM |
| To: | Beau Robertson |
| Subject: | RE: Missing MV3 receipts |
| Attachments: | image001.jpg |

Lt. Robertson,

Agt. Abshire came in and turned in the receipts that were missing from his MV-3 right after he went 10-8. Cindy came into my office and showed me the receipts. Abshire had not signed the receipts nor did he have the property tag number on them. I had to call him off of patrol and back into the office to make these corrections. Please add this to your list of documentation on Abshire.

Thanks,

Captain Robert Buatt
LDWF Enforcement Region 5
1213 N. Lakeshore Dr.
Lake Charles, LA 70601
337-491-2580
rbuatt@wlf.la.gov



CONFIDENTIALITY MESSAGE - NOTE: This e-mail constitutes communications which may involve investigative information and records of a law enforcement agency, personal information, and/or deliberative process information, and is therefore PRIVILEGED and CONFIDENTIAL. No dissemination of this message by you is authorized absent express written or e-mail consent of the sender. This information is intended only for the use of the specific individual or entity named above. If you or your employer is not the intended recipient of this e-mail, or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this e-mail is strictly prohibited. If you have received this transmission in error, please immediately delete the message. Thank You.

From: Beau Robertson
Sent: Monday, June 01, 2015 5:12 PM

LDWF 000416

To: Todd Abshire; 'toddabshire88@gmail.com'
Cc: Robert Buatt
Subject: Missing MV3 receipts

Todd, I have tried to call you a couple times today and it has gone straight to your voicemail. Your MV3 is missing receipts for an oil change and for the tire repair that was completed on your truck this month. This needs to be taken care of first thing tomorrow morning because Cindy is doing the MV3's tomorrow morning. Please advise when this is taken care of. Thanks.

Lieutenant Beau Robertson
Louisiana Wildlife and Fisheries
Law Enforcement Division
1213 N. Lakeshore Drive
Lake Charles, LA 70601
Office: 337-491-2588
Fax: 337-491-2971
Mobile: 512-925-2830



CONFIDENTIALITY MESSAGE - NOTE: This e-mail constitutes communications which may involve investigative information and records of a law enforcement agency, personal information, and/or deliberative process information, and is therefore PRIVILEGED and CONFIDENTIAL. No dissemination of this message by you is authorized absent express written or e-mail consent of the sender. This information is intended only for the use of the specific individual or entity named above. If you or your employer is not the intended recipient of this e-mail, or an employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any unauthorized dissemination or copying of this e-mail is strictly prohibited. If you have received this transmission in error, please immediately delete the message. Thank You.

LDWF 000417

**ACKNOWLEDGEMENT OF RECEIPT AND REVIEW OF**

**Louisiana Department of Wildlife and Fisheries (LDWF)**

**Employee Handbook <u>and</u> Policies**

My signature acknowledges that I have been informed of the Louisiana Department of Wildlife and Fisheries (LDWF) Employee Handbook outlining the responsibilities of employees and the LDWF organization, which is located on the Department's Intranet website under: Forms>Personnel>Personnel Forms. My signature hereon also acknowledges that I have been informed of the Department's policies on the Intranet website. I further hereby acknowledge my obligation to remain aware of and comply with the terms and provisions of all existing, revised and new policies and/or procedures when issued and/or updated by LDWF, including compliance with these policies and the provisions within the Employee Handbook as a condition of my employment and/or continued employment by LDWF.

I understand that the Handbook is not an employment contract, but does provide the organizational employment policies and procedures by which I am governed. If I have any questions, I further understand that I should contact either my Supervisor or the Human Resources office for clarification.

The Employee Handbook is subject to change without notice. It is understood that changes in policy and/or procedure will supersede or eliminate those currently found in this Employee Handbook and/or on the Department's Intranet website, and I will be notified of such changes through normal communication channels.

LDWF Mission Statement: www.wlf.louisiana.gov
LDWF Employee Handbook: http://wlfntl/ (Forms/Personnel)
LDWF Policies and Procedures: http://wlfntl/ (Policies/Procedures)
Department of Civil Service: www.dscs.state.la.us (Common Myths; Chapter 14)

NAME OF EMPLOYEE: Todd Abshire                    ID #: 279129

SIGNATURE OF EMPLOYEE: _____     DATE: 12/09/2013

SIGNATURE OF HR REPRESENTATIVE: Paulette Jenito   DATE: 12-09-13



EXHIBIT
25

Louisiana Department of Wildlife and Fisheries                                    May 2010
Employee Handbook

**Part 1: Wildlife and Fisheries** ..................................................................................... **7**
   LDWF Organizational Purpose and Structure ............................................................. 8
      **Office of the Secretary** .......................................................................... 12
      **Office of Management & Finance** ............................................................ 13
      **Office of Wildlife** ................................................................................. 16
      **Office of Fisheries** ............................................................................... 17

**PART 2:  State Employment Information** ................................................................... **20**

  **Job Classification** ..................................................................................................... **20**

  **Appointments** ............................................................................................................ **21**
    Probational Appointment ........................................................................................ 22
    Provisional Appointment ........................................................................................ 23
    Job Appointment ................................................................................................... 24
    Restricted Appointment ......................................................................................... 25
    Re-Employment ..................................................................................................... 27
    Transfer ................................................................................................................ 28
    Promotion ............................................................................................................. 29

  **Discrimination** .......................................................................................................... **31**

  **Americans With Disabilities Act (ADA)** ................................................................... **32**

  **Outside Employment** ................................................................................................ **33**

  **Ethics** ....................................................................................................................... **12**

  **Dual State Employment** ............................................................................................ **37**

  **Performance Planning and Review (PPR)** ............................................................... **38**
    Performance Planning Session ............................................................................... 38
    PPR is designed to accomplish four goals: ............................................................ 39
    Four Steps in the PPR Cycle ................................................................................. 40
    Performance Rating Appeals ................................................................................. 41
    Employee Opportunities To Get Maximum Benefit from the PPR Process ............ 43

  **PAY** .......................................................................................................................... **46**
    Paydays ................................................................................................................ 47
    Mandatory Direct Deposit ..................................................................................... 48
    Direct Deposit – Banks ......................................................................................... 49
    Deductions ........................................................................................................... 50
    Louisiana Employees Online (LEO) ....................................................................... 51

  **Hours of Work** ......................................................................................................... **52**
    Attendance ........................................................................................................... 52
    Break Periods ....................................................................................................... 54
    Lunch Time ........................................................................................................... 54
    Overtime .............................................................................................................. 55
    State Overtime ...................................................................................................... 56

**PART 3:  Benefits** .................................................................................................... **57**

  **Legal Holidays** ......................................................................................................... **57**
    Annual and Sick Leave .......................................................................................... 60
    Annual Leave ........................................................................................................ 62
    Sick Leave ............................................................................................................ 63
    Civil and Special Leave ......................................................................................... 64
    Compensatory Leave ............................................................................................ 66
    Educational Leave ................................................................................................. 68



EXHIBIT
26
tabbies'

LDWF 000682

Louisiana Department of Wildlife and Fisheries
Employee Handbook

May 2010

Family and Medical Leave.................................................................. 69
Funeral Leave .................................................................................... 70
Leave Without Pay ............................................................................. 72
Military Leave ..................................................................................... 72
Other Types of Leave ........................................................................ 75
Leave Payment Upon Separation From Service................................ 76

**Health and Life Insurance** ...................................................................**77**
Health Insurance for Active Employees ............................................ 77
Pre-Existing Condition (PEC) ............................................................ 77
Effective Date of Coverage ............................................................... 79
Late Applicants .................................................................................. 80
Basic Life Insurance .......................................................................... 81
Coverage for Retirees ....................................................................... 82

**Supplemental Insurance** .....................................................................**83**

**Flexible Benefits Plan** .........................................................................**84**

**Workers' Compensation Insurance** ....................................................**85**

**Deferred Compensation** ......................................................................**86**

**Credit Union** ........................................................................................**87**

**U.S. Savings Bonds** ............................................................................**88**

**Retirement** ...........................................................................................**89**
Louisiana State Employees Retirement System (LASERS) .............. 89
Deferred Retirement Option Plan (DROP) ........................................ 89
Disability Retirement ......................................................................... 91
Retirement Formula – Employment prior to July 1, 2006.................. 91
Retirement Formula – Employment after July 1, 2006...................... 92
Conversion of Unused Sick and Annual Leave ................................. 93
Survivor's Benefits ............................................................................ 95
Refund ............................................................................................... 95
Repayment of Refund ........................................................................ 96
Other Service Credit .......................................................................... 97

**PART 4:  Conduct and Discipline** ...................................................**97**

**Customer Service Standards**..............................................................**98**

**Appearance** .........................................................................................**99**

**Confidentiality** ..................................................................................**100**

**Political Activities** ...........................................................................**100**

**Disciplinary Action** .........................................................................**102**

**PART 5:  Grievances and Appeals** ................................................**105**

**Grievance Process** ...........................................................................**107**
Informal Oral Discussion ................................................................. 107
Formal Written Grievance ............................................................... 108
Hearing ............................................................................................ 109
Civil Service Appeals....................................................................... 111

**PART 6:  Other Useful Information**................................................**112**

**Use of State Equipment and Property** ............................................**113**

LDWF 000683

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

**Operation of State Vehicles** ........................................................................... **114**

**Use of Personal or Other Non-State Vehicle** ....................................... **115**

**E-Mail and Internet Use** ................................................................................ **116**

**Travel** ...................................................................................................................... **117**

**Safety** ...................................................................................................................... **118**

**Use of Drugs and Alcohol** ............................................................................ **121**

**Smoking** ................................................................................................................. **123**

**Training** .................................................................................................................. **124**

**Changes in Personal Data** ............................................................................ **126**

**Employee Notification Form** ......................................................................... **127**

**Official Employment Record** ........................................................................ **127**

**Layoff** ...................................................................................................................... **128**

**Employee Assistance Program (EAP)** ...................................................... **129**

**Resignation Courtesies** .................................................................................. **130**

LDWF 000684

Louisiana Department of Wildlife and Fisheries                          May 2010
Employee Handbook

# Part 1: Wildlife and Fisheries

Congratulations and welcome to the Louisiana Department of Wildlife and Fisheries (LDWF). You have our encouragement and support throughout your career with this Department. We feel that your background, experience, and personality are the best to help us achieve the goals of LDWF. We are counting on you to continue and, perhaps, advance the standards and levels of achievement that have been set by your fellow employees.

You and your job are important. No matter what your job title, the duties assigned to you assist the Department to fulfill its overall mission. You are expected to carry out your tasks as skillfully and efficiently as possible. You are also expected to be aware of, understand, and abide by the policies, rules, and regulations of the Department, regardless of Office, Division or Section in which you work.

This handbook has been prepared to inform and educate you about the rules, policies, and employee benefits applicable to everyone in our agency. Specific procedures that affect you will be discussed with you by your supervisor.

**<u>It is your responsibility to read this handbook completely, review certain parts to become familiar with the entire handbook and keep it for reference.</u>**

**LDWF Organizational Purpose and Structure**

  

The charge of the Louisiana Department of Wildlife and Fisheries is to protect, conserve, and replenish the natural resources, wildlife and aquatic life of the state.

The importance of these resources to our quality of life and economic well being is immeasurable. The Department manages about 1.345 million acres to preserve habitats for fish and wildlife and provides a wide range of opportunities for outdoor recreation. These opportunities for outdoor recreation include 300,000 days of hunting, 425,000 days of fishing, and 190,000 days of other recreational pursuits. These lands also contribute economic advantages to hunters and trappers and, in coastal areas, function as nursery grounds for

LDWF 000685

Louisiana Department of Wildlife and Fisheries                                    May 2010
Employee Handbook

important Louisiana fishery industry. Important to preserving the valuable wildlife and fish resources of our state are sound research, management, and enforcement programs.

**To achieve its goals, the Department consists of four major offices:**

Under the direction of the LDWF Secretary, the Offices perform all of the responsibilities assigned to the Department. Each of these Offices has a specific function to execute in partnership with other Offices in order to address the goals and mission of LDWF.

---

## Office of the Secretary
## Office of Management and Finance
## Office of Wildlife
## Office of Fisheries

---

LDWF 000686

Louisiana Department of Wildlife and Fisheries                         May 2010
Employee Handbook

## Office of the Secretary

The mission of the Office of the Secretary is to provide

- leadership and support services, administrative direction, and accountability for departmental programs;

- administrative direction and leadership to ensure the success of subordinate programs; and

- department-wide coordination, communication, personnel and basic resources needed to accomplish the department's mission.

In addition, the following entities are located within the Office of the Secretary:

Enforcement Division
Louisiana Seafood Promotion and Marketing Board
Fur and Alligator Council

## Office of Management & Finance

The mission of the Office of Management and Finance is to implement sound

- fiscal and human resources policies and practices;
- manage contracts and grants;
- provide procurement, computer and communication services;
- provide public information services and
- perform various other internal services to meet the operational, functional, and administrative needs of the Department.

In addition to the foregoing management and financial services, the Office of Management and Finance provides two additional and unique services

- socioeconomic research related to wildlife and fisheries issues; and
- licenses and registration issuance to the public.

LDWF 000687

# Office of Wildlife

The mission of the Office of Wildlife is to provide wise stewardship of the state's wildlife and habitats, to maintain bio-diversity, including plant and animal species of special concern, and to provide outdoor opportunities for present and future generations to produce a greater appreciation of the natural environment.

The Office of Wildlife addresses stewardship through public lands systems, local/state/regional planning assistance, private lands technical assistance, population and habitat monitoring, and regulations.

The Office of Wildlife has two divisions:

**Wildlife Division**
**Fur and Refuge Division**

# Office of Fisheries

The Office of Fisheries is responsible for the continued providence of abundant resources for both commercial production and recreational enjoyment. This Office is largely responsible for making Louisiana a leader in the nation's production of shrimp, blue crab, oysters, crawfish, tuna, red snapper, wild catfish, black drum, sea trout and mullet. The mission of the Office of Fisheries is to ensure that living aquatic resources are sustainable for present and future generations of Louisiana citizens by providing access and scientific management.

The goals of the Office of Fisheries are to improve their ability to manage living aquatic resources through enhancement and more efficient and effective data collection, analysis and regulation and to improve access to those resources.

The Office of Fisheries has two divisions:

**Marine Fisheries Division**
**Inland Fisheries Division**

LDWF 000688

# PART 2:  State Employment Information

### Job Classification

State employment is divided into unclassified and classified service. "Unclassified" employees of the department serve at the discretion of their appointing authority. Employees not included in the unclassified service are in the "classified service as governed by the State Department of Civil Service." Therefore, information contained in this section refers to employees in the "classified" state service.   For further information regarding unclassified service, contact the Human Resources Office.

The duties and responsibilities of each position will be covered *generally* in a job specification and *specifically* in an individual position description (SF-3). Over a period of time, duties and responsibilities may change, and it will be necessary to update your position description to indicate current duties and responsibilities.

NOTE:  All LDWF and other state department job vacancies are posted and announced on the Civil Service Job Search website located at www.dscs.state.la.us.  Each employee should review this website to learn of new positions offered.  All interested, eligible and/or qualified employees may apply for a job by following the instructions as listed on the specific announcement.

### Appointments

There are several types of appointments which may be made to a Civil Service classified position. Among these are:  probational, provisional, job appointment, and restricted appointments. A brief description of each follows:

### Probational Appointment

Before attaining permanent status, each employee must serve a probationary period of at least six (6) months but not to exceed 24 months. This probationary period serves as a trial period and provides an opportunity for the employee to learn and succeed in the job, as well as for the Department to assess and evaluate an employee's job performance.  Unsatisfactory job performance during this probationary period may result in termination of employment.

Probationary terminations cannot normally be appealed except in cases in which discrimination or violation of the Civil Service Rules is alleged. Probational employees receive all of the same benefits granted to permanent employees in regard to leave, retirement, etc., except that they are ineligible for promotions.

LDWF 000689

## Provisional Appointment

At times, there will be vacancies in permanent positions for which there are fewer than five (5) qualified applicants available for the Department of Civil Service to certify. In these cases, the Department of Civil Service may authorize the agency to make a provisional appointment. A qualified applicant may be employed for a period of time with the understanding that he or she cannot be granted a probational appointment (leading to permanent status) until he or she satisfies the necessary Civil Service requirements, which may include passing an appropriate examination. Although provisional appointees are considered temporary, they receive all benefits granted permanent employees in regard to leave, retirement, etc.; however, they do not obtain permanent status.

## Job Appointment

A job appointment is a temporary appointment made by the appointing authority. The appointment may last up to a maximum of three (3) years; however, its duration shall not exceed its actual need. Such appointments may be used for the following reasons:
- for work of a temporary nature;
- to substitute for another employee; or,
- for projects not expected to last over three (3) years.

LDWF is required to maintain written justification stating the reason for the temporary appointment. Job Appointment employees receive all of the same benefits granted most other employees; however, they do not gain permanent status and may be separated at any time.

## Restricted Appointment

A restricted appointment is a temporary appointment, or combination of appointments not to exceed a cumulative total of six (6) months in a calendar year for any person. A good "rule of thumb" to understand this type of appointment is that if you have served six months on a restricted appointment, you would not be hired again on such an appointment for six months.  It is used only for the following reasons:

- for work of a temporary nature;
- to substitute for another employee;
- pending filling the position in a regular manner, or,
- to address an emergency or work overload situation.

Persons, who meet the minimum qualification requirements and who are capable of performing the required duties, may be hired on a restricted appointment. Restricted appointees do not earn any benefits, including annual or sick leave,

LDWF 000690

and do not contribute to the state retirement program (LASERS).  They do contribute to the Social Security System and are taxed at the current rate. They are paid only for actual hours worked and not for any holidays or other times the department is officially closed.  However, they are eligible for worker's compensation.

## Re-Employment

LDWF does not like to lose good, qualified and well-trained employees. If an employee who has attained permanent status resigns, and was in good standing, he or she will have non-competitive re-employment eligibility rights for a period of ten years from the effective date of resignation. During that time the person may be considered for re-employment in any job having the same or lower pay grade scale (e.g., AS, TS, PS. WS) for the job in which he/she had permanent status, provided the minimum qualifications are met. For this type of appointment, the person need not be within reach on a Civil Service "Official Certification of Eligibles List", nor does he/she have to re-take any examinations. The employee does, however, have to serve a probationary period as previously described.

## Transfer

When vacancies occur in any State Department, Office or Division, the jobs are announced and sometimes filled by transfers. Employees interested in transferring should respond to posted job announcements. A transfer takes place when an employee changes from one position in a Department/Office/Division/Section of state service to a different position in another Department/Office/Division/Section of state service without a break in service of one or more working days. Although some transfers involve a promotion or demotion, most are lateral moves. Transfers may affect the permanent status of an employee.

## Promotion

With approximately 800 classified positions in LDWF, there are promotional opportunities. It is the policy of this Department to fill vacant positions by selecting the best-qualified and most suitable individuals from as wide a range of candidates as possible. Efforts are normally made to fill vacant positions by promotion of qualified permanent state employees from within LDWF.  In considering employees for promotion, administrators and supervisors will first consider the position to be filled and the experience, education, and training or other special requirements of the position.

No matter what your background, experience or education, you are encouraged to apply for a vacant position if you are interested and meet the minimum qualifications. In some instances you may be required to take and pass the Civil Service examination for that job.

LDWF 000691

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

It is the responsibility of employees to apply for and take Civil Service examinations as they qualify for different positions. The agency is not required to wait for an employee to receive a Civil Service score. Procedures may vary from Office to Office, so, advise your supervisor or Human Resources of your interest, and ask how you can be made aware of promotional opportunities.  You may also wish to ask for recommendations on what you can do to improve your chances for promotion. This may include improving your work or job performance in specific areas or acquiring special training.  NOTE:  Most LDWF and other state department job vacancies are posted and announced on the Civil Service Job Search website located at www.dscs.state.la.us.  Each employee should review this website to learn of new positions when offered.  If interested, eligible and/or qualified, employees may apply for a job by following the application instructions as listed on the specific announcement.

**Discrimination**

It is the policy of the Department of Wildlife and Fisheries to prohibit discrimination against any person on the basis of race, color, religion, sex, age, national origin, disability, veteran status or any other non-merit factor.   See PPM#2, Equal Employment Opportunity and PPM#29 Equal Opportunity in Department's Programs, Activities or Services.

All employees in the Department with any responsibility for recruitment, selection, placement, training, evaluation or any other aspect of human resources procedures must give their full support to the policy through active cooperation and personal example to ensure its successful implementation.

**Americans With Disabilities Act (ADA)**

The Americans with Disabilities Act is an anti-discrimination statute that requires individuals with disabilities to be given the same consideration as other individuals without disabilities are given in regard to job application procedures; the hiring, advancement or discharge of employees; employee compensation; job training; and other terms, conditions, and privileges of employment.

To ensure equal opportunity, LDWF management will provide reasonable accommodations to the known physical and mental limitations of a qualified applicant or employee with a disability. Qualified applicants or employees must notify LDWF management of the need for any accommodation.  See PPM#20, Early Return to Work.

**Outside Employment**

You are expected to devote your primary attention to the requirements of your job with the Department of Wildlife and Fisheries. Outside employment is

LDWF 000692

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

permissible, provided it does not affect your regular work or require you to perform duties which would be prohibited for public employees by the Code of Governmental Ethics. (Refer to Conflict of Interest for more complete information).

Please refer to Policy #10, "Outside Employment or Other Income Producing Activities" and Policy #65 Ethics for more information and the procedure for written approval of outside employment.

## Ethics

Since you are in a position of public trust, you must not engage in any activity, either privately or officially, where a conflict of interest may exist. Some of the activities which may represent a conflict of interest for public employees, as outlined in the Ethics Policy #65, are as follows:

- **Gifts**:  An employee may not accept any thing of economic value, directly or indirectly, as a gift from someone who is considered a prohibited source.
- **Prohibited Income:**  An employee who is prohibited from receiving income in situations for the performance of his official duties and responsibilities.
- **Prohibited Contractual Arrangements:**  No employee, member of his immediate family or legal entity in which he as a controlling interest shall bid on or enter into any contract, subcontract, or other transaction that is under the supervision or jurisdiction of his agency.
- **Participation:**  An employee cannot participate as a public servant in a transaction in which the person has a substantial interest.
- **Financial Disclosure:**  Employees, and their immediate family members, who receive a thing of economic value from a prohibited source through any transaction involving the Department must follow the rules pertaining to financial disclosure.
- **Nepotism:**   An immediate family member of an agency head may not be employed in his/her agency.
- **Post-Employment:**    Not allowed to assist a person for compensation, in a transaction or in an appearance in connection with a transaction involving his former agency or render any service on a contractual basis to or for his former agency for 2 years following his termination of employment.

## Dual State Employment

State employees are prohibited by law from holding two full-time state government jobs. It may be possible to hold more than one part-time job or one

LDWF 000693

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

full-time job and a part-time job as long as the second job is less than thirty-five (35) hours per week.

In the event you are appointed to **more than one state job, it is imperative that you notify the Human Resources Director of this agency.** Under the Fair Labor Standards Act, the State of Louisiana is one employer. Therefore, even though you may work for two different Departments of state government, one of your employers may be liable for overtime benefits if you actually work more than 40 hours per week or 80 hours per pay period.

### Performance Planning and Review (PPR)

When you are employed, your supervisor will review job responsibilities and expected level of performance with you.  See PPM #23, Performance, Planning and Review. Thereafter, your performance will be evaluated on a continuous basis through a system of planning conferences and reviews.

### Performance Planning Session

Your supervisor will conduct a performance planning session, no later than 30 calendar days after:

- employment;
- your Anniversary Date; or
- movement into a position having a different position number and significantly different duties.

The Civil Service Performance Planning and Review (PPR) process is to improve two-way communication and feedback between you and your supervisor. This improved communication builds accountability, making sure what is supposed to be accomplished by State employees is really accomplished.

**PPR is designed to accomplish four goals:**
- help employees and supervisors set performance expectations to improve performance;
- identify important performance factors for each employee's job;
- encourage employees and supervisors to talk about work performance; and
- document and measure performance of each individual employee

### Four Steps in the PPR Cycle

LDWF 000694

Louisiana Department of Wildlife and Fisheries                                May 2010
Employee Handbook

- <u>Performance Planning</u> – should occur no later than 30 days after initial appointment or Anniversary Date [1]
- <u>Continual performance observation, documentation, and feedback</u> – and written and verbal communication during the entire rating year.
- <u>Performance review, rating and counseling</u> – an ongoing process, which results in the rating being given within 60 calendar days before or by the Anniversary Date each year.
- <u>Performance planning</u> – as the cycle continues – also, planning updates can occur at any time in the cycle, whenever there are changes in job duties, performance expectation, or supervisors.

**Performance Rating Appeals**

Once each year, you will receive notice of your official performance rating which is required by Civil Service rules. A permanent employee, who disagrees with an official rating or re-rating, has a right to have the rating reviewed by the Appointing Authority or designated Appeal Reviewer as appropriate.

A written request for review must be postmarked or received in the Human Resources Section no later than fifteen <u>(15) calendar days</u> after the <u>employee's</u> Anniversary Date, or for a re-rating, no later than fifteen (15) calendar days after the day that falls six months after the employee's Anniversary Date. In the request for review, the employee must explain why he/she believes a higher rating is warranted and must attach whatever supporting documentation he or she wants the Appeal Reviewer to consider.

A <u>permanent employee</u> who disagrees with the Appeal Reviewer's decision has a right to have the PPR files reviewed by the Director of Civil Service or the Director's designee.

**Employee Opportunities To Get Maximum Benefit from the PPR Process**

- Keep your own Kudos file and give it to your supervisor before rating time.
- If your Rating Supervisor has asked you to remind him/her that your planning or rating deadline is due and has asked you to help him/her remember, don't be shy – he/she really wants you to!
- Be aware if you have not received a rating by the time your anniversary date has occurred, your official rating will be Un-Rated as of the day after the anniversary date. You do not have to wait to be notified that you earned an Un-Rated; you can go on and Request a Review if you wish. There is a form on the C.S. website that you can use for this purpose.

---

[1] Anniversary Date – Civil Service rule **6.14** (a) "When a new employee has been continously employed, without a break in service of one or more working days for a period of six months, he becomes eligible for and may be granted a merit increase provided that the appointing authority has determined his performance merits such an award." This is known as the employee's merit eligibility date and will always be known, thereafter, as the employee's Anniversary Date, provided there is <u>no break in service</u>.

LDWF 000695

Louisiana Department of Wildlife and Fisheries          May 2010
Employee Handbook

Either way, your Request for Review must be received by the day that falls 15 days after your anniversary date.

- You can only request a review of a PPR rating if you are in disagreement with the overall rating category. Only a permanent employee can file a request for a review.
- You are eligible for a merit increase on your anniversary date, or first merit eligibility date, if you have a Meets Requirements, Exceeds Requirements, Outstanding or even Un-Rated. There is no rule that guarantees a merit increase.
- If you are requesting a review, you must explain specifically which factor scores you disagree with, what rating you are requesting, and why you disagree. Submit any documentation you wish to have considered for change of rating category.
- If you wish to submit supporting documentation along with your Request for Review, but feel you cannot compile it by the deadline date, the agency is under no obligation to allow you extra time, nor should you assume you will be allowed extra time to produce the documentation. It is recommended you make your request for an extension in writing, and the Appointing Authority or designee can provide you with a reply granting or denying the request.
- Have an understanding of the Performance Factor Ratings; understand that *not* receiving a "5" on every factor does not mean that you're not doing a good job. A Meets Requirements rating means just that – you have met the expectations set for you by your supervisor – your performance has not been "deficient."
- Request informal feedback throughout the year from your supervisor, especially if there are areas in which you personally are trying to improve.

## PAY

Each job within the Civil Service Pay Plan is assigned a pay grade within 6 pay schedules.  These schedules are:

- Administrative (AS)
- Medical (MS)
- Protective Services (PS)
- Scientific and Technical (TS)
- Social Services (SS)
- Technical and Skilled Trades (WS)

The pay rates for the state's classified workforce will be established in accordance with a system that generally considers such factors as availability of applicants, the quality of the applicant pool, turnover rates, federal law, market competition, pay practices of market competitors, the evaluation system ranking, employee performance, and level of funding available.

LDWF 000696

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

## Paydays

The Department of Wildlife and Fisheries' payroll operates under the statewide payroll system (ISIS-HR), which is maintained by the Office of State Uniform Payroll. Pay statements are issued on a bi-weekly pay cycle. There are twenty-six (26) pay periods annually.  It is imperative that you sign your time and attendance record each pay period.

## Mandatory Direct Deposit

In accordance with LA Revised Statute 39:247, the Office of the Governor, Division of Administration, Office of State Uniform Payroll (OSUP) has adopted a rule governing direct deposit of employee pay. Beginning July 1, 2002, all employees hired by an agency which pays employees through ISIS-HR are required to receive wage and compensation payments via direct deposit through the Automated Clearing House (ACH).

Direct deposit of pay must be considered a condition of employment (unless you qualify and have been approved for a bona fide disability exemption) and LDWF has agreed not to submit job offers to prospective employees who are not willing to receive their wage and compensation payments via direct deposit. Payroll checks will not be produced for employees who have not complied with the provisions of this rule. Wage and compensation payments will be suspended and placed in a suspense holding account until such time as the employee completes an approved direct deposit enrollment authorization form and forwards the form to the Employee Administration, LDWF Human Resources Section.

### Direct Deposit – Banks

In the ISIS HR system, employees are given the opportunity to have their net pay direct deposited into a maximum of four (4) bank accounts. The "main bank" record for those employees on direct deposit will indicate the primary account to which an employee's net pay, less any amounts going to "other banks", will be deposited.

An employee can also have three "other bank" (secondary) accounts. For these, they will be able to specify a fixed dollar amount or a percentage of net pay to go into the accounts.

### Deductions

By law, LDWF is required to withhold federal and state income tax, and either state retirement or social security from your check. You may authorize other

LDWF 000697

deductions to be made from your check such as insurance, credit union payments (savings and/or loan), U.S. Savings Bonds, United Way and other miscellaneous deductions.

**Louisiana Employees Online (LEO)**

What is it?  LEO is a portal to ISIS-HR for employees to view and change their personal information:

- Enables employees to view benefits, payroll information and personal information;
- Allows employees to update their home and e-mail address, direct deposit and emergency contact information, work telephone number, and withholding information; and
- Enables users to find information such as place of employment, telephone number, e-mail address, etc., on any state employee whose record exists in the ISIS-HR

**How do I get to LEO?** Go to https://leo.louisiana.gov

**Hours of Work**

The normal work week for most LDWF employees will consist of 40 hours, divided into five eight-hour days. There will be other work schedules designed to provide coverage in 24-hour facilities/operations requiring shift work. If you work in a facility/operation which utilizes varying work schedules, your supervisor will keep you informed of changes in reporting time.

**Attendance**

Your job is important to the overall   accomplishment   of   the   Department's objectives. You should make every effort to be at your duty station at the scheduled times.

Sometimes, of course there will be good reasons for absence or tardiness. In these situations, there are certain rules that must be observed. If you are unable to return or arrive at work at the scheduled time, notify your immediate supervisor as early in the work day as possible; or if required by your appointing authority, ask that you be granted appropriate leave. Except in unusual circumstances, leave must be requested and approved in advance. Your supervisor has the authority to approve or disapprove leave, and unscheduled absences may not be approved.

LDWF 000698

Notification to your supervisor will help him or her make plans to cover your job with minimal possible inconvenience. If you are unable to contact your supervisor personally, you may have someone else do so for you. Remember, however, it is your responsibility to notify your supervisor.

**Break Periods**

You may be given two fifteen (15) minute break periods away from your duty station during an eight-hour shift. You may be asked to delay your break periods if your presence is needed at your post. These breaks are paid time and are given at the agency's discretion and, as such, are not mandatory. Break time cannot be accumulated to shorten the workday nor can the afternoon break be scheduled at the end of the work day. You should make every effort to be at your duty station at scheduled times.

**Lunch Time**

Your lunch break will be not more than thirty (30) minutes. Lunch periods are not to be used to shorten your work day.  No office will be closed during lunch time and all primary work areas will have continuous coverage.

**Overtime**

Each employee's position has been identified as **exempt or non-exempt, based on the Fair Labor Standards Act (FLSA)** and is reflected in the ISIS-HR system for this Department.

Schedules may be adjusted for **non-exempt employees** within the work week instead of allowing overtime. Schedules may be adjusted for **exempt employees** within the pay period instead of allowing overtime.

Overtime compensation requires prior approval by **the Appointing Authority/designee** for both **exempt** and **non-exempt employees**. All employees must receive prior approval for either a schedule adjustment or to be compensated for overtime worked.

Effective delivery of services may require you reporting to work on holidays or before or after regular working hours. In accordance with appropriate Civil Service Rules, Department policies, and the Fair Labor Standards Act, you will either be granted compensatory time or paid for overtime worked.

**State Overtime**

State overtime is work performed by an employee at the direction of the appointing authority or his designee as follows:

- In excess of the employee's regularly scheduled work period or workday;
- On a holiday, including designated holidays; or

LDWF 000699

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

- During official closures;

State Overtime performed during official closures due to emergency situations may be compensated at the time and one-half rate.

# PART 3:  Benefits

As an employee of the Department of Wildlife and Fisheries, you will have a variety of benefits available to you. Listed below are some of these benefits.

**Legal Holidays**

The following are recognized as legal holidays:

- New Year's Day – January 1

- Martin Luther King Day

- Mardi Gras Day

- Good Friday – Friday preceding Easter Sunday

- Independence Day – July 4

- Labor Day – First Monday in September

- Veteran's Day – November 11

- Thanksgiving Day – Fourth Thursday in November

- Christmas Day – December 25

- General Election Day – every 2 years

- Gubernatorial Inauguration Day – every 4 years for employees *who work within the city limits of Baton Rouge*

Some of our services must be delivered on a 24-hour basis, 7 days a week. It will, therefore, be necessary that some employees work on days observed as holidays. Your supervisor will explain special provisions made for employees who have to work on holidays.   (Note:  Non-leave earning employees do not receive holiday pay.)

LDWF 000700

Louisiana Department of Wildlife and Fisheries                                May 2010
Employee Handbook

**Leave**

**Annual and Sick Leave**

In addition to their regular days off, all permanent, probational, provisional or job-appointed employees earn annual and sick leave. The amount of leave earned is based on the number of years of state service and the number of hours worked as depicted in the following schedule:

| State Service | Hours Earned | Hours earned bi-weekly | Approx. Hours earned per month | Approx. Days earned per year |
|---|---|---|---|---|
| 0 – 3 years | .0461 | 3.6880 | 8 hours | 12 days |
| 3 – 5 years | .0576 | 4.6080 | 10 hours | 15 days |
| 5 – 10 years | .0692 | 5.5360 | 12 hours | 18 days |
| 10 – 15 years | .0807 | 6.4560 | 14 hours | 21 days |
| 15 years or more | .0923 | 7.3840 | 16 hours | 24 days |

**Employees do not earn annual or sick leave as follows:**

- for any overtime hour;
- for any hours of leave without pay;
- for any hours of travel outside regular duty hours; or
- for any hours in an on-call status outside regular duty hours.

You are expected to use earned leave in a responsible manner. All leave taken must be properly applied for and properly documented on appropriate time sheets or records. Annual or sick lave may be taken in increments of no less than one-half hour.

**Annual Leave**

Annual leave is provided for vacations and personal business and should be requested in advance. Except in cases of emergency, annual leave must be applied for and approved by your supervisor or division head in advance. Approval or denial of annual leave will be based on workload or other factors

LDWF 000701

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

surrounding the need for leave. Accumulated unused leave is carried forward to the succeeding calendar year.  See PPM#24, Approval of Annual Leave.

## Sick Leave

Sick leave is provided for situations where an employee is prevented from performing his/her duties due to illness or because of medical, dental or optical consultations or treatments.  Sick leave should be considered as an insurance policy and used only when absolutely necessary. Special care should be taken to avoid abuse. Leave request forms should be submitted to your supervisor immediately upon return to duty following sick leave, if application was not made in advance. Your supervisor may require certification of your need for sick leave.

Sick leave is not charged in less than one-half hour increments and is earned on the same basis as annual leave. Accumulated unused sick leave is carried forward to the succeeding calendar year. It is not payable upon resignation from state service.

An appointing authority may place an employee on sick leave when the employee asserts the need to be absent from the work place because of the employee's illness or injury.

## Civil and Special Leave

Whenever necessary, you will be given time off from your duties without loss of pay or accumulated leave, when:

- Performing jury duty;
- Summoned to appear as a witness before a court, grand jury, or other public body or commission, except when you are the plaintiff or defendant, or you are summoned as a result of employment other than state employment;
- Performing emergency civilian duty in relation to national defense;
- Your Appointing Authority determines that you are prevented by an Act of God from performing your duties;
- During Office Closures;
- Voting in an election on a regularly scheduled work day and there is not sufficient time before or after working hours to vote; or
- Participating in a required state Civil Service examination on a regular work day (up to six in a one-year period) or taking a required examination which is pertinent to your state employment before a state licensing board.

## Compensatory Leave

As stated earlier, occasions may arise which require that you work holidays or longer than your regularly scheduled work day. In some instances, you may

LDWF 000702

Louisiana Department of Wildlife and Fisheries                          May 2010
Employee Handbook

receive compensatory leave in lieu of overtime pay. Use of compensatory leave or "K-Time" must be applied for in the same manner as annual leave, and it will be charged in the ISIS-HR system before annual leave or leave without pay. Your employer may, at any time, require you to take any or all compensatory leave. Upon separation from state service or transfer from LDWF, any unused compensatory leave, which is not paid, will be canceled.

All unused compensatory leave earned at the **time and one-half rate** and credited to an employee will be paid upon his separation or transfer. Compensatory leave earned at the **time and one-half rate** may be accrued up to a maximum of 240 hours in any calendar year. All unused compensatory leave credited to an employee above the maximum of 240 is automatically paid by the ISIS-HR payroll system to the employee when earned.

Compensatory leave earned at **straight time** may be accrued up to a maximum of 360 hours in any calendar year. All unused compensatory leave credited to an employee above the maximum of 360 may be canceled on December 31 of each year.

The Department of Wildlife and Fisheries has opted to pay for any leave credited at the **straight time rate** at the time of transfer or separation **unless budget constraints dictate otherwise**. This leave cannot be re-credited upon re-employment in the Department of Wildlife and Fisheries, or any other Department. See PPM#3, Hours of Work and Overtime Compensation.

**Educational Leave**

You may be granted educational leave with pay, provided the course you take is pertinent to your work and provided the course will require no more than 30 calendar days in one calendar year. However, leave will not normally be granted if the course of study is available during off-duty hours.   See PPM #16, Educational Leave.

- *Full-time Educational Leave Without Pay:* You may be considered for full-time educational leave without pay for a maximum period of one year at a time. Educational leave is not a vested right, but may be granted upon approval by the proper appointing authority. If you qualify and funds are available, you may be granted an educational stipend.
- *Part-time Educational Leave:* If you wish to take one or two courses toward an undergraduate or graduate degree, with the courses given during working hours, you may request leave to do so. Prior approval must be secured from the proper administrative personnel and educational or annual leave or leave without pay may be granted. A flexible work schedule also may be considered whenever possible.

LDWF 000703

## Family and Medical Leave

The Family and Medical Leave Act of 1993 (FMLA), provides to eligible employees a total of twelve (12) work weeks of "job-protected" **paid and/or unpaid leave** during any twelve (12) month period for:

- The birth of a child and the care of a newborn;
- The placement of a child for adoption or foster care;
- To care for a parent, child or spouse with a serious health condition;
- The employee's own serious health condition.

It is the policy of Wildlife and Fisheries to use the appropriate paid leave, (i.e., sick or annual) when available. If the appropriate leave is not available then leave without pay will be granted while under FMLA.   See PPM #12, Family and Medical Leave.

## Funeral Leave

To assist employees through the period of bereavement following the death of a relative, LDWF employees with permanent or probationary status ***may be granted*** up to two days of funeral leave to attend the funeral services or burial rites of immediate family members.  On leave request forms for funeral leave, you will be required to provide the name of the deceased and the relationship to you. A list of those for whom funeral leave may be approved is as follows: Husband/Wife,     Father-in-law,     Father/Stepfather,     Mother-in-Law, Mother/Stepmother, Grandfather/Grandmother, Brother/Stepbrother, Grandchild, Sister/Stepsister, Daughter/Stepdaughter, Son/Stepson.

Annual leave may also be granted for funeral arrangements. Annual leave may be approved in accordance with normal policy to attend the services of other relatives and friends or to extend leave beyond the allowed funeral leave time. Contact your supervisor for details and to request such leave.

## Leave Without Pay

Under unusual circumstances and upon request, leave without pay (LWOP) may be granted when it is in the best interest of the agency. However, except for educational or military purposes, leave without pay will not be granted if you have any applicable types of accrued leave to your credit. LWOP must be limited, and approval for LWOP over 30 days, for any reason, will be reported to the Department of Civil Service. Any LWOP for over 30 days is deducted from your adjusted state service date.

## Military Leave

LDWF 000704

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

The Department of Wildlife and Fisheries supports the commitment of our employees to serve in the armed forces of the United States or the National Guard.

You may refer to Civil Service Rule **11.26 Military Leave** which can be found at the Civil Service website www.dscs.state.la.us. The provisions of this rule shall apply to members of a Reserve Component of the Armed Forces of the United States, who are called to duty for military purposes and to members of National Guard Units that are called to active duty as a result of a non-local or non-state emergency. Some of the issues this rule will address are as follows:

- Military Leave with Pay;
- Use of Annual and Compensatory Leave for Military Purposes;
- Use of Leave Without Pay for Military Purposes;
- Rights Upon Return.

Employees who are called to military duty will receive a maximum of fifteen (15) days of military pay per calendar year, regardless of the number of "tours" an individual serves during the calendar year.

For all employees whose military base pay is <u>less than</u> state base pay, and once military leave with pay is exhausted during a calendar year, the employee may be placed on leave without pay and receive a payment equal to the difference between his military base pay and his state base pay. An employee, with no annual/compensatory leave will be placed on leave without pay and thus will automatically receive the benefit of Civil Service Rule 11.26. An employee who does have annual and/or compensatory leave, may choose to use leave, or may choose to be placed on leave without pay (thus preserving personal leave balances) to receive the benefit of this rule.  Please contact Human Resources for more specific information.

**Other Types of Leave**

Emergency Situations – Annual or compensatory leave usually may be requested in an emergency situation where prior approval has not been obtained. When such leave is not based on a bona fide emergency, or you have not notified your supervisor in the manner prescribed by your Office, leave without pay may be charged. Requests of this nature are expected to be minimal and non-compliance may subject an employee to disciplinary measures.

Job Interview – Employees may be granted time off with pay with no leave charged to report for an interview in connection with a possible transfer or promotion within the agency, or with another state agency, provided the vacancy is a bona fide scheduled, posted vacancy. Annual leave or leave without pay will be charged for interviews conducted in the private sector.

LDWF 000705

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

Orientation, Conferences and Workshops – No leave will be charged for orientation, conferences, conventions or workshops, if attendance at such functions is required or considered to be in the best interest of the Department. Prior approval must be obtained through the Appointing Authority in advance for such leave.

## Leave Payment Upon Separation From Service

Upon separation from state service, you will be paid the value of any accrued annual leave up to a maximum of 300 hours at your hourly rate of pay. Fractions of an hour will be disregarded. All sick leave and any annual leave above 300 hours will be recorded in your personnel record and re-credited, if you are re-employed in state service within five (5) years of separation provided your last separation was not a dismissal for cause.

## Health and Life Insurance

## Health Insurance for Active Employees

All new employees and their qualifying dependents are eligible for health and life insurance coverage under the Office of Group Benefits (OGB) located at www.groupsbenefits.org

## Pre-Existing Condition (PEC)

Employees and dependents who apply for coverage are subject to a pre-existing condition limitation.

- Under the pre-existing condition limitation, **no benefits are payable during the first twelve (12) months** of coverage in connection with any disease, illness, accident, or injury diagnosed or treated during the six months immediately prior to the enrollment date. Pregnancy is not considered a pre-existing condition.
- You must complete an **enrollment form** within 30 days after acquiring each new dependent (by birth, adoption, marriage, or otherwise). If you fail to do so, your dependent may be subject to the pre-existing condition limitation.

**You may be exempt** from all or part of the pre-existing condition limitation if you were continuously covered under another health care plan within 63 days prior to effective date of your coverage in OGB Program.

***Remember:***

LDWF 000706

Louisiana Department of Wildlife and Fisheries                May 2010
Employee Handbook

You must complete an enrollment form within thirty (30) days after acquiring each new dependent (by birth, adoption, marriage, or otherwise). If you fail to do so, your dependent may be subject to the pre-existing condition limitation.

## Effective Date of Coverage

### New Hire and Transfers:

The effective date of coverage for new hires and transfers, whose employment begins on the first of the month, will be the first day of the following month.  If employment begins on the second day of the month or later, coverage is effective the first day of the second month following employment.

| EXAMPLE: | If Employment Begins: **September 1** | Coverage Begins: **October 1** |
|---|---|---|
| | If Employment Begins: **September 2** | Coverage Begins: **November 1** |

### Late Applicants

Late Applicants are employees who apply for coverage more than thirty (30) days after employment or hire date.  The effective date of coverage for late applicants, whose forms are <u>received prior to the fifteenth</u> of the month will be the first day of the month, following the date of receipt by OGB of all required forms. The effective date of coverage for late applicants, whose forms are <u>received on or after the fifteenth</u> of the month, will be the first day of the second month following receipt.

### Basic Life Insurance

Basic life insurance for which you are eligible is set at a fixed policy face value. Basic plus supplemental life insurance is based upon your annual salary and the policy face value, as well as the premium changes in accordance with your rate of pay.   Please check with Human Resources for the amounts and related premiums or visit the Office of Group Benefits website:  www.groupbenefits.org.

### Coverage for Retirees

To be eligible for retiree coverage, you must be enrolled for coverage as an employee at the time of retirement.  For those beginning participation or rejoining on or after January 1, 2002, the state subsidy of your premium is based on the number of years you have participated in a Group Benefits program, such as a PPO or an HMO.   This is called vesting.   Please refer to the OGB website (www.groupsbenefits.org) for more information.

LDWF 000707

Louisiana Department of Wildlife and Fisheries                May 2010
Employee Handbook

When you retire, and if you continue your health coverage and all or part of your life coverage (depending upon age), the agency will continue to pay a portion of your premium.

If you go on approved leave without pay (LWOP) and **meet certain conditions**, the agency will continue to pay the employer's share of the insurance premium provided you continue to pay the employee's share during the period of approved leave without pay.

### Supplemental Insurance

From time to time, private insurers will offer additional life and health insurance, as well as accident and dental insurance policies. You may enroll in the different plans, and if they are authorized for payroll deductions, the Department will deduct the premiums from your check. However, you will be responsible for 100% of the premiums, as well as the contracted provisions included under each plan.

A complete vendor/coordinator list effective April 25, 2003 is available with this handbook or you can view the current list on the Office of State Uniform Payroll website at http://www.doa.state.la.us/memos/fy2003/03-61.pdf. The Department of Wildlife & Fisheries in no way promotes an of these individual plans, but it does allow payroll deductions for the payment of premiums.

### Flexible Benefits Plan

The State of Louisiana offers the Flexible Benefits Plan (Flex Plan) with Premium Conversion and Flexible Spending Accounts. This is an Internal Revenue Code Section 125 sanctioned cafeteria plan. Your eligible insurance premiums, dependent care expenses, and medical care expenses are deducted from your gross salary – before taxes. Therefore, you pay less in tax and your spendable income increases.

Premium Conversion allows you to pay your portion of your eligible insurance premiums before taxes are calculated. Dependent Care Flexible Spending Account allows you to pay eligible dependent care expenses for your child, disabled spouse, elderly parent, or other dependent incapable of self-care. Health Care (Medical) Flexible Spending Account allows you to pay for eligible for out-of-pocket medical, dental, and vision care expenses not covered by your health benefits plan. See https://www.groupbenefits.org/ for more details.

### Workers' Compensation Insurance

You are covered by Workers' Compensation Insurance, which pays certain benefits to employees who become disabled, or miss work because of an on-the-job work related injury.

LDWF 000708

Louisiana Department of Wildlife and Fisheries                              May 2010
Employee Handbook

Workers' Compensation is a legally required employer-paid program designed to protect you from loss of total income due to injuries occurring on the job. Should you become injured while working on your job, you should notify your immediate supervisor at once and request that an injury report be completed, no matter how minor the injury may appear, and forward the report to the Human Resources Section for submittal to the state Workers' Compensation Section, Office of Risk Management, Division of Administration.

New Employees to state service must enroll in the plan within 30 days of employment.

## Deferred Compensation

Deferred Compensation was created by the U.S. Congress in 1978 for public employees, as a way to supplement their retirement. It will defer current income tax liability and provide you with additional income at retirement.

All employees are eligible to participate in the Deferred Compensation program. Information can be secured from the Human Resources Section relative to the application process for enrollment.

## Credit Union

As an employee of the Department of Wildlife & Fisheries, you and members of your immediate family are eligible to join the credit unions established for state employees. These credit unions make loans, offer insured savings accounts and other services. LDWF does not take part in the administration of the credit unions nor in the approval or denial of loans. The State does, however, offer payroll deductions to pay off loans and/or increase savings shares. LAWILIFIE is a private entity and is not an agency of the Louisiana Department of Wildlife & Fisheries or the state of Louisiana.

## U.S. Savings Bonds

In addition to other savings programs, you may want to participate in the U.S. Savings Bond payroll deduction plan. Contact the National Bond & Trust (NBT), who is the administrator for bonds at 1(800) 426-9314 or http://www.nbtco.com. You may also contact the Bureau of Public Debt at http://www.savingsbonds.gov for information. You will need to provide your social security number.

## Retirement

## Louisiana State Employees Retirement System (LASERS)

One of the major benefits of working for the Department of Wildlife & Fisheries is the retirement program. Most employees become members of the Louisiana

LDWF 000709

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

State Employees' Retirement System (LASERS) upon employment.  Dependent upon age or other factors, some employees may be covered by Social Security.

For more information see the LASERS website at http://www.lasers.state.la.us.


## Deferred Retirement Option Plan (DROP)

Active employees who have retirement eligibility may elect to participate in this program.  DROP is an optional method of retiring from LASERS.  When an employee enters DROP, his/her status in LASERS changes from an active member to retiree, even though they continue working at their regular job.  LASERS will credit the participant's DROP benefit to a special DROP account during participation.  Active employees cannot withdraw money from DROP accounts until employment ends.

Employees may take part in DROP only once and for no more than three (3) years.  An employee may enter DROP on the first eligible date for regular retirement.  However, the member may also begin participation within sixty (60) days after retirement eligibility.  If a member waits to enter DROP at some point after the sixty  (60) days, the length of time he/she can stay in DROP is reduced.

## Disability Retirement

You may apply for disability retirement if you have ten (10) or more years of creditable state service.  To be eligible for benefits with ten (10) or more years of service, you must be active in state service at the time of application or, if out of service, you must be able to provide compelling evidence that your disability was incurred while you were employed.  If you have twenty (20) or more years of creditable state service and become disabled, you may apply for disability retirement whether or not you are still active in state service at the time you become disabled.  Benefits for disability retirement will be computed on the same basis as those for regular retirement.

## Retirement Formula – Employment prior to July 1, 2006

Regular retirement benefits will be based on the following formula: 2.5% x number of years of service x your average monthly salary.  Average monthly salary is computed by adding the thirty-six (36) highest consecutive months' income and dividing the sum by 36.    The minimum regular retirement eligibility is 10 years at age 60 or 25 years at age 55 or 30 years at any age.   The employee contribution rate is 7.5%.

## Retirement Formula – Employment after July 1, 2006

Regular retirement benefits will be based on the following formula:  2.5% x number of years of service x your average monthly salary.  Average salary is

LDWF 000710

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

computed by adding the sixty (60) highest consecutive months' income and dividing the sum by 60. Minimum retirement eligibility is 10 years at age 60 and the employee contribution rate is 8%.

## Conversion of Unused Sick and Annual Leave

The amount of annual leave paid by the agency (up to 300 hours) cannot be converted to retirement credit and contributions cannot be made on this amount. The annual leave paid by the agency (up to 300 hours) is paid to the member at the hourly rate of pay at termination. However, any remaining unused annual, and all unused sick leave certified by the agency in accordance with the leave accrual rates established by the State Civil Service Commission upon retirement, will be credited to the member on the following basis:

| | |
|---|---|
| 1 – 26 days    =   0.10 year | 131 – 156 days = 0.60 year |
| 27 – 52 days    =   0.20 year | 157 – 182 days = 0.70 year |
| 53 – 78 days    =   0.30 year | 183 – 208 days = 0.80 year |
| 79 – 104 days =   0.40 year | 209 – 234 days = 0.90 year |
| 105 – 130 days = 0.50 year | 235 – 260 days = 1.00 year |

The formula for calculating the additional retirement benefit for eligible leave is: **final average compensation x retirement accrual rate x leave service credit**

Louisiana law allows members at retirement, either to add converted eligible leave to the monthly retirement benefit, or be paid the actuarial value (not the hourly salary rate) of the converted eligible leave in lump sum. Only leave that can be converted to retirement credit is eligible for a lump sum payment.

## Survivor's Benefits

Survivor's benefits are payable to the surviving spouse and/or minor children of a deceased member. To be eligible, the deceased member must have accumulated a certain number of years of creditable service; and the number of years required is different for each situation.

## Refund

The money you contribute to the retirement system is not lost. Either you or your beneficiary will receive benefits at least equal to your contributions. If you leave state service before gaining retirement eligibility you may request a refund of all monies you have contributed to the system.

Eligibility for a refund begins when you have been out of state service for a minimum of thirty (30) days. You will, of course, lose retirement credit for the service time that the refund money corresponds.

LDWF 000711

Louisiana Department of Wildlife and Fisheries                          May 2010
Employee Handbook

**Repayment of Refund**

If you return to state service and remain a contributing member of the retirement
system for at least eighteen (18) months, you may repay refund(s) plus interest
compounded annually with prior state service credited.   Repayment of a
refund(s) is completely optional and may be completed at any time until the day
of retirement.

**Other Service Credit**

The retirement system provides for the purchase of other governmental or types
of service. It also provides for coordination of benefits with other systems and
other benefits.  There are also provisions for purchasing military time, which can
be credited to your total state service.   Human Resources can provide further
information.


# PART 4:  Conduct and Discipline

While we want to project a positive image of the Department, it would be unfair to
gloss over certain performance expectations which, if not met, could result in
disciplinary action.  Your physical (or personal) appearance, or behavior and the
manner in which you conduct yourself will affect the overall image of the
Department.  Please read this part of your handbook carefully and make special
note of the prohibited activities.

**Customer Service Standards**

- We will always treat our customers with courtesy and respect.
- We will provide our customers with information that is current and
  accurate.  If unsure, our staff will find a more knowledgeable person to
  assist.
- We will work continually to streamline and improve our services.
- We make every effort to communicate with our customers in a clear,
  understandable manner.
- We will maintain a neat physical (or personal) and or work appearance
  and a positive attitude.
- We will respond promptly to all inquiries, requests, suggestions and
  complaints.  Every effort will be made to provide a complete and accurate
  response.
- We will provide fair and consistent treatment to all customers.
- We will encourage feedback and actively listen to our customers so that
  we may better understand their motivations and how to best provide
  products, services and information.

LDWF 000712

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

## Appearance

In projecting a respectable image to the public, your personal appearance is important.  The clothes you wear should be suitable for the type of work you do.  Ask your supervisor if you have any doubt.  No matter what you wear, you should be neat and well groomed.

## Confidentiality

The records of our service users and employees are, in most cases confidential and, in all cases highly personal.  Therefore, confidentiality must always be maintained.  Be careful that you do not pass information on to others except to authorized persons, who need the information to perform their jobs.

## Political Activities

To protect the many privileges associated with state employment, the limiting of certain political activities is necessary.  As an employee of this Department and as a citizen of this country, you may:

- Exercise your right to vote;
- Express your political opinions privately on your own time;
- Act as a commissioner or official watcher at the polls;
- Support issues involving bonded indebtedness, tax referenda or constitutional amendments;
- Attend rallies, meetings, etc.,  where candidates express their views or otherwise campaign, provided such attendance is to increase your awareness of the candidates' views and not to express approval of any candidates; and
- Seek election or support or oppose candidates who seek election as the classified employee serving on the State Civil Service Commission, the Group Benefits Board, or the Retirement Board.

Any other participation in political activities may be in violation of state and federal laws, as well as a violation of governmental ethics.  Before you engage in any activity that may have political overtones, remember that the restrictions of today are designed to prevent the abuses that existed in the not-too-distant past.  Ask the Human Resources Section to determine if the activity you plan is allowable.   Failure to comply with the rules and regulations may lead to disciplinary action.  Some examples of *prohibited activities* are listed below:

- Making political contributions.
- Soliciting votes or contributions.
- Endorsing any candidate by public speech or use of political bumper stickers, signs, etc;
- Using your influence to have others contribute to a political party or candidate, or interfering with the result of an election or nomination process; and
- Being a candidate for or holder of any public office, or being an active member of any national, state, or local political campaign or political party.

LDWF 000713

Louisiana Department of Wildlife and Fisheries                      May 2010
Employee Handbook

**Disciplinary Action**

The purpose of disciplinary action is to motivate employees to correct improper behavior or conduct and to remove inefficient, unproductive employees from the work force.   In most cases, a simple counseling session is sufficient action. However, if counseling does not cause the improper conduct or behaviour to be corrected, disciplinary action may be taken.   Types of disciplinary action may include suspension, reduction in pay, demotion or dismissal.

Employees will be disciplined only for just cause.   Your responsibility as an employee includes knowing, understanding and abiding by the rules, regulations, policies, and procedures that govern your work.  It is impossible to list every rule, procedure, etc., that you must observe.  However, if you will review the list of rule infractions provided below, you will know, generally what you should or should not do.

- Failure to perform assigned duties during work time;
- Excessive tardiness;
- Excessive absenteeism;
- Malicious use of profane language to co-workers/clients;
- Absence without authorized leave;
- Revealing confidential information to unauthorized persons;
- Negligence to duties;
- Possession, use, or under the influence of intoxicants or illegal drugs at work;
- Unauthorized possession, use, or threatening use of weapons;
- Fighting or violence resulting in injury to others and/or property;
- Violating proper standards of decency or morality on the job;
- Falsification of records;
- Conduct unbecoming to a public employee according to the Code of Ethics;
- Misuse or misappropriation of Departmental property, or property of another employee;
- Unauthorized use of Departmental equipment or property; and
- Insubordination (unwillingness to carry out supervisory directives).

LDWF 000714

Louisiana Department of Wildlife and Fisheries                           May 2010
Employee Handbook

# PART 5:  Grievances and Appeals

In an organization as large as ours, it may be expected that misinformation, poor communication, or other problems may cause you to think or feel that certain actions taken or not taken were unfair or unjust.  It is the policy of LDWF to:

- resolve employee problems at the lowest possible supervisory level, and at the earliest possible opportunity after such problems are recognized; and
- insure that each employee shall have access to an appropriate grievance procedure for resolving such problems.

A grievance is defined as a disagreement, dispute or complaint between an employee and management; an alleged act of unfair treatment of an employee; or, an alleged violation of Department/Office policy.  Excluded from this definition are those matters within the jurisdiction of the Department of Civil Service or Civil Service Commission and allegations of discrimination (based on race, sex, age, disability, national origin, or political or religious belief).

The grievance procedure does not guarantee that everyone will be pleased with the outcome of a grievance decision or resolution once it is filed.  It does, however, guarantee that you will have an opportunity to have your problem reviewed through a process that promotes resolution or, at least clarification of the circumstances which formed the basis of the complaint without fear of reprisal.

## Grievance Process

Should you feel it necessary to file a grievance, certain steps must be followed.  These steps are outlined for you below, or you may refer to Department of Wildlife and Fisheries PPM # 4, Grievance Policy.

## Informal Oral Discussion

Discuss your grievance with your immediate supervisor before implementing the formal steps of the grievance procedure.  Perhaps the two of you may find an immediate solution to your complaint.  Your request for a discussion must be made within fourteen (14) working days following the date you became aware of the action or situation, which caused the grievance.  Your immediate supervisor

LDWF 000715

must meet with you and render an oral decision within seven (7) working days following your request.

## Formal Written Grievance

If the grievance cannot be resolved through discussion with your immediate supervisor, of if a decision is not rendered within the prescribed time limit, you may present your grievance in writing to your Division Administrator within seven days of the date the oral decision should have been rendered.  Your Division Administrator will take the appropriate steps to investigate the grievance and give you the opportunity to present your viewpoint.  An answer to the grievance, in writing will be provided to you within fourteen (14) working days from receipt of the written grievance.

## Hearing

If you are not satisfied with the decision rendered at that time, you may submit your grievance in writing to the appropriate Appointing Authority within seven (7) working days following the date of receipt of the written decision.  A hearing shall then be held.  The appropriate Appointing Authority may choose to hear the grievance or they may refer it to the Hearing Officer or to a Grievance Committee.  You will be given notice of a hearing at least five (5) working days in advance.  The hearing will be held at a location on the property of the Department, and during normal working hours.

In the course of the hearing, you will be provided the opportunity to present all pertinent information relating to the complaint or problem.  This includes witnesses, affidavits, records, etc.

The Appointing Authority will evaluate the case and issue a written decision to all interested parties, including the Director of Civil Service, within twenty one 21 working days following the date the grievance enters into this step.  If the Appointing Authority personally hears the grievance, a written decision will be issued to all interested parties within fourteen (14) working days following the date of the hearing.

If the respondent, at any step, fails to render a decision within the established time limits, you may advance your grievance to the next higher step in the process.  You must process your grievance properly within the established time limits at each step, or it may be dismissed by the respondent at the step at which the procedure lapsed.  For complete information, you may refer to the LDWF Grievance Policy #4 located on the LDWF Intranet under the Human Resources Section.

LDWF 000716

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

**Civil Service Appeals**

The Civil Service Commission also has a procedure for hearing employee appeals.  The Civil Service Commission will generally hear the following types of cases:

- Dismissal of a permanent employee, suspension, demotion or reduction in pay as a disciplinary action.
- Claims of discrimination based on political or religious preferences, race or disability.
- Violation of Civil Service law and/or rules.

Should you decide that it will be in your best interest to file an appeal, the notice of appeal to the Civil Service Commission must conform to the guidelines listed in Chapter 13 of the Civil Service Rules.


# PART 6:  Other Useful Information

This section provides additional information in summary form for new and current employees; however, it does not cover all LDWF policies and/or procedures.  Please refer to the LDWF Intranet website at wlfnt1/ for other useful information, including  current policies and procedures, as well as  forms and links to other information.  The LDWF Intranet website is updated periodically to reflect any changes or modifications to existing information.  It is the responsibility of each employee to keep abreast of such changes, updates and/or new information as it becomes available.

**Use of State Equipment and Property**

State equipment and other property are owned and maintained by LDWF.  Treat all assigned equipment and property of the Department as you would your own.  Report any misuse of property or damaged and unsafe equipment to your supervisor.  Use only that equipment which you are authorized and trained to use.  Upon termination of employment, it is the responsibility of each employee to return any assigned or other used equipment or property to LDWF.

**Operation of State Vehicles**

All new employees must take the Driver Safety Course within 90 days of employment and/or prior to driving any state issued vehicle.  Each employee must also be recertified every three (3) years to maintain eligibility for state

LDWF 000717

driving privileges.  (See Policy # 46 – Driver Safety Program and Policy # 32 – Department Vehicles Temporary Overnight Storage for further details.)

Employees using state-owned vehicles must have proper authorization to do so and must have a valid driver's license of the proper class for the vehicle.  State-owned vehicles are to be operated in accordance with state and local traffic laws at all times.  Employees are expected to drive defensively and to take every possible safety precaution whenever these vehicles are utilized.  Safety belts are to be used at all times while a vehicle is being operated.

Before driving a state-owned vehicle, be sure to check with your supervisor about what to do in case of an accident or breakdown.  Use of any state-owned vehicle for other than state business is strictly prohibited and such use may be followed by dismissal and/or criminal prosecution.  The same is true for the abuse of state-owned vehicles or their use by unauthorized personnel.

**Use of Personal or Other Non-State Vehicle**

If travel is required in the course and scope of employment, and a state vehicle is not available or appropriate for use, employees are required to use a personal or other non-state vehicle, and must have access to such vehicle.

A personal vehicle driver's license is required and employees must pay all operating expenses, such as, but not limited to fuel, repairs, replacement of parts, and insurance.  In such cases, the employee must have current personal automobile liability insurance, which is the primary coverage.  A mileage travel allowance is authorized and reimbursable at the rate established by the state's Division of Administration.

**E-Mail and Internet Use**

LDWF has a policy, which establishes guidelines for the proper use of electronic mail (e-mail) and Internet resources.  All employees, who use these resources, should do so in a professional, ethical and lawful manner.  Such computer and telecommunications systems belong to LDWF, and the Department has the sole right to regulate their use.  It is the responsibility of each employee to review and follow the established guidelines for e-mail and Internet usage.  (See Policy # 36 – E-Mail and Internet Use and # 39 – Prohibition of Computer Games for further details.)

**Travel**

Employees in some positions may be required to travel and are required to follow current State Travel Rules and Regulations.  In many cases, this may be a condition of employment and should have been discussed in the initial interview and reviewed with you upon employment.

LDWF 000718

If you are required to travel, you must always have an official travel authorization form approved by your supervisor before travel is begun. Also, the only means for reimbursement of personal expenses for official travel is the filing of a travel expense account form. It will be necessary that you keep records of mileage and vouchers for tolls, parking, meals and any overnight accommodations, or other applicable expenditures to support payment claims. Your supervisor will discuss the allowable limits for reimbursements from time to time, particularly when changes occur in rates. LDWF travel regulations are available on the Internet at: http://www.state.la.us/osp/traveloffice.

**Safety**

In accordance with state statute and regulation, the Department of Wildlife and Fisheries (WLF) has implemented an operational safety and loss prevention plan to protect employees from injury and harm. Policy #48, Workplace Safety Program, is the general safety policy and plan for the Department, with other individual policies on specific topics. Please refer to the packet of information distributed at the New Employee Orientation that is described as "Orientation to the WLF Loss Prevention/Safety Program." Basic safety policies, procedures and forms are listed and provided.

The material in that informational packet will serve as an additional source and guide for the Department's comprehensive health and safety program in all work units— headquarters (HQ) and field. Both at HQ, and each Regional/District Office, there is available an "Emergency Response Plan," which outlines steps that will be followed in the event of emergencies. At HQ and at the site offices statewide, Emergency Contact Numbers, and exit routes and emergency procedures are posted. First Aid kits, Blood Borne Pathogen material and Personal Protective Equipment (PPE) are also provided.

The importance of integrating safety into the total job function cannot be overemphasized. Employees should be constantly reminded that safety must become an everyday consideration in their work, as well as in the various work sections and areas. In short, safety should be a practical learning experience to be used in performing job duties.

Proper use of safety/security information provided to employees, coupled with the WLF safety policies and procedures, plus work unit safety procedures and training, and information secured from vendors on new equipment and products, should result in a program through which each and every employee becomes safety/security -conscious and knowledgeable. It is expected that employees and supervisors will become thoroughly familiar with this material.

The Department is also committed to a violence free workplace. Policy #17, Workplace Violence Prevention, outlines responsibilities in this effort, procedures

and forms for reporting, incident investigation and response, and tips on recognizing inappropriate behavior and minimizing violence.

## Use of Drugs and Alcohol

All new employees are required to successfully pass a required drug test for employment.   In addition, random drug tests on current employees are conducted throughout the year.   If you are selected to take a random drug test, you will be advised and scheduled by your supervisor.  (See Policy # 15 – Drug Testing for further details.)

The use of illegal drugs or alcohol during working hours is prohibited.  An employee found under the influence of any such substance shall be subject to immediate suspension and/or dismissal.  Employees must notify their supervisor when they must take prescribed medication that could alter their work performance in any way or jeopardize their safety or that of others. (See Policy # 14 – Substance Abuse and Drug Free Workplace for further details.)

## Smoking

LDWF has been designated a smoke-free work place as set forth in Act 1106 of the 1992 Regular Legislative Session.  This act entitled, Louisiana Office Indoor Clean Air Law, was enacted to "protect the health, comfort, and environment of the workers of this state in the office work place."  It is not intended to deny individuals the right to smoke, but to provide individuals with a safe and healthful workplace.

You will be responsible for reviewing LDWF Smoking Policy # 30 and are expected to review with your supervisor the areas that are designated as smoking areas.  You may smoke only in designated smoking areas.  (See Policy # 30 – Smoking Policy for further details.)

## Training

Within each division, your supervisor will instruct you personally or assign someone to instruct you in the basic tasks involved in your work.   The Comprehensive Public Training Program (CPTP) is the state-funded training program for state employees.   Through the CPTP, agencies are offered management development and supervisory training, and general application classes on topics such as computer software and writing skills.  Some of these courses may be helpful to you in your work or for advancement purposes.  With your supervisor's permission and approval, these courses may be taken during work hours.  Enrollment is on a first-come, first-served basis, and are offered free of charge.  Check with the WLF Training Coordinator in the Human Resources Section for further details.

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

The Department of State Civil Service has required designated supervisory/management training through the Mandatory Supervisory Training (MST) program for specific job titles. See Policy #40, Mandatory Supervisory Training, for further details.

As an employee of the Department of Wildlife & Fisheries, you may request special educational leave for courses related to work. Your Appointing Authority will evaluate the request in light of the importance of the course to your work and the need to the agency. In some cases, and always with prior approval, you may obtain reimbursement for tuition paid for a job-related course which you successfully complete. See Policy # 16, Educational Leave, for further details.

### Changes in Personal Data

It is very important to you and to the Department that current, accurate information is maintained in your employment records. Therefore, please be sure to report any changes in your name, address, tax withholding exemptions, insurance coverage, martial status, beneficiaries (either retirement or life insurance), etc., to the Human Resources Section immediately. **NOTE: Some of these changes can be made through Louisiana Employees Online (LEO).** If you find that any of the information on your Employee Notification forms is incorrect (social security number, race, sex, date of birth, etc.), please ask your Human Resources Section representative to correct these errors.

### Employee Notification Form

Human Resources will send you an Employee Notification Form (ENF) as official notification of any change in position, pay status or organizational assignment. We suggest that you keep copies of the Employee Notification form in a file, so that you will have a record of your employment history. In addition, each employee is responsible for updating his/her own SF-10 Application as needed and should maintain a copy of the original. Human Resources does not maintain any hard copies of your SF-10. Employees can access their ENF using LEO at https://leo.louisiana.gov.

### Official Employment Record

Each employee of the Department of Wildlife & Fisheries has an official employment record. You may review the contents of your record upon written request to the Human Resources Section and by appointment in the presence of a designated employee of that office. Please allow a minimum of three (3) working days for Human Resources to provide access to your record.

An activity folder or "supervisory file" may be maintained by your supervisor for job performance and evaluation purposes. This is separate and apart from your official employment record maintained by Human Resources.

LDWF 000721

Louisiana Department of Wildlife and Fisheries                    May 2010
Employee Handbook

**Layoff**

When there is a shortage of funds or work, or if jobs must be abolished, a layoff could occur.  The Human Resources Section will compile information needed to establish the preference of layoff for the employees to be separated.   In determining the order of layoff, factors such as appointment status and length of state service will be considered.

**Employee Assistance Program (EAP)**

The state of Louisiana Employee Assistance Program is designed to assist and support employees, who are experiencing personal problems, and who may benefit from outside management or professional help.  These problems include substance abuse, family, emotional, financial, and other personal problems that affect job performance, job security, or the health and well being of the employee.   No information about an employee's participation in the Employee Assistance Programs will be placed in the employee's personnel file or released without the employee's written consent.  Participation in this program is voluntary and will not jeopardize your present position or future job opportunities.  For more information, contact the Human Resource Section.

**Resignation Courtesies**

We naturally regret the loss of a conscientious and competent employee, but we realize that not all employees will be with us from initial employment to retirement.  If you decide to resign from you position, please give your supervisor at least a two (2) weeks advance notice.  This will allow your supervisor to make arrangements to cover your workload with the least disruption of service to our customers/clients.

Be sure to leave your current address with your supervisor and Human Resources Section.  This will assure that your W-2 form (statement of earnings that must accompany your income tax return) or other separation documents will be sent to you promptly.

We hope that the information provided in this handbook will assist you in becoming more quickly oriented to Department policies and programs, as well as basic Civil Service rules and provisions.  As new questions come to mind, please call them to the attention of your supervisor.  It is also our hope that you will find your job with LDWF to be interesting, challenging, and personally rewarding.

**We wish you every success as you begin your new career at the Louisiana Department of Wildlife & Fisheries!**

LDWF 000722



# State of Louisiana

## Department of Wildlife and Fisheries

## Law Enforcement Division

**EFFECTIVE: March 27, 2003**
**RESCINDS: Enforcement Division Policy Manual Implemented April 1, 1997.**
**DISTRIBUTION: All Wildlife Enforcement Agents of the Enforcement Division**
**AUTHORITY OF:**

Colonel Jeff Mayne

Date: 3-25-14

Secretary Robert Barham

Date: 3-26-2014

# Policy & Procedure Manual



EXHIBIT
27

LDWF 000723

LDWF 000724

Louisiana Department of Wildlife and Fisheries Law Enforcement – Policy and Procedure Manual

NAME: *Abshire, Todd*

## Supplement Filing Record

| Directive Number | Date Filed | Effective Date | Agents Initials | Supervisor Initials |
|---|---|---|---|---|
| *Example* 3-1.2 | 2/3/03 | 2/1/03 | JAD | CJR |
| *Manual* | | | | |
| PP 4-2 | 5-19-14 | 5-1-14 | T.A.C.A. | PJO |
| PP 2-6 | 5-19-14 | 5-12-14 | T.A.C.A. | PJO |
| PP 2-1 | 7-20-14 | 7-7-14 | T.A.C.A. | |
| PP 1-3 | 7-24-14 | 7-24-14 | T.A.C.A | |
| SOP 1.5 | 11-15-14 | 10-1-14 | T.A.C.A. | |
| SOP 1.06 | 11-15-14 | 10-1-14 | T.A.C.A. | |
| SOP # 1.23 | 1-14-2015 | 1-8-2015 | T.A.C.A. | |
| PP 1-3 | 1-14-2015 | 1-8-2015 | T.A.C.A. | |

T.A. 1/14/2015

Supplemental Filing Record – Region / Section Original –

Louisiana Department of Wildlife and Fisheries Law Enforcement Division – Policy and Procedure Manual –

# Table of Contents

| Directive Number | Description | Date Last Revised |
|---|---|---|

Forward        Written Directive System

**Chapter 1      Law Enforcement Role and Authority**

**1-1        Department of Wildlife and Fisheries Law Enforcement Division Role**      March 27, 2003

1-1.1    Oath of Office

1-1.2    Oath of Honor

1-1.3    Code of Ethics

1-1.4    Enforcement Division and Agents Role in Criminal Justice

1-1.5    Maintaining and Issuing Policy and Procedure Manual

1-1.6    Annual Reports

1-1.7    Policy and Procedure Dissemination

**1-2        Limits of Authority**      March 27, 2003

1-2.1    Legally mandated authority and responsibilities of sworn wildlife enforcement agents of the Enforcement Division

1-2.2    Contractual Agreements

1-2.3    Legal Authority to carry and use weapons by Wildlife Enforcement Agents

1-2.4    Procedures for assuring compliance with all applicable constitutional requirements for Interviews; Interrogations; Access to counsel

1-2.5    Search and Seizure without a warrant by Agents

1-2.6    Procedures for any arrest, made with or without a warrant

1-2.7    Authority, guidelines, and circumstances when agents may exercise alternatives to arrest, prearrangement confinement

1-2.8    Seizures

1-2.9    Use of discretion by agents

1-2.10   Strip and body cavity searches

**1-3        Use of Force**      January 8, 2015

1-3.1    Use of Force

1-3.2    When an Agent may use deadly force

1-3.3    Warning shots and drawing firearms

LDWF 000727

Louisiana Department of Wildlife and Fisheries Law Enforcement Division – Policy and Procedure Manual -

1-3.4   Use of authorized less-than-lethal force

1-3.5   Medical aid after use of less-than-lethal force

1-3.6   Reports to be submitted when force is used

1-3.7   Shooting investigations and shooting incidents

1-3.8   Removal form line duty assignment pending administrative review

**1-4      Physical Arrest and Transportation Procedures**                    March 27, 2003

1-4.1   Physical Arrest

1-4.2   Use of Handcuffs

1-4.3   Physical Detention of Minors

1-4.4   Transport of Arrested Persons

1-4.5   Documenting Arrests

1-4.6   Data Check on Arrested or Cited Persons

1-4.7   Diplomats and Consular Representatives

1-4.8   Disposition of Passengers

**1-5      Agency Jurisdiction, Mutual Aid and Emergency Response**                    July 1, 2006

1-5.1   Specific Geographical Boundaries of LDWF Enforcement Division

1-5.2   Enforcement division's responsibilities and interagency agreement regarding jurisdiction.

1-5.3   Emergency situations and emergency response

1-5.4   Request for federal law enforcement assistance

**1-6      Firearms**                    March 18, 2014

1-6.1   Weapons and Ammunition authorized for use by Enf. Division Personnel

1-6.2   Carrying and storage of weapons

1-6.3   Purchase of Duty Firearm

1-6.4   In-Service Training

1-6.5   Requirements

1-6.6   Off-Duty Authorization

1-6.7   Violations


**Chapter 2      Patrol**

**2-1      Enforcement Uniform and Dress Code**                    July 7, 2014

2-1.1   Wildlife Enforcement Uniform

LDWF 000728

Louisiana Department of Wildlife and Fisheries Law Enforcement Division – Policy and Procedure Manual -

2-1.2   Wildlife Enforcement Agent Personal Appearance

2-1.3   Use of Personal Flotation Devices (PFD)

2-1.4   Body Armor

**2-2**     **Citations**                                                November 23, 2011

2-2.1   Citation Distribution

2-2.2   Issuing Citations

2-2.3   Voiding Citations

2-2.4   Filing Citations

**2-3**     **Offense Reports**                                          November 23, 2011

2-3.1   Offense Reports

2-3.2   Filing of Offense Reports

2-3.3   Seizure Tags

**2-4**     **Boating Collisions, Crash, Casualties, Investigations**    June 29, 2011

2-4.1   Written directives for boating collisions, crash or other casualty investigations

**2-5**     **Pursuit Driving and Emergency Response Code**              Feb. 10, 2005

2-5.1   Emergency Driving and Emergency Response

2-5.2   Pursuit Driving

2-5.3   Fresh Pursuit into Other States

2-5.4   Use of Audible and Visible Warning Devices

**2-6**     **Work, Schedules, Leave, Time and Related Matters**         May 12, 2014

2-6.1   Work Hours and Time

2-6.2   Accrual of Time, Overtime and Compensatory Time

2-6.3   Vessel/Outboard Motor Inspection – Paid Overtime               Oct. 22, 2013

**2-7**     **Light Duty**                                               March 29, 2004

2-7.1   Light Duty Assignment

**2-8**     **DWI Enforcement**                                          Feb. 10, 2005

2-8.1   Prerequisites

2-8.2   Detection

2-8.3   DWI Arrest

2-8.4   Blood Withdrawal Procedures for Non-Compliant Suspects

**2-9**     **Evidence**                                                 June 16, 2009

LDWF 000729

Louisiana Department of Wildlife and Fisheries Law Enforcement Division – Policy and Procedure Manual –

2-9.1   Policy

2-9.2   Objectives

2-9.3   Agent Responsibilities

2-9.4   Supervisor Responsibilities

2-9.5   Responsibilities of the Evidence Custodian and Alternate

2-9.6   Collection of Evidence or Property

2-9.7   Photographing Crime Scenes or Boating Crashes

2-9.8   Documentation of Seized Evidence or Property

2-9.9   Region & Headquarters Evidence/Property Storage Rooms

2-9.10 Storage of a Seized Vehicle, Vessel, Outboard Motor, Trailer or Aircraft

2-9.11 Inspections, Audits and Inventories

2-9.12 Procedures for the Transfer of Custody

2-9.13 Disposition and Forfeiture Procedures

2-9.14 Seizure of Live Evidence or Property


**Chapter 3     Code of Conduct and Ethics**
**3-1     Code of Conduct and Ethics**                          June 7, 2011
3-1.1   The Code of Conduct

3-1.2   Action upon receipt of a personnel complaint

3-1.3   Disciplinary Action

3-1.4   Written directive for use of social networking


**Chapter 4     Organization and Administration**
**4-1     Organization**                                       August 20, 2013
4-1.1   Geographical Structure of Enforcement Division

4-1.2   Rank Structure

4-1.3   Residency Policy

4-1.4   Job Specification and Duties

4-1.5   Secondary Employment

4-1.6   Conflict of Interest

**4-2     Communication Procedures**                           May 1, 2014

LDWF 000730

Louisiana Department of Wildlife and Fisheries Law Enforcement Division – Policy and Procedure Manual -

4-2.1   General Communication Procedures

4-2.2   Communication Definitions

4-2.3   Communication Procedures

**4-3     Court Attendance**                                                    September 21, 2011

4-3.1   Court

4-3.2   Court Procedures

**4-4     Awards**                                                              March 27, 2003

4-4.1   Awards and Recognitions

**4-5     Promotions and Hiring Procedures**                                    March 27, 2003

4-5.1   Promotion Board

4-5.2   Hiring Procedures/Cadet Interview Board

**4-6     Retirement and Resignations**                                         March 27, 2003

4-6.1   Procedures for Retirement or Resignations

**4-7     Pregnancies**                                                         March 27, 2003

4-7.1   Pregnancies

**4-8     Military**                                                            March 27, 2003

4-8.1   Military Leave

**4-9     Grievance Procedures**                                                March 27, 2003

4-9.1   Grievance Procedures

**4-10    Collective Bargaining / Associations / Recommendations**             March 27, 2003

4-10.1  Collective Bargaining and Labor Organizations

4-10.2  Louisiana Wildlife Agents Associations (LWAA)

4-10.3  Suggestions for Improvements


**Chapter 5     Training, Auxiliary and Technical Services**

**5-1     Training**                                                            March 27, 2003

5-1.1   Training

5-1.2   Responsibilities of the Director of Training

5-1.3   Wildlife Enforcement Training Academy

**5-2     Media Relations**                                                     March 27, 2003

5-2.1   Media Relations and Public Information

Louisiana Department of Wildlife and Fisheries Law Enforcement Division – Policy and Procedure Manual -

**5-3**   **Honor Guard**                                                         March 27, 2003

5-3.1   Honor Guard

**5-4**   **Fleet**                                                                July 7, 2008

5-4.1   Fleet Use and Operations

5-4.2   Reporting a Fleet Accident or Fleet Incident

5-4.3   Fleet Accidents/Incidents Investigations

5-4.4   Vehicle / Vessel Incident/Accident Review

5-4.5   Repairs to Damaged Equipment

**5-5**   **Purchasing**                                                          March 29, 2004

5-5.1   Purchasing Authority

**5-6**   **Personnel Files**                                                     April 03, 2013

5-6.1   Personnel Files

**5-7**   **Enforcement Services**                                                October 24, 2007

5-7.1   Enforcement Services

LDWF 000732

Table of Contents
Revised January 2014

Standard Operating Procedures

General                                                    Date last revised
   Civil Restitution                    SOP # 1.01        09/11
   Equipment Seizures                   SOP # 1.02        11/07
   Commercial Fish Shipments            SOP # 1.03        4/99
   Trespassing                          SOP # 1.04        4/99
   JEA / NMFS Cases / Patrols           SOP # 1.05        7/13
   JEA Patrol Documentation and
   Vessel & Dealer Inspections          SOP # 1.06        7/13
*  Game and Fish Seizures                 SOP # 1.07        1/14
   Warning Citations                    SOP # 1.08        7/07
   Cell Site Location "PING"            SOP # 1.09        6/13
   Emergency Response                   SOP # 1.10        7/06
   Firearm & Hunter Ed Exemption        SOP # 1.11        10/01
   Complaint, Call out Form             SOP # 1.12        12/01
   Work Time Call In                    SOP # 1.13        3/02
   Personal Flotation Device Loaner Program  SOP # 1.14   7/07
   Vehicle - Firearms - Uniform Inspections  SOP # 1.15   7/08
   Wildlife Conflict Resolution         SOP # 1.16        2/09
   Public Assistance Report& Search/Rescue Form  SOP # 1.17  01/13
   GPS Coordinates                      SOP # 1.18        11/10
   Registration of Vessels with no clear Chain
     Of Ownership                     SOP # 1.19        07/11
   LADWF Tip Program                    SOP # 1.20        09/11
   Vessel and Outboard Motor Inspection SOP # 1.21        12/11
   Dealer Registration                  SOP # 1.22        12/11
Fishing Licenses General
   Commercial Fishermen License         SOP # 2.01        4/99
   Commercial Gear License              SOP # 2.02        6/99
   Commercial Vessel License            SOP # 2.03        4/99
   Recreational Fishing                 SOP # 2.04        4/99
   Recreational Gear License            SOP # 2.05        8/00
   Commercial Fresh Product License     SOP # 2.06        7/00
"Fish"
   Rec. & Comm. Finfish
   Measurements and limits.             SOP # 3.01        9/03
   Open                                 SOP # 3.02
   Shark                                SOP # 3.03        8/02
   Shrimp                               SOP # 3.04        4/99
   Crab (undersize)                     SOP # 3.05        4/99
   Crab (Crab Trap rings)               SOP # 3.06        4/99
   Crawfish                             SOP # 3.07        1/00
   Exotic                               SOP # 3.08        4/99
   Oysters "undersize"                  SOP # 3.09        11/04
Game
   Deer & Turkey Tagging                SOP # 4.01        4/99
   Night Hunting                        SOP # 4.02        4/99
   Hunting Licenses                     SOP # 4.03        4/99
   Migratory Birds                      SOP # 4.04        10-12
   WMA Hunting Permit                   SOP # 4.05        7/00
   Alligator                            SOP # 4.06        8/02
   Use of Decoys / Eye board            SOP # 4.07        2/05

* Denotes new or updated SOP

LDWF 000734



# Department of Wildlife and Fisheries
## New Employee Safety Orientation Sign In Sheet

My signature below acknowledges that I have reviewed the presentations, read the policies, and have had the opportunity to ask questions on material covered.

**The LDWF Intranet link to the following policies is:**
http://intranet/omf/hr/policy.php

- **4-11** Workplace Safety Program/Policy #48 (Includes General Safety Rules, Employee's and Supervisors Responsibilities and Evacuation)
- **4-7** Driver Safety Program/Policy #46
- **4-8** Water Vessel Operator Safety Program/Policy #47
- **1-14** Substance Abuse and Drug-Free Workplace/Policy #14
- **1-13** Sexual Harassment/Policy #6
- **1-12** Workplace Harassment Discrimination Policy #6B
- **4-9** CPR/First Aid/Policy #44
- **4-10** Bloodborne Pathogen/Policy #43
- **2-25** American's With Disability #3
- **1-11** Workplace Violence Prevention Policy #17
- **1-10** Ethics Policy # 65

:

_____        2-24-2014
(Signature)                                 (Date)

Todd Abshire
(Print Name)                           (Office/Division/Section)

279129
(Personnel Number)

Return to:   Vicky Rice
             Property Control
             Room #232A
             225-763-3956 Fax
             vrice@wlf.la.gov



LDWF 001309

 

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s). |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | **Amended Charge** 461-2016-00282 |

| Louisiana Commission On Human Rights | and EEOC |
|---|---|

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Todd A. Abshire | (337) 802-6990 | ▬▬ |

**Street Address** / **City, State and ZIP Code**
4281 Houston River Road, Westlake, LA 70669

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| LOUISIANA DEPARTMENT OF WILDLIFE AND FISHERIES | 500 or More | (337) 491-2588 |

**Street Address** / **City, State and ZIP Code**
1213 North Lakeshore Drive, Lake Charles, LA 70601

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
|  |  |  |

**Street Address** / **City, State and ZIP Code**

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **06-01-2014**  Latest **08-10-2015**
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I.   I was hired by the State of Louisiana on December 9, 2013 as a Wildlife Enforcement Cadet (Law Enforcement Position). I was discharged on August 10, 2015. I first engaged in a request for an accommodation based on disabilities incurred while serving in the military in June of 2014 and as late as July of 2015. On multiple occasions, I engaged my supervisor, Mr. Beau Robertson, in requests for guidance on specificity of reporting requirements, and explained that my need was the result of my incurred disability. The guidance was not provided. On August 10, 2015 after taking medication as treatment for PTSD, I was accused of being drunk by my supervisor, and later discharged, even though I explained that my behavior was the result of my condition and my medication. In addition, on August 10, 2015; my supervisor, Beau Robertson, called paramedics to my workplace to verify my medical condition; even after explaining my condition and my use of medication, I was discharged.

II.  My supervisor, Lt. Beau Robertson, told me on June 18, 2015:  I thought you were a Marine; you need to suck it up.  This was in response to my many requests for accommodation and my request to file paperwork and a complaint about rumors and verbal harassment related to my PTSD. On August 10, 2015, after the June 18, 2015 meeting with Lt. Robertson and Capt. Robert Buatt, I was discharged.

III. I was discriminated against and retaliated against because of my disability in violation of the Americans with Disabilities Act of 2008, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 7/15/2016    _signature_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date    Charging Party Signature | |

EXHIBIT
**32**

LDWF 000553

RECEIVED

DEC 2 3 2016

SMITH LAW FIRM

EEOC Form 161 (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To:   Todd A. Abshire
      4281 Houston River Road
      Westlake, LA 70669

From:   New Orleans Field Office
        Hale Boggs Federal Building
        500 Poydras Street, Room 809
        New Orleans, LA 70130

☐   On behalf of person(s) aggrieved whose identity is
    CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 461-2016-00282 | Ligita D. Landry, Supervisory Investigator | (504) 595-2876 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒   The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

☐   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐   Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):**  EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

_Dardar ~_                                    SEP 2 9 2016

Enclosures(s)

Keith T. Hill,                                (Date Mailed)
Director

cc:   Sherri L. Gregoire, Esq.                Justine M. Dalaune, Esq.
      LOUISIANA DEPARTMENT OF NATURAL         SMITH LAW FIRM
      RESOURCES                               830 North Street
      P.O. Box 94396                          Baton Rouge, LA 70802
      Baton Rouge, LA 70804

EXHIBIT
tabbies'
**33**

PLF000727

**From:** Todd Abshire
**To:** Justin Delaune
**Subject:** Fwd: incomplete application for WLF Enf Cadet
**Date:** Wednesday, December 14, 2016 8:43:43 PM

---------- Forwarded message ----------
From: **Todd Abshire** <toddabshire88@gmail.com>
Date: Tue, Sep 15, 2015 at 2:36 PM
Subject: Re: incomplete application for WLF Enf Cadet
To: Ruth Rigg <Ruth.Rigg@la.gov>

Alrighty, Thank you ma'am.

On Tue, Sep 15, 2015 at 2:22 PM, Ruth Rigg <Ruth.Rigg@la.gov> wrote:

> Ya' got me!  I am still actively working the Cadet list but @ first opportunity, I
> will check CS Rule 9.1e because right now, that means zero to me.
>
>
> **Ruth Rigg**
>
> **HR  Specialist**
>
> **225-219-1323** Phone
>
> **225-342-3709** Fax
>
> ruth.rigg@la.gov
>
>
>
>
> **From:** Todd Abshire [mailto:toddabshire88@gmail.com]
> **Sent:** Tuesday, September 15, 2015 2:00 PM
>
> **To:** Ruth Rigg
> **Subject:** Re: incomplete application for WLF Enf Cadet
>
>
> Ms. Rigg
>
> Also, I was already employed as a Wildlife Agent up until August 10, 2015 until I was
> terminated "pursuant to Civil Service Rule 9.1 (e)", or at least that is what my termination
> letter states. I have not been able to discern the reasoning or basis behind my termination,
> and was not referred to HR by anyone. I read the CSR regarding employment and believe

EXHIBIT
34

PLF000432

this should not bar me from being eligible for this position, but I am no expert on this whole area of Civil Service workings, so any idea on how this will affect my application?

Thanks!

Todd Abshire

On Mon, Sep 14, 2015 at 8:47 AM, Ruth Rigg <Ruth.Rigg@la.gov> wrote:

Thank you!


**Ruth Rigg**

**HR Specialist**

**225-219-1323** Phone

**225-342-3709** Fax

**ruth.rigg@la.gov**




**From:** Todd Abshire [mailto:toddabshire88@gmail.com]
**Sent:** Sunday, September 13, 2015 6:31 PM
**To:** Ruth Rigg
**Subject:** Re: incomplete application for WLF Enf Cadet


Ms. Rigg

My apologies on attaching the wrong DD214. Attached to this email is the DD214 that shows 4 years on continuous Active Service.

Todd Abshire


On Fri, Sep 11, 2015 at 2:28 PM, Ruth Rigg <Ruth.Rigg@la.gov> wrote:

You must  fax or email a copy of your DD-214 which shows @ least 4 years of continuous active military duty or  transcripts with a minimum of 60 semester hours from a regionally accredited college or university, as specified in the job posting, or your application will not be referred.

PLF000433

The DD-214 attached to your application shows just under a year of service & cannot be used to qualify.

**Ruth Rigg**

**HR Specialist**

**225-219-1323 Phone**

**225-342-3709 Fax**

**ruth.rigg@la.gov**

---

CONFIDENTIALITY NOTICE
This email communication may contain confidential information which also may be legally privileged and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.
COMPUTER SYSTEM USE/CONSENT NOTICE
This message was sent from a computer system which is the property of the State of Louisiana and the Department of Natural Resources (DNR). It is for authorized business use only. Users (authorized or unauthorized) have no explicit or implicit expectation of privacy. Any or all uses of this system and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed to Department of Natural Resources and law enforcement personnel. By using this system the user consents to such interception, monitoring, recording, copying, auditing, inspection, and disclosure at the discretion of DNR.

---

CONFIDENTIALITY NOTICE
This email communication may contain confidential information which also may be legally

privileged and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.
COMPUTER SYSTEM USE/CONSENT NOTICE
This message was sent from a computer system which is the property of the State of Louisiana and the Department of Natural Resources (DNR). It is for authorized business use only. Users (authorized or unauthorized) have no explicit or implicit expectation of privacy. Any or all uses of this system and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed to Department of Natural Resources and law enforcement personnel. By using this system the user consents to such interception, monitoring, recording, copying, auditing, inspection, and disclosure at the discretion of DNR.

---

CONFIDENTIALITY NOTICE
This email communication may contain confidential information which also may be legally privileged and is intended only for the use of the intended recipients identified above. If you are not the intended recipient of this communication, you are hereby notified that any unauthorized review, use, dissemination, distribution, downloading, or copying of this communication is strictly prohibited. If you are not the intended recipient and have received this communication in error, please immediately notify us by reply email, delete the communication and destroy all copies.
COMPUTER SYSTEM USE/CONSENT NOTICE
This message was sent from a computer system which is the property of the State of Louisiana and the Department of Natural Resources (DNR). It is for authorized business use only. Users (authorized or unauthorized) have no explicit or implicit expectation of privacy. Any or all uses of this system and all files on this system may be intercepted, monitored, recorded, copied, audited, inspected, and disclosed to Department of Natural Resources and law enforcement personnel. By using this system the user consents to such interception, monitoring, recording, copying, auditing, inspection, and disclosure at the discretion of DNR.

PLF000435