# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TODD ALEXANDER-CLOUD**                    **CIVIL ACTION NO. 16-669-BAJ-RLB**
**ABSHIRE,**

**Versus**

**LOUISIANA DEPARTMENT OF**                         **JUDGE BRIAN JACKSON**
**WILDLIFE AND FISHERIES**
                             *Consolidated with*
**TODD ALEXANDER-CLOUD**
**ABSHIRE,**                              **CIVIL ACTION NO. 16-852-BAJ-RLB**

**Versus**

**LOUISIANA DEPARTMENT OF**                    **MAGISTRATE JUDGE BOURGEOIS**
**WILDLIFE AND FISHERIES**

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

MAY IT PLEASE THE COURT:

**INTRODUCTION**

Plaintiff Todd Abshire is a former combat Marine who suffers from Post-Traumatic Stress Disorder ("PTSD"). After his Honorable Discharge, Mr. Abshire commenced full time employment with Defendant, Louisiana Department of Wildlife & Fisheries ("LDWF") on December 9, 2013. He attended the LDWF Enforcement Academy as an Enforcement Cadet from December 9, 2013 until his graduation on June 10, 2014. He thereafter began work as an Enforcement Agent.[1]  He was terminated on August 10, 2015.[2]

---

[1] R.Doc.1-2 p. 1
[2] R.Doc. 1-2 p. 7

Mr. Abshire brought the instant suit asserting claims that his former employer, LDWF, failed to reasonably accommodate the limitations arising from his disability, that LDWF retaliated against him, and terminated his employment because of his disability, all in violation of the ADA 42 U.S.C. § 12101 *et seq.* As a result of LDWF's discrimination and retaliation against him, Mr. Abshire has asserted damages in the form of loss of income, loss of enjoyment of his personal and professional life, mental anguish and emotional distress.

## I.      SUMMARY JUDGMENT STANDARDS

In considering a motion for summary judgment, "[t]he court must draw all reasonable inferences in favor of the non-movant and may not make credibility determinations. . ." *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 874 (5th Cir.2013); *Reeves v. Sanderson Plumbing Co.*, 530 U.S. 133 (U.S. 2000). That is, the court should give credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, *supra*, at 151.

On a motion for summary judgment, the evidence should be viewed in the light most favorable to the non-movant. See *Am. Home Assurance Co. v. U. S. Alliance*, 378 F.3d 482, 486 (5th Cir. 2004). A "district court cannot . . . weigh the evidence when deciding a summary judgment motion." *EEOC v. Chevron-Phillips Co.*, 570 F.3d 606 (5th Cir. 2009) and *Harvill v. Westward Commun., L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005).

In *Hunt v. Cromatrie*, 526 U.S. 541 (1999), the United States Supreme Court held at 552-53: "[S]ummary judgment in favor of the party with the burden of persuasion...is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact."

In *Tolan v. Cotton*, 134 S.Ct. 1861, 1867-68 (2014), the United States Supreme Court reiterated the importance of traditional summary judgment standards:

> Considered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion.… we intervene here because the opinion below reflects a clear misapprehension of summary judgment standards in light of our precedents....

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

(internal citations omitted.)  The Fifth Circuit has recently emphasized the importance of *Tolan* in *Porter v. Houma Terrebonne Housing Authority Bd. of Comm'rs*, 810 F.3d 940, 942 (5th Cir.2015).

## II.    DEFENDANT INCORRECTLY APPLIES THE PARTIALLY OVERRULED EEOC V. *CHEVRON PHILLIPS* DECISION IN STATING THE PRIMA FACIE ELEMENTS OF PLAINTIFF'S DISABILITY DISCRIMINATION CLAIM

*EEOC v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606 (5th Cir. 2009) was overruled in part by *EEOC. v. LHC Group, Inc.,* 773 F.3d 688, 696 (5th Cir.2014). In *EEOC v. LHC Group, Inc.,* the court held that Plaintiff must prove: (a) that the employee is disabled; (b) that the employee is qualified - meaning that he has the requisite skill, training, education or experience and that he can perform the essential functions of his position with or without reasonable accommodations; and (c) that the employee suffered an adverse employment action because of his disability. *Id.* at 695 (citing *Zenor v. El Paso Healthcare Sys.,* 176 F.3d 847, 853 (5th Cir.

1999). See also *Riel v. Electronic Data Systems Corp.*, 99 F.3d 678 (5th Cir. 11/1/96). Under *LHC Group, Inc., supra.* the Defendant's additional element under *Chevron Phillips* should not be applied. That is- the employee does not have to prove that he "was replaced by or treated less favorably than a non-disabled employee.[3] In an ADA failure to accommodate claim, the employee must also prove that (d) his disability and resulting limitations were known by the covered employer; and (e) that the employer failed to make reasonable accommodations for these limitations. See *Griffin v. UPS*, 661 F.3d 216, 222 (5th Cir. 2011); *Mzyk v. N.E. Indep. Sch. Dist.,* 397 F. Appx 13, 16 n3 (5th Cir. 2010); *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 335 (4th Cir. 2013); and *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013). A failure to accommodate claim does not require the Plaintiff to show intentional discrimination. *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999). See also *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1283 (7th Cir. 1996). (The *McDonnell-Douglas* burden shifting framework is not required in a failure to accommodate claim, where Plaintiff has not stated a disparate treatment claim, but only alleges facts, which if proven, negate the need for indirect proof, or burden shifting, as those proven facts would constitute direct proof of discrimination in violation of the ADA). *Id.*

Thereafter, if Plaintiff is successful in proving a prima facie case, the Defendant can defend by proving the existence of a legitimate/non-discriminatory reason for the termination. *LHC Group, Inc., supra.* at 694. Plaintiff can rebut this defense by offering sufficient evidence

---

[3] *LHC Group, Inc.* used the *Zenor* formulation – for three reasons: 1. it was first used by the Fifth Circuit in *Chiari v. City of League City*, 920 F.2d 311 (5th Cir. 1991), whereas the formulation in *Burch v. Coca-Cola Co.*, 119 F.3d 305 (5th Cir. 1997) was used in a later 5th Circuit decision (*Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394 (5th Cir. 1995)); 2. *Burch's* formulation came from the Supreme Court's decision in *McDonnel Douglas Corp. v. Green* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed. 2d 668 (1973) - a discriminatory hiring case (not a termination case as in *LHC* or the instant matter); and 3. because the *Burch* formulation requires the employee to prove causation twice and is "at odds with the underlying principles of anti-discrimination legislation – namely, to remove artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." 773 F.3d at 696.

4

to create a genuine issue of material fact that Defendant's reason for termination is false or pretextual. Alternatively, Plaintiff can offer sufficient evidence that if Defendant's reason for termination is true, it is only one of the reasons for the termination, and another reason is plaintiff's protected characteristic. *Id.* at 702. citing *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 204), *Evans v. Tex. Dep't of Transp.*, 547 F.Supp.2d 626, 640 (E.D. Tex. 2007) *aff'd*, 273 Fed. Appx. 391 (5th Cir. 2008). If Plaintiff establishes a prima facie case of discrimination and is able to provide sufficient evidence that Defendant's explanation is pretextual, Plaintiff is entitled to an inference that Defendant's conduct was discriminatory. *Id.*

## III. PLAINTIFF PRESENTS A PRIMA FACIE CASE OF DISABILITY DISCRIMINATION

First, there is a genuine issue of material fact as to what are the essential functions of the Wildlife Enforcement Agent and Cadet positions, and consequently Plaintiff's qualification, because Defendant's numerous job descriptions for these positions are inconsistent. Second, Plaintiff is not required to show that he was replaced by or treated less favorably than a similarly situated non-disabled employee. Mr. Abshire contends that LDWF discriminated against him on the basis of his disability and limitations in three (3) ways when: (i) LDWF failed to provide him with effective reasonable accommodations that would have assisted him in performing his job[4]; (ii) LDWF totally failed to make any attempt to engage in the interactive process, leading in a failure to provide reasonable accommodations; and (iii) LDWF terminated Mr. Abshire's employment because of his disability and limitations. These acts/omissions by LDWF constitute violations of the ADA, 42 U.S.C. § 12101 *et seq.*

---

[4]  In determining what is a reasonable accommodation, the court is not limited to evaluating accommodations which would enable the employee to perform the essential job functions. An accommodation is also reasonable if it allows the disabled employee to enjoy equal benefits and privileges of employment as other similar non-disabled employees. *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.,* 730 F.3d 450, 453 (5th Cir.2013)

1. **Plaintiff is Undisputedly Disabled**

The first issue is whether Mr. Abshire is disabled. 42 U.S.C.A. § 12102 of the ADA defines the term disability:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

". . . a major life activity also includes . . . neurological [and] brain. . ." functions. *Id.*

The Fifth Circuit recognizes that Post Traumatic Stress Disorder (PTSD) is a mental disability afforded protection under the Americans with Disabilities Act (ADA). *Dees v. Austin Travis County Mental Health and Mental Retardation*, 860 F.Supp. 1186 (5th Cir.1994); *Donaldson v. Burlington Ind., Inc.*, 2004 WL 1933603 (5th Cir. 2004); *Hamilton v. Southwestern Bell Tele. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998). The EEOC's regulations provide that PTSD is a type of impairment, that by its very nature, substantially limits major life activities. As such, PTSD is consistently defined as a disability.[5]

Dr. Louis Cenac, a board certified psychiatrist who does extensive work with veterans, provided a deposition as Plaintiff's expert. He conducted a mental status evaluation and interviewed Mr. Abshire on July 26, 2017.[6] Dr. Cenac diagnosed Mr. Abshire with posttraumatic stress disorder, dissociative type.[7] Dr. Jean Boudreaux, Defendant's own expert, agreed with this diagnosis.[8] Dr. Cenac arrived at this diagnosis due to the quality of Mr. Abshire's presentation, his history of dissociative events, post-combat adaptation which involved avoidance and hyperactivity to environmental sounds and exposure to life threatening events or extraordinarily

---

[5] *Disability Discrimination and the Workplace*, Susser and Petesch (2nd Ed.) pp. 661-662.
[6] Cenac depo p. 30
[7] Cenac depo pp. 32-33
[8] Boudreaux depo p. 41

gruesome situations as a combat marine.[9] Dr. Cenac testified that Mr. Abshire's symptom of "avoidance" was observable in that he avoids relationships and socialization with others.[10] Other symptoms of Mr. Abshire's PTSD include his indifference and seemingly cold attitude toward others.[11] Dr. Cenac also testified that Mr. Abshire is experiencing significant emotional pain, and consequently sometimes seeks to avoid events, people or places which might trigger memories of his trauma.[12] Regardless, it is apparently undisputed that Plaintiff is disabled.

### 2.   Plaintiff Was Qualified to Perform the Essential Functions of His Position

Having established that Plaintiff is disabled, the issue then becomes whether Plaintiff is qualified.  "To survive a motion for summary judgment on a failure-to-accommodate claim, a plaintiff ordinarily must furnish significant probative evidence that he is a qualified individual with a disability . . ."[13] To satisfy the "qualified individual" prong, the employee must demonstrate that, "with or without reasonable accommodations, he can perform the essential functions of the employment position." *Riels v. Electronic Data Systems Corp.,* 99 F.3d 678, 682 (5th Cir. 1996). Additionally, the employee must have the requisite training, skill and education to perform the essential functions of his job. This is apparently undisputed.

A job function may be essential if: the position exists to perform the function, because of the limited number of employees among whom the function can be distributed to, or if the function is highly specialized so that the incumbent is hired for her expertise or ability to perform the particular function.[14] Determining the essential functions of a position requires both consideration of the employer's judgment as to what functions are essential and a written job description *issued before* the employer interviews applicants or advertises for the position. 42

---

[9] Cenac depo p. 33
[10] Cenac depo pp. 34-35
[11] Cenac depo p. 75-76
[12] Cenac depo p. 58
[13] *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 8/4/99)
[14] 29 C.F.R. § 1630.2(n)(2)

U.S.C. § 12111(8). In addition to the employer's judgment and position descriptions, the EEOC[15] regulations also point to the following:

> (iii) The amount of time spent on the job performing the function;
> (iv) The consequences of not requiring the incumbent to perform the function;
> (v) The terms of a collective bargaining agreement;
> (vi) The work experience of past incumbents in the job; and/or
> (vii) The current work experience of incumbents in similar jobs.

The employer bears the burden of proof on whether a job function is an essential job function.[16] The Fifth Circuit Court of Appeals has held that when most of the evidence of essential job functions consists of *post hoc* job descriptions, determining what job functions are essential is best answered by a jury.[17] Additionally, an employer cannot turn every condition of employment into a job function, let alone an essential job function, just by inserting it into a job description.[18] A dispute as to a material fact regarding whether a job duty is an essential function requires a Plaintiff to have his day in court. *Riel v. Electronic Data Systems Corp.,* 99 F.3d 678 (5th Cir. 11/1/96).

Defendant cites a list of the purported essential functions of an LDWF agent, which includes, but is not limited to, preparing reports, being subject to call 24 hours a day, 7 days a week, administering Standard Field Sobriety Tests ("SFSTS") and a vague mention of enforcement duties. Defendant also offers the declaration of Col. Joseph Broussard. No other evidence is offered by Defendant.

On about August 20, 2013, the LDWF revised its Policy and Procedure Manual. Section 4-1.4 of this manual provides the Enforcement Cadet's job duties. This list makes no mention of

---

[15] 29 C.F.R. § 1630.2(n) & app. (2011); *EEOC v. E.I. Du Pont de Nemours & Co*., 480 F.3d 724, 730 (5th Cir. 2007); *George v. Fresenius Med. Care N. Am*., No. CV 15-14-RLB, 2016 WL 4944130, at *11 (M.D. La. Sept. 15, 2016); 29 C.F.R. § 1630.2(n)(3)
[16] § 2:200.Determining essential functions, 1 Fair Employment Practices § 2:200
[17] *Barber v. Nabors Drilling U.S.A., Inc.,* 130 F.3d 702, 707 (5th Cir.1997)
[18] *Cripe v. City of San Jose,* 261 F.3d 877, 887 (9th Cir.2001)

the job function of being on call 24 hours a day, 7 days a week, being able to administer SFSTS, or being able to prepare reports[19] as either essential or marginal job functions. The August 20, 2013 Policy and Procedure Manual also includes "examples of work" which are noted as "common duties" for the Enforcement Agent position. The completing reports function appears therein, however the requirements of being on call 24 hours a day, 7 days a week, and administering SFTS is curiously absent. [20] On October 1, 2013, LDWF advertised for the Wildlife Enforcement Cadet position online.[21] This job advertisement says nothing of report writing or administering SFSTS. It notes under "responsibilities and/or *preferences*" being *subject* to call 24 hours a day, 7 days a week. Mr. Abshire applied for the Wildlife Enforcement Cadet position on October 15, 2013.[22] About one month prior to when Mr. Abshire was hired as a cadet, the LDWF issued a position description for the Wildlife Enforcement Senior Agent position on November 13, 2013.[23] The November 13, 2013 position description provides that the person in this position is "subject to call 24 hours a day, 7 days a week," however nowhere in this description does it indicate that the agent must be able to administer SFSTS. Additionally, the requirement of completing reports is vaguely mentioned on the second page.[24] On June 10, 2014, Mr. Abshire began work with LDWF as an Enforcement Agent.[25] Curiously, ***seven days later***, LDWF issued a revised position description for the Wildlife Enforcement Senior Agent position. The *very first* job function is amended to state: "learns to and prepares reports. . ." and then states learning ". . . to enforce wildlife, fisheries and boating laws . . ."[26] Coincidentally, or not, these two vague job functions are the very functions Mr. Abshire is found to be deficient in,

---

[19] R.Doc. 28-2 pp. 20-31
[20] R.Doc. 28-2 p. 27-28
[21] Abshire depo ex. 2
[22] Abshire depo ex. 3
[23] R.Doc.28-2 p. 7
[24] R.Doc.28-2 p. 9-10
[25] R.Doc. 1-2 p.1
[26] R.Doc.28-2, p. 15-18

and for which he is later terminated. The June 17, 2014 position description was further amended to delete the requirement of being on call 24 hours a day, 7 days a week; and to add the never before cited duty of administering SFSTS[27] (another function he was found to be deficient in). Because much of the evidence of what job functions are essential is comprised of inconsistent job descriptions, which purported essential functions Plaintiff disputes, and which functions are not delineated as marginal or essential - a genuine issue of fact exists making summary judgment inappropriate. *Barber v. Nabors Drilling U.S.A., Inc.,; Riel v. Electronic Data Systems Corp., supra.*

**3.** **The Declaration of Col. Joseph Broussard Is Not Made From His Personal Knowledge, Consists of Hearsay and Is Otherwise Improper Summary Judgment Evidence**

The declaration of Col. Joseph Broussard[28] consists of hearsay, is not made of his own personal knowledge, and is thus inadmissible. Fed. R. Evid. arts. 602, 801 and Fed R.Civ. P. art. 56. Secondly, it says nothing of Defendant's purported essential job function of administering SFSTs, and fails to address the inconsistent LDWF job descriptions for the Enforcement Cadet and Agent positions. Indeed, Col. Broussard states that he never communicated with Mr. Abshire. He never supervised Mr. Abshire. Accordingly, this affidavit is not probative of whether Mr. Abshire could perform the essential functions of his job. Further, Col. Broussard does not make this affidavit from his own personal knowledge (he *received* a memorandum recommending Mr. Abshire be terminated, and he recalls *Capt. Buatt reporting* (to some unidentified person) that Mr. Abshire was unavailable at times). Col. Broussard states nothing of his knowledge of the facts as presented in any memorandum, whether or not he personally knew

---

[27] R.Doc.28-2 p. 16
[28] R.Doc. 28-2 pp. 1-6

whether Mr. Abshire was unavailable, and says nothing of whether he was ever present during these communications about Mr. Abshire's alleged performance deficiencies.

Moreover, many LDWF agents were having problems correctly and timely submitting paperwork and/or reports during Mr. Abshire's employment.[29] Furthermore, Capt. Buatt testified that he never disciplined any LDWF agent for report writing deficiencies.[30] However, Mr. Abshire was disciplined[31] and thereafter terminated for report writing/paper work deficiencies. Thus, Col. Broussard's declaration is improper summary judgment evidence and should not be used to address Mr. Abshire's alleged lack of qualification.

4. **Plaintiff Disputes Whether Being On Call 24-7 Was an *Essential* Function of Plaintiff's Position**

As stated above, this job function is inconsistently asserted in some LDWF job descriptions, yet absent from others.

Defendant misrepresents the evidence in asserting that Mr. Abshire admitted that being on call 24 hours a day, 7 days a week was an essential part of his job. In fact, Mr. Abshire testified he understood that being on call 24 hours a day, 7 days a week *was an aspect of his job.*[32] As stated above, the evidence shows that there were many purported aspects of Mr. Abshire's job which vacillated. Additionally, in the "Job Specific Supplemental Questions" of Mr. Abshire's October 15, 2013 employment application, Mr. Abshire is specifically asked "are you willing to accept varying work schedules, and *the addition of on-call duty, if required*?"[33] The fact that this job application questionnaire specifically states that Mr. Abshire *may be required* to be on call, strongly suggests that being on call 24/7 is not an essential function of the

---

[29] Robertson depo pp. 84-87, Robertson depo exs 6-7, Buatt depo pp. 48-50, Buatt depo ex. 2
[30] Buatt depo pp.24-26
[31] Abshire depo ex. 21
[32] R.Doc. 19-1 p. 7, Abshire depo pp. 60, 147
[33] Abshire depo ex. 3

Cadet or Agent position. See *Riel v. Electronic Data Systems Corp.*, *supra*. In *Riel*, the plaintiff was terminated for not meeting milestone deadlines. The Fifth Circuit held that because the requirement of meeting milestone deadlines was not contained in the job description given to Riel, and because Riel's direct supervisor did not communicate to Riel's doctor that meeting milestone deadlines was an essential function of Riel's position, a genuine issue of material fact existed regarding whether Riel was qualified.

5. **Sufficient Evidence Exists to Create a Genuine Issue of Material Fact Regarding Whether Mr. Abshire was Qualified to Perform the Essential Functions of His Position**

According to the United States Marine Corps[34] and Dr. Cenac,[35] Mr. Abshire was more than capable of performing his job as a combat Marine where he enforced the law. Indeed, Plaintiff earned a Marine Corps Good Conduct Medal while in active duty and attained the rank of Corporal.[36] After being honorably discharged from the Marine Corps Reserves he attained the rank of Sergeant.[37] Likewise, Dr. Cenac opined that Mr. Abshire was able to be a Wildlife Enforcement agent. He testified that Mr. Abshire could operate a boat, and could do what was needed as a Wildlife Agent. Dr. Cenac further testified that Mr. Abshire had effectively made arrests as an agent, and that when placed in positions of confrontation when he was a Marine – he was successful.[38] This testimony and other evidence creates genuine issues of material fact as to whether Mr. Abshire was qualified.

---

[34] LDWF 001469 (portion of Abshire depo ex. 5)
[35] Cenac depo pp. 67-68
[36] LDWF 001469 (portion of Abshire depo ex. 5)
[37] LDWF 001459 (portion of Abshire depo ex. 5)
[38] Cenac depo pp. 68-69,71, 103

### IV.    Defendant Had Ample Notice Of Mr. Abshire's Disability And Limitations

Dr. Cenac testified that people see Mr. Abshire's periods of dissociation (episodes symptomatic of his PTSD) as unusual and distressing.[39] The evidence shows that such episodes distressed LDWF supervisors and agents, but LDWF had ample notice of Mr. Abshire's PTSD and resulting limitations. Co-worker Sgt. Stuart Guillory testified that other cadets in the Training Academy stated that Mr. Abshire was taking "crazy pills."[40] Mr. Abshire also noted that no one would return his telephone calls or emails. As such, he felt his co-workers were "out to get him."[41]  Moreover, Mr. Abshire testified that in response to his numerous requests for accommodations, Cpt. Buatt responded on June 18, 2015: "I thought you were a Marine. You need to suck it up."[42] Mr. Abshire was called a "fa**ot" by fellow LDWF agents. Regardless, Mr. Abshire reported this to his supervisors, who did nothing.

Both of Mr. Abshire's superiors, Lt. Robertson and Capt. Buatt, testified that neither of them had any training in ADA accommodations requests.[43] Additionally, neither of them knew what the term "interactive process" meant.[44] Indeed, LDWF's own Human Resources Director believes that if an employee does not use the magical words "request for accommodation", then a disabled employee is not making a request for reasonable accommodations under the ADA.[45] This is directly contrary to law.

Mr. Abshire's October 15, 2013 employment application[46] specifically states Mr. Abshire is an honorably discharged veteran who has a disability which is service-connected and

---

[39] Cenac depo pp. 68-69,71, 103
[40] Guillory depo p. 13
[41] Abshire depo ex. 35 (PLF0000359)
[42] Abshire depo pp. 310-311.
[43] Robertson depo p. 10, Buatt depo p.14
[44] Robertson depo p. 11, Buatt depo p.15
[45] Harrell depo p. 115
[46] See Abshire depo ex. 3

recognized by the Veterans' Administration.[47] Further, he specifically discloses in the "Health History" portion of his employment application that he is taking Zoloft for depression and PTSD.[48]

Pursuant to LDWF's Policy and Procedure Manual, the Cadet Interview Board, which is comprised of an unidentified Colonel, reviews employment applications for the position of Enforcement Cadet.[49]

In spite of receiving at least two (2) written notices of Mr. Abshire's disability and requests for accommodation, and the existence of Mr. Abshire's LDWF employment application which clearly states that he suffers from a disability, Lt. Beau Robertson executed an affidavit stating that Mr. Abshire never advised anyone within his chain of command or the LDWF Human Resources Office that Mr. Abshire suffered from a disability or needed an accommodation to perform the essential functions of his position.[50] Yet, Lt. Robertson testified that Col. Martin advised Capt. Buatt (Lt. Robertson's commanding officer) that Mr. Abshire suffered from PTSD.[51] In making this sworn statement, Lt. Robertson testified that he did nothing to verify whether Mr. Abshire ever informed anyone at LDWF that he had PTSD and/or needed an accommodation.[52]

## V. Plaintiff Sufficiently Made Numerous Requests for Reasonable Accommodations

Importantly, a request for a reasonable accommodation need not be in writing, use certain language, mention the ADA, or even state that it is a request for a reasonable accommodation. 2 *EEOC Compliance Manual*, Enforcement Guidance for Psychiatric Disabilities at 19, 21; *Taylor*

---

[47] LDWF000016 (in Abshire depo ex. 3)
[48] LDWF001322 (in Abshire depo ex. 3)
[49] R.Doc. 28-2 p. 30
[50] Robertson depo ex. 5
[51] Robertson depo p. 65
[52] Robertson depo pp. 67-72

*v. Phoenixville School Dist, supra.* at 313. In April of 2015, Capt. Buatt and Lt. Robertson visited Mr. Abshire at his home, at which time Mr. Abshire advised them both of his PTSD and resulting limitations.[53] On May 5, 2015, Mr. Abshire emailed his commander, Lt. Robertson and specifically advised Lt. Robertson of his PTSD, and that this disability had been interfering with his work, and reminded Lt. Robertson of their meeting one month prior when the same information was conveyed to Lt. Robertson. In this email Mr. Abshire requested more one on one time with Lt. Robertson, and copies of some of Lt. Robertson's prior reports to use as templates.[54] On May 17, 2015, Mr. Abshire again wrote to Lt. Robertson again advising him of his PTSD, and reminding him of his previous requests for accommodations. This email also reflected that Mr. Abshire had gone to the LDWF office on his days off to attempt to speak to Lt. Robertson about these requests.[55]

### VI.   PLAINTIFF WAS DISCRIMINATED AGAINST WHEN DEFENDANT FAILED TO ENGAGE IN THE INTERACTIVE PROCESS AND FAILED TO REASONABLY ACCOMMODATE MR. ABSHIRE

#### A.  Defendant LDWF Failed to Engage in Any Interactive Process

"To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation." This process is designed to identify the employee's limitations and determine possible accommodations. *Taylor v. Phoenixville Sch. Dist, supra.* at 311. 29 C.F.R. § 1630.2(o)(3).

> Once an employee makes such a request, however, the employer is obligated by law to engage in an "interactive process": a meaningful dialogue with the employee to find the best means of accommodating that disability.

---

[53] PLF0000775, Robertson Depo ex. 8
[54] Robertson depo ex. 8
[55] Robertson depo ex. 9

*EEOC v. Chevron-Phillips Co.*, *supra.*, at 621 (internal citation omitted). "Both parties

have a duty to assist in the search for reasonable accommodations and to act in good faith." *Id.* at

312.

> Neither party should be able to cause a breakdown in the process for the
> purpose of inflicting liability. Rather, the courts should look for signs of
> failure to participate in good faith or failure by one of the parties to help
> the other party determine what specific accommodations are necessary… a
> party that fails to communicate, by way of initiate or response, may also
> be acting in bad faith.

*Id.* at 312. Once the employer knows of the disability, the burden is on the employer to request

additional information.[56] The purpose of the interactive process is to determine a reasonable

accommodation. As the Third Circuit put it: "it would make little sense to insist that the

employee must have arrived at the end product . . . before the employer has a duty to

participate."[57] Participation in the interactive process is an obligation of both employer and

employee. Id. at 317.

   See also *EEOC v. Convergys Customer Management Group, Inc.* 491 F.3d 790, 795(8th

Cir. 2007); *Cravens v. Blue Cross & Blue Shield of Kansas City*, *supra.* "The interactive process

is not an end in itself."[58] As this court recently held:

> A failure to engage in the interactive process is not a per se violation of
> the ADA. See *Id.* '[W]hen an employer's unwillingness to engage in a
> good faith interactive process leads to a failure to reasonably
> accommodate an employee, the employer violates the ADA.' *Silva*, 575 F.
> App'x at 424 (quoting *Loulseged v. Akzo Nobel Inc*., 178 F.3d 731, 736
> (5th Cir. 1999)). Thus, in *Silva*, the Court held that, 'even if a genuine
> issue of material fact exists as to whether the [defendant employer]
> participated in the interactive process in good faith, its dereliction cannot
> be said to have led to a failure to reasonably accommodate [plaintiff]

---

[56] *Id.* at 315.
[57] *Id.* at 316
[58] *Pike v. Office of Alcohol & Tobacco Ctrl of La. Dep't Revenue*, 14-511, U.S. Dist. Ct, Md LA (6/15/16) R.Doc.
85, p. 74 citing 29 C.F.R. § 1630.2(o)(3)

because there is no evidence that a reasonable accommodation was feasible.'

*Id.* at p. 75. "One of the consequences for an employer who fails to engage in the interactive process is that the employer may fail to discover an appropriate accommodation for the employee's disability . . . and [when] the employer fails to provide one, such failure is a violation of the ADA." *EEOC Enforcement Guidance*, p. 1063.

In *Spurling v. C & M Fine Pack, Inc.,* 739 F.3d 1055 (7th Cir. 2014) the employer failed to engage in the interactive process and terminated Plaintiff without first collaborating with her or her doctor to find a reasonable accommodation.

In *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996) defendant's employee relations director advised the mentally disabled plaintiff via letter that he was required to return to work at a new school on a certain date or be terminated. The Seventh Circuit held: ". . . defendant could have spoken with either Bultemeyer or [his psychiatrist]. Had it done this, it would have been properly engaging in the interactive process." *Id.* at 1284. Rejecting the defendant's contention that plaintiff was not qualified, the Seventh Circuit held that Defendant did not allow Bultemeyer an opportunity to demonstrate his qualifications because the defendant failed to discuss the needed accommodation. Thus, a genuine issue of material fact existed as to whether plaintiff could have performed the essential functions of his job, which precluded defendant's motion for summary judgment. *Id.* at 1285. The court noted: ". . . courts should look for signs of failure to participate in good faith or failure of one of the parties to help the other party determine what specific accommodations are necessary." The defendant blamed Bultemeyer for failing to specifically request a specific accommodation. *Id.* at 1286. The court concluded that defendant caused a second breakdown in the interactive process when it failed to

ask Bultemeyer or his psychiatrist what plaintiff needed to return to work, and that Defendant's failures constituted bad faith in failing to engage in the interactive process. *Id.* 1286-1287.

In *EEOC v. Chevron Phillips Chemical Co., supra.,* the Fifth Circuit held that when the employer does not engage in good faith in the interactive process, the employer violates the ADA. See also *Zivkovic v. S. California Edison Co.,* 302 F.3d 1080, 1089 (9th Cir.2002) (the interactive process generally requires offering an accommodation that is reasonable and effective). If there is a genuine dispute as to whether the employer engaged in good faith in the interactive process, summary judgment is inappropriate. *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 953 (8th Cir. 2009).

In *Taylor v. Phoenixville Sch. Dist.*, *supra.* at 311, the Third Circuit held that ". . . the employer must make a reasonable effort to determine the appropriate accommodation." ". . . The employee's initial request for an accommodation ... triggers the employer's obligation to participate in the interactive process." *Taylor v. Principal Financial Group, Inc., supra.* at 165.

"Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs." *Taylor v. Phoenixville Sch. Dist.*, *supra.* at 315. "[T]he process must be interactive because each party holds information the other does not have or cannot easily obtain." *Id.* In *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131 (2d Cir.1995) the Second Circuit noted that he employer has far greater access to information than the typical plaintiff about its own organization. "In short, an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation." *Taylor v. Phoenixville Sch. Dist.*, *supra.* at 317.

The Fifth Circuit looks to the EEOC's Interpretive Guidance to the Code of Federal Regulations in interpreting the ADA. See *Rizzo v. Children's World Learning Centers, Inc.*, 173 F.3d 254, 259 (5th Cir.1999), *on reh'g en banc*, 213 F.3d 209 (5th Cir.2000). The EEOC Interpretive Guidance provides greater detail as to what is required in an "interactive process" under the ADA, explaining:

> "When an individual with a disability has requested a reasonable accommodation to assist in the performance of a job, the employer, using a problem solving approach, should:
>
> > **(1)** Analyze the particular job involved and determine its purpose and essential functions;
> >
> > **(2)** Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
> >
> > **(3)** In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and
> >
> > **(4)** Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both the employee and the employer."

*Id.* at 37.

Additionally, the Job Accommodation Network ("JAN") is a source of free, expert, and confidential guidance on workplace accommodations and disability employment issues, which assists employer and employees in identifying accommodations for disabled employees.[59]

Here, Plaintiff made numerous requests for reasonable accommodations. After those requests were made, Defendants' duty to engage in the interactive process was triggered. *EEOC v. Chevron-Phillips Co.*, *supra.* LDWF knew of Mr. Abshire's disability, but requested no information from him or any of his doctors, and instead ignored him. Instead, according to Dr. Boudreaux, who did an extensive review of Mr. Abshire's medical records and personnel file,

---

[59] See https://askjan.org/links/about.htm (accessed November 6, 2017).

LDWF did not perform any kind of individualized assessment of Mr. Abshire's capabilities or impairments prior to terminating him.[60] Lt. Robertson denied ever discussing Mr. Abshire's disability limitations in April 2015, denied ever receiving not one but two written requests for accommodations.  This repeated failure to engage in the interactive process led to a failure to accommodate Mr. Abshire. *Pike v. Office of Alcohol & Tobacco Ctrl of La. Dep't Revenue*, *supra*.

### B.  LDWF Failed to Reasonably and Effectively Accommodate Mr. Abshire

The employer's duty to provide reasonable accommodations pursuant to the ADA is a continuing one. *McAlindon v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999) (quoting *Ralph v. Lucent Techs., Inc.,* 135 F.3d 166, 172 (1st Cir. 1998)).

> An ineffective 'modification' or 'adjustment' will not accommodate a disabled individual's limitations." Barnett, 535 U.S. at 400, 122 S.Ct. 1516. Ineffective modifications therefore are not accommodations. Cf. *Humphrey v. Mem'l Hosps. Ass'n,* 239 F.3d 1128, 1137 (9th Cir.2001) ("An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position.")

*U.S. E.E.O.C. v. UPS Supply Chain Sols.,* 620 F.3d 1103, 1110 (9th Cir. 2010) "Prior accommodations do not make an accommodation reasonable." *Wood v. Green*, 323 F.3d 1309 (11th Cir. 2003). "The word accommodation . . . conveys the need for effectiveness." *U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 400, 122 S.Ct. 1516, 152 L.Ed.2d 589. What the employee requires may change over time. *EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1111-12 (9th Cir. 2010). A covered employer unlawfully discriminates against an employee with a disability if it fails to provide the employee with a reasonable accommodation "to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the

---

[60] Boudreaux depo pp. 26-27

employer can show that the accommodation would pose an undue hardship. *Taylor v. Phoenixville Sch Dist., supra.* at 311.

The employee is not required to request the specific accommodation that he or she requires the employer to provide.[61]  See, also *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 621-22 (5th Cir. 2009) (Because Plaintiff sufficiently "communicated the nature of her condition and her requested accommodations"; she "was not required to come up with the solution ... on her own."  See also *Armstrong v. Burdette Tomlin Mem. Hosp.*, 438 F.3d 490 (3rd Cir. 2006) (It was error for the district court to issue a jury instruction that implied that the employee had the burden of identifying and requesting a specific accommodation when he was required to show only that he had requested an accommodation.) See also *E.E.O.C. v. Convergys Customer Management Group, Inc.*, 491 F.3d 790, 795-96 (8th Cir. 2007); *McDaniel v. Milligan*, 2014 WL 3700573, at *6 (E.D. Ark. 2014); *Moates v. Hamilton County*, 976 F. Supp. 2d 984, 993 (E.D. Tenn. 2013) ("In its brief, Defendants try to impose a burden on Plaintiff to create her own accommodations and come up with 'suggestions of her own.' ... Even though Plaintiff may be able to offer assistive input into creating a reasonable accommodation, the ADA is clear that this is not a burden that Plaintiff carries on her own."); *Hildebrand v. Dollar General Corp.*, 2013 WL 3761291, at *9 (M.D. Tenn. 2013); *Taysom v. Bannock County*, 2013 WL 3322296, at *7 (D. Idaho 2013); *Tish v. Magee-Women's Hosp. of University of Pittsburgh Medical Center,* 2008 WL 4790733, at *15 (W.D. Pa. 2008) ("The burden was not on Tish to request a specific accommodation. Once Magee was aware of Tish's disability and consequent need for a reasonable accommodation, the burden was on Magee to request additional

---

[61] EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, Question 5 (EEOC October 2002, Revised),
http://www.eeoc.gov/policy/docs/accommodation.html; Questions & Answers about Health Care Workers and Americans with Disabilities Act, Question 4 (EEOC Feb. 26, 2007), http://eeoc.gov/facts/health_care_workers.html.

information for the purpose of determining whether Tish's disability could have been reasonably accommodated."); *Velente-Hook v. Eastern Plumas Health Care*, 368 F. Supp. 2d 1084, 1093-94 (E.D. Cal. 2005); *Medlin v. Rome Strip Steel Co., Inc.*, 294 F. Supp. 2d 279, 291-92 (N.D.N.Y. 2003).

This conclusion does not change even if the employee initially requests an accommodation that is unreasonable or unworkable. *Summers v. Altarum Institute, Corp.*, 740 F.3d 325, 331 n.4 (4th Cir. 2014); *Huiner v. Arlington School Dist.*, 2013 WL 5424962, at *6 (D.S.D. 2013), or one that the employer could not provide.  T*aylor v. Phoenixville School Dist.,* 184 F.3d 296, 315 (3d Cir. 1999). The employer still must follow through and participate in good faith in an interactive process to mutually find a reasonable accommodation.

The Fifth Circuit in *Chevron Phillips Chem. Co., LP* , *supra*. held: "A jury, however, reasonably could find that, since CPChem knew that Netterville had required medical leave due to her CFS, it knew that the release related to this condition, and that she therefore had adequately communicated the nature of her condition and her requested accommodations. Further, Netterville was not required to come up with the solution (*i.e.,* a CPChem location closer to home) on her own." *Id.* at 621–622.

Defendant argues that Mr. Abshire was reasonably accommodated when Lt. Robertson provided or made his prior reports accessible to Mr. Abshire. The fact that Mr. Abshire was given copies of Lt. Robertson's reports is immaterial as this assistance clearly did not effectively accommodate Mr. Abshire, since his report writing deficiencies continued. Furthermore, Defendant apparently does not dispute that Plaintiff requested, but was denied, more one on one time with Lt. Robertson.

### C. There Were Reasonable Accommodations Which Would Have Assisted Mr. Abshire in Performing His Job Duties.

Without citation to any authority, evidence, or reference material of any kind, Defendant concludes there were no reasonable accommodations for Mr. Abshire. Mr. Abshire asserts he could have easily been reasonably accommodated and the Defendant has presented no evidence of undue burden. Dr. Cenac testified that LDWF could have inserted him into a team environment where he could have worked more closely with others,[62] given him more work experience with senior agents, reassigned Mr. Abshire,[63] further trained him, provided an audio recorder to dictate reports, or given him an assistant to timely and correctly write reports.[64] Dr. Cenac further testified that a perceptive LDWF supervisor could have easily assisted Mr. Abshire with his report writing issues and provided him with monthly evaluations to address Mr. Abshire's instances of depersonalization and derealization.[65] Additionally, Dr. Cenac testified that LDWF could have accommodated Mr. Abshire by sending him for treatment (which would be free to LDWF due to Mr. Abshire's status as a veteran).[66]

### D. A Genuine Issue of Material Fact Exists Regarding Whether Mr. Abshire's Termination Was Pretexual

If Defendant can offer evidence of some legitimate, non-discriminatory reason for Plaintiff's termination, Plaintiff can rebut this defense by offering sufficient evidence to create a genuine issue of material fact that Defendant's reason for termination is false or pretextual. Alternatively, Plaintiff must offer sufficient evidence that if Defendant's reason for termination is true, it is only one of the reasons for the termination, and another reason is plaintiff's protected

---

[62] Cenac depo pp. 66-67
[63] Cenac depo p. 86-87, 105
[64] Cenac depo pp. 79-81
[65] Cenac depo pp. 83-86
[66] Cenac depo p. 89

characteristic. *LHC Group, Inc., supra.* at 702. citing *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004), *Evans v. Tex. Dep't of Transp.*, 547 F.Supp.2d 626, 640 (E.D. Tex. 2007) *aff'd*, 273 Fed. Appx. 391 (5th Cir. 2008).

Defendant argues that Plaintiff was terminated for not being able to timely and accurately submit reports. Assuming that Mr. Abshire's report writing problems could have been a legitimate non-discriminatory reason for his termination; there is evidence that Mr. Abshire was terminated at least in part because of his disability.

Capt. Buatt worked with several other agents who needed accommodations in the form of assistance with report writing.[67] However, Capt. Buatt did not accommodate Mr. Abshire to assist him with report writing. Capt. Buatt further testified that an agent could be disciplined for showing a lack of improvement, but he never counseled or disciplined anyone for report writing deficiencies.[68] Additionally, many LDWF agents were having problems correctly and timely submitting paperwork and/or reports during Mr. Abshire's employment,[69] but only Mr. Abshire was terminated for alleged report writing/paper work deficiencies. While Buatt and Robertson made no derogatory comments about plaintiff's PTSD, they completely ignored his requests for accommodations on April 2015, May 5, 2015 and May 15, 2015 and failed to engage in the interactive process.

### E. MR. ABSHIRE SUFFERED ADVERSE EMPLOYMENT ACTIONS BECAUSE OF HIS DISABILITY

First, it should be noted that the ADA protects certain employee conduct from adverse employment actions unless that conduct poses a direct threat to the employee, her co-workers or the public. In *McKenzie v. Dovala, supra*, the Court held:

---

[67] Buatt depo pp. 18-22
[68] Buatt depo pp. 23-25
[69] Robertson depo pp. 84-87, Robertson depo exs 6-7, Buatt depo pp. 48-50, Buatt depo ex. 2

> ...ADA protects McKenzie from adverse employment action based on conduct related to her illness so long as she does not pose a "direct threat." 42 U.S.C. 12113 (a), (b)....A "direct threat" is defined as a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 41 U.S.C. 12111(3). The determination that an individual is unqualified because she poses a direct threat must be "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job," which in turn must be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." citing 29 CFR 1630.2 (r).

Defendant apparently does not dispute that Mr. Abshire suffered adverse employment actions. Plaintiff submits that he suffered two adverse employment actions: (1) on about May 11, 2015 he was placed on administrative leave; and (2) when he was terminated.

Dr. Cenac testified that Mr. Abshire's ". . . sense of alteration of consciousness and derealization is clearly described in the complaints from his superiors of the LDWF in which they describe Mr. Abshire as being in a dreamlike state."[70] Dr. Cenac further testified that Mr. Abshire's symptoms had such an effect on his employment at LDWF that he was terminated.[71] Mr. Abshire's supervisors attributed his "states of derealization" or "dreamlike states" as resulting from intoxication, when he was not intoxicated. Rather, those instances of detachment and estrangement were symptoms of Mr. Abshire's PTSD.[72] Dr. Cenac opined that if Mr. Abshire failed to properly notify his supervisors of a schedule change, it was because of a dissociative event when Mr. Abshire was not communicating regularly with others.[73] He added that if Mr. Abshire failed to meet report writing deadlines, it was because of his PTSD and

---

[70] Cenac depo p. 60
[71] Cenac depo p. 61
[72] Cenac depo p. 62
[73] Cenac depo p. 66

resulting attention deficits.[74] Dr. Cenac explained that common symptoms of PTSD include problems with focus and a lack of concentration.[75]

On May 11, 2015 Mr. Abshire was called in to Lt. Robertson's office. According to Lt. Robertson, Mr. Abshire's eyes were glassy, although Mr. Abshire reported he was not intoxicated, and did not drink on the previous night. In response to these observations, Lt. Robertson called an ambulance. Emergency Medical Technicians examined Mr. Abshire. He was noted only as having high blood pressure, but was otherwise normal and not under the influence of alcohol or any illegal substance.[76] Nevertheless, and without conducting any other assessment or ordering any other assessment, Lt. Robertson secured Mr. Abshire's weapons and badge and placed him on administrative leave.[77] On May 13, 2015, Mr. Abshire was formally counseled several times for not completing reports correctly, failing to make report corrections, and for failing to properly make schedule changes, and (failing or forgetting to be on call 24 hours a day, seven days per week[78]).[79] These failures can easily be attributed to problems with memory and focus, which as Dr. Cenac testified – are symptoms of his PTSD.[80]

Here, Mr. Abshire was terminated for his alleged inability to timely and properly submit paperwork, one instance where he was unable to administer an SFST, and other alleged instances where he was not sufficiently acquainted with LDWF enforcement regulations. These deficiencies are attributable to Mr. Abshire's lack of concentration, memory deficit, and instances of dissociation as pointed out by Dr. Cenac. Moreover, no "direct threat" defense has been even alleged by the defendant, much less proven.  Therefore, LDWF cannot persuasively

---

[74] Cenac depo p. 78-79
[75] Cenac depo p. 104
[76] See excerpt of certified medical records from Acadian Ambulance LDWF 000642-644.
[77] R.Doc. 28-4 pp. 44-46
[78] R.Doc.28-2 pp.43
[79] R.Doc.28-2 pp. 39, 42
[80] Cenac depo pp. 78-79

maintain that the law does not protect Mr. Abshire from conduct caused by his illness. See, for e,g., *Equal Employment Opportunity Commission v. E.I. Du Pont De Nemours and Co.,* 480 F. 3d 724 (5th Cir. 2007).

### F. MR. ABSHIRE PRESENTS SUFFICIENT EVIDENCE FOR HIS PRIMA FACIE CLAIM OF RETALIATORY DISCHARGE

Plaintiff Abshire has alleged that he was terminated in retaliation for engaging in protected conduct, in violation of the ADA, 42 U.S.C. § 12101 *et seq.* Mr. Abshire asserts that by requesting a reasonable accommodation for his disability and limitations under the ADA, he engaged in protected conduct. On this claim, Defendant LDWF misstates the law and neglects crucial facts.

To establish a prima facie case of retaliation under the ADA, a plaintiff must show that (i) he engaged in conduct protected by the ADA; (ii) an adverse employment action occurred, (iii) a causal connection between the protected activity and adverse action. *Feist v. La. Dep't. of Justice, Office of the Att'y. Gen*., 730 F.3d 450, 454 (5th Cir. 2013). If Plaintiff proves his prima facie case of retaliation, LDWF must then show evidence of a non-retaliatory reason for the adverse employment action. The burden then shifts to Mr. Abshire to demonstrate pretext (i.e. that the adverse employment action would not have occurred "but for" the retaliatory motive). *Id.*

LDWF first points to Mr. Abshire's deposition and asserts that "asking for help" is not a request for accommodation, and thus cannot constitute protected activity. LDWF misstates the law in this regard. As previously stated, a request for a reasonable accommodation need not be in writing, use certain language, mention the ADA, or even state that it is a request for a reasonable accommodation. 2 *EEOC Compliance Manual*, Enforcement Guidance for Psychiatric Disabilities at 19, 21; *Taylor v. Phoenixville School Dist, supra*. at 313.

Second, LDWF neglects to identify Mr. Abshire's numerous requests for accommodation on April 2015, May 5, 2015 and May 15, 2015. Moreover, Defendant apparently does not dispute that Mr. Abshire suffered an adverse employment action (i.e. termination).  Defendant's contention that there is no causal connection between Mr. Abshire's May 15, 2015 request for accommodation and his August 10, 2015 termination is without merit.  The Fifth Circuit has held that "a time lapse of up to four months may be sufficiently close" to satisfy the causal connection temporal proximity requirement. *Id.* at 454 citing *Evans v. Houston,* 246 F.3d 344, 354 (5th Cir. 2001).  Furthermore, Plaintiff contends that he was terminated due to the very limitations of his disability: lack of concentration, focus, and periods of dissociation.  But for Defendant failing to reasonably accommodate Mr. Abshire, and instead choosing to repeatedly ignore him, he would have adequately performed his job as a Wildlife Enforcement Agent.

<strong><u>CONCLUSION</u></strong>

For these reasons, Defendant's Motion for Summary Judgment should be denied as there are numerous genuine issues of material fact on Plaintiff's claims of discrimination and retaliation.

Respectfully submitted;

**SMITH LAW FIRM**

/s/ J. Arthur Smith, III
J. ARTHUR SMITH, III (#07730)
J. ARTHUR SMITH, IV (#37310)
830 North Street
Baton Rouge, LA  70802
Telephone (225) 383-7716
Facsimile (225) 383-7773
jasmith@jarthursmith.com
asmithiv@jarthursmith.com
*Counsel for Plaintiff,*
*Todd Alexander-Cloud Abshire*

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that a copy of the foregoing Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment was filed electronically with the Clerk of Court for the United States District Court, Middle District of Louisiana, by using the CM/ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

November 6, 2017                                    /s/ J. Arthur Smith, IV___
Date                                                         J. ARTHUR SMITH, IV

29