UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

TODD ALEXANDER-CLOUD ABSHIRE                    CIVIL ACTION

VERSUS

LOUISIANA DEPARTMENT
OF WILDLIFE AND FISHERIES                    NO.: 16-00669-BAJ-RLB

RULING AND ORDER

Before the Court is the **Motion for Summary Judgment (Doc. 28)** filed by

Defendant, Louisiana Department of Wildlife and Fisheries ("LDWF") seeking the

dismissal of all claims brought by Plaintiff, Todd Abshire pursuant to Federal Rule

of Civil Procedure 56. Plaintiff filed an Opposition. (Doc. 39). LDWF filed a Reply.

(Doc. 43). Plaintiff then filed a Sur-Reply. (Doc. 46). The Court has jurisdiction under

28 U.S.C. § 1331. For the following reasons, the **Motion for Summary Judgment**

**(Doc. 28)** is GRANTED.

I.      BACKGROUND

Plaintiff, a disabled veteran, began his employment as a Wildlife Enforcement

Cadet on December 9, 2013, by entering the LDWF Training Academy ("the

Academy"). (*Id*. at ¶¶ 13, 16). Prior to his employment with LDWF, Plaintiff was

diagnosed with Post Traumatic Stress Disorder ("PTSD") due to his time in the

military as a combat Marine. (*Id*. at ¶ 2; Doc. 39 at p. 1). Plaintiff's symptoms from

PTSD include: the inability to go to certain places and be around crowds of people;

1

the inability to answer the phone; anxiousness; feelings of withdrawal due to changes in his routine; and hypervigilance, which causes increased anxiety, exhaustion, and the inability to concentrate on paperwork. (Doc. 28-8 at ¶ 3).

The job posting for a Wildlife Enforcement Cadet provided, *inter alia*, that the "[p]osition is subject to call 24 hours a day, 7 days a week." (*Id.* at ¶ 5). Additionally, LDWF contends that its internal job description describes the following functions as "100% E" or "essential" for an Agent: preparing reports; qualifying with firearms; learning to check hunters and fisherman for equipment, limits, and license compliance; conducting investigations of complaints and alleged violations; investigating boating accidents; assisting other law enforcement agencies with the apprehension of criminals; providing search and rescue services; and providing information to the public on wildlife and fisheries conservation and boating safety.[1] (*Id.* at ¶ 22).

According to Plaintiff, at the time he applied for the Cadet position, he had no concerns that his PTSD would impact his ability to perform the job duties as he understood them. (*Id.* at ¶ 7). Plaintiff admitted that there was no discussion of his PTSD during the pre-employment hiring process; however, he noted that he was a disabled veteran in his employment application, and noted that he was taking Zoloft for his "Depression/PTSD" in his health history form dated November 4, 2013. (*Id.* at

---

[1] Plaintiff disputes that these job functions are the "essential job functions" for an Enforcement Agent because Plaintiff alleges that "much of the evidence of what job functions are essential is comprised of inconsistent job descriptions," which were amended and revised subsequent to Plaintiff's employment. (Doc. 39 at pp. 8–10).

¶¶ 9–11). The LDWF policy requires a two-year probationary period for a Wildlife Enforcement Agent. (*Id.* at ¶ 14).

Plaintiff began his employment at the Academy where he spent approximately six months training as a cadet. (*Id.* at ¶ 16). During his orientation at the Academy, Plaintiff received a copy of the LDWF Employee Handbook, which contains an anti-discrimination policy and the LDWF's Americans with Disability Act ("ADA") policy on requesting accommodations. (*Id.* at ¶ 17). Plaintiff also received the Law Enforcement Division Policy and Procedure Manual ("Enforcement Manual"), which contains job descriptions, job duties, and the policies and procedures for Law Enforcement Cadets and Law Enforcement Agents. (*Id.* at ¶ 19). While at the Academy, Plaintiff did not need and did not request any kind of accommodation for his PTSD. (*Id.* at ¶ 24). Plaintiff graduated from the Academy on June 10, 2014. (*Id.* at ¶ 25).

Thereafter, Plaintiff was assigned to work in Region 5, District B, in Cameron Parish, where he entered another phase of training during which he was supervised by a Field Training Officer ("FTO"). (*Id.* at ¶¶ 26, 32). During this period, Plaintiff reported, at various times, to "Sgt. David Sanford, Sgt. Aaron Monceaux, and Sgt. Keith Delahousaye," as well as Lt. Beau Robertson ("Lt. Robertson"). (*Id.* at ¶ 27; Doc. 40 at ¶ 27). In turn, Lt. Robertson reported to Captain Robert Buatt ("Captain Buatt"). (Doc. 28-8 at ¶ 37).

During his first meeting in the Region, Plaintiff advised Lt. Robertson that he suffered from PTSD, but that his PTSD had not previously been an issue for him in

the past. (*Id.* at ¶ 28). Plaintiff also informed Lt. Robertson that he had no experience in law enforcement nor had he ever been hunting or fishing, so he was going to need help. (*Id.* at ¶ 29). Captain Buatt was aware that Plaintiff suffered from PTSD because Lt. Col. Sammy Martin, who oversees the LDWF Enforcement Administration, informed him of it upon Plaintiff's graduation from the Academy. (*Id.* at ¶ 30). During the period in which he was supervised by a FTO, Plaintiff only discussed his PTSD with Sgt. Monceaux and Sgt. Sanford, but he did not request any accommodations relating to his PTSD, other than requesting copies/samples of old reports, which he received. (*Id.* at ¶ 34).

On December 9, 2014, Plaintiff was promoted from Wildlife Enforcement Cadet to Wildlife Enforcement Agent.[2] (*Id.* at ¶ 38). In this capacity, Lt. Robertson provided Plaintiff with feedback by leaving written comments on the weekly reports that were submitted to Lt. Robertson for review and approval. (*Id.* at ¶ 39). Plaintiff also requested copies of Lt. Robertson's old reports as a template to improve the quality of his own reports; however, the copies were never provided directly from Lt. Robertson, but were accessible in the office filing cabinets. (*Id.* at ¶ 40).

On April 8 and 9, 2015, during Plaintiff's scheduled vacation days, both Captain Buatt and Lt. Robertson made several attempts to contact Plaintiff by phone to discuss paperwork issues. (*Id.* at ¶ 41). However, Plaintiff did not answer or return the calls, prompting Captain Buatt to send Lt. Robertson to Plaintiff's home to ensure

---

[2] The job duties of a Wildlife Enforcement Agent differ from those of a Wildlife Enforcement Cadet "by the presence of performing full range of field enforcement work and by the supervision received." (Doc. 28-2 at p. 27).

his safety and well-being. (*Id.* at ¶ 41). Plaintiff testified that he did not respond to phone calls from Captain Buatt or Lt. Robertson because he was having a PTSD episode, and that he conveyed this to Lt. Robertson during the home visit at which time Plaintiff literally cried on Lt. Robertson's shoulder. (*Id.* at ¶ 42). On April 21, 2015, Plaintiff did not report to work as scheduled because he had changed schedules with a co-worker, but failed to notify the Lieutenant or the Captain. (*Id.* at ¶ 42). On that date, Lt. Robertson counseled Plaintiff about his failure to return phone calls and his failure to follow proper LDWF policy with respect to schedule changes. (*Id.* at ¶ 43). On April 27, 2015, Lt. Robertson informed Plaintiff of repeated problems with untimely and incorrect purchase card logs and receipts (expense reimbursements) from March, as well as incidents of not reporting to work on time. (*Id.* at ¶¶ 44–45).

On May 3, 2015, Lt. Robertson notified Plaintiff that his MV-3 report[3] for the month of April was late. (Doc. 28-8 at ¶ 46). However, when he finally submitted the report, Captain Buatt found numerous mathematical errors. (*Id.* at ¶ 46). Captain Buatt noted the errors and returned it to Plaintiff for correction, but upon re-submission, the errors identified by Captain Buatt had not been addressed. (*Id.*). On May 4, 2015, Captain Buatt and Lt. Robertson met with Plaintiff to discuss the various performance issues that had developed over the past few months. (*Id.* at ¶ 47). At this meeting, Plaintiff felt "railroaded" because Lt. Robertson made no mention of their discussions at his home on April 9 where Plaintiff informed him that

---

[3] An MV-3 report is a mileage log for the vehicle that Plaintiff was assigned to drive while working for LDWF. (Doc. 28-8 at ¶ 46, n.79).

he was struggling with his PTSD. (*Id.* at ¶ 48). On May 5, 2015, Plaintiff sent Lt. Robertson an email message wherein he requested that in the future, prior to the quality of his work becoming an issue, Lt. Robertson notify him of same so they could address the issues professionally.[4] (*Id.* at ¶ 48; Doc. 28-1 at p. 199). The email further provided,

> [w]hen you came to my house last month to check on me I told you that due to my PTSD I had hit a pretty rough patch in my life, and that lately it had been interfering with work. I know in the past I have asked about working together more so that I can pick your brain and get feedback on my performance, and also getting some copies of your old paperwork to use as a template. Any chance this could happen?

(*Id.*). On May 9, 2015, Lt. Robertson received a call from Sgt. Stuart Guillory who advised Lt. Robertson that Plaintiff had reported to work and that he appeared disoriented. (Doc. 28-8 at ¶ 50). Plaintiff was subjected to a field sobriety test, but no other medical examinations or drug tests were performed on him. (*Id.*). As a result of this incident, Plaintiff was taken to the hospital, and subsequently sent home on paid administrative leave. (*Id.*).

On May 13, 2015, Captain Buatt and Lt. Robertson presented Plaintiff with a "Counseling Conference Worksheet" ("May 13 Worksheet") that summarized the discussions that were held during the May 4, 2015 meeting. (*Id.* at ¶ 51; Doc. 28-1 at p. 214–16). During the meeting, Captain Buatt wrote on the Worksheet, "[e]mployee

---

[4] According to LDWF, Lt. Robertson never received the email. (Doc. 28-8 at ¶ 48, n.90). Further, LDWF has searched its archives and the email has not been located in either Lt. Robertson's email inbox or Plaintiff's sent emails. (*Id*). Nonetheless, the Court must construe the facts in the light most favorable to the non-moving party. Here, Plaintiff has produced a copy of this email that was sent from his LDWF email address to Lt. Robertson with a carbon copy to his Gmail address, which is in the record. (Doc. 28-1 at p. 199). Thus, at this stage the Court will consider the email.

advised that he is dealing with some issues in his personal life. Other than personal issues, the employee advised he has no excuses for the performance problems mentioned on this counseling conference worksheet."[5] (*Id.* at ¶ 51). Plaintiff has testified that these "personal issues" related to his PTSD. (Doc. 28-1 at p. 124). On May 17, 2015, in response to the May 13 Worksheet, Plaintiff testified that he prepared a written memo to Lt. Robertson. In the memo, Plaintiff wrote:

> My purpose in writing this is to address issues that have occurred at work within the last few months, formally re-submit my previous requests, and express my concern regarding a lack of dialogue between us. I have asked several times since coming to Region 5 and falling under your supervision for assistance concerning paperwork, work related issues, and professional development. Most of these requests have been verbal, but I have also sent emails to your state email on at least three occasions . . . . I was under the impression that after explaining my reoccurring struggles with PTSD to you when you came to my home in April that Capt. Buatt would be informed . . . .[6]

(Doc. 28-8 at ¶ 52; Doc. 28-1 at p. 200). On May 23, 2015, Lt. Robertson, Senior Agent Justin Lowry, and Plaintiff worked a boating safety patrol. (Doc. 28-8 at ¶ 54). During the patrol, the agents encountered a boat in which the operator admitted to drinking alcohol and showed signs of impairment. (*Id.*). Plaintiff did not conduct a Standard Field Sobriety Test ("SFST") to verify the operator's impairment. (*Id.*). On that same

---

[5] The "performance problems" mentioned on the Worksheet are the incidents described on the following dates: April 8, April 9, April 21, April 27, May 3, and May 4, 2015. (Doc. 28-1 at pp. 214–16).

[6] According to LDWF, it has no record of this memo and Lt. Robertson has never seen this memo. (Doc. 28-8 at ¶ 52, n.97). Further, Plaintiff has been unable to produce the requested "native copy" of the memo; nonetheless, LDWF itself has managed to place a copy of the memo in the record as "Exhibit 20" within record exhibit 1 of its' motion. (*Id.*; *see also* Doc. 28-1 at p. 200). As such, the Court will consider the email as record evidence.

patrol, Plaintiff failed to inform a watercraft operator that a 16-year old passenger was required to wear a life jacket. (*Id.*).

On August 5, 2015, Lt. Robertson and Captain Buatt met with Plaintiff for his 2014-2015 annual evaluation. (*Id.* at ¶ 55). In the evaluation, Plaintiff was rated a "Needs Improvement/Unsatisfactory." (*Id.* at ¶ 55). Specifically, Plaintiff received the lowest rating on the following areas:

- Maintains a working knowledge of laws, policies, SOPs, job requirements, conditions and other directives and adheres to same;
- Assignments completed on time without reminders;
- Produces work that is detailed, accurate and neat;
- Reports for duty on time and as scheduled;
- Available for callouts and handles commitments reliably;
- Performs will [sic] without close supervision.

(*Id.* at ¶ 56; Doc. 28-1 at pp. 201–05). The May 23 boating safety patrol incident where Plaintiff could not perform/administer SFST resulted in a zero rating for failure to "[maintain] a working knowledge of laws, policies, SOPs, [and] job requirements . . . ." (*Id.* at ¶ 57). Likewise, Plaintiff received a zero rating for "[n]umerous instances that are documented of failing to" complete assignments on time, failing to produce work that was accurate, failing to report schedule changes, and failing to be available for callouts. (*Id.* at ¶¶ 58–61). Further, in the evaluation meeting, Captain Buatt informed Plaintiff that an overall rating of "Needs Improvement/Unsatisfactory" during his probationary period, could jeopardize his employment. (*Id.* at ¶ 62). Plaintiff admits that there was no mention of his PTSD during this meeting. (*Id.*).

Nonetheless, on that same date, Captain Buatt made a written recommendation to Colonel Joseph Broussard, the final decision-maker, that

Plaintiff's employment with LDWF be terminated based on the totality of Plaintiff's performance deficiencies over the course of the entire performance appraisal year and "[d]ue to [Plaintiff's] poor performance and deceptive tendencies."[7] (*Id.* at ¶¶ 63, 66; Doc. 28-1 at p. 207). After an independent review of Plaintiff's employment record, Colonel Broussard approved the decision to terminate Plaintiff "based on the fact that [Plaintiff] received a 'Needs Improvement' performance rating during his probationary year." (*Id.* at ¶ 67; Doc. 28-2 at ¶¶ 17–18). Plaintiff never requested an accommodation for his PTSD from Col. Broussard, and Col. Broussard was unaware that Plaintiff suffered from PTSD. (Doc. 28-8 at ¶ 68).

On August 10, 2015, Plaintiff was notified that his employment with LDWF was terminated in accordance with Louisiana Civil Service Rule 9.1(e).[8] (*Id.* at ¶ 71; Doc. 28-1 at p. 206). On July 15, 2016, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that he was terminated on the basis of his disability. (Doc. 28-1 at p. 285). Plaintiff filed his first Petition for Damages on August 10, 2016, in the Nineteenth Judicial District Court, State of Louisiana, which was removed to federal court on October 6, 2016. (Doc. 1).

---

[7] During his deposition, Captain Buatt explained that an instance of Plaintiff's "deception" occurred when Plaintiff told him that his reason for not answering the phone was that "he didn't know who was calling because he didn't have my number, and he just didn't want to answer an unknown number or that number." (Doc. 28-3 at pp. 35–36). Captain Buatt then confronted Plaintiff providing that he personally gave Plaintiff his number and saw him enter it into his phone, at which time Plaintiff admitted it. (*Id.*). Captain Buatt also recounted another occasion where a federal fisheries report assigned to Plaintiff was missing, and after questioning, Plaintiff informed him that he submitted the report to Lt. Robertson. (*Id.* at pp. 42–45). However, according to Captain Buatt, the report was never submitted to Lt. Robertson, but was instead later found inside Plaintiff's LDWF vehicle. (*Id.*).

[8] Louisiana Civil Service Rule 9.1(e) provides that "[a] probationary employee may be separated by the appointing authority at any time."

On November 18, 2016, Plaintiff amended his complaint asserting claims of disability discrimination and retaliation under the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, the Americans with Disabilities Act ("ADA"),[9] 29 U.S.C. § 12101, *et seq.*, and the Louisiana Employment Discrimination Law ("LEDL"), La. Rev. Stat. § 23:301, *et seq.* (Doc. 7 at ¶ 4).

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and footnote omitted).

In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997) (citing *Brothers v. Klevenhagen*, 28 F.3d 452, 455 (5th Cir. 1994)). At this stage, the Court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d

---

[9] The disability discrimination claims in the amended complaint were brought under the Rehabilitation Act and the LEDL only; the ADA claim was omitted from the amended complaint. (Doc. 7 at ¶ 4). Nonetheless, although Plaintiff's amended complaint only states claims under the Rehabilitation Act and LEDL, the parties' proposed joint pretrial order includes an ADA claim. (Doc. 47 at p. 6). "[The pretrial] order controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d); *see also Valley Ranch Dev. Co v. FDIC*, 960 F.2d 550, 554 (5th Cir. 1992). Therefore, the Court will consider Plaintiff's ADA claim, even though it was not included in the amended complaint.

1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992). However, if the evidence in the record is such that a reasonable jury, drawing all inferences in favor of the non-moving party, could arrive at a verdict in that party's favor, the motion for summary judgment must be denied. *Int'l Shortstop, Inc.*, 939 F.2d at 1263.

In sum, summary judgment is appropriate if, "after adequate time for discovery and upon motion, [the non-movant] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment will lie only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Sherman v. Hallbauer*, 455 F.2d 1236, 1241 (5th Cir. 1972).

### III.   DISCUSSION

#### A. The Rehabilitation Act, the Americans with Disabilities Act, and the Louisiana Employment Discrimination Law.

Plaintiff claims that LDWF is liable under the ADA, the Rehabilitation Act, and the LEDL for failing to reasonably accommodate his disability (PTSD), failing to engage in the interactive process to discuss reasonable accommodations for his disability, retaliating against him for seeking accommodations relating to his disability, and ultimately terminating his employment because of his disability. (Doc. 36 at p. 2). LDWF argues that Plaintiff cannot establish that he was a qualified individual with a disability, that he notified LDWF of his need for an accommodation,

11

or that an accommodation was available that would allow him to perform the essential functions of his job. (Doc. 28).

The remedies under the Rehabilitation Act are nearly identical to those featured in the ADA. *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). The ADA, however, applies only to public entities, including private employers, 42 U.S.C. § 12131(1), whereas the Rehabilitation Act prohibits discrimination in federally-funded programs and activities, 29 U.S.C. § 794(a).[10] The parties do not dispute that LDWF receives federal funds, so the Court will analyze Plaintiff's Rehabilitation Act claims and ADA claims together. Likewise, the ADA and LEDL provide similar rights and remedies; thus, courts have also used the ADA to analyze LEDL claims.[11] *Antoon v. Woman's Hosp. Found.*, 2012 WL 1094715, at *3 (M.D. La. Mar. 30, 2012); *see also Lindsey v. Foti*, 2011-0426 (La.App. 1 Cir. 11/9/11), 81 So.3d 41, 44, *writ denied*, 2012-0133 (La. 3/23/12), 85 So.3d 92 ("The Louisiana statutes are similar to the [ADA]. Thus, in interpreting Louisiana's

---

[10] The primary difference between the two statutes is that the Rehabilitation Act prohibits discrimination "solely by reason of" a person's disability, whereas the ADA provides that "discrimination need not be the sole reason" for the adverse action or exclusion but rather "a motivating factor." *Pinkerton v. Spellings*, 529 F.3d 513, 516–19 (5th Cir. 2008). Because the Rehabilitation Act has a stricter causation element, a Plaintiff who cannot maintain an ADA claim is unable to meet the elements of a Rehabilitation Act claim.

[11] As such, LDWF's argument that its Motion to Dismiss is unopposed in relation to the Rehabilitation Act and LEDL claims due to Plaintiff's failure to address such in his opposition is without merit. (Doc. 43 at p. 2).

employment discrimination laws, our courts have relied upon similar federal statutes and the interpreting federal jurisprudence.").

## 1. Plaintiff's Disability Discrimination Claim

The parties to this action disagree over the elements necessary to establish a prima facie case of discrimination. In a discriminatory-termination action under the ADA, the employee may either present direct evidence that he was discriminated against because of his disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a Title VII case. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (citing *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013)). This analysis first requires Plaintiff to establish a prima facie case of discrimination. *Id.* If Plaintiff is successful, then LDWF must articulate a legitimate, nondiscriminatory reason for terminating Plaintiff. *LHC Grp., Inc.*, 773 F.3d at 694. Finally, the burden shifts back to Plaintiff to show that LDWF's proffered reason is pretextual. *Id.* In the Rule 56 context, a prima facie case of discrimination plus a showing that the proffered reason is pretextual is typically enough to survive summary judgment. *Id.*

Here, Plaintiff elected to establish his discriminatory-termination claim under the *McDonnell Douglas* burden-shifting framework. As noted, this framework requires Plaintiff to first establish a prima facie case of discrimination. To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) he has a disability; (2) he was qualified for the job; and (3) he was subject to an adverse employment action on account of his disability. *LHC Grp., Inc.*, 773 F.3d at

13

697. Because the first element is uncontested for purposes of summary judgment,[12] the Court will turn to Plaintiff's qualifications for employment.

a. Plaintiff's Qualifications to Perform the Essential Functions of a Wildlife Enforcement Agent.

A plaintiff can establish that he is "qualified" by showing that "either (1) [he] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417–18 (5th Cir. 2017) (quoting *LHC Grp.*, 773 F.3d at 697). The ADA defines a "qualified individual with a disability" as "an individual who, with or without accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). Congress did not specify which job functions are "essential" under the ADA. *Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996). Rather, it provided that whenever an employer gives written descriptions of the essential functions of a job, those descriptions are entitled to substantial deference. *Id.* (citing 42 U.S.C. § 12111(8)).

Additionally, "[e]ssential functions" are "fundamental," as opposed to "marginal," job duties, 29 C.F.R. § 1630.2(n)(l), such that a job is "fundamentally alter[ed]" if an essential function is removed, 29 C.F.R. § Pt. 1630, app. at 397. *Credeur v. La. Thr. Office of Atty. Gen.*, 860 F.3d 785, 792 (5th Cir. 2017). Further,

---

[12] *See* LDWF's Memorandum in Support. (Doc. 36 at p. 3) ("Plaintiff's prima facie case of disability discrimination fails for two reasons. First, Plaintiff cannot establish that he was qualified . . . . Second, Plaintiff's claim fails because he has no evidence that he was replaced by or treated less favorably than a similarly-situated non-disabled employee".).

"consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* (quoting 42 U.S.C. § 12111(8)). Lastly, the regulations promulgated by the EEOC provide additional non-exhaustive factors to guide the essential-function inquiry, such as the amount of time spent on the job performing the function and the consequences of not requiring the employee to perform the function. *Id.* (quoting 29 C.F.R. § 1630.2(n)(3)).

The LDWF maintains that the essential functions of Plaintiff's job as a Wildlife Enforcement Agent included conducting law enforcement procedures in the field, such as administering SFSTs; preparing related reports and other administrative reports; and the ability to be on call 24 hours a day, 7 days a week. (Doc. 36 at pp. 5–6). Plaintiff contends that there is a genuine issue of material fact as to whether an essential function of his enforcement duties included conducting SFSTs, preparing reports, and being on call because these functions were "not delineated as marginal or essential" until revisions and amendments that occurred after Plaintiff's employment. (Doc. 39 at p. 10).

Giving deference to the employer's judgment and written job descriptions contained in the job posting, and Enforcement Manual as they apply to a Wildlife Enforcement Agent, the Court finds that conducting law enforcement procedures in the field, such as administering SFSTs; preparing related reports and other administrative reports; and the ability to be on call 24 hours a day, 7 days a week are

essential functions of Plaintiff's position. The amendments and revisions referenced by Plaintiff were issued in relation to the Wildlife Enforcement *Senior* Agent position, which differs from that of the Wildlife Enforcement Agent "by the [presence] of [the] responsibility of serving as a [FTO] and performing specialized enforcement tasks." (Doc. 28-2 at pp. 7, 27) (emphasis added). Additionally, the job posting for which Plaintiff submitted his employment application stated that the "[p]osition is subject to call 24 hours a day, 7 days a week." (Doc. 28-1 at p. 179). Moreover, not requiring law enforcement agents to perform the function of being available at all times may lead to the hindrance of search and rescue missions, criminal investigations, and criminal apprehensions. (Doc. 36 at p. 6). Furthermore, it is common practice for law enforcement agents, of all levels, to spend a great deal of time preparing both accurate and timely citations and investigative reports while on patrol, and to facilitate civil or criminal proceedings.

As such, Plaintiff must demonstrate that he is "qualified" by showing either he could perform the essential functions of the job despite having PTSD or that a reasonable accommodation of his PTSD would have enabled him to perform the essential functions of the job. The Court finds that Plaintiff has not demonstrated that he could perform the essential functions of the job, nor has he demonstrated that a reasonable accommodation would have enabled him to do so.

For several reasons, it is apparent that Plaintiff could not perform the essential functions of a Wildlife Enforcement Agent on the basis of his having been diagnosed with PTSD. First, Plaintiff was presented with the May 13 Worksheet, which

highlighted that Plaintiff's PTSD prevented him from answering and returning phone calls, as well as other employment related issues, such as submitting timely and accurate reports and citations—even with the use of old samples/templates. (Doc. 28-1 at pp. 214–16). Further, during Plaintiff's 2014-2015 annual performance evaluation, Plaintiff was rated a "Needs Improvement/Unsatisfactory." (Doc. 28-1 at pp. 201–05). Specifically, Plaintiff received zero ratings due to his inability to administer SFSTs, which constituted a failure to maintain a working knowledge of laws, policies, and job requirements. (*Id.*). Plaintiff also failed to promote boating safety by failing to inform a watercraft operator that a 16-year old was required to wear a life jacket. (Doc. 28-8 at ¶ 54). Likewise, Plaintiff received a zero rating for numerous documented instances of failing to complete assignments on time, to produce work that was accurate, to report schedule changes, and to be available for callouts. (*Id.* at ¶¶ 58–61).

Plaintiff does not dispute that he did not and could not perform the essential function of being on 24 hour call. Critically, Plaintiff testified, "[i]t gets to the point where I can't even answer the phone, because I'm so, like locked in" and that "they tried getting a hold of me and stuff, and there were times where I just couldn't physically answer the phone." (Doc. 28-1 at pp. 9, 151). Plaintiff further testified that "I knew my phone was ringing, but it's [–] I couldn't even will myself to go check [–] check it." (*Id.* at p. 68). *See Gober v. Frankel Family Trust*, 537 F. App'x 518, 520–22 (5th Cir. 2013) (affirming summary judgment in favor of an employer who terminated

his employee based on evidence that the employee could not perform the essential on-call functions of his employment, and was thus not qualified for the position).

Nonetheless, Plaintiff's expert has suggested that the following accommodations would have enabled Plaintiff to perform the essential functions of the job: LDWF could have inserted him into a team environment where he could have worked more closely with others, given him more work assignments with senior agents, reassigned him, further trained him, provided him with an audio recorder or personal assistant to dictate reports, or send him for treatment. (Doc. 39 at p. 23). However, the Court finds that these accommodations, although arguably reasonable under the ADA,[13] would not have enabled Plaintiff to (1) understand enforcement policies and implement them in the field (*i.e.* SFSTs, schedule changes); (2) submit timely and accurate reports and citations; and (3) be available for call 24 hours a day.

Here, Plaintiff was already working in a "team environment" and "with senior agents," but this did not help him understand enforcement policies and implement them in the field nor did it help him submit timely and accurate reports. Moreover, Plaintiff admitted that Lt. Robertson provided him with feedback by leaving written comments on his weekly reports, and that although Lt. Robertson never personally provided him with copies of his old reports to use as samples/templates, the copies

---

[13] Under the ADA the term "reasonable accommodation" may include—job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment of devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 809 (5th Cir. 1997) (quoting 42 U.S.C. § 12111).

were accessible in the office filing cabinets and his co-workers also provided samples/templates. (Doc. 28-1 at pp. 155–56; Doc. 28-8 at ¶ 40).

Furthermore, Plaintiff offers no evidence to show that other positions were available to facilitate a reassignment. *See Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) ("[f]or the accommodation of a reassignment to be reasonable, it is clear that a position must first exist and be vacant. Under the ADA, an employer is not required to give what it does not have."). Lastly, neither Plaintiff nor his expert offered any recommended accommodation to address Plaintiff's inability to be available 24 hours a day, 7 days a week. Rather, Plaintiff asserts that "[w]hether reasonable accommodations exist for being on call 24/7 is academic, as [he] disputes that this function is an essential function." (Doc. 46 at p. 11). Because the Court concluded that being on call and thus able to answer the phone is an essential job function, LDWF is not required to relieve Plaintiff of this duty, modify the duty, or reassign other employees to the duty. *See Gober*, 537 F. App'x at 522 (citing *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 710 (5th Cir. 1997)) ("Task reassignment is not a reasonable accommodation if the task is an essential function of the job."). Accordingly, the Court concludes that Plaintiff was not a qualified individual for purposes of the disability discrimination claim asserted under the ADA.

> b. Adverse Employment Actions On Account of Disability

The Court also finds that the evidence reflects that LDWF did not take adverse employment action against Plaintiff because of his disability. Terminating an employee because of a disability is prohibited under the ADA. *LHC Grp., Inc.*, 773

F.3d at 700-01. The United States Court of Appeals for the Fifth Circuit applies "a 'motivating factor' test, which provides that 'discrimination need not be the sole reason for the adverse employment decision . . . [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome.'" *Delaval v. PTech Drilling Tubulars, LLC.*, 824 F.3d 476, 480 (5th Cir. 2016) (citing *LHC Grp.*, 773 F.3d at 694). Also, only "ultimate employment decisions such as hiring, granting leave, discharging, promoting or compensating" rise to the level of an adverse employment action. *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 531 (5th Cir. 2003) (quoting *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999)).

Here, Plaintiff asserts that he was subjected to adverse employment actions when: (1) he was placed on administrative leave in May 2015, and (2) he was terminated on August 10, 2015. (Doc. 39 at p. 25). The Court finds that Plaintiff's disability was not the motivating factor for LDWF's actions, and only the termination may qualify as an adverse employment action. Although Plaintiff was placed on administrative leave, he continued to be paid a salary. (Doc. 28-1 at p. 99). Additionally, Plaintiff's leave was only for the remainder of the weekend to allow him an opportunity to visit his physician following the incident were he appeared disoriented on the job. (*Id.*). The Fifth Circuit has consistently held that placement on paid leave—whether administrative or sick—is not an adverse employment action. *Breaux v. City of Garland*, 205 F.3d 150 (5th Cir. 2000); *see also McCoy v. City of*

*Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007). Therefore, paid administrative leave is not an adverse employment action within the meaning of the ADA.

It is undisputed that Plaintiff suffered an adverse employment action—namely, termination; however, Plaintiff must establish a "nexus" linking the action to his disability. *LHC Grp., Inc.*, 773 F.3d at 700 (citing 42 U.S.C. § 12112(a)). As previously noted, LDWF argues that Plaintiff was terminated due to his numerous performance deficiencies during his two-year probationary period, which resulted in a "Needs Improvement/Unsatisfactory" performance rating. (Doc. 43 at p. 13). LDWF further contends that Plaintiff's termination was in accordance with Louisiana Civil Service Rule 9.1(a) and (e), which provides that "[t]he probationary period . . . shall be used for the . . . elimination of any probationary employee whose performance does not meet the required standard of work," and that "[a] probationary employee may be separated by the appointing authority at any time." (Doc. 28-1 at p. 206; Doc. 36 at p. 13). Plaintiff argues that he was terminated for his alleged inability to timely and properly submit paperwork, one instance where he was unable to administer an SFST, and other alleged instances where he was not sufficiently acquainted with LDWF enforcement regulations, but that these deficiencies are attributable to his lack of concentration, memory deficit, and instances of dissociation as pointed out by his expert. (Doc. 26 at p. 39). Plaintiff further argues that the ADA protects him from conduct caused by his PTSD; thus his termination was connected to his PTSD.

The Court finds that Plaintiff has not sufficiently refuted the legitimate, nondiscriminatory reason for his termination. The Fifth Circuit has repeatedly held

that a charge of "poor work performance" is adequate when coupled with specific examples. *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015). *See also Feist v. Louisiana, Dep't of Justice, Office of Att'y Gen.*, 730 F.3d 450, 455 (5th Cir. 2013). Here, LDWF charges that Plaintiff exhibited poor work performance. (Doc. 36 at p. 11). In its memorandum, LDWF provides the following specific examples:

> In his August 5, 2015, Annual Appraisal, under the Section, "Assignments Completed on time without reminders," Plaintiff was rated a zero. In the comments section, Lt. Robertson wrote, "Numerous instances that are documented of failing to meet deadlines for P-card purchases, MV-3s, and offense reports not being turned in on time."

> [U]nder the Section, "Produces work that is detailed, accurate and neat," Lt. Robertson wrote that there were "above average number of timesheets, reports and citations as well as MV3s that contained mistakes that had to be corrected."

> [U]nder the Section, [] "Reports for duty on time and as scheduled," Lt. Robertson wrote, "several documented instances of agent not reporting for duty on time and/or late for scheduled event." [Plainitff] admits that he failed to notify Lt. Robertson of a schedule change on April 21 . . . .

> [U]nder the Section, "Available for callouts and handles commitments reliably," Lt. Robertson wrote, "numerous times agent was called by supervisors and was unavailable and did not return calls."

(Doc. 36 at pp. 12–13). By asserting that Plaintiff was fired based on poor performance and citing specific examples predating the termination decision and known to the decision-maker at the time of the decision, the burden has shifted back to Plaintiff to prove pretext. *See e.g., Burton*, 798 F.3d at 231. Lastly, the decision to terminate Plaintiff was made by Col. Broussard, an individual who did not know that Plaintiff

had PTSD.[14] As previously provided, a prima facie case of discrimination plus a showing that the proffered reason is pretextual is typically enough to survive summary judgment. There being no showing of a prima facie case of discrimination, LDWF is entitled to summary judgment on Plaintiff's disability discrimination claims under the ADA, the Rehabilitation Act, and the LEDL.

## B. Plaintiff's Failure to Accommodate Claim

LDWF argues that Plaintiff's claim that LDWF failed to engage in the interactive process should also be dismissed because Plaintiff cannot establish that he was a qualified individual with a disability, that he notified LDWF of his need for an accommodation, or that there was an accommodation available that would enable him to perform the essential functions of the job. (Doc. 28 at ¶ 6). Plaintiff argues that he made numerous requests for reasonable accommodations and that the burden was on LDWF to engage in the interactive process to reasonably accommodate him. (Doc. 39 at p. 16).

The ADA "requires an employer to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a

---

[14] Plaintiff argues that "[t]he declaration of [Col. Broussard] consists of hearsay, is not made of his own personal knowledge, and is thus inadmissible" because "Col. Broussard states nothing of his knowledge of the facts as presented in any memorandum [recommending Plaintiff's termination], whether or not he personally knew whether [Plaintiff] was unavailable, and says nothing of whether he was ever present during these communications about [Plaintiff's] alleged performance deficiencies." (Doc. 39 at p. 10). However, the Court finds that Col. Broussard's declaration is not hearsay as it was not offered to prove the truth of the matter asserted, *i.e.* that Plaintiff's performance was deficient; rather it is being offered to establish why he approved the termination recommendation. Furthermore, the declaration also consists of his personal knowledge, as the final decision-maker, with respect to the reason *he* made the decision to terminate Plaintiff, which is in accordance with Rule 56(c). *See* Fed.R.Evid. 801(c)(2); *see also* Fed.R.Civ.P. 56(c)(4); *see e.g., LHC Grp., Inc.*, 773 F.3d at 701 (emphasis added).

disability.'" *Delaval*, 824 F.3d at 481 (quoting 42 U.S.C. § 12112(b)(5)(A)). To prevail on a failure to accommodate claim, the plaintiff must show "(1) [he] is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist*, 730 F.3d at 452 (citing *Griffin v. UPS*, 661 F.3d 216, 222 (5th Cir. 2011)). There is no dispute that Plaintiff has a disability (PTSD) and that LDWF was made aware of the disability; however, the parties dispute whether LDWF knew of the associated limitations of the disability, and whether LDWF failed to make reasonable accommodations for such limitations. Nonetheless, for the reasons offered in the Court's ruling on Plaintiff's disability discrimination claim, Plaintiff cannot properly be characterized as a qualified individual with a disability. Therefore, Plaintiff cannot prevail on a failure to accommodate claim.

Even so, the Court will briefly address whether LDWF knew of the associated limitations of Plaintiff's PTSD. "[The Fifth Circuit] has recognized that 'where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.'" *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 444 (5th Cir. 2017) (citing *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009)). Once this is accomplished, an employer must engage in the "interactive process," or a flexible dialogue, with the employee with the goal of

finding an appropriate accommodation for the limitation. *Chevron Phillips*, 570 F.3d at 621.

The Court finds that there is insufficient evidence to show that LDWF knew of the associated limitations of Plaintiff's PTSD, and that it failed to make reasonable accommodations for those limitations. The Court notes the following: Plaintiff's PTSD is a mental impairment and thus, was not obvious. And it is clear that Plaintiff complained about his PTSD affecting his work performance on several occasions—even going as far as weeping in the presence of his supervisor. (Doc. 28-8 at ¶ 42). It is equally clear, as evidenced by the email and memo sent to Lt. Robertson, that Plaintiff specifically revealed his PTSD and suggested possible accommodations—such as more one-on-one time with Lt. Robertson and copies of his old reports. (Doc. 28-1 at pp. 199–20). But Plaintiff must show that his supervisors, namely, Lt. Robertson and Captain Buatt, attributed his limitations—inability to answer the phone, perform enforcement policies in the field, and submit timely and accurate reports—to a physical or mental impairment; in other words, they must have known that Plaintiff sought more one-on-one time and copies of old reports/templates because of a medical condition. *See e.g., Patton*, 874 F.3d at 444.

The only evidence supporting Captain Buatt's knowledge of the resulting limitations of Plaintiff's disability is Plaintiff's deposition testimony that the "personal issues" noted on the May 13 Counseling Worksheet wherein Captain Buatt wrote "[e]mployee advised that he is dealing with some issues in his personal life," were related to his PTSD. (Doc. 28-1 at p. 124). Plaintiff also included in his May 17

memo to Lt. Robertson that he "was under the impression that after explaining [his] reoccurring struggles with PTSD to [Lt. Robertson] . . . that Capt. Buatt would be informed." (Doc. 28-1 at p. 200). These statements are too vague to show that Plaintiff identified his inability to answer the phone, perform enforcement policies in the field, and submit timely and accurate reports as limitations resulting from his PTSD. Furthermore, Plaintiff admits that there was no mention or discussion of his PTSD during, before, or after meetings with Captain Buatt regarding his work performance.

Whether sufficient evidence supports Lt. Robertson's knowledge of the resulting limitations of Plaintiff's disability is a closer question. Plaintiff testified that he did not respond to phone calls from Captain Buatt or Lt. Robertson because he was having a PTSD episode, and that he conveyed this to Lt. Robertson during the home visit at which time Plaintiff wept on his shoulder. (Doc. 28-1 at p. 70). It is reasonable to infer that based on this incident, Lt. Robertson was on notice that PTSD aggravated Plaintiff's anxiety, which in turn caused Plaintiff to be unable to answer the phone. Furthermore, the email and memo sent to Lt. Robertson both reveal that Plaintiff has asked for "assistance concerning paperwork, work related issues, and professional development . . . that he recognize[ed] the limitations and effects [sic] [PTSD] plac[ed] on [him]" and that he has "tried seeking assistance over the course of the last year." (Doc. 28-1 at p. 200). But this is not enough; a jury must be able to infer Lt. Robertson's knowledge of the "limitations experienced by the employee *as a*

*result of* [his] disability."[15] *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 164 (5th Cir. 1996).

In the case of a mental disability such as PTSD, specificity in attributing a work limitation to a disability is particularly important. *Id.* at 164–65. Although it can be inferred that Lt. Robertson was aware of Plaintiff's limitation to being on call 24 hours a day, 7 days a week, Plaintiff did not articulate to Lt. Robertson that his disability caused his inability to understand enforcement policies and implement them in the field (*i.e.* SFSTs, schedule changes) or to submit timely and accurate reports and citations, nor was this causal relationship obvious. Accordingly, Plaintiff has not created a genuine dispute of fact that LDWF failed to make reasonable accommodations for the associated limitations of Plaintiff's PTSD. Absent a showing of a prima facie case of failure to accommodate, LDWF is entitled to summary judgment on Plaintiff's failure to accommodate claim under the ADA.

### C. Plaintiff's Retaliatory-Discharge Claim

Plaintiff has alleged that he was terminated in retaliation for engaging in protected conduct. (Doc. 39 at p. 27). LDWF contends that Plaintiff's claim for retaliatory discharge fails because he cannot show that he engaged in protected activity. (Doc. 36 at p. 20). To establish a prima facie case of retaliation under the ADA, a plaintiff must show that (1) he engaged in activity protected under the ADA;

---

[15] For example, the jury must be able to infer that Lt. Robertson knew that Plaintiff was unable to submit timely or accurate reports and citations because a symptom of his PTSD—hypervigilance, which causes increased anxiety, exhaustion, and the inability to concentrate on paperwork—hindered his job performance.

(2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse action. *Feist*, 730 F.3d at 454.

"If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Id.* (quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388–89 (5th Cir. 2007)) (internal citation omitted). In order to avoid summary judgment, the plaintiff must show "a conflict in substantial evidence" on the question of whether the employer would not have taken the action "but for" the protected activity. *Id.*

Here, the Court finds that Plaintiff engaged in protected activity on April 9, 2015 during the home visit with Lt. Robertson, on May 5, 2015 in the email sent to Lt. Robertson, and on May 17, 2015 in the memo sent to Lt. Robertson, all of which involved Plaintiff's requests to spend more time with Lt. Robertson; for Lt. Robertson's old reports; or for assistance concerning paperwork, work related issues, and professional development. Each also mentioned Plaintiff's struggles with PTSD. The Fifth Circuit has held that special words, like "reasonable accommodation," need not be uttered, nor must the ADA be mentioned, for an employee to request an accommodation so long as the employee explains that the adjustments are for a medical condition-related reason. *Patton*, 874 F.3d at 444. Therefore, the Court is persuaded that Plaintiff, indeed, engaged in protected activity under the ADA.

Second, it is undisputed that an adverse employment action occurred, that is, LDWF terminated Plaintiff on August 10, 2015, three months after the latest request.

However, there is no causal link between Plaintiff's request for accommodations and his termination because the record is deplete of evidence indicating that LDWF would not have terminated Plaintiff "but for" him essentially "asking for help" and more attention. As the Court previously determined, LDWF followed its customary regulations and policies when it terminated Plaintiff for poor performance. Likewise, Plaintiff has not shown a conflict in substantial evidence on the question of whether LDWF would not have terminated him "but for" the protected activity. The Court is persuaded that Defendants have advanced several legitimate, non-discriminatory reasons for terminating Plaintiff, including the many enumerated performance deficiencies. Therefore, LDWF is entitled to summary judgment on Plaintiff's retaliation claim.

IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the Louisiana Department of Wildlife and Fisheries' **Motion for Summary Judgment (Doc. 28)** is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff, Todd Abshire's claims against Defendant are **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the **Motions in Limine (Docs. 30, 49, 50, 51, and 53)** are **DENIED AS MOOT.**

Baton Rouge, Louisiana, this **23rd** day of April, 2018.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

JURY